MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

(302) 658-9200
(302) 658-3989 FAX

MARYELLEN NOREIKA
(302) 351-9278
(302) 425-3096 FAX
mnoreika@mnat.com

September 12, 2012 - Original Filing Date
September 19, 2012 - Redacted Filing Date

The Honorable Gregory M. Sleet
United States District Court
  For the District of Delaware
844 King Street
Wilmington, DE 19801

REDACTED - PUBLIC VERSION

    Re:    *Shelbyzyme, LLC v. Genzyme Corp.,* C.A. No. 09-768 (GMS)

Dear Chief Judge Sleet:

    Genzyme respectfully requests, on the basis of the crime-fraud exception, that the Court order Shelbyzyme to produce about thirty (30) withheld documents.[1] These documents chronicle the facts regarding the abandonment and revival of the '491 application.[2] Had Shelbyzyme not deliberately concealed those facts, by repeated misrepresentations and omissions, the USPTO would not have revived the '491 application and this suit would not have been brought.

    As demonstrated below, Genzyme has made a *prima facie* showing that applicants committed fraud in reviving the '491 application and that the requested documents were in furtherance of that fraud. Thus, Genzyme respectfully requests that the Court order production of the documents. Genzyme has also met its threshold burden for *in camera* review of the documents. Genzyme believes that such review, together with the other evidence to which Genzyme has pointed, also supports an order to produce the documents.

I.    INTRODUCTION

    The '831 patent in suit would not have issued and this suit not brought but for the improper revival of U.S. patent application 08/790,491 ("the '491 application"), the parent of the application that issued as the '831 patent. The requested documents all relate to that improper revival.

    Research Corporation Technologies ("RCT"), Research Foundation of the City University of New York ("RF-CUNY"), and David Calhoun ("Calhoun") had financial motives to revive the '491 application and to use that revival to file the application that issued as the '831 patent. At the time they sought revival, they knew that Genzyme was in late-stage development of a recombinant α-galactosidase A to treat Fabry

---

[1]    Genzyme has attempted to identify the withheld documents based on their descriptions in privilege logs provided by Shelbyzyme. *See* Exs. A-D. The requested Woessner Time Records are part of Ex. E.

[2]    The application that issued as the '831 patent could have been filed only if the '491 application was revived. The '491 application was the only application in the Calhoun family pending in 1999, and when abandoned, no further applications could be filed. The improper revival of the '491 application in 2002 led to the filing of the continuation application that issued as the '831 patent. [*See* Entry 334 (Ex. A).]

disease and knew that Genzyme was not interested in licensing the existing Calhoun baculovirus-limited patents.  The only way for RCT, RF-CUNY and Calhoun to try to get a share of Genzyme's expected profits was to seek non-baculovirus claims in continuation applications in the Calhoun patent family.  To do so, they had to revive the '491 application.

Revival of an abandoned patent application is proper only if its abandonment and the entire delay in revival were unintentional.  37 C.F.R. § 1.137(b).  Neither is the case here.  In reviving the '491 application, Warren Woessner ("Woessner"), the attorney who prosecuted the '491 application and the application that issued as the '831 patent, Calhoun, and Catherine McGrath ("McGrath"), Chief Counsel of RF-CUNY, the owner of the '491 application at the time that it was abandoned and revived (collectively "applicants") knowingly, willfully and intentionally misrepresented and failed to disclose to the USPTO all of the material facts regarding the abandonment and the delay in seeking revival of the '491 application.

## II.   THE FACTUAL BACKGROUND

The '491 application was filed on January 29, 1997. It was owned by RCT.



In July 1999, Woessner received a Notice of Allowance and Issue Fee Due in the '491 application. [*See* DTX-73.]  It indicated that the Issue Fee was due on October 4, 1999, that this date could not be extended, and that failure to pay the fee would result in abandonment.  The Woessner firm sent the Notice of Allowance and Issue Fee Due to McGrath asking, not if it should pay the fee, but what to do with the file. [*Id.*]  McGrath promptly sent the Notice of Allowance and Issue Fee Due and Woessner's request to both Calhoun and the RF-CUNY Patent Committee, which was responsible for making all major decisions and authorizing the payment of all fees in connection with RF-CUNY patent applications.  [*Id.*; *see* Entries 114-115 (Ex. A); McGrath Tr. 9:13-20; 20:13-23; 37:7-15; 50:24-51:10.]  Calhoun emailed Dr. Alvin Halpern, the head of the RF-CUNY Patent Committee, about the Calhoun patent status less than a week later.  [*See* Entry 7 (Ex. B).]

In any event, Woessner made the deliberate decision not

---

[3]   The referenced exhibits and deposition testimony are attached respectively as Appendix A and B.

to pay the issue fee. [Woessner Tr. 156:25-157:9; 157:12-17.] On October 4, 1999, the Issue Fee was not paid and the '491 application went abandoned.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Thus, on December 1, 1999, less than 2 months after the October 4, 1999 Issue Fee payment deadline had passed, RF-CUNY and Woessner knew that the issue fee had not been paid. [*See* Entries 126-129 (Ex. A).]

In January 2000, the USPTO sent Woessner a Notice of Abandonment stating that the '491 application was abandoned for failure to pay the issue fee. [*See* DTX-8] Woessner now knew without doubt, that neither RF-CUNY nor Calhoun had paid the issue fee. [*See id.*] On January 17-18, 2000, Sawitsky, Reardan and Calhoun exchanged e-mails about the Calhoun patent family. [*See* Entries 103-104 and 131-132 (Ex. A); *see also* Entries 13-18 (Ex. C).] ███████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████ [*See* Ex. D.] Shelbyzyme has refused to produce that email or even to identify it.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████ It discussed the draft declaration with McGrath, prepared a final declaration, and sent it to McGrath for signature. [*See* Entry 54 (Ex. C).] McGrath never signed. ██████████████████████
████████████████████████████████████ Sawitsky knew little about the abandonment and revival, she had not been involved with the Calhoun patent portfolio until a month or so after she joined RF-CUNY in September 1999. Sawitsky had left RF-CUNY in June 2001. [Sawitsky Tr. 44:19-45:3; 46:3-6; 46:9-15.]

███████████████████████████████████████████████████████████████
████████████████████████████████ She never said that RF-CUNY meant to pay the fee. Rather, she said that on the day the fee was due, she was not contacted by outside counsel for instructions to pay it and that had she been contacted, she would have followed the appropriate RF-CUNY procedures and an informed decision made.[7] But, RF-CUNY had already made the decision to abandon. Months before, the RF-CUNY Patent Committee, knowing that the Issue Fee was due and that Woessner had asked what to do with the file, had apparently provided no payment instructions. (*See supra* p. 2).

---

[5] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████ Reardan emailed Sawitsky and Calhoun on November 29, 1999, just before his December 1, 1999 e-mail to Genzyme. [*See* Entry 123 (Ex. A).]

[6]   On November 23 and 29, 1999, again just before his email to Genzyme, Reardan contacted Woessner about the Calhoun portfolio. [*See* Entries 124-125 (Ex. A).]

[7]   Shelbyzyme now argues that RF-CUNY did not pay the Issue Fee because it assumed Woessner had paid it.

3

Sawitsky, however, told the USPTO none of these facts because Woessner, McGrath, and Calhoun did not tell Sawitsky that they had received the Notice of Allowance and Issue Fee Due in July 1999, knew of the October 4, 1999 payment deadline, and knew the application had gone abandoned. [*See* McGrath Tr. 45:9-46:4; 46:7; 46:11-20; Sawitsky Tr. 49:24-50:15; Woessner Tr. 165:1-8; 166:17-22; and Sawitsky Tr. 34:15-20; 66:4-15.]. Sawitsky also did not tell the USPTO about RF-CUNY's knowledge of the June 8, 1999 Response to Office Action or its failure to instruct Woessner to respond. Again, she was kept in the dark by McGrath, Woessner and Calhoun, who knew all of the facts. Nor did Sawitsky tell the USPTO that she had long known that the '491 application had gone abandoned (*See* Ex. D; Entries 103, 104, 123, 131 and 132 (Ex. A); Entry 17 (Ex. C).]

In his Petition for Revival, Woessner told the USPTO that the abandonment of the '491 application and the two year delay in reviving it was unintentional. He never told the it that he had deliberately not paid the fee, that he had sent the Issue Fee to RF-CUNY and requested instructions and that he, McGrath, Calhoun (and Sawitsky) had known about the abandonment for two years and had failed to remedy it.

### III.   *PRIMA FACIE* SHOWING OF FRAUD

In the context of patent prosecution, "fraud requires (1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted." *C.R. Bard, Inc.v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998).

Deceptive intent must be shown by "independent and clear evidence" and when the fraudulent conduct involves omission of material facts evidence of a fraudulent intent. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000). Such intent "may be presumed upon proof of a knowing misrepresentation of a material fact." *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1052 (D. Del. 1985); *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Proof of reliance under common law fraud is equivalent to the but-for materiality test for inequitable conduct. *Therasense*, 649 F.3d at 1295. To prove materiality, the accused infringer must show but-for materiality by a preponderance of the evidence. *Id*. at 1291-92. An undisclosed reference is but-for material "if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291.

While a *prima facie* showing of fraud is required for the crime-fraud exception (*see Magnetar Techs. Corp. v. Six Flags Theme Park Inc.,* ___ F. Supp. 2d ___, No. 07-127-LPS-MPT, 2012 WL3609715 (D. Del. Aug. 22, 2012)) such showing "is not a particularly heavy burden" (internal quotations omitted). *See Micron Tech., Inc. v. Rambus Inc*., 645 F.3d 1311, 1330 (Fed. Cir. 2011). While "mere allegation[s]" of omission or withholding may not be enough, "the party seeking to overcome the attorney-client privilege need not conclusively prove fraud, or necessarily submit direct evidence to make a *prima facie* showing of fraud..." *In re Spalding*, 203 F.3d at 808. Further, "[w]hile a *prima facie* showing need not be such as to actually prove the disputed facts, it must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." (internal quotations omitted). *Union Carbide*, 619 F. Supp. at 1052. By contrast, *in camera* review requires evidence sufficient to support a reasonable belief that such review may yield evidence supporting application of the crime-fraud exception. *See, e.g., United States* v. *Zolin*, 491 U.S. 554, 570-573 (1989); *Gen. Electric Co. v. Hoechst Celanese Corp.*, No. Civ. A. No. 87-458-JRR, 1990 WL154218 (D. Del. May 8, 1990).

Genzyme has *prima facie* demonstrated that applicants acted fraudulently before the USPTO when they revived the '491 application, that the USPTO relied on applicants' fraud in reviving the '491 application, and that but for applicants' fraud, the '491 application would not have been revived, the '831

4

patent issued, or this case filed. This evidence also more than satisfies Genzyme's threshold burden for *in camera* review.

First and foremost, applicants deliberately stated that the abandonment of the '491 application and the more than two year delay in reviving it were unintentional, when they plainly were not. In particular, applicants never told the USPTO (1) in the context of the abandonment, that: (a) Woessner, McGrath, Calhoun and the RF-CUNY Patent Committee knew that a response to Office Action was due in the '491 application on June 8, 1999, knew that Woessner would not act without instructions, knew that they had communications about the response, days before it was due, and knew that Calhoun, McGrath and the RF-CUNY Patent Committee had provided no instructions to Woessner; (b) Woessner, McGrath, Calhoun and the RF-CUNY Patent Committee had received the Notice of Allowance and Issue Fee Due in July 1999 and knew that the Issue Fee was due on October 4, 1999 and that the application would go abandoned without its payment; McGrath Calhoun and RF-CUNY knew that Woessner had asked what his firm should do with the file and knew that they apparently had not instructed Woessner to pay the fee; and Woessner had deliberately not paid the Issue Fee;d (2) in the context of the revival that RF-CUNY knew at least as early as December 1999 that the Issue Fee had not been paid; Woessner had received the Notice of Abandonment of the '491 application in January 2000; and RF-CUNY, Sawitsky, and Calhoun knew at least by early 2000 that the '491 application had been abandoned.

Applicants' specific intent to deceive is also confirmed by their knowing and willful false representations and deliberate failures to disclose information that they knew would prevent the revival because neither the abandonment nor the entire delay in reviving was unintentional. The USPTO relied on applicants' intentional false representations and deliberate failures to disclose the relevant information when granting the Petition to Revive. But for those false statements and omitted information the Petition to Revive would never have been granted.

### IV. DOCUMENTS REQUESTED UNDER THE CRIME-FRAUD EXCEPTION

Genzyme seeks production of documents dated before and during the applicants' fraudulent conduct. *See Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 155 (D. Del. 1977). The requested documents were in furtherance of the fraud. *See In re Spalding*, 203 F.3d at 807. In particular, Genzyme seeks production of documents, dated between June to October 1999, that relate to the intentional abandonment of the '491 application. These documents relate to applicants' actions in the context of the June 8, 1999 response to Office Action and the July 1999 Notice of Allowance and Issue Fee due.[8] Genzyme seeks production of documents, dated between October 1999 and November 2001, that relate to applicants' knowledge of the abandonment of the '491 application and their intentional delay in reviving that application.[9] Finally, Genzyme seeks production of documents dated between November 2001 and February 2002 that relate to applicants' fraudulent revival of the '491 application.[10]

### V. CONCLUSION

Genzyme has made the requisite *prima facie* showing that Woessner, McGrath, and Calhoun committed fraud on the USPTO by improperly reviving the '491 application more than two years after they had intentionally abandoned it. Genzyme respectfully requests that the Court pierce Shelbyzyme's claimed privilege and work product shield and order the production of these documents now or, if the Court deems appropriate, after *in camera* review.

---

[8] Entries 98, 99, 100, 101, 102, 103, 104, 114, 115, 133 (Ex. A); 108 (Ex. E); and 3, 4, 5, 6, 7 (Ex. B).

[9] Entries 123, 124, 125, 126, 127, 128, 129, 131, 132 (Ex. A); 13, 14, 15, 16, 17, 18 (Exs. C, D).

[10] The "McGrath Declaration," and the "Sawitsky Declaration" [*See* Entries 119-135 (Ex. E)], Entry 54 (Ex. C); Entry 334 (Ex. A).

                                          Respectfully,

                                          */s/ Maryellen Noreika*

                                          Maryellen Noreika (#3208)

MN/
cc:    Richard L. Horowitz, Esquire (Via Electronic Mail)
        David E. Moore, Esquire (Via Electronic Mail)
        Frederick A. Lorig, Esquire (Via Electronic Mail)
        Joseph M. Paunovich, Esquire (Via Electronic Mail)
        Charles P. Emanuel, Esquire (Via Electronic Mail)