

Potter
Anderson
Corroon LLP

David E. Moore
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000
www.potteranderson.com

September 19, 2012

The Honorable Gregory M. Sleet
U.S.D.C. District of Delaware
844 King Street
Wilmington, DE 19801

**PUBLIC VERSION**

Re:   *Shelbyzyme LLC v. Genzyme Corp.*, Case No. 1:09-CV-00768-GMS

Dear Chief Judge Sleet:

Genzyme's motion is based on the false premise that it has shown a *prima facie* case that RFCUNY intentionally abandoned the '491 application and therefore intentionally concealed that alleged fact from the PTO. To the contrary, evidence which Genzyme omitted from its brief makes clear that the $605 issue fee was not paid due to an inadvertent mistake and that the application was therefore unintentionally abandoned. As detailed *infra*, the $605 fee was not paid because RFCUNY believed the prosecuting attorney Dr. Woessner would pay the fee but he believed RFCUNY would pay it.

In deposition testimony omitted by Genzyme, Ms. McGrath of RFCUNY testified that she thought outside counsel was going to pay the issue fee: **Q.** You knew that an issue fee had to be paid when you had a notice of allowance; correct? **A.** I knew, in fact, if there was a notice of allowance, that **an issue fee would be paid; but it was generally paid by outside counsel.** **Q.** And would outside counsel receive instructions from RFCUNY to pay it? **A. I think they didn't need to receive instructions if they were prosecuting the patent for us.** If they did, we should get a new outside counsel. It should have just been paid, I suppose, if, in fact, that was the case. **Q.** Is it fair to say that you didn't give instructions to Dr. Woessner as to what to do with the file because you knew that CUNY had already decided not to continue prosecution of this application? **A.** That's absolutely not true. McGrath Tr. 31:21-32:11, 36:3-9[1].

In deposition testimony also omitted by Genzyme, Dr. Woessner testified that he thought CUNY was going to pay the issue fee: **A.** We received no instructions at all. ... I hadn't heard a word. **And so they could have been using another firm at that point for all I knew, but I didn't know.** **Q.** Is it correct that you were instructed not to pay the issue fee in the '491 application? **A. Nobody ever instructed me not to pay the issue fee.** **Q.** Prior to the abandonment of that patent application, did you know whether CUNY paid the base issue fee or not? **A.** No, I didn't know. **Q.** So was it your belief that if CUNY paid the issue fee on its behalf, it wouldn't be abandoned; if CUNY didn't pay the issue fee, it would it would go abandoned? **A.** That's correct. Woessner Tr. 115:16-117:13, 148:11-15, 202:15-25.

I.   **Legal Standard**

The evidence which Genzyme omitted, along with other omitted testimony, demonstrates that Genzyme cannot support a *prima facie* case of inequitable conduct, much less one of common law fraud. Genzyme assumes an unlawful intent but as shown above and *infra*, the evidence is consistent with unintentional abandonment and thus Genzyme has not made a *prima facie* case:

---

[1] All deposition testimony cited herein is provided in Appendix B, filed herewith.

> **Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.**

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008), cited with approval in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-91 (Fed. Cir. 2011) (*en banc*).

Genzyme must establish common law fraud in order to pierce attorney-client privilege under the crime-fraud exception. *See Walker-Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). "The party seeking discovery of otherwise privileged communications or documents must prove that the crime-fraud exception applies by showing: (1) a *prima facie* case of criminal or fraudulent conduct, and (2) that the communications were made in furtherance of the crime or fraud." *Webxchange, Inc v. Dell, Inc.*, 264 F.R.D. 123, 129 (D. Del. 2010). A finding of fraud in the patent context "must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000).

The Federal Circuit has made clear that mere allegations of inequitable conduct are not enough to establish the crime-fraud exception. *Id.* at 807-08; *see also Allergan Inc. v. Pharmacia Corp.*, Case No. 01-141-SLR, 2002 WL 1268047, at *1 (D. Del. May 17, 2002) ("absent a *prima facie* showing of fraud, an allegation of inequitable conduct, in and of itself, does not vitiate the attorney-client privilege"); *Merck Sharp & Dohme Pharms. SRL v. Teva Pharms. USA*, Civ. No. 07-1596, 2008 WL 4837397, at *6 (D.N.J. Nov. 5, 2008) ("[defendant] only establish[ed] mere speculation of misrepresentation by [the patentee] to the PTO" and "the withholding of unknown materials does not amount to an intent to deceive.").

Contrary to Genzyme's citation of an almost 30 year old case, *Union Carbide Corp. v. Dow Chemical Co.*, 619 F. Supp. 1036 (D. Del. 1985), today, intent to deceive can never be inferred. The Federal Circuit reconfirmed only last week that its *en banc* decision in *Therasense* requires clear and convincing proof that the applicant knew of the material fact, knew that it was material, and made a **deliberate decision** to withhold it from the PTO:

> [K]nowledge of ... materiality... **cannot by itself prove**, let alone clearly and convincingly prove, that any subsequent non-disclosure was based on **a deliberate decision**. ... This would effectively eviscerate *Therasense's* test for *mens rea* and reinflict the plague of patent unenforceability based on the thinnest of speculation regarding the applicant's putative mental state.

*1st Media, LLC v. EA, Inc. et al.*, Case No. 2010-1435, __ F.3d __ (Fed. Cir. Sept. 13, 2012).

Genzyme cannot possibly meet this stringent standard by omitting evidence that demonstrates the unintentional abandonment of the approved '491 application claims through nonpayment of a $605 issue fee. Lacking any evidence, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Genzyme instead asks the Court post-trial to reopen discovery, nine months after the discovery cutoff[2], to order production or *in camera* review of 100's of pages of documents that Genzyme admits are attorney-client privileged and/or work product. No reported case found by Shelbyzyme or cited by Genzyme provides such an extraordinary remedy, certainly not where a defendant omits critical evidence to mislead the Court.

---

[2] Genzyme raised the very same disputed documents with Shelbyzyme on the April 10, 2012 discovery teleconference and represented to the Court that it would drop its dispute in order to obtain relief in the form of Shelbyzyme revising 4 privilege log entries, unredacting 1 document and allowing Genzyme to take a second deposition of Dr. Woessner and Ms. McGrath. *See* Dkt. No. 126 (April 10, 2012 Tr.) at 26-27, 32-33, 47. The Court ordered the relief since Genzyme stated that was all it needed to prove inequitable conduct.

Moreover, Genzyme has made no proffer that the privileged communications themselves were in furtherance of the alleged crime or fraud. *See Unigene Labs., Inc. v. Apotex Inc.*, where the Federal Circuit affirmed the district court's denial of the defendant's motion to compel privileged documents based on the crime-fraud exception in order to prove inequitable conduct. 655 F.3d 1352, 1359 (Fed. Cir. 2011). The Federal Circuit found that it "need only examine [defendant's] proffered evidence of intent to uphold the district court's refusal to invoke the crime-fraud exception. *Id.* Similarly, in *Merck*, the court found that the defendants failed to satisfy any of the elements of the crime-fraud exception: "[Defendants] only establish mere speculation of misrepresentation by [the patentee] to the PTO." 2008 WL 4837397, at *6 (D. N.J. 2008). This case and Genzyme's motion is distinguishable from the *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1330 (Fed. Cir. 2011) case on which it primarily relies since there is no evidence that the crime of spoliation has occurred here. In contrast, the Federal Circuit has made clear that mere allegations of inequitable conduct, like Genzyme offers in this case, are not enough. *In re Spalding*, 203 F.3d at 807. Shelbyzyme therefore respectfully requests that Genzyme's request be denied.

**II.     Relevant Facts and Analysis**



This conduct demonstrates RFCUNY's clear intention not to abandon the application.

However, neither RCT nor Dr. Woessner transferred the file or the pending claims to RFCUNY, so no decision could be made or instructions provided to Dr. Woessner regarding the outstanding Office Action before it was due. Woessner Tr. 147:19-148:3. Unbeknownst to Dr. Woessner or anyone at his office, the file remained at his office, mislabeled and was not found until after this lawsuit was filed. Woessner Tr. 55:15-56:2, 57:8-59:15, 147:19-148:3. When the June 8, 1999 deadline approached, Dr. Woessner filed a response to the Office Action, believing that RFCUNY or the inventors would later formally retain his firm to continue prosecuting the '491 application since his client RCT has assigned the '491 application back to RFCUNY. Woessner Tr. 105:22-106:22, 115:16-116:10, 116:11-117:15. This conduct demonstrates nothing other than a clear intention not to abandon the application.

On July 2, 1999, the USPTO allowed the '491 application, subject to the payment of a $605.00 issue fee by October 4, 1999. On July 8, 1999, a paralegal at Dr. Woessner's firm faxed Ms. McGrath a copy of the Notice of Allowance. DTX 543. Contrary to Genzyme's assertions and omitted from its brief, she testified that she did not understand that there was a duty to pay the issue fee and thought it would be paid automatically by outside counsel. McGrath Tr. 31:21-32:11, 36:3-9, full quote, *supra* at 1. Dr. Woessner testified that he thought RFCUNY was going to pay the issue fee: "I hadn't heard a word. **And so they could have been using another firm at that point for all I knew, but I didn't know.**" Woessner Tr. 117:9-13; full quote, *supra* at 1.

---

[3] All trial exhibits cited herein are provided in Appendix A, filed herewith.

▮

There was no intentional abandonment since it is a policy at CUNY that if the patent committee were to decide to abandon an application, the committee had to give it back to the inventor and in this case it never did. McGrath Tr. 53:19-54:22, 59:3-20. Moreover, adding to the confusion, in the Fall 1999 timeframe, RFCUNY was in the process of setting up the Office of Technology Transfer, Licensing, and Management ("OTTLM") and hired Barbara Sawitsky as its Director in September 1999 to manage patent prosecution, among other things. Sawitsky Decl. ¶¶ 1-2, Feb. 11, 2002 (PTX 14-438 to 439); Sawitsky Tr. 21:10-23:6. The OTTLM would have been responsible for the '491 application had the file been transferred to RFCUNY but Ms. Sawitsky did not have file or the Notice of Allowance. Sawitsky Decl. ¶¶ 2-3 (PTX 14-438 to 439); Sawitsky Tr. 66:16-67:14; McGrath Tr. at 29:12-18; Woessner Tr. 147:19-148:3, 55:15-56:2, 57:8-59:15. As a result, Ms. Sawitsky did not know that she was responsible for the '491 application or that an issue fee was due before it went abandoned unintentionally. ▮ This conduct demonstrates only one thing, that the '491 application was unintentionally abandoned.

Up to and including the day the issue fee was due on October 4, 1999, neither Dr. Woessner nor his firm contacted Ms. Sawitsky for instructions on whether to pay the fee. Sawitsky Tr. 40:11-15; Sawitsky Decl. ¶ 4 (PTX 14-438 to 439). ▮ On January 3, 2000, the PTO sent Dr. Woessner a Notice of Abandonment. On January 31, 2000, Dr. Woessner sent RCT a letter enclosing the Notice of Abandonment, copying Dayton Reardan of Orphan Medical, Inc. (a licensee of other Dr. Calhoun patents). PTX 8. No one employed by the then assignee RFCUNY, including Ms. McGrath, Ms. Sawitsky, or Dr. Calhoun, was copied on Dr. Woessner's letter reporting the Notice of Abandonment. Id.; Woessner Tr. 124:9-20. Neither Dr. Woessner, RCT nor Orphan Medical was then the assignee of the '491 application and thus none of them had the right or authority to revive it. As a result, any knowledge these individuals or entities had related to abandonment is irrelevant to the inequitable conduct and hence crime-fraud analysis.[4]

Contrary to Genzyme's assertion, the PTO already knew that Dr. Woessner was sent the Notice of Allowance and Notice of Abandonment. *Cf. Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) (rejecting argument that the patentee should have brought an abstract to the specific attention of the Examiner because "[w]hen a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner"). Thus, the PTO could not have relied upon Dr. Woessner's statement regarding the length of the delay in the Petition for Revival in issuing the patent. There is also no evidence of a deliberate decision to deceive by Dr. Woessner or anyone else.

---

[4] 

In June 2001, Ms. Sawitsky left RFCUNY. Sawitsky Tr. at 26:9-10. Three months later, on September 11, 2001, the terrorist attacks on the World Trade Center destroyed the building in which Ms. McGrath worked. McGrath Tr. at 45:14-18, 60:4-23. In December 2001, Dr. Calhoun was deposed in a patent lawsuit between Genzyme and Transkaryotic Therapies, Inc. *See* PTX 39-1. ▮ Ms. McGrath testified that she did not discuss a draft declaration for the revival of the '491 application with Dr. Woessner or anyone at his firm, did not receive or sign a draft declaration, and in fact, could not have received a draft declaration because she did not have a fax machine after her office had been destroyed in the 9/11 terrorist attacks. McGrath Tr. 40:15-17, 43:6-44:17. Genzyme's speculation about the content of a privileged draft declaration is insufficient to vitiate privilege under the crime-fraud exception. *In re Spalding*, 203 F.3d at 807 (crime-fraud exception "requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct").

▮ It was Ms. Sawitsky. Sawitsky Decl. ¶¶ 1-3 (PTX 14-438 to 439); McGrath Tr. at 29:12-18. ▮ Her declaration set forth all material facts concerning the unintentional nature of the abandonment. PTX 14-438 to 439. Ms. Sawitsky in deposition reaffirmed the accuracy of the declaration she submitted to the PTO in order to revive the patent. Sawitsky Tr. 50:17-22. Genzyme does not contend that her declaration was false nor that she knew it was false, nor that she intended to deceive the patent office.

Thus, in February 2002, Dr. Woessner filed a Petition for Revival accompanied by Ms. Sawitsky's declaration. PTX 14-436 to 439. Laying bare Genzyme's contention that the revival was financially motivated, the petition was filed more than 1 year before Genzyme's then uncertain FDA approval, only after which Genzyme could have infringed. ▮ There was no but-for material information withheld from the PTO in the Petition to Revive or intent to deceive. The PTO was aware that it had mailed a Notice of Allowance and Notice of Abandonment to Dr. Woessner. Genzyme's repeated assertions of what Ms. McGrath, Dr. Calhoun and Dr. Woessner should have told Ms. Sawitsky and the PTO are not relevant to the requisite legal threshold necessary to pierce the privilege. *See In re Spalding*, 203 F.3d at 807. Here again, there is no evidence that any of these individuals made a **deliberate decision** to withhold facts or falsify facts in the petition to the PTO or that they had any knowledge of but-for material facts.

In light of these facts, law, and the information omitted from its brief, Genzyme cannot support a *prima facie* case of fraud under the stringent *Therasense* and *Unigene* standards or even reasonable belief of fraud for *in camera* review since there is no evidence of a **deliberate decision** to deceive and thus Defendant's untimely, post-verdict motion should be denied.

Respectfully submitted,

/s/ *David E. Moore*

David E. Moore

DEM/cet

5

cc: Counsel of Record (By Electronic Mail)
    Clerk of the Court
1075817/34933

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 26, 2012, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on September 26, 2012, the attached document was electronically mailed to the following person(s)

**VIA ELECTRONIC MAIL**

Jack B. Blumenfeld
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@mnat.com

Denise L. Loring
James F. Haley, Jr.
Rachel Lader
Mekhala Raghupathy
Andrew Radsch
Kenneth B. Herman
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Denise.Loring@ropesgray.com
James.Haley@ropesgray.com
rachel.lader@ropesgray.com
mekhala.raghupathy@ropesgray.com
andrew.radsch@ropesgray.com
kenneth.herman@ropesgray.com

Megan F. Raymond
Ropes & Gray LLP
One Metro Center
700 12th Street, NW-Suite 900
Washington, DC 20005-3948
Megan.raymond@ropesgray.com

/s/ David E. Moore
David E. Moore

958692 / 34933