```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -

 4   SHELBYZYME LLC,                 )      Civil Action
                                     )
 5        Plaintiff                  )
          Counterclaim-Defendant,    )
 6                                   )
          v.                         )
 7                                   )
     GENZYME CORPORATION,            )
 8                                   )
          Defendant                  )
 9        Counterclaim-Plaintiff.    )    No. 09-768-GMS

10                         -  -  -

11                    Wilmington, Delaware
                    Thursday, July 12, 2012
12                        8:30 a.m.
                       Day 4 of Trial
13                         -  -  -

14
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
15                                   and a jury

16   APPEARANCES:

17          DAVID E. MOORE, ESQ.
            Potter Anderson & Corroon LLP
18               -and-
            FREDERICK A. LORIG, ESQ.,
19          JOSEPH M. PAUNOVICH, ESQ., and
            ROBYN BOWLAND, ESQ.
20          Quinn Emanuel Urquhart Oliver & Hedges, LLP
            (New York, N.Y.)
21
                          Counsel for Plaintiff
22

23

24

25
```

1    **APPEARANCES CONTINUED:**

2           JACK B. BLUMENFELD, ESQ., and
              MARYELLEN NOREIKA, ESQ.
3           Morris, Nichols, Arsht & Tunnell LLP
                    -and-
4           DENISE L. LORING, ESQ.,
              JAMES F. HALEY, JR., ESQ.,
5           KENNETH B. HERMAN, ESQ.,
              MEGAN F. RAYMOND, ESQ., and
6           ANDREW RADSCH, ESQ.
              Ropes & Gray LLP
7           (New York, N.Y.)

8                             Counsel for Defendant

9                      -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  Good morning.  Please, take your
 2    seats, ladies and gentlemen.
 3                    I understand we have an issue or two.
 4                    MR. LORIG:  Your Honor, I believe the only issue
 5    that I am aware of this morning is an issue with one of
 6    their slides, which Mr. Brown will address.
 7                    THE COURT:  Okay.  Mr. Brown.  Is it the
 8    plaintiff's issue?
 9                    MR. LORIG:  It's the plaintiff's issue.
10                    THE COURT:  Ms. Raymond, is it your complaint
11    about the plaintiff's slide?
12                    MS. RAYMOND:  No.  Plaintiffs have an issue on
13    one of our slides.  We have a separate issue about just a
14    couple of exhibits.
15                    THE COURT:  Let me take Mr. Brown.
16                    Good morning, Mr. Brown.
17                    MR. BROWN:  Good morning, Your Honor.
18                    I have an objection to one of their slides.
19    Shall I put it on the Elmo?
20                    THE COURT:  You can put it on the Elmo.
21                    By the way, does Mr. Herman have those case
22    cites he was going to give me?
23                    MS. NOREIKA:  Your Honor, I submitted a letter
24    last night with the case cites.  I have the cases here.
25                    THE COURT:  Just the cites.  Mr. Feldman will
```

1    locate the cases.  We have already done a little looking.

2                    You have copies?

3                    MS. NOREIKA:  Yes.

4                    THE COURT:  You can hand them up to Mr. Feldman

5    here.

6                    Thank you.  We will take a look.

7                    Mr. Brown.

8                    MR. BROWN:  Your Honor, this is one of the

9    slides they propose to use with their damages expert, Dr.

10   Leonard.

11                   On that top part of the slide, there is a

12   reference to the Synpac license, which is one of the

13   ████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18                   That is inconsistent with Genzyme's testimony in

19   Rule 30(b)(6) depositions and it is inconsistent with the

20   language of the document.  It's just not supported by any

21   evidence.

22                   I don't think it's appropriate for them to put

23   it in.

24                   I have the testimony from the witness, if the

25   Court would like to see it.

```
1              THE COURT:  I will accept your representation,
2    Mr. Brown.
3              Ms. Raymond, do you want to respond to this?
4              MS. RAYMOND:  Your Honor, we believe this is an
5    issue for cross-examination.  What this license says is that
6    ████████████████████████████████████████████████████████
7    ████████████████████████████████████████████
8            ██████████████████████████████████████████████████
9    patent issues.
10             That little strip at the bottom in darker blue
11   is the patent, it will say "patent" on it.
12             THE COURT:  So when you say you believe it to be
13   an issue for cross-examination, Mr. Brown I think is
14   complaining that it misrepresents the evidence that has been
15   adduced, both pretrial and thus far at the trial.
16             MS. RAYMOND:  I think it's an issue of
17   interpretation of the evidence, Your Honor.  What I believe
18   Genzyme's witnesses said is when they determined how much to
19   pay for this license, they didn't separately do evaluation
20   for the patent versus the other rights.  But, again, you
21   ████████████████████████████████████████████████████
22   there was no patent that was issued at the time that the
23   agreement was executed.
24             THE COURT:  Could we blow up whatever the
25   offending portion is, so I can see it?
```

1      ███████████████████████████████████ .

2          MS. RAYMOND:  That should say "patent" there,

3 Your Honor.

4          So you have the licensed technology that existed

5 ███████████████████████████████████████████

6 percent.  And then the license says, Should a relevant

7 patent claim issue, the amount of the royalty increases to

8 ████████████

9        ████████████████████████

10          THE COURT:  So it is your belief that the Synpac

11 ████████████████████████████████████

12 percent patent representation.

13          MS. RAYMOND:  Yes, Your Honor.

14          THE COURT:  Mr. Brown.

15          MR. BROWN:  Your Honor, I also have the language

16 from the license.

17          THE COURT:  Could you read it into the record.

18          MR. BROWN:  I could.

19          THE COURT:  Let's see what it says.

20          MR. BROWN:  There are two parts of this that I

21 would like to read into the record.  One is the license

22 grant that grants existing patent rights that are included

23 ██████████████████████████████

24 ███████████████████████████████████████

25 ██████████████████████████████████



21    So what that is saying is in the event that a

22  very specific patent claim issues, one that covers a method

23  of treatment rather than a molecule, then the rate goes up.

24

25  patent rights, and that other provision shows that they had

```
 1    already included patent rights except for that one specific

 2    ██████████████████████████████████████████████

 3              ███████████████████████████████████████████████████

 4    not including any patent rights is simply inconsistent with

 5    the agreement.

 6              Furthermore, the testimony from Genzyme that

 7    they didn't separately value them makes this interpretation

 8    unfeasible.

 9              THE COURT:  Well, at least potentially

10    misleading.

11              MR. BROWN:  Right.

12              THE COURT:  If it is unfeasible.

13              Ms. Raymond.

14              MS. RAYMOND:  Your Honor, the same Genzyme

15    witness testified that there was no issued patent that was

16    relevant to this license at the time.  So that Provision 2.1

17    that Mr. Brown read, talking about patents that had issued,

18    there were no patents that had issued at that time.  There

19    was an application that was pending.  Should that

20    ████████████████████████████████████████████████████

21              I have some difficulty without explanation

22    ██████████████████████████████████████████████████████

23    to the jury, for the reasons that I have just discussed with

24    Mr. Brown.  You can still make your point.  And it may be an

25    issue that is left open to interpretation and it may be one
```

1    that the evidence will, in fact, does at the present time

2    support -- I am not certain that it does -- and you are

3    right, it is fair to say that it is a matter that is going

4    to be subject to cross.  And that's where it will stay.

5              MS. RAYMOND:  So we need to withdraw this

6    picture but not the -- we could just delete that part.

7              THE COURT:  We haven't talked about the one

8    below it.  Is there an issue with the one below?  Is it the

9    same issue?

10             MR. BROWN:  I don't have an issue because it

11   doesn't purport to separate out anything for patent rights.

12             THE COURT:  Ms. Raymond, I don't see how you can

13   really say with an exactly straight face, given the

14   testimony of Genzyme, that you didn't parse out the patent

15   rights, that it's fair to display to the jury that which we

16   just saw.  I am just not going to permit that.

17             MS. RAYMOND:  Thank you, Your Honor.

18             Your Honor, we have an issue with three exhibits

19   that have been identified as being used in connection with

20   Dr. Sands, who is Shelbyzyme's invalidity expert -- or

21   validity expert.

22             THE COURT:  Mr. Paunovich, do you want to join

23   her there?

24             MR. PAUNOVICH:  I am sorry.

25             THE COURT:  Why don't you sit.

1          MS. RAYMOND:  Those exhibits were disclosed in

2     Dr. Sands' surrebuttal report.  During the pretrial

3     conference, you allowed them to file a surrebuttal report.

4     Our understanding was that that surrebuttal report was

5     limited to the scope of Dr. Grabowski's report on prior

6     invention.

7          THE COURT:  I think I recall that limitation.

8          MS. RAYMOND:  These exhibits, Your Honor, are

9     patents that were newly disclosed in Dr. Sands' surrebuttal

10    report.

11         THE COURT:  All of the exhibits?

12         MS. RAYMOND:  Yes, all of them.

13         THE COURT:  Do you want to put the numbers in

14    the record.

15         MS. RAYMOND:  Certainly.  It's PTX-1046 through

16    1048.

17         THE COURT:  Mr. Paunovich, you may now approach

18    the podium.

19         MR. PAUNOVICH:  Thank you, Your Honor.

20         THE COURT:  Do you agree with Ms. Raymond's

21    characterization of my ruling?  I think she correctly

22    characterized it.

23         MR. PAUNOVICH:  Her characterization of the

24    ruling is exactly right.  The exhibits were in support of

25    the rebuttal of Dr. Grabowski's opinion on 102(g).  They

```
 1          claim to have invented a CHO cell system for producing
 2          alpha-galactosidase A.  Dr. Sands identified existing art
 3          that is CHO cell patents that existed for some ten years
 4          prior to what they claim to have invented.  We think it is
 5          well within the scope of his 102(g) response.
 6                    He is not limited to just the documents that Dr.
 7          Grabowski identified in support of his opinion.  And we
 8          believe they are entirely relevant to the issue.
 9                    THE COURT:  Go ahead, confer.  I think Ms.
10          Loring would like to confer with you.
11                    No, she wants to substitute, okay.
12                    MS. LORING:  Is that okay.
13                    THE COURT:  That is fine.
14                    MS. LORING:  The problem, Your Honor, is that
15          Dr. Grabowski put in a supplemental report about prior
16          invention.  Dr. Sands came back and rebutted that.  And then
17          within that, he started talking about how producing
18          alpha-GAL A in CHO cells would have been obvious and the
19          '804 patent was implying or suggesting, maybe even outright
20          saying, that the '804 patent would have been obvious because
21          of these patents.  This actually relates to the questioning
22          of Dr. Desnick last night and the sidebar we had.
23                    First of all, I am not sure what issue this is
24          relevant to because the obviousness of the '804 patent is
25          not an issue in this case.  But also, if it was, it should
```

1    have been in an earlier report.

2              THE COURT:  I agree with you.  Frankly, with

3    respect to Mr. Paunovich and Mr. Lorig, we are not going to

4    waste time going down that road.  I agree.  The exhibits

5    will be excluded.

6              Anything else?

7              MR. LORIG:  Just because we are double-teaming,

8    if Your Honor will forgive me, the patents don't go just to

9    invalidity.

10             THE COURT:  Mr. Lorig, are you attempting to get

11   me to revisit what I ruled?

12             MR. LORIG:  No.

13             THE COURT:  You need to shut it down.  I ruled,

14   Mr. Lorig.

15             MR. LORIG:  You have, Your Honor.

16             THE COURT:  If you are going to respect the

17   Court's ruling, you need to respect my judgment and

18   instruction for you to sit down.

19             MR. LORIG:  I am going to do that, Your Honor.

20             THE COURT:  Please do.

21             Ben, let's see if we can find Ms. Walker, and

22   see if our jury is here.

23             The jury is coming in.

24             (Jury enters courtroom at 8:57 a.m.)

25             THE COURT:  Love a jury that is so prompt.  My

1    goodness.

2              Please, take your seats.

3              All right.

4              MS. LORING:  Your Honor, defendants call Dr.

5    Yiannis Ioannou.

6              ... YIANNIS IOANNOU, having been doing sworn as

7    a witness, was examined and testified as follows ...

8                        DIRECT EXAMINATION

9    BY MS. LORING:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   Please state your full name?

13   A.   Yiannis Ioannou.

14   Q.   Are you one of the inventors on the '804 patent?

15   A.   Yes, I am.

16   Q.   What academic degrees do you hold?

17   A.   I have a Ph.D. in genetics.

18   Q.   Where do you work?

19   A.   At the Mt. Sinai School of Medicine in New York.

20   Q.   What is your position there?

21   A.   I am a professor of genetics and genomic sciences.

22   Q.   How long have you been at Mt. Sinai?

23   A.   Since 1986.

24   Q.   I would like to start by talking about your work with

25   Fabry disease.  When did you first consider working on

1    research relating to Fabry disease?

2    A.    I applied for a Ph.D. program at Mt. Sinai, and I had

3    an interview with Dr. Desnick, who described his work on

4    Fabry disease.

5    Q.    When was that?

6    A.    April of 1986.

7    Q.    Did Dr. Desnick give you anything to review?

8    A.    Yes.  He gave me a couple of publications of his prior

9    work.

10   Q.    Did any of those publications stand out in your mind?

11   A.    Yes.  One particular publication stood out as very

12   important.

13   Q.    Please explain why?

14   A.    In that work, Dr. Desnick and his colleagues reported

15   that they injected alpha-galactosidase A in two Fabry

16   disease patients and they showed that they could actually

17   decrease the GL-3 in these patients.

18   Q.    Please explain to the jury why that stood out in your

19   mind?

20   A.    It was a great piece of work, and it demonstrated that

21   in fact you could treat an untreatable disease.

22   Q.    When did you join the Ph.D. program at Mt. Sinai?

23   A.    In June of 1986.

24   Q.    What was the goal of your graduate work?

25   A.    My goal following my discussions with Dr. Desnick was

1   to develop a way to produce recombinant alpha-galactosidase

2   A so it can be used to treat Fabry patients.

3   Q.      Once you started your graduate work, how frequently

4   did you work on the Fabry disease project?

5   A.      I was a seven-days-a-week kind of guy, except for a

6   couple of weeks in August for vacation.

7   Q.      For how long did you continue that pace?

8   A.      For the duration of my Ph.D. work.

9   Q.      When did you get your Ph.D.?

10   A.      In 1990.

11   Q.      Now, did you record your research anyplace?

12   A.      Yes.  I recorded my work in the laboratory notebook.

13   Q.      What did you record in the notebook?

14   A.      I recorded procedures, experiments, data that I was

15   generating.

16   Q.      Is there anything that you did not record in your

17   notebook?

18   A.      Sure.  Things that were routine, things that I

19   repeated many times, things that I really knew by heart,

20   didn't need to remember, I did not record.

21   Q.      Was there a particular order in which you made entries

22   in your notebook?

23   A.      Yes.  All of my entries in the notebook are in

24   chronological order.

25   Q.      Are all of the pages in your notebook dated?

Ioannou - direct

1   A.    No, they are not.

2   Q.    If a page is not dated, how can you tell when the work

3   was done?

4   A.    Well, you can look for a date before that experiment

5   is described, a date after that experiment is described, so

6   you get a frame of when the work was done.  Also, a lot of

7   the data in my book was used in progress reports, in grants,

8   in grant applications, which are dated.

9   Q.    Let's look at your notebook.  Turn to DTX-602, which

10  is Tab 1 in your binder.  What is DTX-602?

11  A.    It's a copy of my notebooks.

12  Q.    How many notebooks did you have while you were in

13  graduate school?

14  A.    Two.

15  Q.    Are both of those present in DTX-602?

16  A.    Yes, they are.

17  Q.    What was the first task that you took on when you

18  joined Dr. Desnick's lab?

19  A.    The very first task was to isolate a full length cDNA,

20  complementary DNA, for alpha-GAL A.

21  Q.    When you joined Mt. Sinai was the full length cDNA of

22  alpha-GAL A available?

23  A.    No, it wasn't.

24  Q.    Where did you obtain it?

25  A.    I used a partial DNA that was available in the lab.  I

1    got it from another graduate student in the lab.

2    Q.    Were you successful in obtaining the full-length cDNA

3    of alpha-GAL A?

4    A.    Yes, I was.

5    Q.    Is that shown in your lab notebook?

6    A.    Yes, it is.

7    Q.    Did you record your efforts to obtain the partial cDNA

8    in the notebook?

9    A.    Yes, I did.

10   Q.    Turn, please, to Page 10, which is KS4414.  What is

11   shown here?

12   A.    These are positive clones that I isolated when I first

13   started looking for the full length cDNA, 126b is going to

14   end up in the correct full length clone.

15   Q.    When you say positive clones, what do you mean?

16   A.    During the way we look for these genes, things can

17   appear to be positive in the screens.  So we isolate them

18   and will do some further validation to make sure it's

19   correct.

20   Q.    When you say positive you mean it has at least some

21   portion of the alpha-GAL A gene?

22   A.    It did have some portion, right.

23   Q.    What did you do after isolating these positive clones?

24   A.    I validated these clones and I proceeded to carry out

25   DNA sequencing.

1    Q.    What does it mean to perform DNA sequencing?

2    A.    Well, DNA is made up of four building blocks, A's,

3    C's, P's and G's.  So each gene has a specific order of

4    these building blocks.  So by DNA sequencing we can

5    determine the order of these blocks.  And once you determine

6    that you can compare it to the known DNA sequence for

7    alpha-GAL A.  And therefore you know exactly that you have

8    the correct --

9    Q.    Did you complete the sequencing of the full-length

10   gene?

11   A.    Yes, I did.

12   Q.    Did you record that in your notebook?

13   A.    Yes, I did.

14   Q.    Turn to Page 49, which is KS4453.  What is shown

15   there?

16   A.    At the bottom of that page I described that clone 126

17   was completely sequenced, and I determined that, indeed, it

18   is the correct gene.  It has the correct two ends, 3-prime

19   and the 5-prime end, which indicated that it was a

20   full-length clone.  So at this point I had the full length

21   cDNA for alpha-GAL A.

22   Q.    When did this work happen?

23   A.    The date on the next page is September 29th, 1986.  So

24   around the end of September of '86.

25   Q.    Okay.  And that's KS4455?

1   A.    Yes.

2   Q.    How did you feel about obtaining the full-length

3   alpha-gal A cDNA?

4   A.    It was great.  I was in the lab only for a couple of

5   months.  And that was really the first step that was

6   absolutely necessary before you can really even think about

7   doing, developing an expression system.

8   Q.    Did you tell Dr. Desnick about your result?

9   A.    Yes, I did, immediately.

10  Q.    Why did you do that?

11  A.    Well, one, it was very exciting, you always have to

12  tell your mentor, your supervisor.  And two, at the time Dr.

13  Desnick had the policy of actually opening a bottle of

14  champagne when one cloned a gene.

15  Q.    Was there any other reason for providing the results

16  to Dr. Desnick?

17  A.    Yes.  I would share data with Dr. Desnick that he

18  would use in grant applications and other reports.

19  Q.    Turn, please, to Tab 8 in your book, which is DTX-446.

20  What is this document?

21  A.    This is an application to the March of Dimes by Dr.

22  Desnick.

23  Q.    Look at the bottom.  What is the date of this grant

24  application?

25  A.    September 25th, 1986.

Ioannou - direct

1    Q.    Does anything in this grant application reflect work

2    that you conducted?

3    A.    Yes.  On Page MSSM3000, the characterization of the

4    lambda-AG18 and full-length pcD-AG126 cDNA.  Now, pcD-AG126

5    is the clone which I discussed from my notebook.

6    Q.    After you had obtained the full-length cDNA for

7    alpha-GAL A, what was the next step in your Fabry research?

8    A.    The next step was to construct expression vectors to

9    try and produce a recombinant enzyme.

10   Q.    What are expression vectors?

11   A.    Expression vectors are small circular pieces of DNA,

12   like you can insert in your gene, and they allow you to

13   introduce this gene into cells so you can express the

14   enzyme.

15   Q.    And produce the enzyme?

16   A.    And produce the enzyme.

17   Q.    Go back to Tab 1, please, again, DTX-602, your

18   notebook, and turn to Page 77, which is KS4474.

19               At the top, the very first sentence, you note

20   the goal is to, quote, "Clone the 126b gene into the P-91023

21   vector."

22               What does that mean?

23   A.    Well, Clone 126 is the full-length gene of

24   alpha-GAL A, P-91023b, and I abbreviated P91 in various

25   places, is a mammalian expression vector.  So the first step

Ioannou - direct

1   is to put it into this vector so I can attempt to express

2   it.

3   Q.    In mammalian cells?

4   A.    In mammalian cells.

5   Q.    What is the date on Page 77?

6   A.    January 30th, 1987.

7   Q.    And approximately how long is that after you began at

8   Mt. Sinai?

9   A.    It's about six months.

10  Q.    Were you successful in making alpha-GAL A in the P91

11  vector?

12  A.    Yes, I was.

13  Q.    Is that reflected in your notebook?

14  A.    Yes, it is.

15  Q.    Turn to Page 121, KS4522.

16        Please explain to the jury what is shown there.

17  A.    Here is the summary of successfully putting the

18  alpha-GAL A into this P91 vector.  And this is a validation

19  that the alpha-GAL gene went into the vector correctly.

20  Q.    What is the date on this page?

21  A.    April 27th, 1987.

22  Q.    After making the P91 expression vector, what did you

23  do next?

24  A.    I wanted to make sure that it works and that you can

25  produce active alpha-GAL A, so I introduce the vector into

1    mammalian cells.

2    Q.    Would you look please at Page 131 of your notebook,

3    KS4529.

4              What is reflected there?

5    A.    This is a description of my first experiment of

6    putting this P91 vector into mammalian cells, called Cos

7    cells.

8    Q.    At least an example of that is shown in Section A.

9    Why did you chose Cos cells at this point in time?

10   A.    Cos are very unique.  We use them a lot in laboratory

11   work because they allow you to very quickly evaluate

12   expression construction.  You can get results within two to

13   three days.

14   Q.    Now, what is the date on this page?

15   A.    April 31st, 1987.

16   Q.    Is there something unusual about that date?

17   A.    April 31st?  I believe April has 30 days, yes.

18   Q.    So what do you believe the correct date was?

19   A.    I think it's May 1st.

20   Q.    What was your reaction when your first made alpha-GAL

21   A Cos cells?

22   A.    I was ecstatic.  It was the first time that we could

23   actually produce a measure of alpha-GAL A in the lab.

24   Q.    Turn to Page 136 in your notebook, KS4533.  And I'd

25   like to bring up the bar graph.

1          Is there anything on this page that shows how

2     you felt when you had your successful results in Cos cells?

3     A.     Yes.   My ecstatic feeling is reflected in this graph

4     because I actually took the time to manually plot the data.

5     I could have done it on the computer like we usually do.

6          If you look, my penmanship is not great but here

7     I actually spent the time to spell out nicely the bars.

8     Q.     Because they're for posterity?

9     A.     That's right.   For everybody to admire.

10    Q.     Can you tell from your notebook when you obtained

11    these results in Cos cells?

12    A.     Yes.   The next page is dated May 4th, 1987.   I'm at

13    Page 4536.

14    Q.     So let's turn now to Tab 3 in your book, DTX-256.

15         What is this document?

16    A.     It's a grant application by Dr. Desnick.

17    Q.     And if you look at DTX-256.   Sorry.   If you look at

18    the bottom of the page, there is a date.   What is the date

19    on the document.

20    A.     February 23rd, 1988.

21    Q.     Please turn to Page MSSM2959.

22    A.     Yes.

23    Q.     Look at the bottom of the paragraph under the heading,

24    the expression of the full length alpha-GAL A.   And you see

25    a notation to successful expression of the full length cDNA

1    in Cos 1 cells, and continued work in other systems.

2            What is reflected here?

3    A.    This is the work that we were just discussing in my

4    lab book of the Cos 1 expression.

5    Q.    Did there come a time when you began working with CHO

6    cells?

7    A.    Yes.

8    Q.    Please look back to Tab 1 in your notebook, DTX-602,

9    and turn to Page 211 which is KS4597.

10           There is a references at the top to C55 cells.

11   What are you recording there?

12   A.    Here, I started growing the C55 cells.  They're CHO

13   cells, Chinese Hamster Ovary cells, and they have a specific

14   property that makes them good for recombinant protein

15   expression.

16   Q.    Let's turn now to Page KS4600, which is Page 214 of

17   your notebook.

18           And there is a circle on the bottom, a reference

19   to PMSG-GAL.  What is that?

20   A.    That is another mammalian expression vector, and it's

21   one that actually works really well in C55 CHO cells.

22   Q.    Did you ever use the PMSG vector to make alpha-GAL A?

23   A.    Yes, I did.

24   Q.    Is that reflected in your notebook?

25   A.    Yes, it is.

Ioannou - direct

1   Q.    Let's turn to Page KS4661, which is Page 229 of your

2   notebook.

3               And what is shown there on the bottom half?

4   A.    These have the results of the expression of PSMG in

5   the C55 cells; and at the bottom of the page you can see

6   that I'm expressing recombinant alpha-GAL A in these cells.

7   Q.    Can we bring up the top sentence as well?

8               And you see at the top the notation is C55.  Is

9   that right?

10  A.    That's right.

11  Q.    Now, we talked a little bit earlier about the P91

12  vector that you used with Cos cells.  Did you ever use the

13  P91 vector to produce alpha-GAL A in CHO cells?

14  A.    Yes, I did.

15  Q.    Is that reflected in your notebook?

16  A.    Yes, it is.

17  Q.    Look please at KS4636, Page 253 of your notebook, up

18  at the top.

19              What is shown there?

20  A.    So right at the top, I describe another CHO cell line.

21  These are DG44 cells.  It's just another mutation that these

22  cells have.  And these cells work great with the P91

23  expression vector.

24  Q.    Now, turn please to Page KS4640, which is Page 257 of

25  your notebook.

Ioannou - direct

1          Please explain to the jury what is shown on this

2     page?

3     A.    Once I introduce the vector into the CHO cells, I have

4     isolated individual cells, grew them up.  They're called

5     clones.  And here, I'm analyzing how much enzyme each one of

6     the separate clones is producing.

7     Q.    I see some handwritten circles around some of the

8     numbers.  Who made those circles?

9     A.    I did.

10    Q.    And why did you circle those numbers?

11    A.    Well, the very first circle up on top, the 497 number,

12    that is just how much activity CHO cells have before you put

13    in your expression vector.  And then some of the other

14    clones you can see that we can increase activity of the

15    enzyme above what CHO cells have.  So this were the best

16    clones from this experiment.

17    Q.    The best.  What do you mean by "the best clones?"

18    A.    Expressing the most enzyme.

19    Q.    And so why did you circle the clones that were

20    expressing the most enzyme?

21    A.    Because I selected these clones to proceed with

22    something called gene amplification.

23    Q.    What is gene amplification?  Please explain to the

24    jury.

25    A.    When you introduce an expression vector into a cell,

Ioannou - direct

1    eventually it goes into the chromosome and it goes in maybe

2    one or two copies.

3              With gene amplification, that is where the DG44

4    cells come in, you can grow them in the presence of a

5    specific poison.  And in order for them to survive, they

6    have to make more and more.  They have to duplicate the

7    expression vector.  So as they duplicate the expression

8    vector, they make more and more alpha-GAL A enzyme.

9    Q.    So after selecting these, the clones that made the

10   most alpha-GAL A, what did you do next?

11   A.    I proceeded to grow them in the presence of this

12   poison to get gene amplification.

13   Q.    Were you successful in doing that?

14   A.    Yes, I was.

15   Q.    Now, is amplification done all in one step?

16   A.    No, it's a long process and is done in small steps

17   because you don't want to kill the cells.  You just increase

18   the poison slowly.

19   Q.    How many steps did it take for you to complete the

20   amplification process?

21   A.    It took about eight steps.

22   Q.    And how long did that take?

23   A.    Each step takes about six to eight weeks.  So I would

24   say about 12 to 14 months.

25   Q.    Well, let's look now at Page 263 of your notebook,

1    KS4644.

2              What is the date on this page?

3    A.    December 5th, 1988.

4    Q.    What does this page show?

5    A.    This is the second step in amplification.  On the top

6    line there you can see that .08 micromolar, that's the level

7    of the poison.  The poison is MTX.  It's an application for

8    methotrexate.  It's an anti-tumour drug.  That is what we

9    use to do this.

10   Q.    Now, going back to the full screen, I see again some

11   circled numbers.  Did you make those circles as well?

12   A.    Yes.

13   Q.    And why did you circle those numbers?

14   A.    Well, for example, if you go for the clone No. 5,

15   which is one of the original ones we just discuss, I call it

16   the parent.  After amplification, for example, that clone 3

17   under the parent 5 is now making tens of thousands of units

18   of alpha-GAL A.  So these were my best clones.

19              In fact, clone, I'm going to call it clone 5-3

20   from now on is the one that I'm going to take through all

21   the steps of amplification.

22   Q.    Let's turn now please to KS4647, which is Page 267 of

23   your notebook.

24              And what is shown on this page?

25   A.    This page describes a very unexpected discovery which

Ioannou - direct

1    showed us that not only these cells made lots and lots of

2    enzyme in their lysosome, but they were also secreting a lot

3    of enzyme into the media.

4    Q.    And why was that significant, if at all?

5    A.    This was extremely significant.  I would say this was

6    a game change because one thing is you can actually now push

7    the cells to produce even more enzyme because you don't have

8    to worry that they're going to fill up their lysosomes and

9    there is just no more room so you are going to kill the cell

10   or whatever.

11            Here, they can just speed it up.  It's much

12   cleaner because you don't have to kill the cells to get it

13   out.  And basically you have a mini-cell factory constantly

14   producing recombinant enzyme.

15   Q.    And when you saw this secretion, what was your

16   reaction -- when you saw the secretion of the alpha-GAL A,

17   what was your reaction?

18   A.    This basically jelled in our mind that we really had a

19   system to produce all the alpha-GAL A we would need to treat

20   all Fabry patients.

21   Q.    Now, earlier you mixed there were eight amplification

22   steps that you performed.  Did you record all of these

23   amplification steps in your notebook?

24   A.    No, I didn't.

25   Q.    Why not?

1    A.    After the first two or three steps, it became routine.

2    I just was changing the amount of poison I was giving the

3    cells so I didn't really write everything down in this book.

4    Q.    Are these eight amplification systems recorded

5    anywhere else?

6    A.    Yes.  I showed in my thesis and in our patent.

7    Q.    Could you explain to the jury what you mean by thesis?

8    A.    Well, when you complete your Ph.D. project, you have

9    to write everything you have done for that time, and you

10   have to stand in front of a committee of professors and

11   basically prove that you were productive and that you have

12   made novel discoveries so you can get a Ph.D. degree.

13   Q.    What did you do next on your Fabry research project?

14   A.    I continue working on the project by purifying the

15   enzyme.  So started to characterize the enzyme and basically

16   getting ready for all the preclinical studies that I was

17   going to do.

18   Q.    And what do you mean by characterize the enzyme?

19   A.    This is a human enzyme producing a Chinese Hamster

20   Ovary cell.  Among other things, it has a couple hydrate

21   sugars attached to it.  So I was characterizing the sugars

22   to compare it to the enzyme as made by human cells to make

23   sure that it's very similar and there were no surprises.

24   Q.    And why was its necessary for the recombinant Chinese

25   Hamster Ovary produced enzyme to be very similar to the

Ioannou - direct

1    natural human enzyme?

2    A.    Well, you want to minimize any toxicity or any other

3    issues you have because you are going to inject humans with

4    this protein.  So you want it to be as close to the human

5    enzyme as possible.

6    Q.    And is the work of purifying and characterizing your

7    recombinant alpha-GAL A enzyme recorded in your notebook?

8    A.    Yes, it is.

9    Q.    Let's look at Page KS4667, which is Page 291.

10            What is reflected on this page?

11   A.    Here, I describe the procedure for purifying the

12   recombinant enzyme.

13   Q.    And then turn to Page KS4672, which is Page 299.

14            What is shown there?

15   A.    Here, I show some of the physical properties of this

16   enzyme that I was characterizing.

17   Q.    And then turn please now to Tab 6 of your book, which

18   is DTX-259.

19            Do you recognize this document?

20   A.    Yes, it's a grant application by Dr. Desnick.

21   Q.    Look at the second page.  And please tell the jury

22   what the date of this document is?

23   A.    It's January 23rd, 1990.

24   Q.    And is any of your work reported in this March of

25   Dimes application?

1    A.    Yes.

2    Q.    Turn please to Page MSSM2858.

3              The first full paragraph under -- that's the

4    one, yes.  Under the heading 1.  What is expressed there?

5    What is reported there?

6    A.    This is my expression in CHO cells.  The amplification

7    that I was just describing is shown here.

8    Q.    Okay.  Let's go back now again to your notebook, Tab

9    1.  PTX-602.

10             And I'd like to now look at your second notebook

11   with.  Turn please to 19, KS4691.

12             What is shown there?

13   A.    These are experiments I was carrying out to

14   characterize the carbohydrate, the sugars on the recombinant

15   enzyme.

16   Q.    Why were you doing that?

17   A.    Well, sugars, in addition to, you know, you want them

18   to be similar to the human enzyme, are also important in

19   enzyme uptake by cells.

20   Q.    And did you perform any experiments to determine

21   whether your recombinant alpha-GAL A could be taken up by

22   Fabry cells?

23   A.    Yes.

24   Q.    Look, please, back to your first notebook, Page

25   KS4673, which is Page 301 of your notebook.

1           And you see at the top, under the heading, there

2    is a reference to clone 5-3, 250.  What is that?

3    A.    This is the 5-3 clone that we've been discussing.  And

4    250 is the amount of, is the step of the amplification, is

5    the amount of amplification, 250 molars.

6    Q.    Which amplification step were you at at this point in

7    time?

8    A.    I believe this was the seventh step.

9    Q.    And looking down the page, Page 301, what does this

10   page show?

11   A.    This basically shows enzyme uptake by Fabry cells.

12   Q.    Was this the first uptake experiment that you

13   performed?

14   A.    I believe this is the first one that I recorded, yes.

15   Q.    And approximately when did you conduct this study?

16   A.    The next date in my lab book is January of '90, so

17   this was prior to January of 1990.

18   Q.    And turn to Page 20 of your second notebook, MSSM491,

19   and please identify how you determined that date.

20   A.    Yeah.  This is a data printout.  And right on the

21   upper corner there, you can see that this data was generated

22   Wednesday, January 24th, 1990.

23   Q.    Let's look now at Page 22 of your second notebook,

24   KS4695.

25           What is shown here?

Ioannou - direct

1    A.    This is my studies to determine whether the

2    recombinant enzyme has M-6-P, the mono-6-phosphate tag that

3    it needs in order to get into cells.

4    Q.    What were the results?

5    A.    The recombinant enzymes was properly modified with the

6    M-6-P tag.

7    Q.    Why is that important?

8    A.    Because this is basically the zip code that the enzyme

9    needs in order to grab on to the receptor cells and go to

10   the lysosome.

11   Q.    And which receptor are you referring to?

12   A.    The mannose-6-phosphate receptor.

13   Q.    Did you do any other studies to confirm the presence

14   of M-6-P on your recombinant alpha-GAL A?

15   A.    Yes, I did.

16   Q.    Turn to page KS4698, which is Page 24 of your second

17   notebook.  What is shown there, please?

18   A.    These are additional studies indicating that the

19   recombinant enzyme indeed has --

20   Q.    24.

21   A.    Yes.  -- indeed has mannose-6-phosphate.

22   Q.    Did there come a time when you did another uptake

23   experiment?

24   A.    Yes.

25   Q.    Did you record the results of that experiment?

1   A.    The results of that experiment are in the computer

2   file, in my thesis and in our patent.

3   Q.    Look, please, at Tab 13 of your book, DTX-604.  What

4   is this?

5   A.    This is an uptake experiment of recombinant alpha-GAL

6   A using Fabry disease cells.  What you can see, that top

7   curve, you can see that the enzyme gets into the cells very

8   efficiently.  But when I add mannose-6-phosphate, which

9   blocks the mannose-6-phosphate receptor on the plasma

10  membrane, you can no longer get the enzyme in, as you can

11  see with the flat line, no enzyme gets in when you block the

12  receptor.

13  Q.    You said it gets into the cells very efficiently, and

14  you were pointing to that top curve?

15  A.    Right.

16  Q.    That goes up and straightens out.

17        Can you explain how you can tell by that curve

18  that the alpha-GAL A is getting into the cells efficiently?

19  A.    Right.  The shape of the curve, actually, is

20  indicative.  We use it to prove that in fact you are getting

21  it via a receptor on the membrane, because you can see, once

22  you start putting more and more enzyme on the cells, there

23  is no more receptor, so you just -- the amount of enzyme

24  that you are getting kind of flattens out.  So that

25  indicates, with varying the enzyme, in the beginning, very

1    little enzyme in the beginning of that graph, you get a big

2    jump with how much gets in and then it flattens out.

3    Q.    So the numbers on the left side show you how much

4    alpha-GAL A is actually getting into the cell?

5    A.    Exactly.

6    Q.    Now turn, please, to Tab 9, which is DTX-456 in your

7    book.  What is this document?

8    A.    This is a grant application by Dr. Desnick.

9    Q.    What is the date on this?

10   A.    May 15, 1990.

11   Q.    We see that at the top.

12   A.    Yes.

13   Q.    And is your work reflected in this document?

14   A.    Yes.

15   Q.    Turn, please, to Page MSSM3785, Figure 3 at the top of

16   the page.  What is this?

17   A.    This is the same graph we just discussed of the uptake

18   of recombinant enzyme by Fabry cells.

19   Q.    That was your experiment?

20   A.    Yes.

21   Q.    Is other of the worked that you performed on your

22   alpha-GAL A project also reflected on this document?

23   A.    Yes, on Page 3785 we are discussing the high-level

24   production in the bioreactor, enzyme purification, then on

25   the next page, characterization and so forth.  That reflects

1    my work.

2    Q.    Let's go back to Tab 1, your notebook, again, and look

3    at Page KS4704, which is Page 31 of your second notebook.

4    What is shown on this page?

5    A.    This is a test I did to determine that the recombinant

6    enzyme could get into a cell and it could actually break

7    down GL-3.

8    Q.    Why is that important?

9    A.    It's important because it shows that the enzyme kind

10   of actually attacked the natural GL-3 substrate.

11   Q.    What is the date that you did this work?

12   A.    July 26, 1990.

13   Q.    Look now at Page 33 of your second notebook, KS4705.

14   What did you record there?

15   A.    This is more characterization I was doing of the

16   carbohydrates on alpha-gal A just to understand the type of

17   glycosylation that is on the enzyme.

18   Q.    That is dated when?  In the upper left-hand corner.

19   A.    August of '90.

20   Q.    You explained to the jury a little bit about your

21   Ph.D. thesis.  When did you submit your Ph.D. thesis?

22   A.    I finished writing my Ph.D. thesis and submitted it in

23   June of 1990.

24   Q.    And then you defended it when?

25   A.    In August of 1990.

1    Q.    Look, please, at Tab 10, which is DTX-463.  Do you

2    recognize this document?

3    A.    Yes.  It is a copy of my Ph.D. thesis.

4    Q.    What does it describe?

5    A.    It describes the expression, the high-level expression

6    and purification of recombinant alpha-GAL A for using it in

7    the treatment of Fabry disease.

8    Q.    And what is reflected in this document in terms of

9    your work?

10   A.    This document reflects everything I did from day one

11   until I wrote this thesis.

12   Q.    Let's look at Page MSSM5060, which is Page 79 of your

13   thesis.  I believe we will find Table 3.  What is shown in

14   Table 3?

15   A.    This is a summary of all the amplification steps that

16   we have discussed with this clone 5-3, and basically just

17   gives you the level of protein increase as we went through

18   the different steps of amplification.

19   Q.    Those are the steps that you did with the poison

20   methotrexate?

21   A.    Exactly.

22   Q.    Now look at MSSM5105, which is Page 124 of your

23   thesis.  And I would like you to look at the last sentence

24   that starts at Page 124 but then goes over to Page 125.

25   That says, "Thus, the prerequisites for therapy have been

1    achieved and a promising drug is now available for human

2    clinical trials."

3              What did you mean by that?

4    A.    I mean that we finally have all the recombinant

5    alpha-GAL A we need to carry out enzyme replacement therapy

6    for Fabry disease.

7    Q.    Now, when you began mammalian cell production, why did

8    you start with COS cells?

9    A.    Because, as I mentioned previously, COS cells allow

10   you to quickly validate, one, did you make the correct

11   expression construct, and, two, is the gene you isolated

12   really functional?  So that can be answered really quickly

13   in COS cells.

14   Q.    Between June of 1986 when you started your graduate

15   work to the time that you defended your thesis, did you work

16   on expression systems other than COS and CHO?

17   A.    Yes, I did.

18   Q.    What is an example of those systems?

19   A.    I spent time trying to express the enzyme in bacteria.

20   Q.    Why did you do that?

21   A.    Bacteria are easy to grow, easy to manipulate, very

22   cheap to produce large amounts of enzyme.  And the fact that

23   they do not glycosylate recombinant proteins is an advantage

24   in certain studies that you can do with the enzyme.

25   Q.    So how did that work in bacteria relate, if at all, to

1    your mammalian cell work?

2    A.    It's all interrelated, because the bacteria work was

3    to help us characterize the enzyme and understand it better,

4    so it would have given us some clues into the structure of

5    this protein.

6    Q.    While you were working on the, doing your bacteria

7    work, did you stop work on the mammalian systems?

8    A.    No.  Everything I did was done concurrently in the

9    lab.

10   Q.    Did you ever investigate the possibility of making

11   recombinant alpha-GAL A in insect cell systems?

12   A.    I considered everything when I was working on this

13   project.  I did consider it.  I even constructed the

14   expression vector that is necessary to go into insect cells.

15   Q.    Did you complete those experiments?

16   A.    No, I did not pursue it past that point.

17   Q.    Why not?

18   A.    Because it was very clear at the time that insects do

19   not glycosylate mammalian proteins the same way as mammals.

20   Q.    Now, I would like to go back to the time when you were

21   a brand-new graduate student starting to work in Dr.

22   Desnick's lab.

23             At that time, what did you feel that you needed

24   to accomplish?

25   A.    The goal was very clear.  Dr. Desnick showed that you

1   could actually treat this disease in 1979 if only you had

2   enough material.  We didn't have enough.  So the goal was to

3   develop a system to produce large quantities of enzymes so

4   you could treat patients.

5   Q.   How did you feel in performing that work?

6   A.   At the end of this work -- I mean, it's not often that

7   a graduate student gets to see the project bring something

8   from the bench to the bedside.

9            So I am honored.

10  Q.   Do you still work on Fabry disease?

11  A.   No.

12  Q.   Why is that?

13  A.   After we finished all the preclinical studies, it was

14  up to the medical doctors to carry out the clinical trials.

15  So I took on new challenges in other lysosomal storage

16  diseases.

17           MS. LORING:  Thank you.  I have no further

18  questions.

19           THE COURT:  Thank you, Ms. Loring.

20           Mr. Paunovich, you may cross.

21                       CROSS-EXAMINATION

22  BY MR. PAUNOVICH:

23  Q.   Good morning, Dr. Ioannou.

24  A.   Good morning.

25  Q.   You were not the first person to have the idea to use

1   enzyme replacement therapy to treat Fabry disease.  Correct?

2   A.    The idea was there years before I started my project.

3   Q.    In fact, the idea was there for about 20 years before

4   you started your work on Fabry disease.  Correct?

5   A.    Enzyme replacement?

6   Q.    That's correct.

7   A.    Yes.

8   Q.    And in your '804 patent, you don't claim -- you don't

9   pretend to claim native enzyme replacement therapy, do you?

10  A.    What do you mean by native?

11  Q.    Meaning isolated by a means other than recombinant.

12  Correct?

13  A.    That's correct.

14  Q.    And the paper that you referred to earlier of Dr.

15  Desnick's and the study from 1979, that study was using

16  natively isolated enzyme.  Correct?

17  A.    Yes.  That enzyme was purified from human tissue.

18  Q.    Which is different from recombinant -- deriving a

19  protein from a recombinant source.  Correct?

20  A.    That's correct.

21  Q.    And in June of 1986, when you started working at Mt.

22  Sinai School of Medicine, there was no recombinant method

23  for a way to produce recombinant protein for enzyme

24  replacement therapy.  Correct?

25  A.    For alpha-GAL A?

1   Q.    That's correct.

2   A.    There was no method.

3   Q.    And even though the idea for enzyme replacement

4   therapy existed, there wasn't any way to do that using

5   recombinant means to produce alpha-GAL A at that time.

6   Correct?

7   A.    Well, that's what the project was, to develop it.

8   Q.    And so in June of 1986 no such method existed.

9   Correct?

10  A.    There was no successful production of recombinant

11  enzyme in 1986, no.

12  Q.    And you agree that you need to do uptake experiments

13  in order to know that recombinant DNA will be

14  therapeutically functional.  Correct?

15  A.    I think you mixed it up.  Recombinant DNA or

16  recombinant protein?

17  Q.    Recombinant protein.

18  A.    That's not correct.

19  Q.    So you don't agree -- until you actually do the uptake

20  experiments, either in vivo, in vitro or in vivo, you don't

21  know for sure whether it will be taken up.  Correct?

22  A.    You don't know for sure, that's correct.

23  Q.    You don't know whether it will be therapeutically

24  functional.  Correct?

25  A.    You don't know with absolute certainty, but you can be

1    sure that it will be based on other data.

2    Q.    So you don't know that it will be therapeutically

3    functional.  Correct?

4    A.    Beyond any doubt?

5    Q.    If you can refer to the very first tab of Volume I of

6    your binder, it's a copy of your deposition.  Go to Page 92,

7    beginning at Line 5.

8              THE COURT:  Lines 5 through what?

9              MR. PAUNOVICH:  5 through 8.

10             THE COURT:  Let him read them, then you may

11   examine him.  And let me read them.

12             MR. PAUNOVICH:  And continuing to Lines 10

13   through 13, Your Honor.

14             MS. LORING:  What page?

15             THE COURT:  92.

16             MR. PAUNOVICH:  92, 5 through 8 and then 10

17   through 13.

18             THE COURT:  Doctor, have you had a chance to

19   review those lines?

20             THE WITNESS:  Yes.

21   BY MR. PAUNOVICH:

22   Q.    Dr. Ioannou, at your deposition, were you asked:  "But

23   until you actually do the uptake experiments either in vitro

24   or in vivo, you don't know for sure whether it will be taken

25   up.  Correct?"

Ioannou - cross

```
 1                And did you provide the answer:

 2                "If you are referring to whether you know that

 3      something would be therapeutically functional, you need to

 4      do the experiment, that's correct."

 5                Were you asked that question and did you provide

 6      that answer?

 7      A.    Yes, I did.  But it followed a line of questioning on

 8      whether I would know for sure, with absolute certainty.  And

 9      that was when I said "correct."

10      Q.    And if we can call out PTX-713.  It is also in your

11      binder, I believe Volume I.  This is PTX-713, which I

12      believe should be sequentially numbered.

13                THE COURT:  Do you see that, Doctor?

14                THE WITNESS:  I see it on the screen.

15      BY MR. PAUNOVICH:

16      Q.    These are the uptake experiments that are in your '804

17      patent.  Correct?

18      A.    Correct.

19      Q.    And this particular computer image came from your

20      computer.  Correct?

21      A.    That's correct.

22      Q.    And the dates that are identified in your computer for

23      this file are April 12th and April 13th, 1990.  Correct?

24      A.    I believe that's correct.

25      Q.    And you don't have any written record of the exact
```

1    date when these experiments were performed to allow you to

2    enter this data into your computer.  Correct?

3    A.    That's correct.

4    Q.    And you would agree that having the idea doesn't

5    necessarily mean that you have a complete invention at the

6    time that you have the idea.  Correct?

7    A.    I don't know legally what you need.  But, yes, I would

8    say an idea is not a complete invention.

9    Q.    Now, we can drop that.

10            You were asked some questions about your lab

11   notebook earlier.  You were referred to a number of

12   different pages.  If we can pull up DTX-602.

13            Dr. Ioannou, it is actually in the defendant's

14   notebook from previously.  I apologize that you have a lot

15   of extra paper up there.

16   A.    That's okay.

17   Q.    Mr. Ryder, I apologize, I don't have a pin cite.  If

18   you can pull up what is Bates Page KS4673, probably about

19   midway through.  There will be internal page numbers, two

20   pages ahead, please?

21            I am sorry, one back.

22            There.  Thank you.

23            Dr. Ioannou, you testified on direct that you

24   believed that this was the first evidence of doing uptake

25   experiments.  Is that right?

Ioannou - cross

1    A.    This is my first uptake experiment.

2    Q.    And on this page, there is no date.  Correct?

3    A.    Correct.

4    Q.    And you would agree with me that in the experiment

5    that you performed on this page, the cells were not washed

6    before being lysed and assayed for uptake.  Correct?

7    A.    I didn't write down that they were washed.

8    Q.    And if the cells weren't washed and then lysed and

9    assayed, isn't it true that the uptake -- or the presence of

10   alpha-GAL that you would be measuring would include

11   alpha-GAL that was in the medium?

12   A.    If I did not wash it in this experiment, that would be

13   true.

14   Q.    If that was the case, you would have potentially false

15   results, i.e., no -- you might have alpha-GAL that is in the

16   medium and not actually taken up by the cell.  Isn't that

17   right?

18   A.    If that was the case, yes.

19   Q.    And looking through your lab notebook, you can't

20   provide the date at which you decided to skip all other

21   recombinant expression systems as options and focus only on

22   producing alpha-galactosidase A in CHO cells?

23   A.    I never skipped anything.  I worked on every possible

24   expression system I could get my hands on.

25   Q.    My question is, you can't identify an exact date when

1    you decided to focus exclusively on CHO cells in your

2    notebook?

3    A.    I worked simultaneously on many projects.  I don't

4    know what you mean by exclusively.

5    Q.    So what I'm trying to get at is when did you decide to

6    skip other options and focus on CHO cells?

7              THE COURT:  He just answered that twice I think

8    that he didn't skip other options.

9    BY MR. PAUNOVICH:

10   Q.    Can you provide a specific date when you began working

11   on CHO cells?

12   A.    Yes.  On CHO cells, as it was recorded in my lab

13   notebook.

14   Q.    Now, in your lab book, you would agree that the

15   majority of the experiments that you have identified are

16   undated.  Correct?

17   A.    Most of the experiments we went through on direct were

18   dated.

19             MR. PAUNOVICH:  Let's look at some of those.

20   Let's go to DTX-602 again, Mr. Reiter.

21             And I apologize, I'm going to make you jump

22   around a little bit.  I'd like to go to KS4636.  It should

23   be internal Page 253.

24   BY MR. PAUNOVICH:

25   Q.    This is one of the first pages that you referred to.

1    Isn't that right, Dr. Ioannou?

2    A.    This is the DG44 experiment, yes.

3    Q.    And there is no date on this page?

4    A.    That is right.

5         MR. PAUNOVICH:  And if we can go to is, for

6    example, KS4414, please.

7         I'm sorry.  You know what?  We can take that one

8    down.  It's taking a little while.

9    BY MR. PAUNOVICH:

10   Q.    Now, Dr. Ioannou, you don't know the date you had an

11   invention to file that is disclosed in the '804 patent, do

12   you?

13   A.    I'm sorry.  I don't understand that question.

14   Q.    Do you recall when the patent was filed, your '804

15   patent, in relation to when you believe you and Dr. Desnick

16   and Dr. Bishop had the completed the invention that is

17   disclosed in the patent?

18   A.    The invention was completed prior to us filing for it.

19   Q.    And my question is, do you recall the date in relation

20   to when you and your co-inventors believed that you had

21   completed the invention that is disclosed in the '804

22   patent?

23   A.    I don't recall the exact date.

24   Q.    But you do recall disclosing the invention to Mt.

25   Sinai School of Medicine.  Correct?

1    A.    I do recall filing the disclosure, yes.

2    Q.    And if we can pull up PTX-1035, Page 3.

3              Are you able to see that on your screen,

4    Dr. Ioannou?

5    A.    Yes.

6    Q.    And this is the invention disclosure for your '804

7    patent, on or about April 30th, 1990?

8    A.    It appears to be.

9    Q.    And that is approximately three weeks after the dated

10   uptake experiments in early April 1990?

11   A.    For that graph, yes.

12             MR. PAUNOVICH:  Can we pull up DTX-488?

13             I'm sorry.  PTX.

14   BY MR. PAUNOVICH:

15   Q.    This is a copy of your '804 patent.  Correct?

16   A.    Correct.

17   Q.    And you can't show me where in your patent it

18   discloses a method for treating Fabry disease, can you?

19   A.    It's not discussed in the claims, no.

20   Q.    And you can't show me where in your patent it

21   discloses a method of treating Fabry disease.  Correct?

22   A.    Actually, I went back and I re-read the patent and we

23   do describe treating Fabry disease patients.

24   Q.    If we can, I'd like to direct you to your deposition

25   transcript.

Ioannou - cross

1    A.    Yes.

2    Q.    At Page 39, Lines 17 through 20.

3              THE COURT:  You know, counsel, that is what he

4    said at the time.  He said he already has taken another look

5    at the patent.

6              MR. PAUNOVICH:  I'll move on, Your Honor.

7    BY MR. PAUNOVICH:

8    Q.    Dr. Ioannou, you have an agreement through Mr. Sinai,

9    a licensing agreement with Genzyme.  Correct?

10   A.    Mt. Sinai has a licensing agreement with Genzyme.

11   ███   ████████████████████████████████████████

12   █████████████████████████████████████████████████

13   A.    I received royalties from Mt. Sinai, yes.

14   Q.    And you are continuing to receive royalties from

15   Genzyme?

16   A.    Yes.

17   Q.    Through Mt. Sinai?

18   A.    Through Mt. Sinai.

19   ███   █████████████████████████████████████████

20   A.    That was an estimate at the time when we discussed it.

21   ██████████████████████████████████████

22   ███   ████████████

23   A.    Yes.

24   Q.    And that portion is 35 percent of the inventors' share

25   through Mt. Sinai; correct?

Ioannou - redirect

1  A.    That's correct.

2  Q.    And the inventors share at Mt. Sinai is only one-third

3  of the monies that Mt. Sinai receives from Genzyme; is that

4  correct?

5  A.    That's correct.

6  Q.    And you agree that Mt. Sinai has received in excess of

7  ██████████████████████████████████████████████████████

8  Genzyme; correct?

9  A.    For the duration.  Yes, for the duration worldwide.

10  That's correct.

11            MR. PAUNOVICH:  No further questions.

12            THE COURT:  All right.  Ms. Loring, redirect.

13            MS. LORING:  Thank you, Your Honor.

14                  REDIRECT EXAMINATION

15  BY MS. LORING:

16  Q.    Dr. Ioannou, please take out PTX-488 which is your

17  '804 patent.

18  A.    What tab is that?

19  Q.    It's in the binder that Mr. Paunovich gave you.  It's

20  PTX-488.  And at the bottom, I'm going to focus on Column 2.

21            Do you recall Mr. Paunovich just asked you about

22  whether you could find a treatment of disease, a method of

23  treatment in your '804 patent.  Would you, please, turn to

24  Column 2 and look at the sentence that starts at Line 49 and

25  goes down to about Line 53 or so.  It starts with the

1    alpha-GAL A enzyme.  Could you read that, please?

2    A.    Line 49?

3    Q.    Line 49.

4    A.    The invention is demonstrated here by working examples

5    in which high levels of alpha-GAL A were produced in

6    mammalian expression systems.

7    Q.    Dr. Ioannou, I'm sorry.  Column 2.  Are you in the

8    '804 patent?

9    A.    Yes.

10            THE COURT:  That's PTX-488.

11            THE WITNESS:  This is PTX-488.

12            THE COURT:  Look in Column 2, under

13   Introduction.

14            THE WITNESS:  Yes, I am under.

15            Yes.  The alpha-GAL A enzyme produced in

16   accordance with the invention may be used for a variety of

17   purposes, including, but not limited to, enzyme replacement

18   therapy for Fabry disease.

19   BY MS. LORING:

20   Q.    And is that where you found the discussion of the

21   method of treatment in your patent?

22   A.    Yes.  Also, there is a longer description further in.

23   Q.    Thank you.

24   A.    Yes.

25            MS. LORING:  I have no further questions.

 1              THE COURT:  Thank you, doctor.

 2              (Witness excused.)

 3              THE COURT:  Yes.

 4              MR. HALEY:  Good morning, ladies and gentlemen.

 5    My name is Jim Haley.  Together with our team, I represent

 6    Genzyme.  And right now we're going to play some video

 7    transcripts from the deposition of Dr. George Copolla who,

 8    as you know, is one of the co-inventors of the '831 patent

 9    and also a co-owner of Shelbyzyme.

10              THE COURT:  Mr. Haley, would give the jury some

11    sense of, given that this is their favorite part of the day,

12    how much time.

13              MR. HALEY:  Less than ten minutes, I believe,

14    Your Honor.

15              MR. MILLER:  11.

16              THE COURT:  11.

17              MR. HALEY:  11.  I've been corrected.

18              THE COURT:  All right.

19              (Deposition designations of George Coppola played.)

20              "Question:  Dr. Coppola, could you state your

21    full name and address for the record?

22              "Answer:  For the record, my name is George

23    Coppola.  I live at 5 Brentwood Court, Mount Kisco, New

24    York.

25              "Question:  And what year did you join CUNY?

1              "Answer:  Late '87.

2              "Question:  And you left in '90?

3              "Answer:  Yes.  '91, it says here.

4              "Question:  And half-life in the bloodstream is

5      important to get the drug to the place where it's going to

6      do its job; correct?

7              "Answer:  In general, yes.

8              "Question:  And did you understand when you

9      began the project that alpha-GAL had been expressed in E.

10     coli?

11             "Answer:  Please be very certain when you ask a

12     question about express, what that means.  Is it -- on a

13     relative scale of 1 to 100, is it 1 or is it 100; okay?

14             "In order for us to succeed in our demonstration

15     of a methodology, that expression had to be extremely high

16     level.  The expression that I knew it had was able, in an

17     inconsistent way, to barely support the growth of bacteria

18     on minimal plates.  So, yes, it expressed it somehow, but

19     not at very high levels at all.

20             "Question:  And is it correct that when you

21     began your work, alpha-GAL had been expressed in Cos cells?

22             "Answer:  Please be precise about your use of

23     the word, 'express.'  In virtually all of our discussions,

24     we're talking about permanent expression.  Cos cells are a

25     transient expression system.

Coppola - depo.

1            "Question:  And when you began your project in

2      the spring of 1988 on alpha-GAL, did you consider literature

3      on baculovirus expression of recombinant proteins?

4            "Answer:  Of course, I considered the literature

5      on Sf9 cells.  But please bear in mind, this is a simple

6      minor tool in the overall picture.

7            "Question:  And you indicated before the break,

8      Dr. Coppola, that Sf9 cells were available in the art when

9      you began your alpha-GAL project at CUNY; correct?

10           "Answer:  They were available free for pure

11     research and as a fee to corporations.  They are a tool --

12     simple tool to do one task.

13           "Question:  Which is to express -- express a DNA

14     sequence which is inserted into the cells?

15           "Answer:  Correct.  Correct.  Probably the

16     simplest part of the entire project.

17           "Question:  Is it also correct that vectors

18     suitable for transvecting Sf9 cells were also available when

19     you began your project in 1988?

20           "Answer:  They were vectors.  They weren't mine.

21     I made the vectors I used.

22           "I had a copy of it after it was all done.

23           "Question:  If you look at Pages 3751 through

24     3751 of Defendant's Exhibit 82, you can see it's entitled,

25     'Combined Declaration For Patent Application and Power?'

Coppola - depo.

1              "Answer:  Um-hmm.

2              "Question:  And it's correct that on Page 3752,

3    your name appears under Inventor No. 202; correct?

4              "Answer:  Um-hmm.

5              "Question:  And if you look at Page 3751,

6    there's a statement that says, 'I hereby state that I have

7    reviewed and understand the contents of the above identified

8    specification including the claims as amended by any

9    amendment referred to above.'

10             "You see that?

11             "Answer:  Yes.

12             "Question:  And is that your signature on the

13   bottom of Page 2, which is 3752?

14             "Answer:  Yes.

15             "Question:  And it's dated May 22, 1989?

16             "Answer:  Yes.

17             "Question:  Yes.  When you signed it in May, did

18   you review the application?

19             "Answer:  Yes.  And could anything be done about

20   it?  No.

21             "Question:  When you say could anything be done

22   about it, was there something you wanted to do about it?

23             "Answer:  I don't know.

24             "Question:  Now, if you look at your scientific

25   paper, which is Exhibit 90, and, specifically, at Page 202.

1              "Answer:  These are the preliminaries.  These

2       are your first samples.  They were fractionated later and it

3       showed uptake in proper low side.

4              "Question:  Is it correct that reading the

5       legend to Figure 3, there's no indication of how the

6       specific activity, the units per mil, were determined?

7              "Answer:  It's defined.

8              "Question:  As units per mg; correct?

9              "Answer:  Yes.  A unit is defined, though.

10             "Question:  And --

11             "Answer:  Hydrolysis of an animal per, et

12      cetera.  You got it?

13             "Question:  Is this the first time that you had

14      co-transvected Sf9 cells with vectors including the

15      alpha-GAL gene?

16             "Answer:  No.

17             "Question:  And when was the first time you had

18      done that?

19             "Answer:  In the springtime, as far as I can

20      recollect.

21             "Question:  Could you point me to a notebook

22      page where you did that?

23             "Answer:  No, I can't.

24             "Question:  Because?

25             "Answer:  I don't remember.

1        "Question:  Was this the first time, that is

2    'this' being September 16, 1988, that you had co-transfected

3    insect cells with a plasma containing the alpha-GAL gene

4    sequence and the other plasma which was required for insect

5    cell expression and saw inclusion bodies produced?

6        "Answer:  You just asked that question, and I

7    answered you, no.

8        "Question:  If you will go back then to -- we

9    can start, if you would like, on the table of contents of

10   the notebook which begins at Page 3023.  Does that help you

11   identify an experiment when you have co-transfected Sf9

12   cells with two plasmids, at least one of which is CC4,

13   including the alpha-GAL gene sequence?

14       "Answer:  3 October 1988.

15       "Question:  And what page is that?

16       "Answer:  Page 79 of C-2.  It may even be

17   earlier, I don't know.  This is the first one I have found

18   so far.

19       "Question:  Sorry.  Could you show me what the

20   page looks like so I can find it in the exhibit?

21       "Mr. Paunovich:  Maybe 3105.

22       "Question:  Thank you.

23       "And that date is 3 October '88.  Correct?

24       "Answer:  Yes.

25       "Question:  I think maybe I'm confused.  If you

1    go back to the page which is dated September 16, 1988, which

2    is earlier in the book, September 16, 1988, that page.  Is

3    this experiment, September 16th, 1988, the first experiment

4    where you saw inclusion bodies demonstrating infection of

5    insect cells in a co-transfection experiment using CC4?

6                    "Answer:  I can't answer that without an

7    enormous amount of searching.  I can't do it from memory.

8    This is stuff from 23 years ago.

9                    "Question:  First, do you recognize what's been

10   marked as Defendant's Exhibit 214 as your third notebook?

11                   "Answer:  It's notebook C-3, it appears.

12                   "Question:  And those are the same numbers that

13   you have reported in Table 2 of the patent.  Correct?

14                   "Answer:  Correct, with obvious rounding.

15                   "Question:  And, so, at least as to that column,

16   the numbers in the patent are units per mg?

17                   "Answer:  Seems so.

18                   "Question:  Now, I want to direct your attention

19   to Defendant's Exhibit 214 and Page KS395.  It must be near

20   the end of Book 3.  I believe it's dated 23 March 1990 -- 23

21   May 1990, sorry.  Maybe it's April.  It's 23 March 1990.

22                   "So Page 275, what does it say at the top?

23                   "Answer:  Restart of Normal Human Fibroblast,

24   Fabry Fibroblast Endocytosis.

25                   "Question:  And what was the purpose of this

Coppola - depo.

1    experiment?

2              "Answer:  To look at the effect of sugars on

3    endocytosis.

4              "Question:  And then alpha-GAL is added through

5    the rest of them with one sugar or another.  Correct?

6              "Answer:  Correct.

7              "Question:  And what is the result of these

8    experiments?

9              "Answer:  You will see at the bottom of the page

10   that it says, 'Possible that cells were too old for proper

11   uptake.  Try again with fresh cells.'"

12             MR. HALEY:  I hope that was not too long, ladies

13   and gentlemen.

14             Genzyme would now like to call Dr. Maggie

15   Shafmaster, the former chief IP counsel at Genzyme.

16             ... MAGGIE K. SHAFMASTER, having been duly sworn

17   as a witness, was examined and testified as follows ...

18             THE COURT:  Good morning.

19             THE WITNESS:  Good morning.

20             MR. HALEY:  May I proceed, Your Honor?

21             THE COURT:  Yes.

22                        DIRECT EXAMINATION

23   BY MR. HALEY:

24   Q.    Good morning.

25   A.    Good morning.

1          MR. HALEY:  May I approach, Your Honor?

2          THE COURT:  Please do.

3   BY MR. HALEY:

4   Q.   Good morning, Dr. Shafmaster.

5   A.   Good morning.

6   Q.   What is your full name?

7   A.   Maggie K. Shafmaster.

8   Q.   Where do you live?

9   A.   I live in Cambridge, Massachusetts.

10  Q.   What do you do for a living?

11  A.   I am chief patent counsel for sanofi-pasteur.

12  Q.   Is there any relationship between sanofi-pasteur and

13  Genzyme?

14  A.   Yes.  Sanofi-pasteur and Genzyme are both owned by the

15  same parent company, Sanofi.

16  Q.   When did Genzyme become acquired by Sanofi?

17  A.   That was last year.

18  Q.   What is Sanofi's business?

19  A.   Sanofi is a global pharmaceutical company.

20  Q.   What is the business of sanofi-pasteur?

21  A.   Sanofi-pasteur makes vaccines.

22  Q.   In Genzyme, what are your responsibilities as chief

23  patent counsel at sanofi-pasteur?

24  A.   I manage the IP attorneys around the world who are

25  supporting all the products of sanofi-pasteur.

Shafmaster - direct

1    Q.    What is your educational background since high school?

2    A.    I have a B.A. in biology from the University of

3    California.  I have a Ph.D. in molecular biology and

4    virology from Cornell University.  And I have a J.D. from

5    New York law School.

6    Q.    Did you go to law school at night?

7    A.    I did.

8    Q.    Did you work during the day while you were in law

9    school?

10   A.    I did.

11   Q.    That must have been a tough four years.

12   A.    It was.

13   Q.    Where did you work during the day when you were in law

14   school?

15   A.    I worked at the intellectual property firm of Fish &

16   Neave.

17   Q.    How long did you work at Fish & Neave?

18   A.    I was there a total of eight years.

19   Q.    At Fish & Neave did you work with any of Genzyme's

20   trial counsel here today?

21   A.    I did.

22   Q.    Who?

23   A.    I worked with you, Mr. Haley, I worked with Denise

24   Loring, and I worked with Ken Herman.

25   Q.    What did you do after you left Fish & Neave in 1997?

 1   A.    I joined Genzyme as senior patent counsel.

 2   Q.    How long did you work at Genzyme?

 3   A.    I was there about 14 years.

 4   Q.    Could you share with the jury what your work at

 5   Genzyme was like?

 6   A.    Working at Genzyme was extraordinary.  The philosophy

 7   set by the CEO and shared by everyone in the company was

 8   that patients come first.

 9         It was very special, and I was very proud to be

10   a part of it.

11   Q.    What was your next position at Genzyme?

12   A.    I became managing intellectual property counsel.

13   Q.    What were your responsibilities as managing

14   intellectual property counsel?

15   A.    I started to manage some of the other IP attorneys,

16   all of us working in the area of biologics.

17   Q.    What are biologics?

18   A.    Biologics are products that are made in living cells.

19   Q.    Are the enzymes used to treat lysosomal storage

20   diseases like Fabry disease biologics?

21   A.    Yes, they are.

22   Q.    Have you ever had any responsibility for managing the

23   intellectual property as it relates to lysosomal storage

24   diseases at Genzyme?

25   A.    Yes, I did.

Shafmaster - direct

1    Q.    When did that begin?

2    A.    In 2004 I began managing the attorney who was directly

3    responsible for providing IP advice to the LSD business

4    unit.

5    Q.    What was your next position at Genzyme?

6    A.    I became vice president for intellectual property.

7    Q.    Were you promoted again after that?

8    A.    I was.

9    Q.    What was that position?

10   A.    I was promoted to senior vice president and chief

11   patent counsel.

12   Q.    When was that?

13   A.    That was in December of 2007.

14   Q.    What were your responsibilities as chief patent

15   counsel at Genzyme?

16   A.    I was responsible for managing all of the IP attorneys

17   at Genzyme and making sure that all of our clients at

18   Genzyme had the advice they needed.

19   Q.    Now, I am going to turn to your 14 years of experience

20   at Genzyme.  During those 14 years were you involved in

21   considering third-party patents for potential licensing by

22   Genzyme?

23   A.    Many times.

24   Q.    Could you estimate how many times you considered

25   patents that ultimately ended up in licenses to Genzyme?

Shafmaster - direct

1    A.    I would think probably at least two dozen times.

2    Q.    In those considerations, were there any IP factors,

3    intellectual property factors, that you generally considered

4    in deciding the royalty rates in such licenses?

5    A.    Yes, there were factors that we would almost always

6    look at if we were thinking about licensing a patent.

7    Q.    And what were some of those factors?

8    A.    First we would look to see the scope of the claims,

9    how broad the claims were, and get a feel for whether the

10   patent would allow us to exclude our competitors from the

11   area that we were working in.

12            We would look at the term of the patent or how

13   long it would last, how long it would give us protection.

14            We would look at how broadly it was filed around

15   the world.   Each patent is good only in the country that

16   issues it.

17            And most importantly, we would look at the

18   validity and enforceability of the claims to determine if we

19   thought the patent would hold up if we got into litigation.

20   Q.    In the context of the patent licenses that you were

21   involved in, what were the typical royalty rates?

22   ████ ████████████████████████████████████████████████████████

23   ██████████

24   Q.    In your years at Genzyme, do you know whether or not

25   Genzyme has ever been sued for patent infringement before

1  this case?

2  A.    Aside from a royalty dispute that we and many other

3  members of the biotech community got into with one

4  particular patent owner, I am not aware that Genzyme has

5  ever been sued before for patent infringement.

6  Q.    Why do you think that is?

7  A.    Genzyme was a pretty risk-averse company.  We worked

8  really hard to make sure we didn't infringe third-party

9  patents.

10  Q.    I am now going to turn to the '831 patent, which as

11  you know is the patent in suit.  When did you first become

12  aware of the '831 patent?

13  A.    On or immediately after March 14, 2006, the day it

14  issued.

15  Q.    How did you learn of the '831 patent?

16  A.    RCT, the patent owner, sent it to Genzyme on the day

17  of issue.

18  Q.    And where does it show on the patent that they were

19  the owner?

20  A.    The patent owner is listed as the assignee.

21        Do you have a pointer?

22        THE COURT:  Do we have a laser pointer?

23        THE WITNESS:  The assignee is right there.  It

24  says RCT.

25  BY MR. HALEY:

1    Q.    It has been blown up.

2    A.    That is the patent owner.

3          Yes, thank you.

4    Q.    Please look in your exhibit book at PTX-437.  What is

5    it?

6    A.    This is an e-mail from David Meeker on which I was

7    copied.

8    Q.    Are you the Maggie Kanter referred to in the cc line?

9    A.    I am.  Kanter was my maiden name.

10   Q.    What was Mr. Meeker's position at Genzyme in 2006?

11   A.    He was the president of the LSD business unit.

12   Q.    What if anything did the RCT e-mail that Mr. Meeker

13   forwarded to you, which is just below this one, say about

14   any potential royalty terms that RCT would consider for a

15   license under the '831 patent?

16   A.    It didn't say anything about royalty terms.

17   Q.    What did you do upon learning of the '831 patent?

18   A.    I immediately reviewed the patent and I ordered the

19   file histories of the '831 patent as well as all the other

20   applications in the patent family.

21   Q.    What are file histories?

22   A.    File histories, they are also called prosecution

23   histories.  I think actually you saw those in the video at

24   the beginning of the trial.  They are the big files the

25   patent examiner and the applicant use that have records of

1   all the communications back and forth during prosecution.

2   Q.    Now, looking at the next demo, which is the '831

3   patent, can you explain to the jury why you decided to order

4   all of the file histories from the patent family?

5   A.    In order to understand the '831 patent, I needed to

6   understand what had happened in the entire family.  There

7   were many applications in the family.  So all of those

8   needed to be reviewed in order to put together the big

9   picture of what was going on.

10  Q.    Could you explain to the jury what you did?

11  A.    Yes.  So this is the '831 patent family.  The box at

12  the top here is the very first application that was filed.

13  And then subsequent applications were filed over the years.

14  And all of these applications are interrelated.

15              So it was important to understand everything

16  that had happened in this chain until we get to the bottom

17  where we get to the '831 patent that ultimately issued.

18  Q.    Were you able to obtain all of the file histories that

19  you needed from the U.S. Patent and Trademark Office?

20  A.    Not initially, no.  It turned out that two of the file

21  histories were missing from the Patent Office.

22  Q.    What did you do to try to get those files?

23  A.    Well, once we determined we couldn't get them from the

24  Patent Office, I got back to RCT and I asked them if they

25  would be willing to provide me copies of their internal

1  files.

2  Q.    Would you look in your book under DTX-410.  Do you

3  recognize this as a string of e-mails?

4  A.    Yes, I do.  This is the string of e-mails between me

5  and RCT trying to get copies of those two missing files.

6  Q.    We have DTX-410 on the board.  Now, would you look at

7  Page 4 and 5 of that document, particularly, a March 27th

8  e-mail from Mr. Reckart to you?

9  A.    Yes.

10  Q.    Who is Mr. Reckart?

11  A.    Mr. Reckart was the senior vice president and general

12  counsel of RCT -- sorry, yes, RCT, the patent owner.

13  Q.    Did you know Mr. Reckart before this time?

14  A.    I did not.

15  Q.    What did you understand Mr. Reckart to be telling you

16  in the context of your request to him?

17  A.    I understood him to be saying that he had the files,

18  he was putting together copies that he was going to send to

19  me, and once I received them, he was happy to discuss things

20  by phone with me.

21  Q.    Did he say anything about a European application?

22  A.    He did.  I had asked him, also, for copies of what was

23  going on in Europe, because I wanted to understand that.  It

24  was part of the same patent family.  And he told me that the

25  European case was irretrievably abandoned.

1   Q.    If you go up one e-mail, do you recognize that as your

2   response to Mr. Reckart?

3   A.    Yes, I do.

4   Q.    What did you inform Mr. Reckart?

5   A.    I thanked him.  I asked him if he could please send

6   the files directly to my attention.  And I told him as soon

7   as I was done reviewing the files, I would love to take him

8   up on his offer to discuss them with me.

9   Q.    Now, if you go to Page 3 of this document, DTX-410,

10  and to an e-mail in the middle of the page, dated April 7th,

11  what is that?

12  A.    That was an e-mail from me to Mr. Reckart saying, I

13  still don't have the files.  Where are they?

14  Q.    You can now go to the bottom of Page 2 of this

15  document, DTX-410, you will see an e-mail dated April 24th,

16  2006.  What is that?

17  A.    It's another e-mail from me to Mr. Reckart, saying, We

18  still don't have the files.  We can't get them from the PTO.

19  Do you know what's going on?

20  Q.    Can you now go to the first page of DTX-410, the very

21  first e-mail, that is dated April 27th, from Mr. Reckart to

22  you.  What did you understand Mr. Reckart to be telling you?

23  A.    I understood him to say that he had finished going

24  through the files, and he was going to be sending them on

25  that day.

1    Q.    Were you ultimately able to receive a complete copy of

2    the files of the '831 patent family?

3    A.    Yes, I was.

4    Q.    What did you do with them?

5    A.    I reviewed them very thoroughly.

6              (Documents passed forward.)

7    BY MR. HALEY:

8    Q.    So I placed in front of you what I understand to be

9    the files of the '831 patent family.  I want to confirm that

10   when you reviewed them, you reviewed the first application,

11   the '421 application, which is at the top.

12   A.    Yes, I did.

13   Q.    Did you review the next application, the '312

14   application, which is the second box?

15   A.    Yes, I did.

16   Q.    Did you review the third application, the '594

17   application?

18   A.    Yes, I did.

19   Q.    Did you review the '734 application?

20   A.    I did.

21   Q.    Did you review the '491 application?

22   A.    I did.  I spent a lot of time on this one.

23   Q.    Did you review the '524 application which issued as

24   the patent in suit?

25   A.    I did.

1    Q.    Now, let me again go to DTX-410 on Page 4.

2              Did you ask Mr. Reckart at RCT to help you get

3    access to any other documents in connection with your

4    review?

5    A.    I did.  Yes.

6    Q.    What did you ask him for?

7    A.    I asked them if they could help me get permission to

8    review the transcript of a deposition that Dr. Calhoun had

9    given in a different lawsuit about Fabry disease.

10   Q.    And why did you need RCT's help to get permission to

11   review that transcript?

12   A.    Well, the transcript was subject to a protective

13   order.  And the protective order said that it was not

14   allowed to be used for any purpose other than that prior

15   litigation.  And so I wanted to make sure that I had

16   permission to review the transcript for the purposes of this

17   analysis, which had nothing to do with that prior

18   litigation.

19   Q.    Did you ultimately get permission from RCT to use the

20   deposition transcript?

21   A.    RCT was able to get permission for me, yes.

22   Q.    Please look in your exhibit book under DTX-564.

23              Do you recognize that?

24   A.    Yes.

25   Q.    What is it?

1    A.    It is the transcript of Dr. Calhoun.

2    Q.    And when was he deposed?

3    A.    He was deposed in December of 2001.

4    Q.    Did you review the Calhoun transcript in connection

5    with your review of the '831 patent family?

6    A.    I did.

7    Q.    Could you turn to Page 139?

8              And at the bottom, Line 18 going over to the

9    next page.

10             Did you review the portion of this transcript:

11             "Question:  Have you filed for any other patents

12   on the baculovirus insect cell expression system for

13   alpha-GAL A?

14             "Answer:  Yes.

15             MR. LORIG:  Your Honor, may we approach briefly.

16             THE COURT:  You may.

17             (Sidebar conference held.)

18             THE COURT:  Yes.

19             MR. LORIG:  Your Honor, they had the opportunity

20   to cross-examine Professor Calhoun on this deposition

21   testimony.  At this point in time, Mr. Haley is asking Ms.

22   Shafmaster to essentially speak hearsay, read the patent

23   and repeat it to the jury.  They could have examined

24   Dr. Calhoun.  What we're doing now is strictly hearsay.

25             MR. HALEY:  All I'm going is asking did you

1   review the document, whether it's hearsay or not.  It's not

2   coming in for the truth, it's coming in for what had she

3   reviewed.

4                MR. LORIG:  To me, you don't go through page by

5   page without the person here to explain the testimony.  It's

6   strictly hearsay.  I have no objections to what she did say,

7   she read the deposition, but not laboriously going through

8   pages trying to infer an opinion somehow.  She said she read

9   the deposition, and I respectfully ask the Court to have it

10  stop here.

11               MR. HALEY:  I'm just reading eight lines of this

12  deposition transcript.  It is not coming in for the truth.

13               THE COURT:  Eight lines, that is it?

14               MR. HALEY:  That's it.

15               THE COURT:  That's it.  Okay.

16               MR. PAUNOVICH:  If I may, Your Honor.  I believe

17  the lines they're reading go to their inequitable conduct

18  claim which are issues not to be for the jury.  The next

19  lines, what you don't see on the screen, they ask him a very

20  ambiguous question.

21               THE COURT:  They all go to what she did.

22               MR. PAUNOVICH:  Understood.

23               THE COURT:  All right.

24               MR. PAUNOVICH:  Thank you, Your Honor.

25               (Sidebar conference ends.)

Shafmaster - direct

1    BY MR. HALEY:

2    Q.    I'm going back to the question, did you review this

3    portion of the transcript:

4              "Question:  Have you filed any other patents on

5    the baculovirus cell expression system for alpha-GAL A?

6              "Answer:  Yes.

7              "Question:  Are those issued?

8              "Answer:  No.

9              "Question:  Pending?

10             "Answer:  No."

11             Next page, please.

12             "Question:  Abandoned?

13             "Answer:  Yes."

14             Did you review that in connection with your '831

15   patent review?

16   A.    Yes, I certainly did.

17   Q.    Now, during the time frame that we have been

18   discussing in 2006, as far as you know, was anyone else at

19   Genzyme in contact with Mr. Kirkpatrick, Mr. Reckart or

20   anyone at RCT about the '831 patent?

21   A.    No.  As far as I know I was the only one communicating

22   with RCT.

23   Q.    Hough did you communicate with Mr. Kirkpatrick at RCT?

24   A.    Mainly by e-mail.  There was at least one phone call

25   but mostly by e-mail.

1    Q.    And in any of those e-mails -- strike that.  About how

2    many phone calls, how many e-mails were there?

3    A.    Probably 20 to 25.

4    Q.    And in any of those e-mails or phone calls that you

5    had with RCT, were there ever any discussions about a

6    royalty that Genzyme might pay for a license under the '831

7    patent?

8    A.    We never got that far.

9    Q.    Did you do anything else in mid-2006 in connection

10   with your review of the '831 patent family?

11   A.    I did.  I did legal research.

12   Q.    And after your review of the prosecution histories,

13   the Calhoun deposition transcript and your legal research,

14   what did you do next?

15   A.    I contacted RCT and asked if we could have a

16   teleconference to discuss my findings.

17   Q.    Could you look at, under DTX-183 in your binder.

18             What is that?

19   A.    This is an e-mail from me to the general counsel of

20   RCT telling him I completed my review and I wanted to have a

21   teleconference asking if he was available.

22   Q.    Let's look under DTX-185.

23             What is that?

24   A.    This is his reply to my e-mail telling me he is going

25   to be leaving RCT shortly.  That he would let Shaun

1    Kirkpatrick, the CEO, know that I had requested a

2    discussion.  But he thought it was best if there were

3    outside counsel.  Frank Desiglio (phonetic) participated in

4    that call.

5    Q.    If you look under DTX-186, what is that?

6    A.    This was an e-mail from me to the folks at RCT setting

7    up the call for the next day.

8    Q.    Did you actually have the call on June 16th of 2006?

9    A.    Yes, we did.

10   Q.    With whom did you speak from RCT on that phone call?

11   A.    Shaun Kirkpatrick was on the phone.  Frank Desiglio

12   was on the phone and I think Tim Reckart was also on the

13   phone.

14   Q.    What did Mr. Kirkpatrick say at the end of your phone

15   conversation?

16   A.    He asked me if I would send to him some of the

17   documents that I had referred to during the conversation.

18   Q.    Did you do that?

19   A.    I did.

20   Q.    Let's look at Tab DTX-187.

21            What is that?

22   A.    This is an e-mail from me to RCT forwarding one of the

23   documents that we had discussed.

24   Q.    What did you say that you were forwarding to

25   Mr. Kirkpatrick in this e-mail?

Shafmaster - direct

1    A.    I told him I was forwarding the 1999 e-mail from

2    Orphan Medical to Genzyme that we had discussed during the

3    conference.

4    Q.    Is that e-mail attached to document DTX-187?

5    A.    Yes.  It's Page 3 of that document.  It was attached

6    to the e-mail.

7            MR. HALEY:  Put it up, please.

8    BY MR. HALEY:

9    Q.    First of all, Jennifer Tegfeldt.  Who is Jennifer

10   Tegfeldt?

11   A.    Jennifer Tegfeldt was an IP attorney as Genzyme who

12   was involved in discussions between Genzyme and Orphan

13   Medical back in 1999 about this patent family.

14   Q.    And who is Dayton Reardan?

15   A.    Dayton Reardan was a businessperson at Orphan Medical

16   who was, at that time, the licensee of the Calhoun patents.

17   Q.    Now, Mr. Reardan says to Ms. Tegfeldt:  You asked one

18   question at our recent meeting with respect to whether or

19   not there is any active prosecution still pending on the

20   Calhoun technology.

21            Do you see that?

22   A.    Yes.

23   Q.    Is that something you reviewed during your review of

24   the '831 patent family?

25   A.    Yes.

1    Q.    And Dayton Reardan, Mr. Reardan indicates what the

2    answer to that question was.  And first he says:  I asked

3    CUNY if they had paid the fees but apparently they have not,

4    so this is the correct status.

5            Is that something you considered?

6    A.    Yes.

7    Q.    And then he quotes an e-mail from someone he

8    identified as Dr. Warren Woesner, who he identified at the

9    bottom as being their patent counsel, and he says:  The

10    answer to the first question is the last application of the

11    alpha-GAL chain was allowed on July 6th, 1999.  The file was

12    then transferred to CUNY.  We were instructed not to pay the

13    base issue fee - if CUNY did not pay it, the application

14    went abandoned on September 6, 1999.

15            Is that something you considered during your

16    review?

17    A.    Yes.

18    Q.    It goes on to say:  However, the application can    be

19    revived by paying a fee and additional continuing

20    applications could be filed to add new claims if we could

21    think of any.

22            Is that something you considered in your review?

23    A.    Yes, it was.

24    Q.    It then says:  There with no other pending

25    applications in this group.  However, the short answer is

1     no.

2              Is that something you considered?

3     A.    Yes, it was.

4     Q.    Did you send anything else to Mr. Kirkpatrick after

5     your telephone conversation?

6     A.    Yes, I did.  He had asked me to send him a chronology

7     of events.

8     Q.    And if you look under DTX-188 in your book, what is

9     that?

10    A.    This is the e-mail from me to RCT, forwarding the

11    chronology of events that we had discussed during our

12    teleconference.

13    Q.    Did you prepare the chronology?

14    A.    I did.

15    Q.    Is the chronology attached to DTX-188?

16    A.    Yes, it is.

17    Q.    Whereabouts?

18    A.    It is the last page.

19              MR. HALEY:  Would you show that?  Blow it up.

20    BY MR. HALEY:

21    Q.    Now, I see you refer to a July 2nd notice of allowance

22    and issue fee due.  What is notice of allowance and issue

23    fee due?

24    A.    A notice of allowance and issue fee due is the name of

25    the paper that the patent examiner sends to the applicant

1    when the claims are allowed.  And the examiner is saying,

2    I'm ready to issue this patent.  You need to pay the issue

3    fee by a certain date, and we'll issue the patent for you.

4    Q.    And there is a parenthetical at the end of that which

5    says the issue fee is due October 4th, 1999.  Is that the

6    date you were referring to?

7    A.    That is the date the paper said the issue fee was due.

8    Q.    You also indicated on the chronology October 4, 1999,

9    issue fee due - no issue fee is paid?

10                What did that mean?

11   A.    Right.  It was just I was trying to provide a list of

12   facts.  And this was a fact that I had gotten from the file

13   history.  That October 4th came and went and no issue fee

14   was paid in this application.

15   Q.    Now, you also referred to a December 1, 1999 e-mail.

16   Is that the e-mail we just looked at?

17   A.    Yes, it is.

18   Q.    And you refer to a January 3 notice of abandonment

19   that was mailed to Dr. Woesner.  What is a notice of

20   abandonment?

21   A.    A notice of abandonment is a paper from the Patent

22   Office that says your last deadline for doing something has

23   come and gone.  You haven't done it.  This case is now

24   officially abandoned.  You lost your rights.

25   Q.    And it also refers to a December 18th, 2001 deposition

1   transcript.  Is that the deposition transcript that you

2   referred to previously in your testimony?

3   A.     Yes.  That is the deposition transcript I reviewed.

4   Q.     And it also prefers to a February 26th petition to

5   revive and an August 27th, 2002 granting of that petition.

6   Do you see that?

7   A.     I do.

8   Q.     Do you know whether RCT contacted Genzyme about a

9   potential license of this patent after the petition to

10  revive was granted?

11  A.     They did not.  Well, not until 2006.

12  Q.     When did Fabrazyme get FDA approval?

13  A.     I believe it was 2003.

14  Q.     So that was some time after the petition to revive was

15  granted?

16  A.     Yes, it was.

17  Q.     Did Mr. Kirkpatrick respond to your e-mail sending the

18  orphan e-mail to Jennifer Tegfeldt in your chronology?

19  A.     He did.

20  Q.     If you look under DTX-318 in your book, what is that?

21  A.     This was his response.  His response e-mail to me.

22  Q.     And what did he say in his response?

23  A.     He said:  Thanks very much for the e-mails forwarding

24  these documents.  We'll look into this and we'll circle back

25  with you shortly.

1    Q.    Did Mr. Kirkpatrick ever get back to you?

2    A.    He never did.

3    Q.    When did you next hear about the '831 patent?

4    A.    The next time I heard about the '831 patent was more

5    than three years later, after it had expired, when we were

6    sued by Shelbyzyme.

7              MR. HALEY:  I have no further questions.

8              THE COURT:  All right.  Mr. Lorig.

9                    CROSS-EXAMINATION

10   BY MR. LORIG:

11   Q.    Good morning.

12   A.    Good morning.

13             THE COURT:  Do you have anything you want

14   distributed?

15             MR. LORIG:  Actually, I do.  Thank you for the

16   reminder, Your Honor.

17             THE COURT:  Yes.

18   BY MR. LORIG:

19   Q.    When you were going over some of your documents with

20   Mr. Haley, you were quoting an e-mail from Mr. Warren

21   Woessner.  Do you recall that testimony?

22   A.    The 1999 Orphan Medical e-mail, yes.

23   Q.    And Mr. Woessner in that e-mail said if CCNY did not

24   pay the issue fee, the application went abandoned on

25   September 6th, 1999.  However, the application can be

Shafmaster - cross

1    revived by paying a fee, and additional continuing

2    applications could be filed to add new claims.

3              Do you recall that?

4    A.    I do.

5    Q.    Indeed, that's what happened.  Correct?

6    A.    Yes.

7    Q.    And during your direct testimony, you talked about the

8    lack of any lawsuits involving Genzyme.  Do you recall that

9    testimony?

10   A.    I do.

11   Q.    In fact, Genzyme was in a multi-year lawsuit against

12   its competitor TKT.  Isn't that right?

13   A.    Yes.  But Genzyme had not been sued for patent

14   infringement.

15   Q.    And that lawsuit went on for years.  Correct?

16   A.    A few years, yes.

17   Q.    And you talked about the Genzyme range of royalties

18   that you were aware of at Genzyme.  Correct?

19   A.    Yes, I talked about the royalties of the licenses I

20   was involved in negotiating.

21   ██      ███████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   A.    I would not characterize that as a royalty.  Genzyme

24   had acquired the entire business of three products from

25   Bayer.  We got the products, we got the sales force, we got

Shafmaster - cross

1    the manufacturing facility.  And we didn't pay anything for

2    it.  Instead, we paid out over time, giving them portions of

3    our revenue.  So it was called a royalty, but it was

4    actually a purchase of a business.

5    Q.    Could you put up PDX-244.

6          These were the financial terms of the Alcafleu

7    ███████████████████████████████████

8    A.    Yes.  That was how we were paying them back for the

9    █████████████████████████████████████████████████

10   million dollars in additional revenues over the next few

11   years.  We were sharing those with them in order to pay them

12   for the fact that we got those products from them.

13   Q.    It was worth it to Genzyme to pay this royalty because

14   you thought you were going to make enough money that you

15   could afford to pay --

16         THE COURT:  Mr. Lorig, you keep referring to it

17   as a royalty.

18         I see what it says there (indicating).

19         She has not accepted your characterization of

20   the payment as a royalty payment.  I would ask you to amend

21   your question.

22   BY MR. LORIG:

23   ██   ███████████████████████████████████████████

24   correct that Genzyme agreed to make these percentage

25   payments because it believed that after making those

Shafmaster - cross

1    payments it would still make money?

2    A.    Yes.

3    Q.    And it's a fact, isn't it, that Genzyme's

4    ███████████████████████████████████████████████

5    percent?  Isn't that correct?

6    A.    I actually have no personal knowledge of what our

7    profit numbers were on Fabrazyme.

8    Q.    Okay.  And, Ms. Shafmaster, during your testimony

9    concerning what you did in 2006, you didn't get to the step

10   of determining whether there was any infringement of the

11   Shelbyzyme RCT patent, did you?

12   A.    No, I didn't.  We never got past the point of

13   determining validity.  RCT went away and never came back.

14   Q.    Ms. Shafmaster, if you could answer my question.  You

15   did not in 2006 investigate infringement.  Is that correct?

16   A.    That's correct, yes.

17   Q.    And did Genzyme prior to this lawsuit obtain any

18   opinion from any outside counsel on the issue of validity of

19   the patent in suit?

20   A.    No.  We never got that far.

21            MR. LORIG:  Your Honor, I have no further

22   questions.

23            THE COURT:  Mr. Haley, any redirect?

24            MR. HALEY:  No, Your Honor.  Thank you.

25            THE COURT:  Thank you, Ms. Shafmaster.

 1                    (Witness excused.)

 2                    THE COURT:  Why don't we take our morning break.

 3                    (Jury leaves courtroom at 10:49 a.m.)

 4                    (Recess taken.)

 5                    THE COURT:  All right.  Ms. Walker.

 6                    (Jury enters courtroom at 11:10 a.m.)

 7                    THE COURT:  Ladies and gentlemen, please, take

 8    your seats.

 9                    Mr. Haley.

10                    MR. HALEY:  Your Honor, ladies and gentlemen,

11    welcome back from your coffee break.  I have exciting news.

12    We are going to play a video of Dr. Dayton Reardan from

13    Orphan Medical.  He was the head of project management

14    there.  It is seven minutes.

15                    "Question:  Can you state your full name for the

16    record, please?

17                    "Answer:  Does that include middle name?

18                    "Question:  Just first and last name is fine.

19                    "Answer:  Dayton Reardan.

20                    "During my tenure at Orphan, we registered 12

21    indications with FDA representing five new chemical

22    entities, and there was a 13th that I really count as we

23    did, but Merck took it back from us and followed our patent

24    to registration, so I kind of claim credit for that one in

25    the U.S. as well.  So so far I've been party to 13

Reardan - depo.

1    successful FDA registration programs.

2              "My expertise is in the area of assisting

3    products and companies through the FDA process.

4              "Question:  Let me ask that again.

5              "Did there come a time when you got involved

6    with the alpha-GAL A when while you were at Orphan Medical?

7              "Answer:  Yes.

8              "Question:  You said the selection team for new

9    incoming technology.  Can you just describe what you mean by

10   that?

11             "Answer:  We were a small firm of ten, 12

12   people, and Dr. Spilker had made a decision early on to have

13   a certain breadth of staff within the firm, or that we

14   contracted in.

15             "So we couldn't afford to hire an inside patent

16   counsel, so we contracted for an external patent counsel

17   that served as our general patent counsel, same as our

18   general counsel.

19             "We did hire a woman on the marketing and sales

20   side.  We had other people that were scientists, both Ph.D.

21   and otherwise, that had experience in the field, and we only

22   hired highly experienced individuals, one of them was a

23   Ph.D. in pharmacology, so if there was a

24   pharmacological-related issue, that person was brought in to

25   advise and assist our team.

1          "So it was an informal group led by Dr. Spilker.

2     I was on every project as my -- in my regulatory role, also

3     in my -- manufacturing, I was the head of -- had

4     responsibility for all the manufacturing and toxicology.

5          "So I was on every one of these selection teams

6     in one of those roles, and we went through over 2000

7     products, and we ended up selecting about 15, one of those

8     was alpha-galactosidase A, based upon that rubric I told you

9     earlier, which was greater than 80 percent likelihood of

10    registration through the FDA process.

11         "Question:  And what about your outside patent

12    counsel, do you remember who that was?

13         "Answer:  He was selected by Dr. Spilker, our

14    president.  His name was Dr. Warren Woessner.  He had just

15    left another patent firm here in town to start his own firm,

16    it's Schwegman, Lundberg, Woessner, & Kluth.  So I've dealt

17    with Warren since 1994.

18         "Question:  Do you understand that Professor

19    Calhoun's patented technology had to do with a baculovirus?

20         "Answer:  Yes.

21         "Question:  Was it your understanding that, for

22    clinical trials, the alpha-GAL A would be produced using the

23    insect cell culture using the baculovirus expression system?

24         "Answer:  Yes.

25         "Question:  Just so we're clear, this document

Reardan - depo.

1    is referring -- Defendant's Exhibit 226 is referring to the

2    alpha-GAL A produced in a baculovirus vector project code

3    GAL, Project No. 17.

4              "About the middle of the page, it says Plans,

5    cell culture plans, cell culture, and there are several

6    options to increase expression level.

7              "Answer:  Yes, I see that, sorry.

8              "Question:  And then it looks like it has four

9    bullet point there.

10             "Do you see that?

11             "Answer:  Yes.

12             "Question:  So the question is:  Do you recall

13   there being a time when Orphan Medical was trying to

14   increase the expression level of the alpha-GAL A enzyme?

15             "Answer:  Yes.

16             "Question:  And right above -- it was actually

17   right where we were before, I'm sorry, under Status, where

18   it says, current process yields milligrams per liter, it

19   goes on to say, Commercially viable process would need to

20   have an expression level of about 50 milligrams per liter.

21             "Do you see that?

22             "Answer:  Yes.

23             "Question:  And the commercially viable process

24   required 50 milligrams per liter.  Is that correct?

25             "Answer:  The document states that a

1    commercially viable process would need to achieve 50

2    milligrams per liter.

3              "Question:  Were you vice president of

4    regulatory affairs at Orphan Medical on or around August 14,

5    1996?

6              "Answer:  Yes.

7              "Question:  Would you agree that you had

8    extensive knowledge and experience with the FDA in

9    developing new pharmaceuticals?

10             "Answer:  Yes.

11             "Question:  Do you know the difference between

12   Dr. Desnick and Dr. Calhoun's methods of producing

13   alpha-GAL A?

14             "Answer:  I don't remember the specifics.  I

15   think Dr. Desnick was mammalian cell production and Dr.

16   Calhoun was insect cell.

17             "Question:  You've been handed what's been

18   marked as Defendant's Exhibit 262, which is SHELBY26368.

19             "Do you recognize this document?

20             "Answer:  It appears to be a letter from me to

21   John Creange of RCT dated January 28th, '98.

22             "Question:  Who is John Creange at RCT?

23             "Answer:  Must have been my contact at the -- at

24   RCT.

25             "Question:  The Re line says, 'Periodic

1      quarterly reports on the progress of the alpha-galactosidase

2      A development project.'

3                  "Is that your recollection, that you would

4      provide RCT periodic quarterly reports?

5                  "Answer:  Most licensors to Orphan Medical

6      required some kind of regulatory reporting and due diligence

7      clauses that we had to comply with, so this would be

8      consistent with the typical license that we entered into.

9                  "Question:  It indicates in the second

10     paragraph, 'The pace of this whole project has hinged upon

11     expression levels of the enzyme at a commercially viable

12     level.'

13                  "And it goes on to state, 'Our initial targets

14     were in the range of 20 milligrams per liter.  We have yet

15     to achieve such a level using the original clone under the

16     RCT patent by Dr. Calhoun, et al.'

17                  "Sitting here today, does that refresh your

18     recollection of the project as of January 28th, 1998?

19                  "Answer:  Yes.

20                  "Question:  This is an e-mail that you sent --

21     do you recognize the Document 269 -- Defendant's Exhibit

22     268?

23                  "Answer:  I don't have specific recollection,

24     but it appears to be an e-mail from me to Jennifer Tegfeldt

25     and Michael Raab of Genzyme.

Reardan - depo.

1                    "Who is Jennifer Tegfeldt?

2                    "Question:  The e-mail -- this is a document

3       that you would have -- this is sent on December 1, 1999.  Is

4       that correct?

5                    "Answer:  Yes.

6                    "Question:  And the subject line is 'Calhoun

7       Patents on Alpha-Galactosidase.'

8                    "Do you see that your e-mail to Ms. Tegfeldt

9       indicates that the application went abandoned on September

10      6, 1999?

11                   "In one paragraph, do you agree that it says,

12      'If CCNY did not pay it, the application went abandoned on

13      September 6th, 1999'?

14                   "Answer:  I'm just going to clarify, it looks

15      like Jennifer was one of the attendees at the meeting that I

16      held with Genzyme, so I'm going to make the assumption she's

17      a Genzyme employee.

18                   "And she asked a question -- it looks like I've

19      taken a quote here from our patent counsel to reply to this

20      question.

21                   "'The following is a statement from our patent

22      counsel.  I asked CUNY if they paid the fees, but apparently

23      they have not, so this is the correct status.'

24                   "So the document appears pretty descriptive.  I

25      don't have anything to add to this document.

1          "Question:  Do you agree that you told Jennifer

2     Tegfeldt and Michael Raab at Genzyme, the two in the cc

3     recipients, that, quote, 'There are no other pending

4     applications in this group'?

5          "Answer:  That's not what I said.  That's a

6     quote from my patent counsel.

7          "Question:  And the patent counsel was Warren

8     Woessner.  Is that correct?

9          "Answer:  Yes.

10         "Question:  But you agree that's in the e-mail

11    dated December 1, 1999 from you to Genzyme?

12         "Answer:  That appears to be what the document

13    says.

14         "Question:  Well, at the meeting you had with

15    Genzyme to discuss licensing the Calhoun patents, did

16    Genzyme accept any offer to license the Calhoun patents?

17         "Answer:  No, we didn't get to that level.

18         "Question:  What experience, if any, have you

19    had in licensing drugs after they have secured FDA approval?

20         "Answer:  I don't know what constitutes

21    'experience,' but on at least four products, examples I can

22    provide, we've licensed products after approval.

23         "Question:  Can you detail those four examples

24    for us, please?

25         "Answer:  I will use the first initial of the

Reardan - depo.

1    drug and the first initial of the company.

2              "The first drug begins with a B, and we

3    out-licensed that to a company -- to companies in Canada,

4    Europe, the Middle East, and Japan, to a company that starts

5    with P.

6              "Question:  And what royalty, if any, did you

7    charge for those patent licenses after you secured FDA

8    approval for the drug?

9              "Answer:  I don't remember the specific numbers,

10   but typically after a drug is approved the risks are

11   completely removed from the program because you have a

12   registered drug, and so there are no other risks other than,

13   basically, launch and marketing risk.

14             "And so if you take a hundred percent of revenue

15   on a product, cost of goods can run anywhere from five to 30

16   percent.  Our cost of goods were typically on the

17   five-percent end, and so that leaves a gross margin of 95

18   percent.

19             "50 percent is typically marketing and sales

20   expense, so somewhere between 40, 45 percent, is net profit.

21   And so we typically out-license those for 50 percent of net

22   profit.

23             "Question:  You, earlier in your testimony,

24   described a patent license for Drug B for Company P, and

25   this license was after securing FDA approval.

Reardan - depo.

1          "Were you able, using the formula you outlined,

2     to obtain a royalty in excess of 22 percent?

3          "Answer:  I don't remember the exact number, but

4     again, I think it was 50 percent of net profits.

5          "Question:  To go back to Exhibit 266, and if

6     Genzyme, after securing FDA approval for Fabrazyme, had

7     indicated an interest in licensing the Calhoun patents, what

8     formula, if any, would you have used to try to calculate

9     such a royalty?

10          "Answer:  Well, we always start at the high end.

11     It's like, you don't go and offer your house at the lowest

12     price.  You start at what you think is a reasonable price

13     that we had experience in garnering on other programs, 50

14     percent of net profits.

15          "Question:  So $25,000 a year was 19, close

16     enough to 20 milligrams, to make it commercially viable,

17     assuming that you were only charging patients $25,000?

18          "Answer:  Probably.

19          "Question:  This is a document that's been

20     marked Defendant's Exhibit 277, it's Bates labeled RCT 1422

21     through RCT 1424.

22          "Do you recognize this document?

23          "Answer:  It appears to be an e-mail from me to

24     Tim Reckart of RCT.  November 20, 2001.

25          "Question:  And David Calhoun was also --

Reardan - depo.

1                "Answer:  David Calhoun and Chris Martin and

2    John Bullion was copied.

3                "Question:  Who's John Bullion?

4                "Answer:  He's the CEO at Orphan Medical.

5                "Question:  You indicate here that you're

6    attaching the term sheets we proposed to an interested third

7    party.

8                "Do you know who the third party was?

9                "Answer:  It appears to be TKT because it's

10    related to the Miyamura patent.

11                "Question:  Now, this term sheet that you

12    included in your -- in this attachment to this e-mail you

13    sent on November 20th, of 2001 is a sale of Orphan Medical

14    ownership of GAL-related property; correct?

15                "Answer:  That's the title of the term on Bates

16    RCT 1423.

17                "Question:  Right.  And GAL is the alpha-GAL A

18    project --

19                "Answer:  Yes.

20                "Question:  -- we've been talking about?

21                "And it indicates what Orphan owns in the

22    background section.  Orphan licenses two Calhoun patents,

23    the Miyamura patents.

24                "The Court Reporter:  I'm sorry.  Orphan owns?

25                "Question:  Orphan licenses two Calhoun patents,

1    the Miyamura patents, a baculovirus bank, and a seed cell

2    bank they created with Dr. Brady, and Calhoun and Orphan

3    have confidentiality.

4           "You indicate in the note -- you reference a

5    Supreme Court reinstating the doctrine of equivalents.

6           "Do you see that?

7           "Answer:  Yes.

8           "Question:  What did you mean by that?

9           "Answer:  I'm not a patent counsel, and I'm

10   using terms here that I may have received from patent

11   counsel, and I don't remember what *Festo* is.

12          "Doctrine of equivalents, as I understand it, is

13   two things are essentially similar, even though they're not

14   defined exactly the same.  That's my understanding of

15   doctrine of equivalents.

16          "Question:  Okay.  But you would agree that

17   what you are offering for sale in the middle here is,

18   essentially, everything that Orphan owns in Section 1.  The

19   only thing Orphan is not offering for sale is its spending

20   and the fact that Calhoun, CUNY, RCT and Orphan are

21   partners.

22          "The Court Reporter:  I'm sorry.  The only thing

23   Orphan is not offering for sale is its spending.

24          "Question:  Its spending to date as well as its

25   partnership with Calhoun, CUNY, RCT and Orphan.  Correct?

1          "Answer:  That appears to be the case.

2          "Question:  What you were offering to TKT on

3   November 16th of 2001 was a royalty of 3.5 percent on net

4   sales if Calhoun is upheld, i.e., *Festo* is overturned; is

5   that correct?

6          "Answer:  That's what this document states.

7          "Question:  And then there's a 1.5 percent of

8   net sales, if not.

9          "Do you know what the 'if not' means?

10         "Answer:  I'm going to assume if *Festo* is not

11  overturned.

12         MR. HALEY:  Your Honor, that completes the

13  playing of the Dayton Reardan deposition.

14         Genzyme now calls Professor Donald Jarvis from

15  the University of Wyoming.

16         THE COURT:  Okay.

17         ... DONALD L. JARVIS, JR., having been first

18  duly sworn, was examined and testified as follows ...

19         MR. HALEY:  Ladies and gentlemen, with me today

20  is Ms. Mekhala Raghupathy.  She is an associate that will be

21  helping me with this examination.

22                    DIRECT EXAMINATION

23  BY MR. HALEY:

24  Q.   Good morning, Dr. Jarvis.

25  A.   Good morning.

1    Q.    Could you state your full name for the record?

2    A.    Donald L. Jarvis Jr.

3    Q.    Where do you live?

4    A.    In Laramie, Wyoming.

5    Q.    What do you do for a living in Laramie?

6    A.    I'm a professor in the Department of Molecular Biology

7    in the University of Wyoming.

8    Q.    What is the main focus of your research?

9    A.    We focus on the baculovirus insect cell system and its

10   development and use for recombinant protein in glycoprotein

11   production.  And we're specifically focused on analysis of

12   glycosylation pathways in the system.

13   Q.    What is a baculovirus?

14   A.    A baculovirus in nature is a virus that infects

15   insects, but in the laboratory it's a vector.  You have

16   heard about vectors.  And we're able to use baculoviruses to

17   introduce genes and coding proteins into insect cells and

18   get them to be expressed in insect cells.

19   Q.    How long have you been working in the baculovirus

20   insect cell expression system?

21   A.    25 years.

22   Q.    What is glycosylation?

23   A.    Glycosylation is a process as you have heard that

24   involves the addition of carbohydrate side chains to

25   proteins.

1    Q.    Would you briefly describe your educational background?

2    A.    Yes.  I earned bachelor's and master's degrees of

3    science in Microbiology from Idaho State University and

4    moved to Houston, Texas to the Baylor College of Medicine

5    where I earned my Ph.D. in virology in 1986.

6              I subsequently had post-doctoral studies in

7    Baylor and then moved to Texas A&M University for further

8    post-doctoral studies.

9    Q.    Turn to DTX-583 in your book.

10             What is that?

11   A.    It's my curriculum vitae.

12   Q.    Have we shown this on the screen?

13   A.    Yes.

14   Q.    Do you have any other academic appointments in

15   addition to your appointment at the University of Wyoming?

16   A.    Yes.  I hold an affiliate faculty appointment at

17   Colorado State University in the Department of Microbiology,

18   Immunology and Pathology.

19   Q.    When did you first join the faculty at the University

20   of Wyoming?

21   A.    I joined in January of 1998.

22   Q.    And before that, what did you do?

23   A.    I was an associate professor in the Department of

24   Entomology at Texas A&M.

25   Q.    What is entomology?

1    A.    Entomology is the study of insects.

2    Q.    When did you join Texas A&M?

3    A.    I joined Texas A&M in July of 1987.

4    Q.    Now, your CV on Page 6 or 7 indicates a number of

5    publications.  How many of those publications relate to

6    insects -- baculovirus insect cell expression?

7    A.    Approximately 80.

8    Q.    Do you have any patents or patent applications that

9    relate to baculovirus insect cell expression?

10   A.    Yes, I do.

11   Q.    How many?

12   A.    I have six issued patents and I believe five that are

13   pending.

14   Q.    Now, your CV indicates that you are a member of a

15   number of professional societies.  What is the glycobiology

16   society?

17   A.    The glycobiology society is a group of scientists who

18   are specifically interested in this process.  We talked

19   about a glycosylation.  We're interested in how it occurs,

20   how carbohydrates are assembled and added to other molecules

21   like proteins in different systems and maybe most

22   importantly the functions of those.  The carbohydrate side

23   chains as well.

24   Q.    Now, your CV also indicates you have won a number of

25   awards.  What is the University of Wyoming Presidential

1    Lecturer award as I see you won in 2012?

2    A.    Yes.  I was very honored to do win this award.  It's

3    an annual award given by the president of the university to

4    recognize a faculty member who has what they consider to be

5    a sustained record of accomplishment in the three areas of

6    research, teaching and service.

7    Q.    Do you teach any courses at the University of Wyoming?

8    A.    Yes, I do.

9    Q.    Which courses do you teach?

10   A.    I teach a number of grad seminar courses that cover a

11   wide variety of topic in molecular biology.  I taught

12   medical virology to first year medical students for

13   13 years.  And I also teach a protein biochemistry course

14   that focuses on, my part of it focuses on glycobiology.

15   Q.    Now, I see that you have won an award called the

16   University of Wyoming Cap & Gown Chapter Mortarboard "Top

17   Prof" Award.  What is that?

18   A.    This is another annual award given by the university

19   to a professor -- professors actually who are nominated by

20   students who they consider to be good teachers.

21   Q.    Are you involved in any commercial companies in

22   addition to your work at the University of Wyoming?

23   A.    Yes, I am.  Last year I actually started up a company

24   and the company is called Glycoback LLC (phonetic).

25   Q.    What does Glycoback do?

1    A.    The hope for this company, it's very young, is that

2    will be able to translate the research progress we made in

3    the academic lab to the private sector.

4    Q.    Have you been retained by Genzyme as an expert in this

5    case?

6    A.    Yes, I have.

7    Q.    What is your hourly rate?

8    A.    $300 per hour.

9         MR. HALEY:  Your Honor, Genzyme offers

10   Dr. Jarvis as an expert in glycosylation of recombinant

11   protein of the baculovirus insect cell expression system.

12        THE COURT:  Any objection?

13        MR. PAUNOVICH:  No objection.

14        THE COURT:  The doctor is accepted.

15   BY MR. HALEY:

16   Q.    What do you understand the purpose of your testimony

17   to be today, Dr. Jarvis?

18   A.    I understand that I am to explain what insect cell

19   lines can and cannot do with respect to glycosylation.

20   Q.    Were you asked to focus in any particular comparison

21   between insect cell lines and other cell lines?

22   A.    Yes.  I was asked to focus on the relative ability of

23   insect cell lines and mammalian cell lines to sialylate

24   glycoproteins and also to add man-6-phosphate to

25   glycoproteins.

1    Q.    Do you have an opinion as to whether insect cell lines

2    can glycosylate proteins like mammalian cell lines can?

3    A.    Yes, I do.

4    Q.    What is your opinion?

5    A.    My opinion is that insect cells can glycosylate

6    proteins like mammalian cells do but they are not able to

7    add sialic acids to glycoproteins, nor are they able to add

8    man-6-phosphate to glycoproteins.

9    Q.    What do you mean when you say they are unable to add

10   sialic acids?

11   A.    What I really mean is they lack the machinery to do

12   so.

13   Q.    When did you first become interested in the

14   baculovirus insect cells as it's used to produce recombinant

15   proteins?

16   A.    In late 1986, I first heard Professor Summers who

17   invented this system give a lecture on this system, and I

18   had read about it and I thought it was very interesting.

19   My graduate studies had focused on protein glycosylation,

20   and I was interested in this as a new system.  That it

21   seemed to me it needed to be studied with respect to the

22   kinds of protein glycosylation it could provide because

23   there was a lot of opportunity I thought to develop that

24   area in this system.

25   Q.    What did you first do to push your research into this

Jarvis - direct

1    area?

2    A.    So when I joined the Summers grad -- sorry.  When I

3    joined the Summers lab in 1987, I expressed a human

4    glycoprotein called tissue issue plasma activator, which is

5    a coagulation factor.

6    Q.    What was the focus of your research in the lab in

7    addition to expressing that protein?

8    A.    The focus was to understand how that protein was

9    glycosylated and to also explore the further processing of

10   that protein, the secretion, the way it moved out of the

11   cell, and also the impact of this ongoing baculovirus

12   infection on those processes.

13   Q.    Had you worked with the baculovirus insect cell

14   expression before this time in the Summers lab in 1987?

15   A.    No, I had not.

16   Q.    How long did it take you to produce, as you said,

17   tissue plasminogen activator in this system?

18   A.    Approximately six weeks.

19   Q.    How did you go about conducting this project?

20   A.    When I came to the lab I was given an office,

21   actually, my own small lab, to share with another post-doc.

22         And at that time Professor Summers and his

23   colleague Gail Smith had prepared a manual, we called it

24   "the cookbook," and you were given this when you came to the

25   lab.  And this cookbook included protocols for insect cell

1    culture, how to make a recombinant baculovirus and how to

2    express proteins in the baculovirus insect cell system.

3    Q.    If you turn to your binder DTX-295, what is that?

4    A.    This is the cookbook, the baculovirus insect cell

5    expression manual.

6    Q.    Is this the manual you used, or at least a related

7    manual that you used to produce tissue plasminogen activator

8    in 1987?

9    A.    Yes.

10   Q.    If you will turn in your book to PTX-1, which is the

11   patent in suit?

12   A.    Yes, I am there.

13   Q.    If you look at Column 5, beginning at Line 37?

14   A.    Yes.

15   Q.    You see a citation to Summers, et al. 1987, A Manual

16   of Methods For Baculovirus Vectors and Insect Cell Culture

17   Procedure, Texas Agricultural Experiment Station, Bulletin

18   No. 1555.

19          Do you see that?

20   A.    I do.

21   Q.    Is that the cookbook that you used as well?

22   A.    Yes, it is.

23   Q.    And you follow along, in this paragraph, it says, "In

24   addition, this publication provides protocols for all of the

25   described manipulations and accordingly is incorporated

1    herein by reference."

2            Do you see that?

3    A.    Yes.

4    Q.    Did you understand from reading the '831 patent that

5    Dr. Calhoun was telling the world that he had used the same

6    cookbook two years after you had used it?

7    A.    Yes.

8    Q.    Now, were you in court when Dr. Calhoun testified

9    about a protein called erythropoietin?

10   A.    I was.

11   Q.    I think you recall that he said it had first been

12   expressed in CHO cells in 1983.  Do you recall that?

13   A.    I do.

14   Q.    Do you know when the first recombinant protein was

15   expressed in the baculovirus insect cell system?

16   A.    Yes, I do.  The first protein to be expressed was

17   reported in the literature in 1983.

18   Q.    By 1987 do you know how many proteins had been

19   produced in a baculovirus expression system?

20   A.    Yes.

21   Q.    About how many?

22   A.    Twenty-five.

23   Q.    I want to ask you a few questions about proteins and

24   glycosylation.  Have you prepared a demonstrative?

25   A.    Yes, I have.

1    Q.    So first of all, will you explain to the jury what the

2    protein is?

3    A.    Okay.  So as you have heard --

4    Q.    You can use your pointer, if you want.

5    A.    Thank you.

6              As you heard, a protein is a molecule that

7    consists of building blocks called amino acids.  I don't

8    know if you have heard that term.  But the blue balls

9    indicate amino acids.  You can see, they are strung together

10   like beads on a string.  And that constitutes the backbone

11   of the protein, and that linear array of amino acids can

12   then fold into three-dimensional structures.

13             This is what gives proteins their functions.

14   Different structures give rise to different functions.

15   Q.    Can you give the jury some examples of common

16   proteins?

17   A.    Sure.  Insulin we have heard mentioned.  Alpha-GAL we

18   have certainly heard mentioned.  Antibodies.

19             There is lots of different proteins.

20   Q.    What determines the amino acids that are along the

21   protein chain, that is the blue balls that are connected by

22   the strings?

23   A.    Right.  This sequence of amino acids is determined by

24   the sequence of the gene.

25   Q.    What is the glycoprotein?

1  A.   Glycoprotein is the same as a protein, but also has

2  these side chains, which are highlighted in red, and these

3  are carbohydrates.  And they are also composed of building

4  blocks, like the protein is.  But in this case the building

5  blocks are sugars, and different carbohydrate side chains

6  can have different kinds of sugars in them.

7  Q.   Is alpha-GAL, as we heard in this case, a

8  glycoprotein?

9  A.   Yes, it certainly is.

10  Q.   Now I want to talk a little bit about glycosylation,

11  that is the glycan that you show down there, the

12  glycosylated proteins.

13         Are there multiple types of sugars that make up

14  the carbohydrate side chains?

15  A.   Yes, there are.

16  Q.   Have you prepared a demonstrative to show that?

17  A.   Yes, I have.

18  Q.   Can you explain to the jury what you are showing on

19  this demonstrative in terms of the type of sugars that make

20  up the carbohydrate side chains?

21  A.   Yes.  This illustrates in general terms the three

22  major types of carbohydrate side chains that we find on

23  proteins.  They are called high mannose, complex, and hybrid

24  structures.

25  Q.   How are these structures different?

1    A.     Let's start with how they are the same.   I think

2    that's important.   That is illustrated here.   There is a

3    core structure that consists of five sugars.

4              We show sugars in circles and colors, because

5    it's easier than saying the names.

6              For example, the green circles are mannose,

7    which is one kind of sugar.   All of these structures have

8    this same core, three mannose and two blue boxes.

9              The high mannose types have on their branches

10   off of the core more mannose residues, so more green

11   circles.   Hence, the name high mannose.

12             The complex structures, on the other hand,

13   rather than having branches consisting of mannose, have

14   branches that consist of other types of sugars indicated by

15   the blue boxes and the yellow circles and the purple

16   diamonds.

17             In the hybrid structure, as the name implies,

18   that consists of a structure in which one branch has a

19   mannose and the other branch has something other than

20   mannose.

21   Q.     Now, while we are on this slide, what is the

22   difference between insect cell lines and mammalian cell

23   lines in terms of the type of carbohydrates they produce?

24   A.     Well, simply put, both cell types can produce high

25   mannose, and to some extent hybrid type structures.   But

1    generally speaking, insect cells cannot produce complex type

2    structures.  And very specifically speaking, insect cells do

3    not produce the kinds of complex structures with these

4    diamonds.

5    Q.    Could you turn back to the patent in suit, that's

6    PTX-1.

7    A.    Yes.

8    Q.    Particularly, if you can go to Column 12 of the

9    patent?

10    A.    Yes, I am there.

11    Q.    You see where it begins, Example 4, Purification of

12    Recombinant Alpha-GAL and Carbohydrate Characterization?

13    A.    Yes.

14    Q.    What is your understanding of what Example 4 of the

15    patent attempts to describe?

16    A.    Well, this was actually an analysis of the alpha-GAL

17    that was produced in the baculovirus insect cell system to

18    characterize the nature of its carbohydrate side chains.

19    Q.    If you go to Column 13, the last sentence of the

20    example, what was Dr. Calhoun's conclusion from these

21    studies of his analysis of the carbohydrates of the

22    alpha-GAL that he had produced in the baculovirus expression

23    system?

24    A.    Well, he concluded that the alpha-GAL A produced in

25    the insect cell system had complex type carbohydrates.

Jarvis - direct

1    Q.    And that was the middle picture you were showing

2    before in your earlier slide?

3    A.    That's correct.

4    Q.    Do you agree with Dr. Calhoun's conclusion?

5    A.    No, I do not.

6    Q.    Why not?

7    A.    Because the test that was performed simply cannot

8    support that conclusion.

9    Q.    What basis do you have for making that opinion?

10   A.    Well, we use this test in my laboratory routinely.

11   It's appeared in a number of our publications.  That test

12   simply cannot support this conclusion.

13   Q.    In your 25 years of work with the production of

14   glycoproteins, with insect cells that are typically used to

15   produce recombinant proteins, have you ever seen any

16   evidence of complex glycoprotein production?

17   A.    No, I have not.

18   Q.    Now let's go back to your description of

19   carbohydrates.  I want to particularly focus on the middle

20   portion, the complex portion?

21   A.    Okay.

22   Q.    We have a demonstrative showing that alone.

23         First of all, what are the purple diamonds?

24   A.    Those are sialic acids.

25   Q.    Do insect cells produce proteins with sialic acid?

Jarvis - direct

1    A.    No, they do not.

2    Q.    Let's put up the next demonstrative.  What are you

3    showing in this demonstrative?

4    A.    This indicates a carbohydrate side chain containing

5    mannose-6-phosphate.

6    Q.    And mannose-6-phosphate is being attached to I guess

7    one of the green circles which you said was mannose?

8    A.    Yes, here.

9    Q.    How does it get attached?

10   A.    Well, there is a complex measure available in some

11   cell types, such as mammalian cell types, that attaches the

12   phosphate to a specific carbon on this particular mannose.

13   Q.    Do insect cell lines that are used in the recombinant

14   production of proteins have the machinery to add M-6-P to

15   their proteins?

16   A.    No, they do not.

17   Q.    Before we turn to the glycosylation of mammalian cells

18   and insect cells, I would like to at least show the jury

19   what we are talking about and where these cells come from.

20            If you could put up the next demonstrative.

21            Could you explain what this is?

22   A.    Yes, I can.  So this is a caterpillar.  This is the

23   fall Army worm.  This is the source, the original source of

24   this insect cell line, of one of the insect cell lines that

25   we routinely use in the laboratory.

1          They were isolated in 1977.  And they were

2   growing in laboratories around the world ever since.  This

3   is an insect, of course.  This is the adult form.  This

4   undergoes metamorphosis to become a moth.  That is quite

5   distinct from the cell lines which were originally derived

6   from this insect in 1977.

7   Q.   What are you showing on the right-hand side of this

8   slide?

9   A.   This is a Chinese hamster.

10  Q.   And how is that related to the CHO cells that you have

11  heard about in this case?

12  A.   This was the original source of the CHO or CHO cell

13  line.

14  Q.   Now I would like to talk to you a little bit about

15  mammalian cell lines that are used to produce recombinant

16  proteins.  Are you familiar with those cell lines and the

17  glycosylation they produce?

18  A.   Yes, I am.

19  Q.   Are they able to glycosylate proteins, that is, add

20  carbohydrates and sugars to the proteins they produce?

21  A.   Absolutely, yes.

22  Q.   Are you familiar with the type of glycosylation that

23  mammalian cells add?

24  A.   Yes, I have.

25  Q.   Have you prepared a demonstrative?

1    A.    Yes, I have.

2    Q.    Could you explain to the jury what you are showing on

3    this demonstrative in terms of the type of glycosylation

4    that mammalian cell lines add to recombinant proteins?

5    A.    Yes, I can.

6              This is way more complex than it needs to be.

7              This actually shows the machinery.  So this is

8    the assembly line in a mammalian cell for the production of

9    these carbohydrate side chains.  And they are built up in

10   various ways.  The most important points that this slide

11   illustrates is that these cells are able to produce

12   carbohydrate side chains that are linked to proteins that

13   have the purple diamonds, which depict sialic acids.  We

14   know this.

15             This also shows that this pathway can produce

16   mannose-6-phosphorylated carbohydrate side chains linked to

17   proteins as well.

18   Q.    So can mammalian cell lines that are used to produce

19   recombinant proteins produce carbohydrates with sialic acids

20   on them?

21   A.    Yes.

22   Q.    Where are you showing that in DDX-109?

23   A.    It's the big red box.

24   Q.    And what about M-6-P, the mammalian cells used to make

25   recombinant proteins, can they be used to make M-6-P?

1    A.    Yes.

2    Q.    Where are you showing that on this slide?

3    A.    It's the purple X.

4    Q.    Now let's turn to insect cell glycosylation, which is

5    the subject of this case.

6          What insect cells are typically used for

7    producing recombinant proteins using the baculovirus

8    expression system?

9    A.    They include cell lines called Sf9, Sf21, and hifi

10   (phonetic).

11   Q.    And Sf9 cells are the ones Dr. Calhoun used.  Correct?

12   A.    That's correct.

13   Q.    And do these insect cell lines produce proteins with

14   sugar groups on them, that is, are they glycosylated?

15   A.    Yes, they do.

16   Q.    What are you trying to show the jury on this slide

17   about insect cell glycosylation?

18   A.    Well, again, more complicated than it needs to be.  It

19   shows our assembly line in the insect cells.  And this

20   assembly line leads to the production of this type of

21   carbohydrate cell chain.

22         Actually, if I can use an analogy, so you have

23   seen the complexity of the mammalian pathway, I liken that

24   to an airplane factory.  This is relatively less complex,

25   and I liken that to a bicycle factory.

1        So you don't need to have as complex of an

2   assembly line to make a bicycle as you do to make an

3   airplane.

4        But, of course, the end products are quite

5   different, too, so the airplane can fly and the bicycle

6   cannot.

7        So I liken this pathway, which is more simple,

8   to the bicycle factory and the mammalian pathway, which is

9   more complex, to the airplane factory, if you will.

10  Q.    How do you know that insect cells don't have the

11  correct machinery to glycosylate proteins as mammalian cell

12  lines do?

13  A.    Well, I have been studying this pathway for 25 years,

14  and we have produced many glycoproteins in this system and

15  we have looked for sialic acid, sialylated glycoproteins,

16  and we have never found them.

17  Q.    Other than your actual work, do you have any other

18  bases for your opinion that insect cell lines do not add

19  sialic acid to the recombinant proteins they produce?

20  A.    I do.

21  Q.    What is that?

22  A.    The scientific literature.  Since this is my field, we

23  have to keep up on everything that's being done around the

24  world in this area.

25  Q.    If you would look in your book under DTX-293?

1    A.    Yes, I am there.

2    Q.    What is that?

3    A.    This is a review article that I coauthored in 2001.

4    Q.    What was the point of this article?

5    A.    This was an article in which we critically reviewed

6    all of the literature that had been published on protein

7    glycosylation in insects, and also in insect cell line

8    systems.

9    Q.    Now, if you would go down in, I guess, the abstract,

10   just before the introduction on the left-hand column, the

11   sentence beginning, "While most," a little higher.  The

12   article says, "While most work indicates that insect

13   cell-derived glycoproteins are not sialylated, some

14   well-controlled studies suggest that sialylation can occur.

15   In evaluating this work, it is important to recognize that

16   oligosaccharide" -- I take it those are sugar?

17   A.    That's correct.

18   Q.    "-- structural determination is tedious work due to

19   the infinite diversity of this class of compounds."

20         What were you trying to tell your scientific

21   colleagues in that sentence?

22   A.    Well, as a critical review, we felt that it was very

23   important to evaluate not only the conclusions that various

24   scientists had drawn in the papers they had published, but

25   also to look hard at the methods they had used, the actual

1    data, and to see if we agreed with those conclusions, and to

2    point out that there are some techniques that allow you to

3    draw very clear conclusions, and there are other techniques

4    that do not.

5    Q.    Did you reach any conclusions from your review of the

6    literature and your own work in this article?

7    A.    Yes, we did.

8    Q.    If you look in the next column over, go down towards

9    the final analysis, about four lines from the bottom of the

10   paragraph.  What was your conclusion?

11   A.    Well, I could read it.

12   Q.    I would rather you say what your conclusion was.

13   A.    I would rather do that.

14             Our overall conclusion was that, there were

15   actually studies out there that most people in biotech, in

16   recombinant DNA don't look at, these are people,

17   etymologists studying insects.  And some of those studies

18   provided relatively convincing evidence to suggest that

19   insects, the ones that fly around and crawl around, had a

20   somewhat limited capacity but nevertheless a capacity for

21   sialylation.

22             In most of the studies, actually, in all of the

23   studies, this capacity was found to be highly restricted to

24   certain types of tissues.

25             So things like the central nervous system, the

 1    brain, the kidney equivalent in insects, appeared to contain

 2    sialic acids, which doesn't necessarily mean they were

 3    sialylated glycoproteins or in some cases sialylated

 4    glycoproteins.

 5              On the other hand, when people looked at insect

 6    cell lines, these lines that we took out of caterpillars in

 7    1977 and at other times, and used in the laboratory, there

 8    was no convincing evidence to indicate that those cells

 9    could sialylate their glycoproteins.

10    Q.    Did you prepare a demonstrative to show that?

11    A.    Yes, I have.

12    Q.    What are you trying to show the jury in this

13    demonstrative?

14    A.    I am really trying to distinguish between an intact

15    living organism and an insect cell line and to make the

16    point that there is evidence to suggest that intact insects

17    have this limited capacity for sialylation.  But it's very

18    specific and specialized.  We think that's biologically

19    interesting, but that's another topic.  I won't bore you

20    with that.

21              On the other hand, insect cell lines that we use

22    to manufacture recombinant glycoproteins like alpha-GAL do

23    not have this capacity.

24    Q.    If we can put up DDX-109.  What are you trying to show

25    on the right-hand side of this slide in terms of whether or

1    not insect cells can make sialic acid on their

2    glycoproteins?

3    A.    So I am trying to show that alpha-GAL A made in the

4    Sf9 or other insect cell lines with the baculovirus vector

5    would lack both mannose-6-phospate and sialic acid.

6    Q.    Do you know any exceptions to the rule that insect

7    cell lines used to produce recombinant proteins cannot add

8    sialic acid?

9    A.    I know of a reported exception.

10   Q.    And what is that?

11   A.    There is a paper from Dr. Castellino's group at Notre

12   Dame University that was published in 1990 which they claim

13   to have produced another recombinant protein, something

14   called plasminogen.  And they had direct data to suggest

15   that this protein had undergone sialylation.

16   Q.    What impact, if any, has the fact that insect cell

17   lines typically used to produce recombinant proteins but

18   don't sialylate them had on your research and your career?

19   A.    Well, I would like to drop back just for a moment and

20   tell you that this part of that impact comes from this

21   Davidson paper.  That was actually a very controversial

22   paper.  The results have not been reproduced and the results

23   were completely at odds with everything else that was

24   available in the literature.  And so that actually prompted

25   us to begin to want to explore this further and also to

1    address it as a problem.

2              So we saw that the vast majority indicated you

3    can't make glycoproteins with sialic acids or man-6-P in our

4    system so we needed to improve the system.  So for about

5    the last 15 years, my lab has been focused on trying to

6    convert the bicycle factory to an airline factory.  We've

7    been trying to get insect cells to be able to produce

8    recombinant proteins specifically with sialic acids.  That

9    has been the focus of our work.

10   Q.    Now, Dr. Jarvis, are you aware of any scientific

11   report concerning the presence or lack of sialic acid on

12   alpha-GAL produced in insect cells?

13   A.    Yes, I am.

14   Q.    If you look in DTX-51 in your binder?

15   A.    Okay.

16   Q.    What is that?

17   A.    This is a paper published in 1994 by Drs. Coppola and

18   Calhoun, and their collaborators.

19   Q.    And if you go to Page 200 of the article.

20   A.    Yes.

21   Q.    Do you see Section D in the right-hand column -- I'm

22   sorry -- the left-hand column?

23   A.    Yes, I do.

24   Q.    And in reading that, can you tell the jury what

25   Dr. Calhoun and Dr. Coppola told the scientific community

Jarvis - direct

1    about whether or not the protein they made, the alpha-GAL A

2    protein they made in the baculovirus insect cell system had

3    sialic acid.

4    A.    Yes.  They said they were unable to detect any sialic

5    acid.

6              MR. HALEY:  Highlight where it says not

7    detected.

8              Is that the portion you are referring to?

9    A.    That's correct.

10   Q.    In your view, are these findings of Dr. Calhoun and

11   Dr. Coppola that their protein lacked sialic acid consistent

12   with your work?

13   A.    Absolutely, yes.

14   Q.    Now I would like to ask you about M-6-P in insect cell

15   lines.  Do insect cell lines used to produce recombinant

16   glycoproteins add M-6-P?

17   A.    No, they do not.

18   Q.    Again, why not?

19   A.    Because they lack the machinery that is necessary to

20   add that.

21   Q.    What is the basis of your opinion?

22   A.    In this case, the basis of my opinion is the

23   scientific literature.

24   Q.    And if you look in your book under DTX-272.

25              What is that?

1    A.     This is one of the key papers that addressed this

2    issue.

3    Q.     And if you look in the abstract, about halfway down,

4    in the sentence beginning "none of?"

5    A.     Yes.

6    Q.     What does that tell you about conclusions that these

7    authors have made concerning the ability of insect cell

8    lines to add M-6-P?

9    A.     Well, simply put, it says that they can't do it.

10   Q.     Now, if you could look under DTX-287 in your book.

11   A.     Okay.

12   Q.     What is that?

13   A.     This is another one of the key papers that address

14   this issue in the literature.

15   Q.     And when was this paper dated?

16   A.     This is a paper from 1990.

17   Q.     And where are the authors located?

18   A.     The National Institutes of Health in Bethesda.

19   Q.     If you look again at the abstract, about three

20   quarters of the way down.

21   A.     Yes.  I'm sorry.  I'm there.

22   Q.     What was the conclusion of these authors to the

23   scientific community?

24   A.     These structures lack the Mannose-6-P recognition

25   marker that targets degradative hydrolysis to lysosome.  So

1    this protein did not have Man-6-P either.

2    Q.    Is that the section you just read to the jury?

3    A.    Yes.

4    Q.    Did you rely on the Aight article (phonetic), which is

5    DTX-272, and the Booz article (phonetic) which is DTX-287 in

6    formulating your opinion in this case?

7    A.    Yes, I did.

8    Q.    Now, do you agree with the Booz report that insect

9    cell lines do not produce glycoproteins that contain M-6-P?

10   A.    Yes, I agree with that.

11   Q.    Just to return -- if we can put up DDX-109.

12              Just to return to the fundamental purpose that

13   you said you were here for.  And that is, can insect cell

14   lines do what mammalian cell lines do, what is your

15   conclusion?

16   A.    Well, my conclusion is that insect cells cannot do

17   what mammalian cells, insect cell lines cannot do what

18   mammalian cell lines can do.

19   Q.    And, specifically, what cannot insect cells do?

20   A.    So, insect cells cannot add sialic acids to

21   glycoproteins.  Nor can they add man-6-phosphates to

22   glycoprotein.

23              MR. HALEY:  Thank you, Dr. Jarvis.  We have no

24   further questions.

25              THE COURT:  Thank you.  Mr. Paunovich, you may

1    cross.

2              THE COURT:  Do you have water there, doctor?

3              THE WITNESS:  I do.  Thank you.

4              MR. PAUNOVICH:  May I approach, Your Honor?

5              THE COURT:  Yes.

6              (Binders passed forward.)

7                      CROSS-EXAMINATION

8    BY MR. PAUNOVICH:

9    Q.    Good afternoon -- or good morning, Dr. Jarvis.

10   A.    Good morning.

11             MR. PAUNOVICH:  Can we call up PTX-1, Page 13?

12   And blow up Column 14, Lines 24 through 31.

13   BY MR. PAUNOVICH:

14   Q.    Dr. Jarvis, this is claim 1 of the '831 patent.

15   Correct?

16   A.    Yes, it is.

17   Q.    And nowhere in that claim does it mention baculovirus.

18   Correct?

19   A.    Yes, that's correct.

20   Q.    And nowhere in the claim does I mention insect cells.

21   Correct?

22   A.    Yes, that's correct.

23             MR. PAUNOVICH:  Your Honor, may I display your

24   claim construction order?

25             THE COURT:  That's part of the record.

1          MR. PAUNOVICH:  Thank you.

2          Can we now call up PTX-682?

3     BY MR. PAUNOVICH:

4     Q.    Dr. Jarvis, are you aware of the Court's claim

5     construction order in this case?

6     A.    Yes, I am.

7          MR. PAUNOVICH:  Can we please blow up paragraph

8     1 of the Court's claim construction order, construing the

9     term "glycosylated?"

10    BY MR. PAUNOVICH:

11    Q.    You agree with me, Dr. Jarvis, that the Court's

12    construction of the term "glycosylated" does not specify

13    that it is insect glycosylation; correct?

14    A.    That's based upon what you're highlighting here?

15    Q.    That's correct.

16    A.    Yes, I agree with that.

17    Q.    It can be any glycol forms of galactosidase A.

18    Correct?

19    A.    Yes.  It says it's construed to mean glycol forms of

20    alpha-GAL A.

21    Q.    All right.  If we can call up paragraph 2 of the claim

22    construction order.

23          And you see here, Dr. Jarvis, the Court is

24    construing the term "recombinant alpha-galactosidase A" is

25    construed to mean "genetically engineered

1    alpha-galactosidase A?"

2    A.    Yes, I do.

3    Q.    And you agree with that genetically engineered

4    alpha-galactosidase A doesn't mean that it is insect cell

5    genetically engineered alpha-galactosidase A; correct?

6    A.    Based on this Item No. 2?

7    Q.    Yes.

8    A.    Yes, that's correct.

9             MR. PAUNOVICH:  All right.  Can we call up

10   Paragraph 4 of the claim construction order which is on Page

11   1 and 2?  Blow up and highlight, please?  Thank you.

12   BY MR. PAUNOVICH:

13   Q.    And, Dr. Jarvis, is this the Court's construction of

14   the term "therapeutically effective amount" in the claims of

15   the '831 patent?

16   A.    Yes, it certainly seems to be.

17   Q.    And you agree with me that the Court's construction

18   does not specify insect cells in any way.  Correct?

19   A.    Yes, I agree.

20   Q.    It also does not specify baculovirus.  Correct?

21   A.    Yes, I agree.

22            MR. PAUNOVICH:  No further questions.

23            THE COURT:  Nothing further?

24            All right.  Doctor, thank you.

25            (Witness excused.)

1          MS. LORING:  Your Honor, plaintiffs call

2     Dr. Gregory Grabowski.

3          ... GREGORY A. GRABOWSKI, having been first duly

4     sworn, was examined and testified as follows ...

5               (Binders passed forward.)

6          THE COURT:  Go right ahead, Ms. Loring.

7                    DIRECT EXAMINATION

8     BY MS. LORING:

9     Q.    Good afternoon.  What is your name?

10    A.    Good afternoon.  My name is Gregory Grabowski.

11         THE COURT:  Doctor, pull it a little closer?

12         THE WITNESS:  A little closer?

13         THE COURT:  Yes.  Thank you.

14    BY MS. LORING:

15    Q.    What do you do for a living?

16    A.    I'm a physician and I'm a professor at the University

17    of Cincinnati.

18    Q.    What are your areas of expertise?

19    A.    I have several.  I have expertise in the clinical and

20    base research in lysosomal storage diseases.  I evaluate

21    patients, I conduct clinical studies, and I do very

22    fundamental research.

23    Q.    And you said you evaluate patients.  Do you treat

24    patients with lysosomal storage disorders?

25    A.    I certainly do.

Grabowski - direct

1    Q.      How many lysosomal storage disorder patients have you

2    treated over the course of your medical career?

3    A.      Well, in Fabry disease, somewhere between 300 and 500.

4    With Gaucher disease, somewhere above 1,000.  And several

5    hundred with different mucopolysaccharidase and glycogen

6    source called Pompeii disease.

7    Q.      And those are also lysosomal storage diseases?

8    A.      Those are all lysosomal storage diseases.

9    Q.      Are you certified or licensed by any medical boards?

10   A.      I'm licensed as a medical doctor in the state        of

11   Ohio.  And I'm certified by the American Board of Pediatrics

12   and the American Board of Medical Genetics with

13   subspecialties in clinical genetics as well as biochemical

14   genetics.

15   Q.      Has your research resulted in any publications?

16   A.      Yes, it has.

17   Q.      Approximately, how many publications have you authored

18   or coauthored?

19   A.      Approximately 275.

20   Q.      Please describe your educational background since high

21   school for the jury.

22   A.      Since leaving high school, I was the first person in

23   my family to go to college.  And I went to the University of

24   Minnesota where I majored in mathematics and chemistry.

25              I applied to, and was accepted into, the Medical

1    School at the University of Minnesota where I did my

2    training.  I did regular work in medical school and about

3    the second year of my medical school, I started to do

4    research on liver disease.

5                 I finished my training at the University of

6    Minnesota Medical School and took my residency in Pediatrics

7    at the same institution, followed by a fellowship, more

8    advanced training, in human genetics.

9    Q.    Do you serve as a consultant for pharmaceutical

10   companies?

11   A.    I do.

12   Q.    Which companies do you consult with?

13   A.    I consult with Genzyme, Shire, Human Genetic

14   Therapies, Amicus Therapeutics, and Pfizer.

15   Q.    What is the general field in which you consult with

16   these companies?

17   A.    The general field is lysosomal storage disease.

18   Q.    How do you view your role as a consultant with these

19   companies?

20   A.    Mostly what I do with these companies is I deal first

21   and foremost with how patients are treated, how do we get

22   drug to people, how do we deliver care to those people.

23                 Secondly, I evaluate and give them my opinions

24   on newer types of therapies that they're developing and give

25   them an idea what I think might happen with them and how

1  important they are.  And,

2            Thirdly, since these are rare diseases, we have

3  to get out the word about where they are, how you diagnose

4  them.  So I help with the development of some therapeutic --

5  I'm sorry -- some educational pamphlets.  And,

6            Lastly, I do philanthropic work particularly

7  with the Genzyme Corporation.

8  Q.    You mentioned you do some consulting work for Genzyme.

9  How long have you been a regular consultant for Genzyme?

10  A.    I've been a regular consultant since 2000.

11  Q.    What sort of consulting have you performed for

12  Genzyme?

13  A.    Just as I described above, with all the areas that I

14  just described.

15  Q.    Are you compensated for your consulting work with

16  Genzyme?

17  A.    I am.

18  Q.    And how much is your compensation generally?

19  A.    Currently, about $242 an hour.

20  Q.    What is the total amount of dollars that you have

21  received from Genzyme since you began consulting 12 years

22  ago in 2000?

23  A.    About $850,000.

24  Q.    Are you a member of any professional societies?

25  A.    I am.

1    Q.    Which ones?

2    A.    The American Association of Physicians.  For Example

3    3, American Association of Physicians.  The American Society

4    of Clinical Investigation; and the American College of

5    Medical Genetics, for which I am the treasurer.

6    Q.    And have you received any professional awards?

7    A.    I have.  There are several.  The Meade Johnson Award,

8    which is a national award for research in pediatrics.

9              The one I'm particularly proud of is the

10   Research Award For Excellence in Research in Gaucher Disease

11   from the National Gaucher Foundation, which is a patient

12   organization.

13             And then the Jacobs Ladder Award for my research

14   in neurodegenerative diseases.

15   Q.    Dr. Grabowski, please turn to DTX-584 in your exhibit

16   book.

17   A.    I'm not sure I have that.

18             I don't have a booklet.

19             THE COURT:  Here, take this one, Doctor.

20             THE WITNESS:  Thank you, sir.

21             MS. LORING:  May we approach, Your Honor?

22             THE COURT:  Just give it to him.

23             THE WITNESS:  What tab was that?

24   BY MS. LORING:

25   Q.    DTX-584.

1    A.    Yes, I see that.

2    Q.    What is that?

3    A.    That is a copy of my curriculum vitae and

4    bibliography.

5    Q.    Who prepared I did?

6    A.    I did.

7    Q.    Does it fairly and accurately summarize your

8    educational and professional experience?

9    A.    Yes, it does.

10   Q.    Do you know David Calhoun?

11   A.    I have met him many years ago in Mt. Sinai, yes.

12   Q.    Do you know Robert Desnick?

13   A.    Yes.

14   Q.    How do you know Dr. Desnick?

15   A.    Well, we started out in 1976 doing studies related

16   to enzyme therapy in Fabry disease.  And I think you heard

17   about those from Dr. Desnick yesterday where we infused

18   enzyme into brothers.  And then I was a member of the Mt.

19   Sinai School of Medicine faculty in his -- in the division

20   that he was chief of for about 13 years before moving.

21   Q.    Let's turn now to your opinions that you have rendered

22   in this case.

23            Have you formed an opinion about whether or not

24   the '831 patent is invalid?

25   A.    I have.

1    Q.    And what is your opinion?

2    A.    That the patent is invalid.

3    Q.    Have you prepared some demonstrative slides to

4    demonstrate your opinions?

5    A.    I have.

6              MS. LORING:  Please put up DDX-209.

7    BY MS. LORING:

8    Q.    Is this a slide that you prepared?

9    A.    It is.

10   Q.    Please summarize to the jury your opinions about the

11   invalidity of the '831 patent.

12   A.    In sum, I think there is -- my opinion is there is  an

13   inadequate written description.  And there is a lack of

14   enablement since there is a failure to enable

15   therapeutically effective alpha-galactosidase A.

16   Q.    Now, do you understand description and enablement

17   requirements are determined from the perspective of a person

18   of ordinary skill in the art relating to the '831 patent?

19   A.    That's my understanding.

20             MS. LORING:  Please put up DDX-210.

21   BY MS. LORING:

22   Q.    Have you formed an opinion about the qualifications of

23   that person of ordinary skill?

24   A.    I have.

25   Q.    In your opinion, what are the fields relevant to the

1    '831 patent?

2    A.    The fields that I think are most important would be

3    the area of recombinant DNA technology and the treatment of

4    patients with Fabry disease.

5    Q.    What is your opinion about the qualifications of a

6    person of ordinary skill in the art?

7    A.    Those qualifications may include a Ph.D. in molecular

8    biology or similar degree, a couple of years or three of

9    experience in recombinant DNA technology, or a medical

10   degree and five years of research and/or clinical experience

11   in the treatment of patients with Fabry disease.

12   Q.    Now, let's turn to the first basis for your invalidity

13   opinion, and that is written description.

14             Please put up DDX-212.

15             Did you prepare this to describe your

16   understanding of the requirements for a proper written

17   description?

18   A.    I did.

19   Q.    And what is your understanding?

20   A.    My understanding is that a patent is invalid if it

21   does not describe the claimed invention.

22   Q.    And what is the purpose of the written description

23   requirement as you understand it?

24   A.    Again, my understanding is that written description

25   has to reasonable convey to skilled persons that the

1   inventor was in possession of the invention at the time the

2   patent application was actually filed.

3   Q.    Please put up DDX-230.

4          Please tell the jury what the bases for your

5   opinion are that the '831 patent lacks an adequate written

6   description?

7   A.    There are two.  The claims are not limited to insect

8   cell production of alpha-galactosidase A.  And there is no

9   description of alpha-galactosidase A produced in cells other

10  than insect cells.

11  Q.    Let's take a look at the '831 patent, which is DTX-1

12  in your book?

13  A.    Yes, I have it.

14  Q.    Have you reviewed this patent?

15  A.    I have.

16  Q.    What in your opinion does the '831 patent describe?

17  A.    What the patent describes by my reading is the

18  production of human alpha-galactosidase A in insect cells

19  using a baculovirus system.

20  Q.    Let's start first with the abstract, which is at the

21  bottom of the right column on the first page?

22  A.    Yes, I see it.

23  Q.    Please read aloud the second sentence of the abstract?

24  A.          The present invention is directed to recombinant

25          human alpha-galactosidase A and provides baculovirus

1          expression vectors and recombinant virus that provides

2          stable expression of extracellular and intracellular

3          levels of this enzyme in an insect cell culture.

4     Q.   What do you understand that sentence, those sentences

5     to mean?

6     A.   Those mean that they are describing a baculovirus

7     system for production of alpha-galactosidase A.

8     Q.   What does it tell you about the alpha-galactosidase A

9     that's described in the patent?

10    A.   That it's produced in the insect cell system.

11    Q.   Now, look, please, at Column 1, the field of the

12    invention, I would like to focus on Lines 20 through 24?

13    A.   Yes.

14    Q.   Starting with the second sentence, please read that

15    sentence aloud?

16    A.        The present invention is directed to recombinant

17         human alpha-galactosidase A and provides baculovirus

18         expression vectors and recombinant virus that produce

19         stable expression of extracellular and intracellular

20         levels of this enzyme in an insect cell culture

21         system.

22    Q.   Again, what does that sentence mean to you with

23    respect to the alpha-galactosidase A described in this

24    patent?

25    A.   It is produced in insect cells.

1    Q.    Now turn, please, to Column 5.  I would like to direct

2    your attention to Lines 51 through 55.  Please read those

3    sentences aloud for the jury?

4    A.       Hence, the recombinant baculoviruses of the

5    present invention provide high-level, stable

6    expression of biologically active alpha-galactosidase

7    A.  The stable expression of high levels of

8    biologically active human alpha-galactosidase A is

9    unique to this present invention.

10    Q.    What does that tell you about the alpha-galactosidase

11    A described in this patent?

12    A.    That they have a unique system for producing high

13    levels of alpha-galactosidase A.

14    Q.    What is that unique system?

15    A.    That is an insect cell system.

16    Q.    I would like you to focus now -- and I know you stated

17    you reviewed this patent.  I would like you to focus on the

18    detailed description of the invention.  That starts at

19    Column 3, around Line 58.  It goes all the way over to

20    Column 10, Line 40.

21    A.    Yes.

22    Q.    Is there any description of cells other than insect

23    cells that are used to produce alpha-galactosidase A?

24    A.    There is not.

25    Q.    Is there any description of any cells that may be

1    useful other than insect cells in producing alpha-GAL A?

2    A.    There is not.

3    Q.    Now let's look at the examples of the patent.  They

4    start up right where the detailed description ends, Column

5    10, Line 41, through the end, Column 14, Line 20.  Could you

6    explain to the jury just generally what these examples

7    describe?

8    A.    Sure.  Examples 1 through 3 describe the construction

9    and development of the baculovirus system for expression of

10   human alpha-galactosidase A.

11              Example 4 describes a purification system and

12   the attempt at the characterization of the glycosylation of

13   that protein.

14              And Example 5 uses the baculovirus system to do

15   uptake experiments in normal and human fibroblast skin

16   cells.

17   Q.    When you say that protein, when you were referring to

18   Example 4, what did you mean?

19   A.    This is the baculovirus expressed alpha-galactosidase

20   A.

21   Q.    And in Example 5, what alpha-galactosidase A was used

22   in that experiment?

23   A.    Again, the alpha-galactosidase A produced in insect

24   cells with a baculovirus system.

25   Q.    Taking the '831 patent as a whole, where if at all

1    does the '831 patent state that expression systems other

2    than insect baculovirus systems would be useful for making

3    alpha-GAL A for the treatment of Fabry disease?

4    A.    It is not described.

5    Q.    Let's move now to the claims, which are on Column 14.

6    I would like you to focus your attention on the claims that

7    are at issue in this suit, which are Claims 1, 2 and 6.  Do

8    these claims recite any particular expression system to

9    produce alpha-GAL A?

10   A.    They do not.

11   Q.    In your opinion, does the '831 patent specification

12   describe the full scope of these '831 patent claims, that

13   is, an alpha-GAL A made using any expression system?

14   A.    No.  The patent specification describes only the M-6

15   cell system based on baculovirus.

16   Q.    And based on that conclusion, what is your opinion

17   about the validity of the '831 patent with respect to the

18   written description requirement?

19   A.    It is invalid.

20   Q.    I would like to turn now to your opinion that the '831

21   patent is invalid for lack of enablement.  Could you put,

22   please, DDX-214 up.

23            Please describe your understanding of the

24   enablement requirement?

25   A.    My understanding is that a patent would be invalid if

1    it does not teach how to make and use the whole invention

2    without undue experimentation.

3    Q.    And what do you understand undue experimentation to

4    mean?

5    A.    My understanding of undue experimentation is that it

6    requires more than just routine application of knowledge of

7    a skilled worker.

8    Q.    Now, let's turn again, please, to DTX-1, the '831

9    patent, Claim 1.  I would like to focus in on Lines 26 and

10   27.

11         Do you see that the claim requires that the

12   alpha-galactosidase A be administered in a therapeutically

13   effective amount?

14   A.    Yes, I see that.

15   Q.    Please put up DDX-228.

16         Do you understand that the term "therapeutically

17   effective amount" has been defined to mean an amount of

18   alpha-GAL A sufficient to reduce the level of GL-3 in the

19   mammalian tissues that are affected by the alpha-GAL A

20   deficiency to normal or near normal levels?

21   A.    That is my understanding.

22   Q.    Have you applied that definition in your analysis of

23   enablement?

24   A.    I did.

25   Q.    Let's look at DDX-229, please.  Does this slide

1    summarize your opinion -- first of all, did you prepare this

2    slide?

3    A.    I did.

4    Q.    Does it summarize your opinion why the alpha-GAL A of

5    the '831 patent may not be administered in a therapeutically

6    effective amount?

7    A.    It certainly doesn't describe how to make the

8    recombinant alpha-GAL A that can be administered this way,

9    and that insect cells cannot produce alpha-galactosidase A

10   with mannose-6-phosphate or sialic acid so that it can be

11   taken up by the affected cells in this disease.

12              And secondly, Example 5 is not supported by the

13   data.

14   Q.    Now, let's take your first reason, that insect cells

15   cannot produce an alpha-GAL A with M-6-P and sialic acid.

16   What is the basis for that opinion?

17   A.    As you have just heard from Dr. Jarvis, insect cells

18   in culture cannot do this.

19   Q.    You are relying on Dr. Jarvis for that opinion.  Is

20   that right?

21   A.    I am.

22   Q.    Please explain to the jury why the absence of M-6-P

23   and sialic acid in insect cells to produce alpha-GAL A would

24   render it ineffective?

25   A.    The importance of those two molecules, those two

1    sugars, is to avoid some trapping of this enzyme by the

2    liver, and the mannose-6-phosphate will help deliver this to

3    the cells that are important in this disease.  And those are

4    the vascular endothelial cells where you have to get this

5    enzyme to be therapeutically effective and actually make

6    people better.

7    Q.    Let's put up DDX-205, please.  I would like you to

8    describe for the jury how alpha-GAL A arrives at the cells

9    and gets into the cells during enzyme replacement therapy?

10   A.    Okay.  As you have heard in your course now in

11   molecular biology that you are getting, this enzyme is

12   administered into the bloodstream.  So it's got to get to

13   the cells and inside the cells.

14            So the first step, number one there, is that the

15   enzyme enters the bloodstream.  And it's shown here with

16   sialic acid, and in the cross, the mannose-6-phosphate, as

17   Step 1.

18            Step 2, the enzyme recognizes the

19   mannose-6-phosphate receptor with that very special target

20   on it, the mannose-6-phosphate.  Once they attach, it is

21   taken into the cell at Step 3.  And then it's delivered, in

22   Step 4, directly to the lysosome.  That is where this GL-3

23   is.  And you have to get rid of it, to degrade it, for it to

24   be therapeutically effective, and to make people better.

25            You can see in the inset there, it shows how it

 1    binds very tightly to that mannose-6-phosphate receptor.

 2    Q.   Now, what tissues and organs are primarily affected by

 3    Fabry disease?

 4    A.   Well, the organs as a whole are primarily the kidney,

 5    the heart, and the brain.  But it is a special compartment

 6    of those tissues.  It's the vascular cells that line the

 7    blood vessels in those tissues that are really important for

 8    Fabry disease.

 9    Q.   When you use the word vascular, what does that mean?

10    A.   Those are the blood vessels.  And these cells are the

11    vascular endothelial cells that surround the blood vessels

12    and make them smooth.

13    Q.   Now, do all cells in the body have M-6-P receptors?

14    A.   No, they don't.

15    Q.   Which cells do not?

16    A.   There is a large group of cells called the

17    reticuloendothelial system that have numerous other

18    receptors but do not have the manno-6-phosphate receptor.

19    Q.   Please tell the jury what the reticuloendothelial

20    system is?

21    A.   Yes.  Again, your course in cell biology.  The

22    reticuloendothelial system primarily are a group of cells

23    whose job it is to sort of clean out the bloodstream and get

24    rid of stuff, bacteria, dead and dying cells and so forth.

25    It eats them up, digests them, and gives them back to the

1   body for reuse.  It is a very large system.

2   Q.    Let's put up DDX-206, please.  I would like to start

3   with sialic acid.  Why in your opinion is sialic acid

4   important to treating Fabry disease?

5   A.    Okay.  So we will look at the left side of this first.

6         What you see here is the liver, which is this

7   pink organ in the center.  With sialic acid attached to a

8   glycoprotein like alpha-galactosidase A, it will avoid being

9   trapped in the liver to a great extent.

10        And because of that, it can get around the liver

11  and get more enzyme to the tissues that are important in

12  Fabry disease, the kidneys, the heart, the brain, and the

13  blood vessels, the cells that are there.

14  Q.    Let's talk about mannose-6-phosphate now.

15        What happens to alpha-GAL A that does not have

16  M-6-P in its glycosylation?

17  A.    The importance of mannose-6-phosphate is that once it

18  gets around the liver, then it can attach to the receptors

19  on the vascular epithelial cells, get taken up into those

20  cells.

21        The problem is on the right-hand side, if you

22  don't have sialic acid on this, most of this enzyme is then

23  taken up by the liver and very little of it, a little of it

24  gets delivered beyond the liver to the cells that are

25  important in Fabry disease to make people healthy.

1  Q.    I am sorry.  That was the continuation of the side

2  with respect to sialic acid.  Is that right?

3  A.    That's right.  We managed.

4  Q.    So based on your understanding from Dr. Jarvis that

5  insect cells cannot produce proteins with sialic acid and

6  M-6-P, in your opinion, can insect-produced alpha-GAL A be

7  administered in a therapeutically effective amount?

8  A.    As I just described from the right-hand side, the

9  answer is, no, it cannot.

10  Q.    Could you simply give the patient more insect-produced

11  alpha-GAL A to compensate for the lack of these receptors?

12  A.    That would be nice.  But we have learned, from

13  treating lots of patients with lysosomal storage diseases,

14  and in particular Fabry disease, that as you increase the

15  dose, the complications become more and more severe.  And

16  what happens is that people who are usually missing this

17  enzyme develop allergies or antibodies to these drugs and

18  have severe reactions as you increase the dose.

19          So this would be not good.

20  Q.    Now, Dr. Calhoun, were you in the courtroom on Tuesday

21  when Dr. Calhoun testified?

22  A.    I was.

23  Q.    Do you recall him referring to an article by

24  Marchesan?

25  A.    I do.

1  Q.    Look at PTX-702 in your binder.

2  A.    I have it.

3  Q.    This is the Marchesan article?

4  A.    It is.

5  Q.    What conclusion does Marchesan draw about the presence

6  of M-6-P on the receptors of certain cells affected by Fabry

7  disease?

8  A.    Their conclusion is that the vascular endothelial

9  cells in culture do not have manno-6-phosphate receptors.

10  Q.    Or very low amounts of receptors?

11  A.    Very low amounts.

12  Q.    Do you disagree or agree with that conclusion?

13  A.    I disagree.

14  Q.    Why do you disagree?

15  A.    These cells were put in culture.  Much like what you

16  just heard from Dr. Jarvis, you have an intact animal or you

17  have a cell in culture.  The cells are different in culture

18  than they are in the animal.  To really make this conclusion

19  improve, that these mannose-6-phosphate receptors are not

20  there, you really need to do the studies in an animal and

21  preferably a human.

22  Q.    And you said these cells were studied in culture.

23  When you say these cells, are you referring to the cells

24  studied in the Marchesan article?

25  A.    I am.  There are several different cell lines of

1    vascular endothelial cells.

2    Q.    Does Marchesan recognize the shortcoming of their

3    research?

4    A.    They do.

5    Q.    Turn, please, to Page PTX-702-9.  I would like you to

6    focus on the left column, third paragraph.

7             Could you please read the first sentence of that

8    paragraph to the jury?

9    A.             A potential limitation of this study is that we

10            have not examined MPR -- that is the

11            mannose-6-phosphate receptor -- expression and enzyme

12            uptake in human tissue in vivo.

13            And in vivo means in the animal, meaning human

14    or other.

15   Q.    Again, why are studies in the live animal important?

16   A.    Because you have to be sure that what you are doing in

17   a tissue culture matches what happens in actual people or

18   animals.

19   Q.    So did Marchesan also look at the amount of alpha-GAL

20   A in their cell cultures that actually reaches the lysosome?

21   A.    They did.

22   Q.    What did they find?

23   A.    They found that very low amounts, about five percent,

24   got to the lysosomes in one of their cell lines.

25   Q.    Let's look at Page 6, PTX-702-6, the left column, the

1    second full paragraph, the third line, it says, "Whereas

2    only five percent of the labeled enzyme was associated with

3    lysosomes in" -- and that is a particular endothelial cell

4    culture that they studied.  Is that right?

5    A.    That's correct.

6    Q.    Now, is this a large amount or small amount?

7    A.    It is quite a small amount.

8    Q.    What does that tell you about the state of the cell

9    culture that Marchesan used?

10   A.    There is something wrong with these cell cultures.

11   Q.    Why do you feel that way?

12   A.    Because there are other data that show that this is

13   not the case in animals and there are other cell cultures

14   that show that they do have mannose-6-phosphate receptors.

15   Q.    Well, if these are cells that are affected by Fabry

16   disease and they do not have M-6-P receptors, and there

17   wasn't something wrong with them, how much of the enzyme

18   would you expect to see reaching the lysosomes?

19   A.    Their conclusion is that if it doesn't get in by the

20   mannose-6-phosphate receptor, that means very little will

21   get in, because that system is not there.  And it would not

22   be therapeutically effective for patients.

23   Q.    You mentioned that there were others things in the

24   literature that contradict Marchesan, I believe?

25   A.    There are.

1   Q.   Look, please, at DTX-601 in your book.

2            MS. LORING:  Your Honor, because the exhibit

3   copy of this document was not clear, we got counsel's,

4   plaintiff's counsel's permission to use the original PDF, so

5   we can see what it actually says.

6   BY MS. LORING:

7   Q.   What is this document, Dr. Grabowski?

8   A.   This is a poster of a presentation that was made by

9   Beth Thurberg.

10  Q.   Who is Beth Thurberg?

11  A.   She is a pathologist at Genzyme Corporation.

12  Q.   Let's look at the third panel.  Let's look at the

13  third panel, could you capture the whole panel, if possible.

14           What is described in that panel?

15  A.   What these experiments are all about is, you can

16  imagine, a slice of tissue, and you want to ask, how do I

17  find if there is a particular molecule there, so you can get

18  antibodies, very specific antibodies, to these molecules.

19           So what she wanted to do and what they show, she

20  wanted to look for man-6-phosphate receptors in organs of

21  tissues that are important to Fabry disease from Fabry

22  patients and normals.  So they used this antibody to look

23  for the mannose-6-phosphate receptor.

24  Q.   And what did they find?

25  A.   In Figures 2, 3, and 4, these are three organs that

1    are majorly involved in Fabry disease.  And these are from

2    people with Fabry disease are normal.  The top Figure 2 is

3    kidney, Figure 3 is the skin, and Figure 4 is the heart.

4              What you see in those black dots, those little

5    arrows that are very hard to see, is that there are

6    Mannose-6-phosphate receptors on vascular endothelial cells

7    in these tissues from humans with this disease.

8    Q.    And does this Thurberg poster (phonetic) show you

9    anything about the role of M-6-P in delivering alpha-GAL A

10   to the lysosome?

11   A.    She also did some cell culture work and that is shown

12   in the Figure 5, for example.  It's just an example.  And on

13   the left-hand side in Figure 5, the white shows the enzyme

14   getting into the cell when you have the Mannose receptor,

15   Mannose-6-phosphate receptor, and the left shows what

16   happens when you don't have it and the enzyme does not get

17   in and get delivered to the lysosome for therapeutic effect.

18   Q.    Is there any other -- so what is the difference then

19   between the Thurberg research and the Marchesan research

20   that could explain the difference and results that we see

21   here?

22   A.    That one is a culture system, and these are in people.

23   And that's the biggest difference.  There is something wrong

24   with those cultures.

25   Q.    When you say one is in culture, which one?

1   A.    The Marchesan paper.

2   Q.    When you say one is in people, which one is that?

3   A.    That is the work from Dr. Thurberg.

4   Q.    And which one is more valuable in your opinion?

5   A.    I think this demonstrates clearly that in people and

6   in Fabry disease, there are Mannose-6-phosphate receptors on

7   vascular endothelial cells.

8   Q.    Now, is any other publication that you are aware of

9   that refutes the conclusions in Marchesan?

10  A.    Yes.

11  Q.    Or contradicts the conclusions in Marchesan?

12  A.    There is.

13              MS. LORING:  Let's pull up DTX-578.

14              And let's turn to the second page, please.

15              What is this?

16              THE WITNESS:  I'm sorry.  What tab is this?

17              THE COURT:  578.

18              THE WITNESS:  578.  Okay.

19  BY MS. LORING:

20  Q.    578.

21  A.    Okay.  Thank you.  I've got it.

22  Q.    What is this article?

23  A.    This is an article on a glycoprotein called prorenin

24  that shows the essential importance of the

25  Mannose-6-phosphate receptors on cultured endothelial cells

1    for the uptake of this protein.

2    Q.    Just very briefly, what is prorenin?

3    A.    Prorenin is a glycoprotein that is important to blood

4    pressure regulation and has to get into vascular endothelial

5    cells.

6    Q.    So let's look at Page 915 of this article.  And I'd

7    like you to look at the right-hand column.  The left

8    paragraph, just above the acknowledgment.

9    A.    Yes.

10   Q.    And the first sentence, could you place read the first

11   sentence to the jury?

12   A.    In conclusion, prorenin internalization by HUVECs is

13   mediated exclusively via high affinity Mannose-6-phosphate

14   receptors.

15   Q.    And what does that mean?

16   A.    That means the receptors are there and prorenin is

17   brought into the cells by that mechanism.

18   Q.    And why is this relevant to the Marchesan article?

19   A.    Because this demonstrates, with this HUVECs which are

20   very similar cells to what was done in the Marchesan

21   article, that these do have receptors on them and these were

22   shorter term cultures than what they had in the Marchesan

23   paper, as far as I can determine.

24   Q.    So was one of the cell cultures that Marchesan studied

25   HUVEC cells?

1    A.    They were.

2    Q.    And what is the difference between the conclusion that

3    Marchesan drew about the HUVEC cells and conclusion that

4    this publication drew about the HUVEC cells?

5    A.    Marchesan says that the Mannose-6-phosphate  receptors

6    are not there, and this article says that they are

7    absolutely there.

8    Q.    Let's turn to your second opinion of why the '831

9    patent is invalid for lack of enabling a therapeutically

10   effective amount of alpha-GAL A, and that is that Example 5

11   is not supported by the data.

12             Can we bring up DDX-2222, please?

13             Did you prepare this?

14   A.    I did.

15   Q.    And what is shown here?

16   A.    On the left-hand side is the example text from the

17   patent and on the right-hand side, are Table 1 and 2 from

18   the '831 patent.

19   Q.    When you say "example text," that is Example 5?

20   A.    Yes.

21   Q.    What type of experiment is Example 5?

22   A.    This is one of these uptake experiments again where

23   you grow cells in culture from normal in Fabry patients and

24   then you add enzyme to them and then you harvest the cells

25   and see how much is inside.

Grabowski - direct

1   Q.     Please look at Table 2.  The left column says enzyme

2   added.  What is shown there?  How much enzyme was added in

3   the four samples:

4   A.     There were four doses of enzyme added:  None, 1,000,

5   2,000, and 4,000 units per milliliter of baculovirus

6   alpha-galactosidase A.

7   Q.     And the next column?

8   A.     Those are the numbers 7, 59, 147 and 270 that are in

9   Fabry cells with the different doses.

10  Q.     So those, when you say in Fabry cells, do you mean the

11  amount that was taken out?

12  A.     Amount taken out, that's correct.

13  Q.     And did you review the laboratory notebook that

14  records this experiment?

15  A.     I did.

16  Q.     Please look at PTX-665.

17         Is that the notebook that you reviewed?

18  A.     That is C3.  It is.  I did.

19  Q.     And that is a notebook you understand prepared by

20  Dr. Coppola?

21  A.     It is.

22  Q.     In your opinion, are the results in Dr. Coppola's

23  notebook consistent or inconsistent with the results of the

24  uptake experiment shown in Example 5 of the '831 patent?

25  A.     They are inconsistent.

Grabowski - direct

1    Q.    Let's look at DDX-225.

2          Did you prepare this slide?

3    A.    I did.

4    Q.    What is shown on the left-hand side of the slide?

5    A.    The left-hand side is one of the pages from

6    Dr. Coppola's notebook.

7    Q.    And then looking at the right-hand side, the top half

8    of the slide, what is shown there?

9    A.    At the very top, there is a note that there was a

10   corrected calculation for some of the results.  And in the

11   table right below that, those are the results that were

12   reported from the regular page.

13   Q.    So that is a blowup --

14   A.    Yes, it is.

15   Q.    -- from the page that is depicted there?

16         What is shown in the bottom half of the right

17   side of DDX-225?

18   A.    Those are Tables 1 and 2 from patent '831.

19   Q.    Now, focusing on the blowup of the data which is in

20   the top half of the right side of DDX-225, do you see that

21   there are four rows of numbers --

22   A.    Yes.

23   Q.    -- that you have highlighted?  Please explain what the

24   left column of those four numbers is.

25   A.    Okay.  If you look at the vertical line and just look

1    to the left of that, you will see that the first line says

2    7.1, 58.1, 147 and 270.  Those are the activity measures

3    they had that they reported here in Fabry cells.  And those

4    are the ones that are in Table 2.

5    Q.    So when you compare the units that were reported in

6    the notebook on the left side of that blowout to the Table 2

7    of the patent, are they the same or are they different?

8    A.    They are the same.

9    Q.    Now, look at, in the right side of the exhibit, the

10   four numbers to the right on the blowup of the data.  What

11   did those numbers represent?

12   A.    Okay.  Just to orient the jury again in case you are

13   lost.  Just take the vertical line and go to the right and

14   you will see numbers .7, 7.1, 5, 16.7 and 27.1.  Those

15   numbers are 10 times less than those in the column on the

16   left.

17   Q.    But what are they?

18   A.    Those are recalculated numbers according to the note

19   that is right above at the top of the page.  And they're 10

20   times less than what was in the previous column.

21   Q.    And what is the significance of the difference between

22   the numbers to the left, 7.1 and going down, and then the

23   corrected numbers?  What is the significance of that 10-fold

24   difference?

25   A.    That means there is 10 times less enzyme in the cells

1    than was reported in the patent.

2    Q.    Are the corrected numbers to the right, the .7, 7.15,

3    16.7 and 27.1, are those described anywhere in the '831

4    patent?

5    A.    They are not.

6    Q.    But are those corrected numbers, those corrected

7    results described in any publication by Drs. Calhoun and

8    Coppola?

9    A.    They are.

10   Q.    Look, please, at DTX-51 in your binder.

11   A.    Yes.

12   Q.    Do you recognize this document?

13   A.    I do.

14   Q.    And what is it?

15   A.    This is a publication in the journal, a peer-reviewed

16   journal Gene by Drs. Coppola, Calhoun and coworkers about

17   baculovirus alpha-galactosidase A.

18   Q.    Let's now turn to DDX-226.   DDX-226.

19              MR. MILLER:   DD.

20              MS. LORING:   Sorry.

21   BY MS. LORING:

22   Q.    Did you compare this comparative slide as well?

23   A.    I did.

24   Q.    And what is shown on the left-hand side of this slide?

25   A.    Again, that is a reproduction of Dr. Coppola's

Grabowski - direct

1    notebook.

2    Q.    And is the blowup on the top of the right-hand side

3    the same?

4    A.    They are the same.

5    Q.    And what is shown on the bottom of the right-hand side

6    of this slide?

7    A.    That is an extract from the article that we just

8    talked about that Drs. Coppola and Calhoun published in

9    Gene, except for one change which is in yellow.  Those are

10   the numbers that I put in that are the corrected numbers.

11   Q.    When you say they are the corrected numbers, how did

12   you -- you put in those numbers in red?

13   A.    Yes, I did.

14   Q.    And what did they represent?

15   A.    Those are the numbers in the column at the top on the

16   right-hand side of the vertical line.

17   Q.    What I mean is how do they relate to the dots on the

18   graph in Figure 3 -- Figure 1?

19   A.    They correlate.  Those are the numbers related to what

20   the graph points are.  In other words, the column above, the

21   column above on the right-hand side has just been used to

22   show how much the activity changes versus how much enzyme is

23   added on the bottom and those are the numbers that relate to

24   each of those points at each of the doses of enzyme that was

25   added to the cells.

1  Q.    I'm still focused on how you got these numbers.

2  (Indicating):  .7 -- 7, 1.7, 2.7.

3  A.    Those are directly from Dr. Coppola's notebook, and in

4  the column up at the right-hand side.

5  Q.    This is a graph.

6  A.    Yes.

7  Q.    And there are dots on the graph.

8  A.    Yes.

9  Q.    And how did you get these numbers, and why did you put

10  them on the graph?

11  A.    To show that they correlated with what was reported in

12  Dr. Coppola's notebook.

13  Q.    Do those numbers represent the dots that are on that

14  graph?

15  A.    Yes.

16  Q.    And so when Drs. Copolla and Calhoun published their

17  data, reporting on their uptake experiment, which numbers

18  from the Coppola notebook did they choose to put into their

19  publication?

20  A.    The corrected numbers.

21  Q.    And, again, did those corrected numbers appear

22  anywhere in the '831 patent?

23  A.    They do not.

24  Q.    Now, based on your analysis of Dr. Coppola's lab

25  notebook, Dr. Coppola and Dr. Calhoun's publication, and

Grabowski - direct

1    the '831 patent, are the results shown in Example 5 of the

2    patent, that uptake experiment, correct or incorrect?

3    A.    They are incorrect.

4    Q.    And in what way are they incorrect?

5    A.    They understate -- they overstate the results of their

6    uptake experiments by 10 times.

7    Q.    And, in your opinion, did these results demonstrate

8    that the insect produced alpha-GAL A may be administered in

9    a therapeutic effective amount?

10   A.    No, they show very little uptake, and it would not be

11   therapeutic to help patients.

12   Q.    Based on that conclusion, is the '831 patent in your

13   opinion valid or invalid?

14   A.    It is invalid.

15            MS. LORING:  I have no further questions.

16            THE COURT:  We'll break until 2:00 o'clock.

17            (Luncheon recess taken.)

18            *     *     *

19            (Proceedings reconvened after recess.)

20            MR. LORIG:  Your Honor, may we address the Court

21   briefly before you bring in the jury?

22            THE COURT:  Do you want to do it here?

23            MR. LORIG:  Open court is fine.

24            THE COURT:  Sure.

25            MR. LORIG:  There is a bit of a disagreement on

1    time left.

2              THE COURT:  I am not going to do that right now.

3    The jury is lined up right at the doorway.  We will do that

4    later.

5              MR. LORIG:  Very well.

6              (jury enters courtroom 2:05 p.m.)

7              THE COURT:  All right, members of the jury.

8    Please take your seats.  I see some brought sweaters.  That

9    is probably a good thing.

10             All right.  Counsel, you may cross-examine.

11             MR. PAUNOVICH:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. PAUNOVICH:

14   Q.    Good afternoon, Dr. Grabowski.

15   A.    Good afternoon.

16   Q.    Can we call out PTX-1, please.

17             You also have a copy in your binder, which is

18   the '831 patent.

19             Are you familiar with the '831 patent, Dr.

20   Grabowski.

21   A.    I am.

22   Q.    And you agree that the claims of the patent are not

23   limited to the method by which you can produce

24   alpha-galactosidase A?

25   A.    That's right.

Grabowski - cross

1    Q.    And you agree that there is nothing in the claims that

2    require or specify that you have to have mannose-6-phosphate

3    or sialic acid?

4    A.    That's correct.

5    Q.    And the claims don't mention anything about the method

6    of production for alpha-galactosidase A.   Correct?

7    A.    That's correct.

8    Q.    If we can call up PDX-901.   You agree with me there is

9    a difference between a method of producing human

10   alpha-galactosidase A and a method of treating a disease

11   using human alpha-galactosidase A.   Right?

12   A.    That's true.

13   Q.    Now, did you review the specification of the '831

14   patent when you were providing your opinions on written

15   description?

16   A.    I did.

17   Q.    If we can call up PTX-1, starting at Page 10, Column

18   7, Line 24 through Column 10, Line 40.

19             Dr. Grabowski, what I have had Mr. Ryder put up

20   on the screen is Column 7 of the patent, and highlight

21   through down Column 10, and down to Column 10 right here?

22   A.    Yes.

23   Q.    Do you have those portions in mind?

24   A.    I do.

25   Q.    And you agree with me that that portion of the

1    specification describes a method for treating Fabry disease

2    using alpha-galactosidase A.   Correct?

3    A.    That's true.

4    Q.    And there is no mention throughout that entire portion

5    of the specification of insect cells.   Correct?

6    A.    That's correct.

7    Q.    And there is no mention of baculovirus?

8    A.    That's correct.

9    Q.    And there is no mention of mannose-6-phosphate?

10   A.    That's correct.

11   Q.    And no mention of sialic acid?

12   A.    Correct.

13   Q.    In providing your opinions on written -- on

14   enablement, did you consider that Dr. Desnick had testified

15   that using CHO cells would be obvious to do when he began

16   his work in 1986 on Fabry disease?

17   A.    I don't know if he said that exactly.

18   Q.    You would agree with me that if Dr. Desnick is correct

19   and it is obvious to use CHO cells to produce

20   alpha-galactosidase in 1986, that a specification that

21   discloses one method of producing alpha-galactosidase could

22   enable another expression system that was well known?

23   A.    I am not sure I quite understand what the question is.

24   Q.    If CHO cells are obvious as of 1986, you agree with me

25   that the same recombinant techniques could be used based on

1    a disclosure that has one method of producing enzyme to

2    produce it in another expression system?

3                 THE COURT:  Ms. Loring, if the doctor

4    understands the question, I will permit him to answer it.

5                 Only if you understand the question.

6                 THE WITNESS:  I actually don't.

7                 THE COURT:  You may need to break that down a

8    little bit, Mr. Paunovich.

9    BY MR. PAUNOVICH:

10   Q.    Would you agree with me that as of 1986 it would have

11   been obvious to produce alpha-galactosidase A in the CHO

12   cell system?

13   A.    I don't know if I can answer that question.  There

14   were other proteins that were produced in CHO cell systems.

15   But I don't know if that would have been obvious for

16   alpha-GAL.

17   Q.    And are you aware that in applying for a patent, a

18   patentee doesn't need to disclose that which is well known

19   in the art?

20   A.    Yes.

21   Q.    And if CHO cells were well known in the art at the

22   time of the filing of the '831 patent, you would agree with

23   me that they would not have any need to disclose that

24   specifically in their specification?

25   A.    I don't know that as a fact.

1    Q.    And you are aware that Amgen had produced EPO in CHO

2    cells as early as 1983?

3    A.    I am aware of that, yes.

4    Q.    Can we call up -- and I believe you also have in your

5    binder PTX-1049.

6    A.    I have 1048.

7              THE COURT:  I don't have it, either.

8    BY MR. PAUNOVICH:

9    Q.    I am sorry.  I meant to say 1048.  My apologies.

10             Can we call up PTX-1048 as well.

11             MS. LORING:  Your Honor, I believe that this was

12   not permitted to be used this morning.

13             I apologize.  I withdraw the objection.

14             THE COURT:  Go right ahead.  You can display it

15   again.

16   BY MR. PAUNOVICH:

17   Q.    So this is a different patent, Dr. Grabowski.  But are

18   you familiar with -- if we can pull up, blow up this portion

19   right here, the Columbia University, are you familiar with

20   the patent from Columbia University for production of

21   proteins in CHO cell systems in 1983?

22   A.    This is the first I have seen it.

23   Q.    Do you dispute that CHO cells were well known and

24   capable of producing recombinant proteins as early as 1983?

25   A.    I don't know if they were well known, but they were

1    known.

2    Q.    Did you consider -- Dr. Grabowski, you didn't consider

3    the '831 patent family file history in providing your

4    opinions on written description and enablement in this case,

5    did you?

6    A.    I considered the '831 patent, yes.

7    Q.    The specification and the claims.  That's what you

8    considered?

9    A.    That's correct.

10   Q.    You did not consider the file histories of the '831

11   patent family, did you?

12   A.    I did not.

13   Q.    If we can call up PDX-317.  Part of what you didn't

14   consider, Dr. Grabowski, was a restriction requirement in

15   the '831 patent family file history where the examiner

16   identified six -- there is Invention I, II, III, IV, V,

17   VI -- inventions that he said was distinct, you didn't

18   consider that, did you?

19   A.    The first time I saw this was during my deposition.

20   Q.    And you don't dispute that the examiner identified six

21   distinct inventions in the patent?

22   A.    He said what he said, yes.

23   Q.    If we can call up DTX-601.  I believe, Mr. Ryder, it

24   is the larger PDF version.

25            In your binder from your direct examination,

1    which I believe might be just to your right there, Dr.

2    Grabowski, it would be DTX-601, which I believe was part of

3    your presentation.

4    A.    Yes.

5    Q.    This is the article that's published by Genzyme that

6    you referred to, indicating that cells of the vascular

7    endothelial system in your opinion have manno-6-phosphate

8    receptors?

9    A.    This is the Beth Thurberg poster presentation that I

10   talked about, yes.

11   Q.    And you agree that this poster presentation was

12   prepared by Genzyme employees?

13   A.    That's what it says, yes.

14   Q.    And are you familiar with the process of peer review?

15   A.    Of course.

16   Q.    What is peer review?

17   A.    Well, peer review is generally, if you prepare an

18   article for publication in a journal, you send it off to the

19   journal, they assign it to reviewers, they review it, decide

20   whether it fits their journal and gives you a decision on

21   whether they would like to publish it, have it modified, or

22   whatever.

23   Q.    And the purpose of peer review is to have independent

24   peers review and decide whether or not the technical

25   information disclosed is legitimate.  Correct?

1    A.    Legitimate I don't think is the correct word.  But it

2    is a process so that the material in the paper can be vetted

3    by people who have expertise in the field, yes.

4    Q.    And you, yourself, act on certain journals doing peer

5    review for articles.  Correct?

6    A.    About one a week, yes.

7    Q.    And you feel that is an important process to assuring

8    that a journal has the correct data that they are reporting?

9    A.    It's to ensure that the science is solidly based as

10    part of the process, yes.

11    Q.    And this posterboard that you have pointed to in

12    support of your opinions is not peer-reviewed, is it?

13    A.    As far as I know, it is not.

14    Q.    And it's more than ten years old, isn't it?

15    A.    It is.

16    Q.    And a poster presentation, this is a presentation

17    that's just presented on a basic posterboard on an easel at

18    some event.  Right?

19    A.    It is a disclosure into the public domain, yes.

20    Q.    If we can call up, blow up Figure 4, I believe, it's

21    this one down here?

22         Now, Figure 4 of this poster presentation, Dr.

23    Grabowski, compares normal heart cells on the left with

24    Fabry disease heart cells on the right.  Correct?

25    A.    It compares heart biopsies from those individuals,

Grabowski - cross

1    yes.

2    Q.    And what the poster says is that the reddish-brown

3    areas in the figure show the locations of M-6-P receptors.

4    Correct?

5    A.    That's correct.

6    Q.    And wouldn't you agree that in this figure there is no

7    endothelial specific marker that is attached to any of the

8    cells?

9    A.    That's correct.

10   Q.    And there is no showing of co-localization of the

11   M-6-P receptor in endothelial cells in this figure?

12   A.    There is no co-location with endothelial cell marker,

13   that's correct.  They did it by microscopy and histology of

14   what the vessels look like, yes.

15   Q.    And based on that visual examination, their conclusion

16   was that cells of the vascular endothelial system have M-6-P

17   receptors?

18   A.    That's correct.

19   Q.    And the fact that there is no co-localization

20   experiment to specifically tie those cells to the M-6-P

21   receptor, wouldn't you agree that you cannot conclude

22   conclusively that the stain that is marking M-6-P receptors

23   in these cells is actually attached to the endothelial cell

24   system?

25   A.    Using a marker for endothelial cells would have been a

1    better experiment, yes.

2    Q.    Now, in offering your opinions on written description

3    and enablement, you also spoke about the Marchesan article?

4    A.    I did.

5    Q.    Do you recall that testimony?

6    A.    I do.

7    Q.    Can you please call up PTX-702.  I believe you also

8    have a copy in your binder, actually, probably in both

9    binders?

10   A.    I have it.

11   Q.    You agree that the Marchesan paper was published in

12   2012?

13   A.    Yes.

14   Q.    It's peer-reviewed?

15   A.    Okay.

16   Q.    Do you agree that it's peer-reviewed?

17   A.    In a secondary journal, yes.

18   Q.    You believe that the article is a secondary journal?

19   A.    The Journal of Inherited Metabolic Disease is not one

20   of the top journals at all.

21   Q.    You don't think it's a well-respected and

22   peer-reviewed journal?

23   A.    It's okay.

24   Q.    You have authored a number of articles that you have

25   published in that exact same journal, haven't you?

1    A.    A couple, yes.

2    Q.    Can we call up DTX-584, Page 25, Item No. 232.

3              Dr. Grabowski, is this Grabowski, G.A., you?

4    A.    That's me.

5    Q.    Did you or did you not publish this article in the

6    Journal of Inherited metabolic Disease?

7    A.    I did.

8    Q.    Did you believe that the journal was a second-tier

9    journal when you published this article in it?

10   A.    I did.

11   Q.    Nonetheless, it was peer-reviewed?

12   A.    It's peer-reviewed.

13   Q.    And I understand that you disagree with the

14   conclusions of the Marchesan paper, you would agree, though,

15   that there can be differences in opinion in the scientific

16   community about research?

17   A.    There always are.

18   Q.    And if the Marchesan paper is right, you would agree

19   that you are wrong on the point of whether or not cells of

20   the vascular endothelial system have or don't have

21   mannose-6-phosphate receptors?

22   A.    I would agree that they have shown in their cell

23   culture systems that they cannot demonstrate a significant

24   number of mannose-6-phosphate receptors on those cells, yes.

25   Q.    And if those authors are correct, then your opinion

1    regarding that article would be incorrect?

2    A.    That's correct.  They also don't use any endothelial

3    cell marker specific to show even that they are dealing with

4    those cells.

5    Q.    And in offering your opinions on written description

6    and enablement, I understand that one of your opinions is

7    that an insect-cell-produced alpha-galactosidase A enzyme

8    would not be therapeutically effective?

9    A.    That's true.

10   Q.    And isn't it true that you can't prove conclusively

11   that an insect-cell-produced enzyme would not be

12   therapeutically effective?

13   A.    With the available data to date, since there is none

14   for alpha-galactosidase A, the answer is no.

15   Q.    If we can call back up PTX-702, Page 10.  If we can

16   blow up the highlighted portion in the left-hand column of

17   Page 10.  This is the conclusion of the Marchesan paper.

18   Isn't that right, Dr. Grabowski?

19   A.    It is.

20   Q.    And their conclusion that the historical assumption

21   that cells of the vascular endothelial system have alpha-GAL

22   mannose-6-phosphate mediated uptake was false in vitro?

23   A.    They believed it was incorrect, that's true.

24   Q.    And their conclusion was that, in fact, there was an

25   alternative pathway for uptake of alpha-galactosidase A by

 1    cells of the vascular endothelial system?

 2    A.    They suggested that's the case.

 3    Q.    And it's your opinion that the cells of that vascular

 4    endothelial system are the most important tissue cell type

 5    in treating Fabry disease.  Correct?

 6    A.    In vivo, that's true.

 7    Q.    Now, Dr. Grabowski, you also provided a

 8    noninfringement opinion in this case.  Correct?

 9    A.    I believe so.

10    Q.    And you haven't offered any opinions on noninfringement

11    here today?

12    A.    Not in my testimony, no.

13    Q.    I'd like to talk to you about some of your opinions

14    that you offered related to infringement.

15              MS. LORING:  Objection, Your Honor.

16              THE COURT:  Sustained.

17              Do you want to see me?

18              MR. PAUNOVICH:  If we can call a sidebar, Your

19    Honor.

20              (Sidebar conference held.)

21              THE COURT:  Ms. Loring?

22              MS. LORING:  Outside the scope of his testimony.

23              MR. PAUNOVICH:  We have their infringement

24    expert admitting to the presence of every element.

25              THE COURT:  There are rules in this courtroom

1    as in every other United States courtroom.  They're called

2    the rules of evidence.  What is your argument as to why I

3    shouldn't exercise my discretion and not accede to this

4    objection?

5              MR. PAUNOVICH:  I think that it's a party

6    admission, given their expert has --

7              THE COURT:  I'm talking about scope.

8              MR. PAUNOVICH:  I understand, your Honor.

9              THE COURT:  Sustained.

10             (Sidebar conference ends.)

11   BY MR. PAUNOVICH:

12   Q.   Now, Dr. Grabowski, stepping back to PTX-072, the

13   Marchesan article.

14   A.   Yes.

15   Q.   You would agree with me if the Marchesan conclusion is

16   correct in vivo that your opinions on invalidity would be

17   wrong in this case?

18   A.   Under all those assumptions, that would be correct.

19             MR. PAUNOVICH:  Thank you.  No further

20   questions.

21             THE COURT:  Ms. Loring.

22                    REDIRECT EXAMINATION

23   BY MS. LORING:

24   Q.   Hello again, Dr. Grabowski.

25   A.   Hello.

Grabowski - redirect

1   Q.    Mr. Paunovich asked you about the Thurberg poster?

2   A.    Yes.

3   Q.    And whether or not using endothelial cell markers

4   would have -- you said would have been a better experiment.

5   Does that in any way change your opinion that the data

6   shown in the Thurberg article establishes that there are

7   M-6-P receptors on cells that are affected by Fabry disease?

8   A.    In vivo?  No, that does not change my opinion at all.

9            MS. LORING:  No further questions.

10           THE COURT:  Thank you, Doctor.

11           THE WITNESS:  Thank you.

12           (Witness excused.)

13           THE COURT:  Perhaps we could collect binders

14  from the witness stand, whomever.  Both sides.

15           (Binders returned.)

16           THE COURT:  Mr. Herman, yes.

17           MR. HERMAN:  Your Honor, defendants call Gregory

18  Leonard.

19           ... GREGORY KEITH LEONARD, having been first

20  duly sworn, was examined and testified as follows ...

21           MR. HERMAN:  Good afternoon.

22           THE COURT:  Hold on, Mr. Herman.  I think

23  Ms. Raymond has some binders.

24           MR. HERMAN:  Sorry about that, Your Honor.

25           MS. RAYMOND:  May I approach?

1            (Binders passed forward.)

2            THE WITNESS:  Thank you.

3            MR. HERMAN:  Good afternoon (indicating towards

4      jury).

5                    DIRECT EXAMINATION

6      BY MR. HERMAN:

7      Q.    Good afternoon, Mr. Leonard.

8      A.    Good afternoon.

9      Q.    What is your name?

10     A.    Gregory Keith Leonard.

11     Q.    Where do you live?

12     A.    I live in Millbrae, California.

13     Q.    What do you do for a living?

14     A.    I'm an economist.

15     Q.    Where do you work?

16     A.    I work at a code called Edgeworth Economics.

17     Q.    What is your position there?

18     A.    Senior vice president.

19     Q.    What do you do at Edgeworth?

20     A.    I do economic analysis for clients who might be

21     companies or government agencies or individuals.

22     Q.    Would you briefly describe your educational

23     background?

24     A.    Sure.  I received a bachelor of science degree in

25     Applied Math and Economics from Brown University and a Ph.D.

1    in Economics from the Massachusetts Institute of Technology

2    or MIT.

3    Q.    Are you a member of any associations or professional

4    organizations?

5    A.    I am.   I'm a member of the Econometrics Society and

6    the American Economic Association, which are the two major

7    professional organizations for economists in the United

8    States.   Then I'm also member of the American Bar

9    Association mainly so I can serve as a senior editor on the

10   antitrust law journal.

11   Q.    Are you actually a lawyer?

12   A.    No, I'm not.

13   Q.    And do you do any work with scholarly journals?

14   A.    I do.

15   Q.    Have you published papers?   What do you do?

16   A.    I'm a referee of peer reviewers.   So when the journal

17   needs to decide whether or not papers should be published,

18   it sends it out to people to review and I serve in that

19   role.

20   Q.    Have you published papers in the field?

21   A.    I have.

22   Q.    About how many?

23   A.    About 50.

24   Q.    Would you look in your book, please, at Exhibit 607

25   and tell us what it is?

1    A.    Yes.   This is my curriculum vitae or resume.

2    Q.    And does it accurately reflect your background and

3    experience?

4    A.    Yes, it does.

5              MR. HERMAN:   Would you go to the first page?

6    BY MR. HERMAN:

7    Q.    Now, Dr. Leonard, what were you asked to do in this

8    lawsuit?

9    A.    I was asked to look at the damages issues and in

10   particular determine what a reasonable royalty would be

11   for Genzyme's use of the patented technology in this case,

12   assuming that the patent was found to be valid and

13   infringed.

14   Q.    And were you in the courtroom when Mr. Wagner gave his

15   opinions on the subject?

16   A.    I was, yes.

17   ███      ██████████████████████████████████████████████

18   █████████████████████████████████████████

19   A.    No, I don't.   I believe that is unreasonably high.

20   Q.    Do you have an opinion as to what a royalty would be?

21   A.    I do.

22   Q.    And what is it?

23   A.    Well, after my analysis, I determined that the

24   ████████████████████████████████████████████████████

25   and then that translated to a dollar amount of about

Leonard - direct

1      ███████████

2      Q.    Would you take a look, please, at your Demonstrative

3      301?

4            And could you explain what we're showing there?

5      A.    Sure.  On the left-hand side, I'm summarizing my

6      opinion, which again is a royalty rate of 3 percent.  And

7      after you apply that to the Genzyme sales during the

8      ██████████████████████████████████████████████████

9      million.

10     Q.    And have you prepared a graphic summarizing your

11     disagreements with Mr. Wagner?

12     A.    Well, as you can see on this one, you know,

13     Mr. Wagner's rate is about 10 times mine so the natural

14     question is why is there such a big difference.

15           On the next slide, what I tried to do is

16     summarize what those differences are.  And that's what I

17     have done here.

18     Q.    And could you explain to the jury what each of these

19     points mean?

20           Taking the first one:  give Shelbyzyme credit

21     for Genzyme's investment?  Could you explain what you had in

22     mind?

23     A.    Sure.  As an economist, to me, what a reasonable

24     royalty means is the amount of money that should compensate

25     just for the patented technology that was used in this case

1    by Genzyme.  It shouldn't include money that is really a

2    return to other activities that went on and particular ones

3    that Genzyme itself did.

4            So in this case, I think we have heard drug

5    development is very risky.  It costs a lot of money.  It's a

6    very good chance you will never get that money back.  And so

7    when somebody is successful at it, for a given drug, the

8    money that they earn on it to a large degree is going to be

9    a return on those investments and a return to those risks

10   that they took.

11           It's important I think, for a royalty to be

12   reasonable, that it doesn't take some of that money that

13   should go to the company that developed the drug and in this

14   case give it to a patent owner.  So my royalty of 3 percent

15   I think does that.  It isolates the value of the patent.

16           Mr. Wagner's 30 percent really gives a lot of

17   money that would really be entitled to Genzyme for its

18   efforts and puts it in the Shelbyzyme royalty, and I think

19   that is not really right as a matter of economics.

20           And then the second point is related which is

21   Genzyme took a lot of risks.  Again, I said that.  That's

22   really the same idea.

23           And then the third point is to get to his

24   royalty rate, Mr. Wagner looked at several license

25   agreements and used them as benchmarks or comparables.  That

1   is often the word that is used.  And when I looked at those,

2   I didn't think those agreements were really comparable at

3   all.  So again it led to a number that was too large in my

4   view.

5   Q.    I would like to talk a little bit about what you

6   did to reach your opinion.  Could you tell the jury what you

7   did?

8   A.    Sure.  Mr. Wagner talked this.  There is the

9   Georgia-Pacific factors.  So I looked at all the factors.

10  As part of that, I did a quantitative analysis to try to

11  assess how much the patent contributed versus how much

12  Genzyme contributed.

13  Q.    Could you explain what you did in your quantitative

14  analysis?

15  A.    Sure.  So what I did is I looked at the profits of the

16  product, and then I tried to say, well, how much of those

17  really need to be paid back to Genzyme to cover the

18  ██████████████████████████████████████████████████████████

19  that, you know, we've heard about.  So it's like anything

20  else, you know, high risk/high reward.  So there is a

21  certain amount of money that needs to be paid back to

22  Genzyme to cover those risks that they took.

23          So what I tried to do is try to quantify that.

24  Then once I quantified that, I can say how much profit from

25  Fabrazyme was left over, and that is the part that could be

1    divided up between Genzyme and Shelbyzyme in this case.

2    Q.    And what did your quantitative analysis reveal?

3    A.    Well, what it revealed is the reasonable royalty that

4    I found should be from this analysis is 1.6 percent.

5    Q.    Now, your earlier demonstrative said 3 percent.  Could

6    you explain how you get from 1.6 to 3?

7    A.    Sure.  There is a bunch of other Georgia-Pacific

8    factors that I looked at.  And those, after looking at

9    those, those led me to bump up the rate from 1.6 to 3.

10   Q.    Now, you testified a little bit earlier about

11   comparable licenses.  Do you remember that?

12   A.    Yes.

13   Q.    And in your examination, did you find any Genzyme

14   licenses which you believe to be comparable and appropriate

15   to consider here?

16   A.    I did.

17   Q.    And could you explain that to the jury, please?

18   A.    Sure.  There is a license agreement between Mt. Sinai

19   and Genzyme involving some patents and also some know-how

20   that Mt. Sinai and Dr. Desnick were going to provide to

21   Genzyme.  And in return for that -- and it related, by the

22   way, to the Fabrazyme product or it became the Fabrazyme

23   product.  And in return for that, Genzyme was going to pay

24   ████████████████████████████████████

25   █      ████████████████████████████████████

Leonard - direct

1    provisions in that agreement which would reduce it?

2    A.    That's right.   The number actually could end up being

3    lower for a couple of different reasons.   So it could really

4    ████████████████████████████████████████████████████

5    those things shook out.

6    Q.    And are you familiar with the term "patent stacking?"

7    A.    Royalty stacking maybe.

8    Q.    Royalty stacking.   What does that mean?

9    A.    Royalty staking is when, for a given product, you have

10   different patent owners coming in and asking for a royalty.

11   And so you can think of one royalty being stacked on

12   another, so you get this big stack of royalty payments.

13         So a lot of times, what will happen a licensing

14   agreement is the licensor and the licensee will agree you

15   ████████████████████████████████████████████

16   somebody else shows up and says, you know, you need to pass

17   ████████████████████████████████████████████████

18   fall to a lower number.   And there was that kind of

19   provision in this Mt. Sinai/Genzyme agreement.

20   Q.    And do you remember what the patent royalty stacking

21   term was?   What the decrease in royalty would be?

22   █   ████████████████████████████████████████

23   ████████████████████████████████████████████

24   royalty rate could go.

25   Q.    Now, in your analysis, did you find any other licenses

1    which you believe were comparable?

2    A.    Yes.   There were two other licenses that I think

3    deserve being to be looked at.

4    Q.    Could you explain that to the jury?

5    A.    Sure.   I think we heard about this a bit yesterday.

6    The RCT representative testified that there were two

7    agreements that RCT entered into, one with a company called

8    Enzon, the other with a company called Orphan Medical.   I

9    think both of those are relevant to look at for determining

10   the reasonable royalty.

11   Q.    And why is that so?

12   A.    Well, because both of those patent agreements, as I

13   understand it, would have ultimately incorporated or covered

14   the patent that is at issue in this case.   So from that

15   point of view, they were licenses that were for this patent,

16   amongst other patents, as I understand it.

17   Q.    What were the royalty rates?

18   A.    The royalty rates in those agreements were both the

19   same.   I think, again, we heard that yesterday.   Between

20   3 percent and 6 percent, depending on the level of sales of

21   the product.

22   Q.    Now, did you hear Mr. Wagner yesterday testify about

23   his reliance on the RCT representative's testimony about

24   what royalty rate RCT would have asked for in this case?

25   A.    Yes, I did.

1    Q.    And do you agree that Mr. Wagner should have relied on

2    that testimony?

3    A.    I don't really think so, no.

4    Q.    Why not?

5    A.    Well, it's almost like a wish list.  You know, he said

6    that is what they would have liked to have gotten.  I would

7    like to be able to dunk the ball like Lebron James but I'm

8    not going to be able to do it.

9         So I think what is really important is to look

10   at what really happened, and the RCT representative never

11   said they got licenses at those high rates.  The ones that

12   we actually see in the case are between 3 and 6 percent so I

13   think those are much more useful and important to look at.

14   Q.    I'd like to turn now to what has been called

15   Georgia-Pacific Factor 13.  And I'd like you to look at

16   Demonstrative 309.

17        Could you explain to the jury what the purpose

18   of Factor 13 is?

19   A.    Yes.  This is a lot of verbiage but what it's really

20   saying is, hey, let's look at the profit that the product in

21   question is generating; and then let's try to divide that

22   between, on the one hand, the patent that is at issue in the

23   case and, two, other things that were brought and in

24   particular by the defendants.

25        So the business risks, the manufacturing

1    capability, significant features that add on the to the

2    product such as FDA approval, for instance.  And,

3              What it is saying is really we want to isolate

4    the part that is due to the patent.  And that is what the

5    reasonable royalty should be.  It should be just the part

6    of the patent.  Everything else is something that the

7    defendant was bringing, in this case, Genzyme, and the other

8    part of the profit should really go to that.

9    Q.    Now, did you hear Mr. Wagner say that he had, in fact,

10   considered what he characterized as sunk costs in his

11   analysis?

12   A.    Yes.

13   Q.    Do you agree that he actually did that?

14   A.    Not really, at least fully.

15   Q.    Could you explain that, please?

16   A.    Sure.  I think what he did is he said, well, on the

17   one hand, for instance, Genzyme had the orphan drug

18   exclusivity.  And on the other hand, Shelbyzyme had the

19   patent.  But then he kind of just weighted those two things

20   ████████████████████████████████████████████████████████

21   split.

22              I think if you look at it, again, you know, why

23   ████████████████████████████████████████████████████████

24   pretty valuable technology coming from Mt. Sinai?  Why did

25   ████████████████████████████████████████████████████████

Leonard - direct

1    licensees?

2              The reason is because the drug development costs

3    and the risks and all of that stuff I talked about that

4    Genzyme was responsible for really deserves a lot more

5    weight than the patent, because it's very costly and very

6    risky.

7    Q.    Did you consider Factor 13 in your analysis of what

8    ought to be an appropriate royalty rate?

9    A.    Yes.  That's really what that quantitative analysis

10   was getting at.  In a way I really think it's what the RCT

11   and Mt. Sinai license agreements are also about.  So, yes, I

12   considered this.

13   Q.    Now, did you hear Mr. Wagner testify that he thought

14   that the Synpac and Alcafleu agreements were comparable

15   agreements that should be considered here?

16   A.    Yes, I did.

17   Q.    Do you have an opinion about that?

18   A.    I do.

19   Q.    What is it?

20   A.    I don't think that they are valid comparables.

21   Q.    Could you explain why?

22   A.    Sure.  In both cases, what Genzyme was getting from

23   Synpac in one case and from Alcafleu in another was a big

24   bundle of assets.  So it wasn't just a patent or the rights

25   to use a patent.  It included a lot more.  Particularly, I

1    think the Alcafleu, it's a very stark example.  They are

2    getting three drugs that were already FDA-approved and were

3    ready to be sold on the market.  They are getting another

4    drug that is pretty well along the way of drug development.

5              In that kind of situation, you are getting a lot

6    more than just a patent, whereas in the hypothetical license

7    in this case, what we are trying to value is just a patent.

8              So you can't on the one hand say a patent plus a

9    bunch of other stuff is equivalent to just a patent.  It's

10   apples and oranges.

11   Q.    So, Dr. Leonard, where does that leave us at the end

12   of the day?

13   A.    Well, I think we have the quantitative analysis that

14   says 1.6 percent.  We have got these three license

15   ██████████████████████████████████████

16             In my view, you know, you are going to end up

17   somewhere in the middle there.  From my point of view, 3

18   percent is the appropriate reasonable royalty to use.

19   Q.    So we can back to 301.  Does this represent your

20   opinion, sir?

21   A.    Yes, it does.

22             MR. HERMAN:  Thank you very much.

23             THE COURT:  Thank you, Mr. Herman.

24             Mr. Lorig, your cross.

25             MR. LORIG:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LORIG:

Q.     Good afternoon.

A.     Good afternoon.

Q.     I don't believe we have met before.  My name is Fred
Lorig.

A.     Nice to meet you.

Q.     Good to meet you.

       Would you agree with me there is a difference
between licensing a drug after it's FDA-approved and
licensing a drug, as with the Mt. Sinai agreement, eight
years before FDA approval?

A.     I guess I need for you to specify what you mean by
licensing a drug, because in the Alcafleu agreement,
something like that, you are getting the whole drug and all
the drug development that went with it, in addition to
whatever patent rights there might be.

Q.     Well, you should have your deposition in your book.

A.     Sure.

Q.     If you would turn to Page 85 of your deposition.  At
Page 85, Line 12, didn't you say, again, I think there is --

       THE COURT:  Why don't you let him take a look.
What lines?

       MR. LORIG:  Lines 12 to 17, Your Honor.

       THE COURT:  Take a look.

Leonard - cross

1      THE WITNESS:  Okay.

2   BY MR. LORIG:

3   Q.    Did you not say in your deposition, "Again, I think

4   there is a difference between one which involved drugs which

5   were already FDA-approved, that were M-1s at the earlier

6   stage.  You may very well use a different kind of approach

7   for those types of, latter types of products."

8           Do you recall giving that testimony?

9   A.    Well, it's not actually what you asked me a minute

10  ago.  I would be happy to explain.

11          THE COURT:  Go ahead.  Please explain.  It's not

12  what he asked.

13          THE WITNESS:  This is talking about the kind of

14  approach one might use to determine what royalty might be

15  appropriate.  So it's kind of a different question than you

16  asked.

17  BY MR. LORIG:

18  Q.    Would you agree with me that in determining what type

19  of royalty would be appropriate, you would have a different

20  approach for a patent which is infringed by a drug which has

21  already been approved by the FDA and one that has not been

22  approved by the FDA?

23  A.    At least what I am talking about here is an approach,

24  a methodological approach.  It could be different but it

25  could be the same, depending on the information you have.

1    Q.    Certainly, you would agree with me, that, for

2    instance, with the Mt. Sinai royalty, which was agreed to in

3    1995, eight years before FDA approval, there was still a

4    great deal of risk involved in that project?

5    A.    That's correct.

6    Q.    And would you agree with me that with regards to the

7    Enzon-Orphan royalties, that those were agreed to before

8    there was any FDA approval and there was a great deal of

9    risk involved?

10   A.    Exactly.  I think that's exactly the point and why

11   they are good comparables for this.

12   Q.    And would you agree with me that, in general, for

13   these types of drugs, at best, one out of ten succeed?

14   A.    Yes, I think that's a very good number.

15   Q.    I would like to put Georgia-Pacific 15 on the screen.

16   Would you put PDX-238 up?

17          This is Georgia-Pacific Hypothetical Negotiation

18   of a Reasonable Royalty.

19          "The amount that a licensor (such as the patent

20   owner ) and a licensee (such as the accused infringer) would

21   have agreed upon (at the time the infringement began) if

22   both sides had been reasonably and voluntarily trying to

23   reach an agreement; that is, the amount which a prudent

24   licensee -- who desired, as a business proposition, to

25   obtain a license to manufacture and sell a particular

```
 1    article embodying the patented invention -- would have been

 2    willing to pay as a royalty and yet be able to make a

 3    reasonable profit and which amount would have been

 4    acceptable by a patentee who was willing to grant a

 5    license."

 6                You are familiar with this factor.  Correct?

 7    A.    Yes.

 8    Q.    And you understand that Georgia-Pacific Factor No. 15

 9    requires the person deciding on a reasonable royalty to

10    determine that reasonable royalty as of the time

11    infringement began.  You understand that.  Correct?

12    A.    Yes, subject to the, for instance, the reasonable

13    profit.  There are other Georgia-Pacific factors.  I want to

14    keep that in mind.

15    Q.    And the time infringement began in this case is March

16    of 2006, after Genzyme had already obtained FDA approval.

17    Correct?

18    A.    Which is again exactly why you need to go back and

19    figure out the value of the Genzyme investments and the

20    risks they took, because we got to make sure that they get

21    that money back in our economic system or things are really

22    going to go awry.

23    Q.    Again, the hypothetical negotiation is as of the time

24    the patent is infringed, which is three years after FDA

25    approval.  Correct?
```

1    A.    Yes.  In my view, though, it should be over the profit

2    that's left after we make sure that Genzyme has been

3    compensated for its costs.

4    Q.    Now, Dr. Leonard, you don't have an opinion as to what

5    Genzyme would have been willing to pay RCT in March of 2006

6    when the '831 patent issued and infringement began.  Isn't

7    that right?  You don't have an opinion as of March 2006?

8    A.    Well, I mean, my reasonable royalty analysis does try

9    to figure out what the right royalty would be in a

10   negotiation at that time that again accounted for the fact

11   that Genzyme had already incurred those risks before the

12   patent even issued.

13          So, I mean, they were in -- there were

14   non-infringing actions on its part that I don't think should

15   be built into the royalty for the reasons I said.

16   Q.    Would you turn to your deposition, please?

17   A.    Yes.

18   Q.    And would you look at Page 104 of your deposition,

19   Line 20, through Page 105, Line 16?

20   A.    Page 104?

21   Q.    Yes, Line 20, through Page 105, Line 16.

22   A.    Okay.

23   Q.    "Question:  And in doing an analysis of a hypothetical

24   negotiation at the date of first infringement in 2006,

25   Genzyme would have done an expected cash flow analysis to

1    determine what was the upper bound of the bargaining range

2    within which they would be better off by taking a license

3    than not taking a license.  Correct?

4              "The Witness:  So you are saying in the

5    hypothetical negotiation they would have -- I mean, I don't

6    know what they would have done."

7              Isn't it a fact that you don't know what Genzyme

8    and RCT would have done as of March of 2006.

9              MR. HERMAN:  Your Honor, I object.  I think that

10   the whole witness' answer should be read.

11             THE COURT:  I agree, on this one.

12             MR. LORIG:  I will read the rest of the answer,

13   Your Honor.

14             "The Witness:  So you are saying in a

15   hypothetical negotiation, they would have -- I mean, I don't

16   know what they would have done.  That's not, you know,

17   again, they -- in any negotiation, they would do an analysis

18   of whether they were better off with the agreement than

19   without it.  And presumably, and I think that's, you know,

20   consistent with what they have said, and again, how they

21   might go about that exactly would depend on the

22   circumstances, I would think."

23             THE WITNESS:  Right.  Again, I am talking about

24   what particular methodology they might have used at that

25   point.

Leonard - cross

1    BY MR. LORIG:

2    Q.    Now, please assume that as of March 2006, Genzyme

3    agreed that the patent at issue in this case is valid and

4    infringed, and that it could exclude Genzyme from selling

5    Fabrazyme from 2006 to 2009.  Do you not agree with me that

6    in that hypothetical, Genzyme would have agreed to split its

7    profits 50-50 with the patentee?

8    A.    I don't agree with that, no.

9    Q.    Could you turn in your book, please, to PTX-78.  Do

10   you see it?

11   A.    Which one?

12   Q.    It's the last tab.

13   A.    758?

14   Q.    That's right.  This is an article entitled Science and

15   Technology Law Review?

16   A.    Right.

17   Q.    You are one of the authors.  Correct?

18   A.    I am.

19   Q.    And if you would, would you turn to Page 263 of the

20   article, which is Page 758-9 of PTX-758.  Turn to Page 758-9

21   of the article.

22   A.    Okay.

23   Q.    You see there, if we blow that up, beginning with

24   Example 1, and the follow-on page, it talks about dividing

25   value between asset owners when both companies have blocking

Leonard - cross

```
1    assets?
2              "Suppose Company A holds a patent on a
3    technology.  Company A has no ability to produce any product
4    itself, and there are no suitable licensees other than
5    Company B.
6              "Company B has important complementary know-how
7    to the patented technology, but cannot use this know-how to
8    produce any product without a license to Company A's
9    patent."
10             Do you see that?
11   A.    Yes.
12   Q.    And if you skip down to the end of the paragraph,
13   where it says, "If the two companies are equally patient,
14   they will equally split the profits from the patented
15   product.  Essentially, each company holds a 'blocking asset'
16   that is required to produce Product AB, and they have no
17   alternative use for their assets (We call this a case of
18   'completely blocking' assets).  The resulting 'Mexican
19   standoff' yields an equal split of the profits."
20             You wrote this article before you accepted your
21   engagement in this case.  Correct?
22   A.    Can I point out that you omitted some very important
23   language?
24   Q.    Can you answer my question first?
25   A.    It was published in 2011.  Yes, I probably wrote it
```

1     earlier in the year.

2     Q.    So you wrote this before you accepted your engagement

3     in this case, as best you recall it?

4     A.    I think so, yes.

5     Q.    And in the next paragraph at the end --

6     A.    Are we going to go back to the language?

7     Q.    We will.  I will give you the opportunity.

8            In the next paragraph, at the very end, it says,

9     "Company A's patent is just as blocking as Company B's

10    know-how in making Product AB.  This puts the two companies

11    on equal footing, each able to block the other.  As a

12    result, they would negotiate an even split of the Product AB

13    profits (assuming both companies are sufficiently and

14    equally patient)."

15           That's what you wrote before you accepted your

16    assignment in this case?

17    A.    Right.  I mean, you got to go up to, if we can show on

18    the screen, starting on the fourth line, I think, that what

19    I said here is you got to account for all the expected

20    future economic costs associated with development and

21    offering the product.  So I am talking about a situation

22    before a product has been developed and marketed and sold.

23    And I am saying it is very important to account for all

24    those costs that would be required to do that.  You know,

25    again, that's exactly the example in this case, where I am

Leonard - cross

1    saying let's subtract all those costs that Genzyme had to

2    incur, and that whatever is left over, that's what we are

3    bargaining over and that's what would get split between

4    Genzyme and between Shelbyzyme.  And that's what the three

5    percent represents.

6    Q.    Well, as of March of 2006, that money on research had

7    already been spent.  And if the patent excluded Genzyme from

8    the market, they would have made no money and had no chance

9    to repay any investment, assuming it had not already been

10   made?

11            THE COURT:  Is that your testimony or was that a

12   question?

13            MR. LORIG:  It was meant to be a question.  May

14   I rephrase it, Your Honor?

15            THE COURT:  Yes.

16   BY MR. LORIG:

17   Q.    Isn't it a fact, Dr. Leonard, that as of 2006, the

18   date of the hypothetical negotiation, whatever development

19   costs Genzyme may have had were already in the past?

20   A.    They were in the past.  But the returns on those that

21   would have made it worthwhile for Genzyme to invest in the

22   project and to take those risks were still coming in the

23   door.  So the problem is, if you allow a reasonable royalty

24   of 30 percent in this case, which isn't reasonable, that's

25   my point, then what you are doing is you are undercutting

Leonard - cross

1    incentives to innovate.

2              Our whole economy is based on this idea.  That

3    is why we are the most innovative economy in the world.  And

4    you can't allow people to take credit for things they don't

5    deserve credit for.  That's the problem.

6    Q.    As of 2006, the date the patent issued and

7    infringement began, Genzyme had already been selling

8    ██████████████████████████████████████████████████████

9    2006.  Isn't that right?

10   A.    They had sold a fair amount.  But the costs are

11   substantial and the chances that you are going to be

12   successful were very low.  So that means you actually have

13   to sell a lot before it becomes worthwhile to do it.  That

14   is kind of the problem with drug development in Genzyme.

15   That's why we want to be very careful about undercutting

16   those incentives for companies that engage in drug

17   development.

18   Q.    The chances for success wasn't very low in March of

19   ██████████████████████████████████████████████████████

20   millions of dollars in sales.  Right?

21   A.    But if you let companies come in with patents and take

22   away the profits of companies who invested when they weren't

23   even infringing, when the patent had not even issued yet,

24   and take those moneys away, then the problem is, people are

25   going to stop investing in drugs, at least to the same

1    degree.  And that's, I think, very dangerous.

2              That's why a reasonable royalty really needs to

3    isolate the value of the patent and not be a taking of the

4    profits that are early returns to costs and other

5    investments.  That's what I think a three-percent royalty

6    does in this case quite nicely.

7    Q.    But in your journal article, you said a 50/50 split

8    would be fair.  Correct?

9    A.    No, this is a 50/50 split of the profit that is left

10   over after you have accounted for the costs of development.

11   Okay?  So that's not doing exactly in this case, what I'm

12   saying should be done here.  And,

13             I will point out one other small thing, which is

14   not really a big point, but that this all depends upon this

15   assumption which I say repeatedly that the companies are

16   equally patient.  That is what leads to a 50/50 split.  You

17   know, Mr. Wagner I think has assumed that but he hasn't

18   really shown that in this case, and that is why I think it

19   is another problem with the 50/50 split.

20   Q.    Well, let's put it back up, if we can.  If we go to

21   the second page, PTX-758.  The top of the paragraph right

22   there.  We're at PTX-758-10.

23             Do you still agree that if the two companies are

24   equally patient, they will equally split the profits from

25   the patented products?

1    A.    Again, the profits have already been defined to take

2    out the development costs.  It's up a couple lines above

3    that.

4    Q.    Now, would you agree with me that Genzyme's internal

5    books don't track the development costs?

6    A.    I don't think I would agree with that.

7    Q.    Did you find any account that specifically said we

8    spent X dollars on developing Fabrazyme?

9    A.    I believe so.  There is a document that says your

10   costs for R&D for the Fabrazyme project.

11   Q.    And would you also agree with me that Genzyme, in its

12   public disclosures, says it has a 77 percent profit rate?

13   A.    No, I would disagree with that.  At least as I think

14   you are trying to use that term.

15   Q.    And why would you disagree?

16   A.    Well, if you look at their financial statements, which

17   I just did a few hours ago, their so-called operating

18   profit, which is the profit after you subtracted off the R&D

19   costs and these other things, is only about 10 percent.  So

20   I'm not quite sure what you mean by 70 percent.

21             MR. LORIG:  Could we turn to PTX-813-2, please.

22             And could you put PTX-813-2 on the screen,

23   please?  PTX-813-2.  There we go.

24             And could we go to the second block down here,

25   please?

1    BY MR. LORIG:

2    Q.    Now, what is the profit margin on these products?

3    Like most companies, we don't report the profitability of

4    individual products.  However, our overall corporate profit

5    margin is public.  Currently, it is approximately 77 percent

6    of our annual revenue.

7              You don't dispute that fact, do you?

8    A.    Well, again, I think what that number is referring to

9    is what is called a gross profit margin.  That's the margin

10   after you have only subtracted off like the costs of making

11   the product and a few other relatively small manufacturing

12   costs.  It doesn't account for sales and marketing.  It

13   doesn't account for R&D, things like that.

14             Once you subtract off all these other costs,

15   which are obviously vital to the operation of the company,

16   that is where you end up at something more like 10 percent.

17   And, again I was just looking at those numbers.

18   Q.    Isn't it a fact, Mr. Leonard, that you did not

19   estimate the cash flow Genzyme expected from U.S. sales of

20   Fabrazyme as of a hypothetical negotiation date of 2006?

21   A.    No.  I mean, no, I didn't do that analysis

22   specifically.  That's correct.

23   Q.    But you did look at Mr. Wagner's spreadsheet on that

24   issue.  Correct?

25   A.    I probably did, yes.

Leonard - cross

1          MR. LORIG:  Could we put PDX-240 on the screen?

2     PDX-240.  Thank you very much.

3          And could we blow up this so the jury can see

4     it.  Just make it a little bit bigger.  Right here.  Thank

5     you.

6          Is there any chance of making this any bigger?

7          It's hard to see from here, Your Honor, and I'm

8     closer.

9          Excellent.  Thank you very much.

10    BY MR. LORIG:

11    Q.    All right.  Now, according to this spreadsheet,    the

12    ████████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████

14    after considering the Mt. Sinai royalty was still

15    ████████████████████████████████████████████████████████

16    don't disagree with these numbers; is that right?

17    A.    Yeah.  I mean I don't disagree with them except to the

18    extent that, again, they don't include the costs or they

19    don't account for the costs that Genzyme incurred previous

20    to 2006 in bringing this product to the market.

21    Q.    Okay.  But looking at these operating margins, net

22    operating margins, if, hypothetically, Genzyme had paid

23    30 percent to RCT at the time of the hypothetical

24    negotiation, that still would have left Genzyme with an

25    ██████████████████████████████████████████

1    A.    That is correct math.  But the problem is, viewed

2    overall, this product would then be not profitable for

3    Genzyme; and that's, again, exactly the problem.

4    Q.    And as of the hypothetical negotiation in March of

5    2006, when Genzyme was already on the market with FDA

6    approval, isn't it a fact that there was no other drug

7    approved by the FDA to treat Fabry disease?

8    A.    At that time, that's correct.  Although I think just

9    to be clear, Replagal, which was another drug, I think was

10   in clinical trials.

11   Q.    So Replagal has never been approved by the FDA in the

12   United States?

13   A.    Well, except to be used in clinical trials.

14   Q.    Yes.

15   A.    But not the formal FDA approval, yes.

16   Q.    And Replagal is owned by another drug company, Shire.

17   Is that correct?

18   A.    That's correct, yes.

19   Q.    And if Genzyme wanted to sell Replagal, it's quite

20   likely that the competitor Shire would want even more than

21   30 percent as a royalty.  Isn't that correct?

22   A.    I don't think we know.  I mean it would be a question

23   of what kind of deal could be cut, and that is not something

24   I don't think anybody in this case has analyzed, including

25   me.

Leonard - cross

1    Q.    Yes.  It's a fact, isn't it, that you didn't do the

2    hypothetical negotiation as of the time infringement began

3    in 2006.  You did it as of 1997, much earlier?

4    A.    No, I didn't.

5    Q.    Could you turn to your deposition, please?  And could

6    you turn to Page 109, please?

7              THE COURT:  What line?

8              MR. LORIG:  109, Lines 11 through 21, Your

9    Honor.

10   BY MR. LORIG:

11   Q.              "Question:  And in your earlier answer, you

12   said you did such an analysis; is that right?"

13             THE WITNESS:  Sure.

14   Q.              "Answer:  I did an analysis of figuring out

15   again what Genzyme was willing to pay given the contributions

16   and risks that it would have been expecting to undertake.

17             "Question:  As of 2006?

18             "Answer:  Well, again, to figure out the value

19   of their contribution and the most they would be willing to

20   pay, you can't do that as of 2006.  That's why I did it as

21   of 1997."

22             You were asked that question and gave that

23   answer?

24             THE COURT:  Go through the whole portion.

25             MR. LORIG:  I'm sorry?

1          THE COURT:  Mr. Herman, is that what you are

2    getting ready to ask me for?

3          MR. HERMAN:  I believe the rest of the answer

4    should be read.

5          THE COURT:  I think the rest the answer in the

6    interest of completeness should be read for the jury's

7    benefit.

8    BY MR. LORIG:

9    Q.    Is there any portion of the answer you would like to

10   add, Doctor?

11   A.    Sure.

12          THE COURT:  The entire thing, I would imagine,

13   Mr. Leonard.  Go ahead.

14          THE WITNESS:  I would, guess.

15   Q.    Go ahead.

16   A.              "Answer:  But again, if you want to -- I

17   mean that is the point of the Georgia-Pacific factor 2 and

18   13.  And then you can -- if you want to, you can augment

19   that and say okay, in the hypothetical negotiation, both

20   sides would recognize even though it's in 2006" -- in other

21   words, I'm doing the hypothetical negotiation in 2006 --

22   "that's it's unreasonable to give value over -- that

23   represents lock-in value."  Lock-in value is basically the

24   value that is associated with Genzyme investments.  So the

25   hypothetical negotiation in 2006 has occurred under that

1    premise would reach the number that I've reached."

2            So I really don't know what you're saying.  As I

3    clearly did the negotiation in 2006.  I just, I took the

4    approach that you first needed to, as I said, take off the

5    part that goes to Genzyme and then figure out the part that

6    is left over, and that is what would be negotiated over in

7    2006.

8    Q.    Isn't it your opinion that the negotiation shouldn't

9    be calculated as of 2006 when infringement began but that is

10   the wrong point in time?  Isn't that your opinion?

11   A.    I think there is -- there is two different ways to

12   look at this.  One is you do it in 2006 but you make the

13   adjustments that I did and I talked about.

14           The other possibility which I discussed in some

15   of my published works is to move the negotiation back in a

16   point in time before those investments were made.  It really

17   leads to the same answer but it's two different ways to do

18   the same thing.

19   Q.    All right.  So you moved the negotiation back in 2006

20   when infringement began until 1997.  Correct?

21   A.    No, I'm saying that is one way to do it.  It's not

22   what I happened to do in this case, but it's another way to

23   do the same thing.

24   Q.    Could you turn to your deposition at Page 120,

25   beginning at Line 7, and reading through the end of the

Leonard - cross

1    page.

2                   THE COURT:  120?

3                   MR. LORIG:  Line 7, 123.

4                   THE COURT:  123.

5                   THE WITNESS:  123.  Yes, I was on the wrong

6    page.

7                   THE COURT:  Yes, you said 120.

8    Q.              "Question:

9                   THE COURT:  Hold on.  What lines?

10                   MR. LORIG:  7 through 25.  Actually the top of

11   124.

12                   THE COURT:  Just hold on a second.

13                   THE WITNESS:  Sorry.  Through 20?  I'm sorry.

14                   MR. LORIG:  124, Line 1.

15                   THE WITNESS:  Okay.

16                   MR. LORIG:  May I, Your Honor?

17                   THE COURT:  Yes.

18                   THE WITNESS:  Okay.  Yes.

19   Q.              "Question:  And what were those

20   alternatives that Genzyme had in 2006 at the date of the

21   hypothetical?

22                   "Answer:  Well, I'm telling you that is another

23   problem.  That you are looking at the wrong point in time.

24                   "Question:  Okay.  So they did have alternatives

25   and those alternatives both times included something else

1    with their assets and doing something else with their assets

2    is something most economists would call a not very close

3    substitute; correct?

4                    "Answer:  I think that is completely incorrect.

5                    "Question:  Okay.

6                    "Answer:  As of -- in 1997, when there are huge

7    risks and costs to be undertaken, there is a lot else you

8    can do, and it's going to look pretty attractive because

9    from that point of view, the royalties that you're willing

10   to pay are very low."

11                   Now, you are referring to 1997, not 2006 when

12   infringement began?

13   A.    Right.  But this is the reason why you need to adjust

14   the negotiation in 2006 to account for this very fact.  So

15   again I did a negotiation in 2006, but I first took out, as

16   I said before, the Genzyme costs and the risks incurred.  I

17   accounted for that.  And then what is left over, that is

18   what we negotiated over in 2006.  And, you know, I'm

19   discussing how that can work.

20   Q.    Well, you didn't do an analysis to see what

21   substitutes Genzyme might have for Fabrazyme as of the time

22   of the hypothetical negotiation; correct?

23   A.    Well, again, I was adjusting for the costs and the

24   risks that were involved.  At that point, there might have

25   been alternatives but I didn't look into those specifically,

 1   that's correct.

 2   Q.    So you didn't look at the alternatives as of March of

 3   2006; correct?

 4   A.    As of that time, no.

 5   Q.    Okay.  And if Genzyme had not been willing to split

 6   its net operating profits 50/50 with RCT because of a valid

 7   and infringed patent, is it your opinion that they would

 8   have discontinued selling Fabrazyme and just given up those

 9   operating profits?

10   A.    No.  I mean my opinion is that is not a way to

11   approach a reasonable royalty in that case.

12             MR. LORIG:  All right.  Thank you very much.

13             THE COURT:  Any redirect, Mr. Herman?

14             MR. HERMAN:  No, Your Honor.

15             THE COURT:  All right.  Thank you, Mr. Leonard.

16   Take care.

17             (Witness excused.)

18             Ladies and gentlemen, let's take our afternoon

19   break.

20             (Jury left courtroom.)

21             THE COURT:  Those who need to leave may leave.

22   Other counsel that need to talk with me can stay.

23             MR. LORIG:  I believe we have an issue about

24   remaining -- excuse me.  I believe we have an issue about

25   remaining time.  By our calculations, defendant has about

```
 1    38 minutes left.

 2              MS. LORING:  Mr. Lorig, may I interrupt?

 3              We have 10 minutes of -- 15 minutes of cross of

 4    Dr. Sands left.  I don't think this is going to be an issue.

 5              MR. LORIG:  May I ask?

 6              MR. EMANUEL:  Eight minutes.

 7              MR. LORIG:  Eight or ten minutes.  It doesn't

 8    make a difference.  I assume.

 9              THE COURT:  We will be in recess.

10              (Brief recess taken.)

11              *     *     *

12              (Proceedings reconvened after recess.)

13              THE COURT:  How many more witnesses does the

14    defense have?

15              MS. LORING:  We are about to rest, Your Honor.

16              THE COURT:  Okay.  Let's bring in the jury then.

17              MR. LORIG:  Your Honor, should we move outside

18    of the presence of the jury?

19              THE COURT:  You want to move, too?

20              MR. LORIG:  On JMOL.

21              THE COURT:  Okay.

22              (Jury enters courtroom at 3:35 p.m.)

23              THE COURT:  Please take your seats, ladies and

24    gentlemen.

25              Ms. Loring.
```

1               MS. LORING:  Your Honor, Genzyme rests.

2               THE COURT:  All right.  Ladies and gentlemen, I

3     just need to speak with the lawyers over here for a minute

4     about a legal matter.

5                    (The following took place at sidebar.)

6               THE COURT:  Okay.

7               MR. PAUNOVICH:  We would move for judgment as a

8     matter of law on infringement, direct infringement, induced

9     infringement, contributory infringement, as well as a

10    declaration that the patent is valid and enforceable.

11              THE COURT:  Denied.

12                   (End of sidebar conference.)

13              THE COURT:  Mr. Lorig, your rebuttal case.

14              MR. LORIG:  Your Honor, Mr. Paunovich will call

15    Dr. Mark Sands to the stand.

16              ... MARK S. SANDS, having been duly sworn as a

17    witness, was examined and testified as follows ...

18              MR. PAUNOVICH:  May I approach, Your Honor?

19              THE COURT:  You may.

20                         DIRECT EXAMINATION

21    BY MR. PAUNOVICH:

22    Q.    Good afternoon, Dr. Sands.

23    A.    Good afternoon.

24    Q.    Can you please introduce yourself to the jury and

25    explain your assignment in this case?

1    A.    My name is Mark Sands.  I was retained by Shelbyzyme

2    to provide opinions on the validity of the '831 patent.

3    Q.    Can we please call up PTX-992 onto the screen.

4          You also have a copy of that exhibit in your

5    binder, Dr. Sands.

6          Do you recognize Exhibit PTX-992?

7    A.    Yes.

8    Q.    What is it?

9    A.    This is a copy of my curriculum vitae.

10   Q.    Can you explain for the jury your education from high

11   school and then also your professional experience?

12   A.    Sure.  I received a Bachelor's degree in 1980 from the

13   Rochester Institute of Technology in nuclear medicine.

14         In 1990 I received my Ph.D. from the State

15   University of New York at Stony Brook in molecular biology,

16   from the Department of Molecular Pharmacology.

17         Beyond that, immediately after I got my Ph.D., I

18   did a three-year postdoctoral fellowship at the Jackson

19   Laboratory, up in Bar Harbor, Maine, where I first became

20   interested in lysosomal storage diseases.

21         Then I did a one-year postdoctoral fellowship at

22   the University of Pennsylvania, where I continued to study

23   lysosomal storage diseases.

24   Q.    What do you currently do for a living, Dr. Sands?

25   A.    I am a professor at Washington University School of

1  Medicine in the Departments of Internal Medicine and

2  Genetics.

3  Q.    And can you please explain -- have you prepared some

4  slides to help explain your testimony today for the jury?

5  A.    Yes, I have.

6  Q.    If we can call up PDX-507.  Can you explain for the

7  jury -- this is a demonstrative that will be on the screen

8  in front of you as well as on this large screen up here.

9  Can you explain for the jury briefly what your experience is

10 with lysosomal storage diseases?

11 A.    Sure.  As I mentioned, I began studying lysosomal

12 storage diseases in 1990 when I was doing a postdoctoral

13 fellowship at the Jackson Laboratory.  And I have continued

14 to study lysosomal storage diseases since that time.

15        We have studied a number of different diseases,

16 including Fabry disease, infantile Batten disease, several

17 of the polysaccharide diseases.

18 Q.    How do these other lysosomal storage diseases relate

19 to Fabry disease in your opinion?

20 A.    So all of the lysosomal storage diseases that we have

21 been studying over the years, like Fabry disease, are caused

22 by deficiency of a single lysosomal enzyme.  In the absence

23 of the lysosomal enzyme, as you have heard here during all

24 the testimony, undegraded material accumulates in the

25 lysosome and causes cellular dysfunctions.

Sands - direct

1    Q.    Do you also do research in this field?

2    A.    Yes.  Actually, that's my primary function, at

3    Washington University.

4    Q.    Have you published any of your research?

5    A.    Yes, we have.

6    Q.    How many peer-reviewed articles have you published?

7    A.    We have published over a hundred peer-reviewed

8    articles.

9    Q.    Do you have any professional experience with Genzyme?

10   A.    Yes, I do.  In 2000, I believe it was 2000, I was

11   invited by Genzyme to give a seminar to talk about our gene

12   therapy work on one of the lysosomal storage diseases.  In

13   addition, I received a grant, I believe it was in 2001, a

14   two-year grant from Genzyme to continue with the gene

15   therapy experiments in one of the mouse models of lysosomal

16   storage diseases.

17   Q.    Do you also have experience with the Mt. Sinai School

18   of Medicine?

19   A.    Yes, I do.

20         I don't remember the exact date.  I believe it

21   was in 2001, I was invited to the Mt. Sinai School of

22   Medicine -- the Department of Human Genetics, to give a

23   seminar on our research regarding gene therapy approaches

24   for lysosomal storage diseases.

25   Q.    What experience do you have in the production of

1    recombinant proteins in the baculovirus insect cell system?

2    A.     Back in the late 1990s and early 2000s, we performed

3    an experiment where we produced a recombinant lysosomal

4    enzyme in the baculovirus system and then did an experiment

5    where we directly compared the in vivo biodistribution and

6    the clinical effects of that baculovirus-produced enzyme to

7    the same enzyme produced in a mammalian system, in an enzyme

8    that is phosphorylated.

9    Q.     Are you familiar with the '831 patent that is at issue

10   in this case?

11   A.     Yes, I am.

12   Q.     Do you believe you have any experience relevant to the

13   issues that you are opining on related to the '831 patent?

14   A.     Yes, I do.  My technical experience and my knowledge

15   base is consistent with everything that is being discussed

16   here at this trial.

17   Q.     Can you describe -- there has been a lot of testimony

18   about recombinant DNA technology.  Can you describe for the

19   jury, briefly, what the state-of-the-art was concerning

20   recombinant DNA in the 1970s and 1980s?

21   A.     Sure.  Just in broad strokes, recombinant DNA

22   technology was really first being developed in the 1970s.

23   It was really in its infancy.  And the development of what

24   you have heard about in this trial, vectors, protein

25   expression systems, again, was just being developed in the

1   seventies.  And in most of the systems that were available

2   in the 1970s, they were what are called procaryotic systems.

3   That basically simply means bacteria, very simple systems.

4          In the 1980s, the procaryotic systems were

5   further developed, of course.  But then people were starting

6   to develop what are called eucaryotic systems.  Those

7   expression systems rely on using cells for more complicated

8   organisms, humans, Chinese hamsters, primates, dogs, cats,

9   that sort of thing.

10  Q.    Are insect cells a eucaryotic expression system?

11  A.    Yes, they are.

12  Q.    There -- you have been present for the testimony

13  throughout this trial?

14  A.    Yes, I have.

15  Q.    There has been a lot of talk about the CHO cell

16  system, the baculovirus system?

17  A.    Yes.

18  Q.    If we can call up Slide PDX-539.  Can you explain for

19  the jury your understanding of the general differences

20  between these two systems that we have heard much testimony

21  about?

22  A.    Sure.  So this is, again, in broad strokes, this is a

23  comparison of the baculovirus insect system to the Chinese

24  hamster ovary system.  Again, both are eukaryotic systems.

25  One difference between the two is the baculovirus system is

```
 1    a transient system.  And what we mean by transient is it

 2    will express very high levels of protein but for a

 3    relatively short period of time.

 4              In contrast, the Chinese hamster ovary cells can

 5    also express high levels of protein but for an extended

 6    period of time.

 7              Both systems are scaleable, so they can be

 8    scaled up to a very large level.  And as I mentioned just a

 9    second ago, in both systems you produce very high levels of

10    recombinant proteins.

11    Q.    Now, the fact that the baculovirus insect system is

12    transient in nature, does that in any way detract from its

13    use to produce recombinant proteins?

14    A.    No.  It really doesn't.  Every system has differences,

15    strengths, weaknesses, that sort of thing.  And, again, as

16    you can see, the baculovirus system is transient.  And you

17    can use a transient expression system for many different

18    applications.

19    Q.    Do people use the baculovirus insect cell system

20    today?

21    A.    Yes.  Actually, it's been, over the years, it's been

22    very well developed.  In fact, there is a very well

23    characterized commercially available product.  Basically,

24    you can call a company, give them some money, they will send

25    you the entire, what amounts to a kit, so you can do that in
```

1   your lab with little or no development.

2   Q.    If you can look at PTX-922.  If we can also call that

3   exhibit up on the screen here.  Do you recognize the

4   document?

5   A.    Yes, I do.

6   Q.    What is it?

7   A.    This is a description of a, as I was just mentioning,

8   a commercially available kit from a company called

9   Invitrogen.

10           Again, basically, this is a manual describing

11  the baculovirus system, and with all the methods laid out in

12  very good detail so that virtually any laboratory with

13  molecular biology capabilities could buy this kit and

14  produce high levels of whatever protein they are interested

15  in.

16  Q.    Is that system used today to produce useful

17  recombinant proteins?

18  A.    Yes, it is.

19  Q.    Now, we can drop that slide, Mr. Ryder, thank you.

20  And call up PDX-521.

21           In your assignment you testified you are

22  providing rebuttal opinions to Genzyme's witnesses that have

23  invalidity contentions in this case.  Is that right?

24  A.    That's correct.

25  Q.    We have displayed PDX-521.  Can you explain for the

1    jury what this summary slide is?

2    A.    So, again, this is a summary related to the claims of

3    the '831 patent that are being disputed here.  This is

4    basically a summary of my opinions, that the inventions were

5    not anticipated, that the written description in the patent

6    meets the criteria for written description, and the patent

7    also meets the enablement requirement.

8    Q.    And what evidence did you base your opinions of

9    validity on in this case?

10   A.    I believe that would be on the next slide.

11   Q.    Let's call up PDX-522.

12   A.    So I formed my opinions based on my personal years of

13   experience with common DNA technology, I have been a trained

14   molecular biologist, again, using recombinant DNA

15   techniques, for more than 25 years, my greater than 20 years

16   experience with lysosomal storage diseases, clearly, a

17   detailed analysis of the '831 patent, my knowledge based on

18   the scientific literature, and I have also had the

19   opportunity to look through laboratory notebooks, listen to

20   testimony.

21         Those are the things that my opinions are based

22   on.

23   Q.    You were present in the courtroom to hear the

24   testimony of Dr. Desnick and Dr. Ioannou?

25   A.    Yes.

Sands - direct

1    Q.     Do you understand that Genzyme contends that the

2    method of treatment claimed in the '831 patent was invented

3    by the Mt. Sinai group before Dr. Calhoun and Dr. Coppola

4    and the patent was filed after them?

5    A.     That is my understanding, yes.

6    Q.     Do you agree with that contention?

7    A.     No, I do not.

8    Q.     Why not?

9    A.     There is plenty of evidence that Drs. Calhoun and

10   Coppola actually conceived of the invention first, and then

11   diligently reduced it to practice.

12   Q.     Do you have a slide to help explain your opinion on

13   anticipation?

14   A.     Yes, I do.

15   Q.     Let's call up PDX-541.

16          What are you displaying on this slide?

17   A.     So, basically, this slide shows a timeline that

18   compares the progress that was made by both groups, both the

19   Mt. Sinai group and Drs. Calhoun and Coppola.

20          And if you look to the far left, in the spring

21   of 1988, Drs. Calhoun and Coppola began work on a

22   baculovirus system for recombinant alpha-galactosidase A.

23   Then less than a year later, in February-March 1989, they

24   had accomplished that goal.  They had produced high levels

25   of recombinant alpha-galactosidase A and performed what I

1    believe is the critical experiment that defines this

2    invention.

3              That is the uptake experiment.  That is really

4    the critical experiment, because if you produce high levels

5    of alpha-galactosidase A, it's enzymatically active, it's

6    glycosylated in some form.  Unless that enzyme gets taken up

7    into the cell, it cannot be therapeutic, because the

8    disease, or the accumulation of this undegraded material

9    occurs within the cell.  You have to get the enzyme in the

10   cell of the or else it cannot be therapeutic.

11             Therefore, again, I feel that this is really a

12   seminal or a milestone for Drs. Calhoun and Coppola.

13             And then approximately one month later, Drs.

14   Calhoun and Coppola submitted their first patent.  And then

15   one year after that, they submitted a second patent.

16   Q.    What is your understanding of when the Mt. Sinai group

17   was able to perform the same, what you have identified as,

18   critical experiments?

19   A.    Right.  So if you look for the bottom, the red flags

20   represent the rough timeline of the Mt. Sinai group and when

21   they met the same or similar milestones.  So, for example,

22   in early April of 1990, a full year after Drs. Calhoun and

23   Coppola did their first uptake experiments the Mt. Sinai

24   performed their uptake experiment, and very shortly after

25   that the Mt. Sinai group submitted or filed their first

1    patent.

2    Q.    Now, you have identified -- I apologize my pointer is

3    not as visible.  But you have identified here in April 30th,

4    Mt. Sinai invention disclosure.  Why did you put that on

5    this slide?

6    A.    Well, in fact, I made an error.  I said this is when

7    they filed the patent.  That is incorrect.  They made an

8    invention disclosure to Mt. Sinai.

9              They filed their patent application in October

10   of 1990.

11             But this date is significant, because this would

12   suggest that at this time, in the spring of 1990, that is

13   when they felt that they truly had their invention in hand.

14   Q.    Now, you were present earlier this morning for the

15   testimony of Dr. Ioannou?

16   A.    Yes, I was.

17   Q.    And did you hear him explain about a portion of his

18   lab notebook that he had done uptake experiments perhaps as

19   early as January of 1990?

20   A.    Yes, I did hear that.

21   Q.    Would that change your opinion in this case that the

22   '831 patent is not anticipated in any way?

23   A.    No.  And what was discussed this morning, there was

24   some issue about that experiment, whether the cells were

25   washed, that sort of thing, which would, which could

1    dramatically affect the results.  But even assuming that the

2    cells were washed, that uptake experiment would have been

3    approximately in this time range (indicating).  Again,

4    significantly after the first uptake experiments and patent

5    filing by Drs. Calhoun and Coppola.

6    Q.    Did you also hear testimony from Dr. Ioannou and Dr.

7    Desnick about when you know if you have a therapeutically

8    relevant recombinant protein?

9    A.    Yes.  And my understanding from their testimony, from

10   their opinions, the uptake experiments, and basically I'm in

11   agreement, full agreement with them, the uptake experiments

12   are really when you have a sense that you have got a

13   recombinant enzyme that can be taken up into the cell and be

14   therapeutic.  Again, you can make all the enzymes that you

15   want.  If it's not taken up in the cell, it can never be

16   therapeutic.

17   Q.    And the last red flag that you identified, this is

18   what, again (indicating)?

19   A.    That is October 1990.  And that is when Mt. Sinai

20   submitted or filed their first patent.

21   Q.    That's the '804 patent of the Mt. Sinai group?

22   A.    That's correct.

23   Q.    Now, do you recall as well some testimony from

24   Dr. Desnick and Dr. Ioannou, what they described as their

25   diligence from around about the time in June of 1986 when

1    Dr. Ioannou had started at Mt. Sinai until the filing of

2    their patent, the '804 patent?

3    A.    Yes, I do.

4    Q.    Do you agree that they were, the Mt. Sinai group was

5    diligent in the various experiments that they performed

6    during that time range?

7    A.    I do not.

8    Q.    Do you have a slide to explain why you disagree?

9    A.    The next slide, actually.

10   Q.    All right.  If we can show PDX-549.

11         Dr. Sands, why do you disagree that the Mt.

12   Sinai group was diligent?

13   A.    Well, they essentially claimed conception here in

14   June 1986.  And my understanding of conception is when you

15   have a clear and permanent idea of what the invention is

16   going to be, so you know what it's going to be and then you

17   work towards that goal.

18         In 1986, the Mt. Sinai group cites a grant

19   application.  That is basically when they first had or with

20   when they first conceived of this idea.  And I've had a

21   chance to review those grant applications and actually

22   several additional grant applications after that.  And in

23   the grant applications, first of all, the goal of the grant

24   application was to test various hypotheses, not really to

25   make therapeutic product but test various hypotheses with

1    respect to alpha-galactosidase A.

2              But the experiments they proposed to accomplish

3    those goals were really a relatively large list of different

4    expression systems, including E. coli, baculovirus and

5    several other systems.  So there was really no clear focus

6    on any one approach or any one invention, if you will.

7    Q.    Now, you have here on the slide "hypothesis" in

8    quotations.  What are you referring to there?

9    A.    Well, again, the goal of these earlier grants were to

10   test, again, basically, basic hypotheses, to test whether

11   something is correct or not correct.  Again, the goal was

12   really not to produce -- the stated goal is not to produce

13   therapy but to test hypotheses about how these enzymes work,

14   where they go, that sort of thing.  More basic biology.

15   Q.    How long had passed from the time when the Mt. Sinai

16   group claims to have conceived of this invention until

17   filing of the '804 patent?

18   A.    Well, you can clearly see up here from June of 1986

19   until October of 1990, over four years had passed from,

20   again, what they refer to as conception to when they filed

21   their first patent.

22   Q.    In your opinion, does that represent diligence?

23   A.    No, that is actually quite a long period of time.

24   And, again, during that period of time, they were

25   experimenting with a number of different expression systems.

1    Q.    Do you recall what types of expression systems they

2    were experimenting with?

3    A.    In the grant proposals, they were proposing to use E.

4    coli, which is again a very simple prokaryotic system, Cos

5    cells, baculovirus, and they actually do mention CHO cells

6    in those forms.

7    Q.    And if we can go back to slide PDX-542.

8              In terms of the diligence of the Mt. Sinai

9    group, how does that compare to Dr. Calhoun and Dr. Coppola?

10   A.    So again if we use this accrued time line.  If we

11   consider spring of 1988 as conception for Drs. Coppola and

12   Calhoun, it basically took them probably a little less than

13   a year, maybe right around a year, from conception to filing

14   their first patent.  And, again, during that time, the

15   notebooks they were basically focusing on, the baculovirus

16   system, working very diligently working towards that goal,

17   again, took only about a year.

18             In contrast, again, assuming that the 1986 time

19   frame was conception for the Mt. Sinai group, it took well

20   over four years to get from conception to filing of the patent.

21   Q.    In your opinion, did the Mt. Sinai group actually

22   conceive of the invention in the '804 patent in June of

23   1986?

24   A.    Well, no.  In fact, that's why I said if you assume

25   conception was -- if you assume conception was 1986.  A

1    grant application with a number of different directions to

2    go, a number of different proposed experiments, proposed

3    expression systems, that is really not conception.  That is

4    not a clear and permanent idea of what the invention is

5    going to be.

6    Q.    Now, to come back to this slide again, in your

7    opinion, in making this determination about whether or not

8    Genzyme is right and the patent is anticipated, what is the

9    most critical part of that analysis as to who had done it

10   first?

11   A.    Well, in my opinion, it's when they perform the uptake

12   experiment and submitted their first patent.

13   Q.    And why, again, is that?  Why is that the most

14   critical event?

15   A.    Well, again, the uptake experiments, without uptake,

16   you don't have therapy.  Again, you can make all the enzyme

17   in the world.  If it does not get in the cell, you will not

18   treat the disease.

19            So the uptake experiments are absolutely

20   critical.  In my opinion, it is the proof of principal

21   experiment, really defines the invention.

22   Q.    And in your opinion, is the '831 anticipated by the

23   Mt. Sinai group work?

24   A.    I'm sorry.  Say that again, please.

25   Q.    In your opinion, is the '831 patent, Dr. Calhoun's

1    patent, is it anticipated and therefore invalid because of

2    the Mt. Sinai work?

3    A.    No, it is not.

4    Q.    All right.  Let's move on from the Mt. Sinai work to

5    written description.  Dr. Sands, you have been present to

6    hear the testimony of Dr. Grabowski?

7    A.    Yes.

8    Q.    And do you understand that he has an opinion that

9    the '831 patent does not meet the written description

10   requirement?

11   A.    Yes.

12   Q.    Do you agree with his opinion?

13   A.    No, I do not.

14   Q.    Let's look at PTX-1 and help explain your opinions.  I

15   believe it's in the front of your binder, loose.

16   A.    Yes.  Got it.

17   Q.    Do you recognize PTX-1 as the '831 patent?

18   A.    Yes, I do.

19   Q.    That is the Drs. Calhoun and Coppola patent?

20   A.    Yes, that's correct.

21   Q.    Now, Dr. Sands, do you have an understanding of what

22   the written description requirement requires?

23   A.    My understanding of written description is that a

24   person of ordinary skill in the art, so someone who knows

25   all the techniques, who is familiar with the system, a

1    person of ordinary skill in the art could read this patent

2    and it would be written in such a way, when you are finished

3    reading it, you would know that the inventors actually

4    possessed the invention.

5    Q.    And can we call up slide -- well, did you analyze the

6    '831 patent to make a determination as to whether or not it

7    met the written description requirement?

8    A.    Yes, I did.

9    Q.    Have you prepared a summary of slides to show the jury

10   what you looked at to determine and show that it has met

11   that requirement?

12   A.    Yes.

13   Q.    Let's call up slide PDX-523.

14         And what have you shown first on this slide?

15   A.    So this is a slide showing several of the claims at

16   the end of the patent.  And, in particular, these are claims

17   1, 2 and 6.

18   Q.    And, what, claim 1 is directed to a method of treating

19   a disease?

20   A.    That is correct.

21   Q.    And so in looking for whether or not there was

22   adequate support for that method of treating disease, what

23   did you look for in the patent?

24   A.    So there is actually several sections in the patent

25   that I looked at.  The first one is in the summary of the

 1    invention, which I believe is in the next slide.

 2    Q.    All right.  Let's call up PDX-524.

 3    A.    Right.  So this is in the summary of the invention.

 4    So this is a summary of the whole patent.  Summary of the

 5    invention.  And if you -- the last paragraph of the summary

 6    basically -- again, I'll just summarize it for you --

 7    basically talks about treating a disease resulting from the

 8    deficiency of human alpha-galactosidase A, and that disease

 9    being Fabry disease.

10    Q.    What else did you look at?

11    A.    So I also looked at patent specifications.  And in

12    particular, column 7, which I think is in the next slide.

13    Q.    If we can call up PDX-525.

14          And can you show the jury -- do you have a copy

15    of the '831 patent there in front of you?

16    A.    Yes, I do.

17    Q.    Can you show them where you are looking at in the

18    patent?

19    A.    Sure.  So it's about three-quarters of the way through

20    the patent.  And there are only two pages left of the

21    patent.  So it's towards, again, the middle to the end of

22    the patent.  And this is a small excerpt from part of the

23    patent specification that is from column 7.  And, again,

24    basically it talks about developing a method of treatment

25    for Fabry disease.

1  Q.    And if we can actually drop this slide and pull up

2  PTX-1, Page 10.

3           Is this the portion of the '831 patent that you

4  were just referring to?

5  A.    That's part of it.  And it extends to the next page as

6  well.

7           MR. PAUNOVICH:  So that is -- can we blow up

8  this portion, just up here?  A callout of this, the column,

9  so the jury knows?

10          Are we able to make that a little bit bigger,

11  Mr. Reiter?

12 BY MR. PAUNOVICH:

13 Q.    So that begins about midway of the patent, Column 7.

14 Is that right?

15 A.    That's correct.

16 Q.    And it goes on for Columns 7, 8, 9 and 10?

17 A.    Yes.  Right up to the first example.

18 Q.    And have you examined those portions of the

19 specification thoroughly?

20 A.    Yes, I have.

21 Q.    Is there any reference to insect cells or baculovirus

22 in that section of the patent?

23 A.    No, there is not.  That entire section is dedicated to

24 a method of treatment for Fabry disease.

25 Q.    Are there other portions of the patent that support

1  your opinion that there is an adequate written description?

2  A.    Certainly.  Actually, on the last page of the patent,

3  in Column 14.

4  Q.    Let's call up the last page of the patent.  And if we

5  can highlight, which portion are you refreshing your

6  recollection to?

7  A.    So highlight Table 2.

8  Q.    Table 2.

9  A.    So this is the -- in this table, this shows the

10  results from, again, what I think is the critical or a

11  critical uptake experiment showing that you have got

12  enzymatically acting recombinant alpha-galactosidase A.  And

13  if you add it to cells in culture, the enzymes can be taken

14  into the cells.  And, again, I think that is really the

15  principal demonstration of the invention.

16  Q.    Now, were you present in the courtroom to hear

17  Dr. Calhoun's testimony during the first -- I'm sorry --

18  second day of the trial?

19  A.    Yes, I was.

20  Q.    Do you recall his testimony regarding certain

21  laboratory notebooks?

22  A.    Yes.

23  Q.    Did you review those laboratory notebooks in providing

24  your opinion on written description?

25  A.    Yes, I did.

Sands - direct

1    Q.    And what did you find in the lab notebooks related to

2    the testimony that you just gave?

3    A.    So the data presented in Table 2 that you just saw,

4    there is an entry in what is called the C3 notebook that has

5    those exact numbers for the data presented in Table 2, for

6    the uptake experiment.

7    Q.    Do you know whether Dr. Calhoun and Coppola performed

8    any other uptake experiments?

9    A.    Yes.  Actually, throughout the C3 notebook, there are

10   several additional uptake experiments basically trying to

11   repeat and confirm the initial findings.  All the findings

12   basically showed the same basic trend.

13   Q.    And what is that basic trend?

14   A.    So all of the experiments demonstrate that the

15   recombinant alpha-galactosidase A produced in baculovirus is

16   taken up by the fibroblasts in a dose dependent fashion.  In

17   other words, if you add more and more enzyme to the media,

18   the cells will take up more.  And,

19         What is particularly interesting is if you add

20   enough alpha-galactosidase A to those cells to actually

21   cells effected by Fabry disease, the level of enzyme in

22   those cells can equal or, in many cases, exceed the normal

23   levels.  And that is really what you are looking for if you

24   are trying to get therapeutic approach.  Certainly, if you

25   can reconstitute the normal or natural levels, you would

1    have a therapeutic response.

2    Q.    Now, to your right are some green covered documents.

3    What are those?

4    A.    These are two of the notebooks from Dr. Calhoun's

5    laboratory.  These are getting a little old, actually.

6    Q.    Do you recall, are those the notebooks that you recall

7    Dr. Calhoun testifying about?

8    A.    Yes.  These notebooks are C2 and C3.

9    Q.    And to go back, you mentioned that there were some

10   experiments, uptake experiments that you found in C3.  Did

11   you also find uptake experiments in C2?

12   A.    Yes, there were.

13   Q.    And if we can call back up PDX-541.

14          When exactly again did you find in examining

15   those documents, Drs. Calhoun and Coppola, when did they

16   perform the first critical uptake experiments?

17   A.    Right around this date, February/March of 1989.

18   Q.    Now, you heard some fairly quick testimony by

19   Dr. Grabowski concerning the Table 2 of the '831 patent and

20   a figure that appears in a paper published a few years later

21   just earlier today.  Do you recall that testimony?

22   A.    Yes, I do.

23   Q.    Do you agree with the opinions that Dr. Grabowski had

24   concerning what he identified as a discrepancy between a

25   paper and a patent?

Sands - direct

1   A.    No, I don't.

2   Q.    Why not?

3   A.    Well, after discussing the data and actually going

4   back to the original notebooks, after discussing this with

5   Drs. Calhoun and Coppola, the discrepancy was actually --

6            MR. HANEY:  Your Honor.

7   A.    -- it can be accounted for.

8            THE COURT:  Yes.

9            MR. HANEY:  Your Honor, he is getting ready to

10  testify about what he heard.

11           THE COURT:  Work it out.

12           MR. PAUNOVICH:  Let's see if we can proceed.

13           THE COURT:  All right.

14  BY MR. PAUNOVICH:

15  Q.    Dr. Sands, do you have a personal understanding of

16  whether or not there is a discrepancy?  And I'm not asking

17  you to tell me what, or to tell the jury exactly what

18  Dr. Coppola or Dr. Calhoun had told you, but do you have an

19  understanding of whether or not there is a discrepancy in

20  the data in the '831 patent as compared to the later paper?

21  A.    There are actually two sets of data.  To my

22  understanding, there are actually two sets of data on that

23  one page in the C3 notebook.  So there appears to be a

24  discrepancy between the data sets between what is published

25  in the manuscript and what is in the patent.

1   Q.    What are the key findings between those two sets of

2   data, though?  Or what are the significant takeaways from

3   those two sets of data?

4   A.    Sure.  So both sets of data represent uptake

5   experiments.  And the discrepancies is that one data set is

6   only about, the levels of enzyme activity, only about

7   10 percent compared to the other data set.  But what it

8   really shows, again, is it shows this dose dependent uptake.

9   And in each case, when you compare that to a normal cell, of

10  course normal there is no disease in it, in both cases the

11  level of enzyme that is taken up by the fibroblasts exceeds

12  the level of activity in normal cells, which, of course,

13  would be therapeutic.

14  Q.    Have you prepared any slides to explain what you mean

15  by that?

16  A.    Yes, I have.

17  Q.    If we can pull up PDX-547.  What have you taken from

18  this slide?

19  A.    We were talking about Table 2 just a few minutes ago.

20  That was in Table 4 form.  These are the same data taken

21  from the patent.  This line right here shows the uptake of

22  alpha-galactosidase A in Fabrazyme fibroblast as the amount

23  of enzyme in the media increases.  You can see this uptake

24  here.

25          These are normal fibroblasts.  Again, this curve

Sands - direct

1      shows the uptake of the same enzyme in a normal fibroblast.

2                What is important about this slide is if you

3      look at the level of enzyme activity here in these Fabry

4      fibroblasts, and actually come over here to this axis, you

5      can see that this level of enzyme activity is actually

6      higher than what you see in a normal cell not exposed to any

7      of the exogenous alpha-galactosidase A.  Again, showing that

8      there is uptake, in again not only normal levels but what

9      you can actually see, which would be therapeutic.

10     Q.    Why is that significant?

11     A.    Well, that is significant because, again, without

12     uptake, you have no therapy.  And again, this level of

13     uptake is, again, near normal levels or above normal levels.

14     Q.    So in your opinion -- you heard Dr. Grabowski's

15     contentions regarding that data.  Do you agree with his

16     contentions regarding that data?

17     A.    Refresh my memory on his contentions.

18     Q.    That there is some sort of problem with the data

19     disclosed in the '831 patent?

20     A.    Well, no, not really.  The data -- in all of the

21     uptake experiments I reviewed, the data are consistent in

22     that the level of enzyme activity in the Fabry fibroblasts

23     reaches normal or exceeds normal levels in each of the

24     experiments.

25                And the true control here are the normal cells.

1    So if you do an experiment on one day, an experiment on

2    another day and you get different numbers -- that's why we

3    run controls.  You always have the normal cells there.  What

4    is the level of activity compared to normal?

5    Q.    And how does the set of data that is in the later

6    paper that Dr. Grabowski spoke about compare to this

7    significant trend that you have identified for the

8    experiments, the separate experiments performed in the '831

9    patent?

10   A.    If you can bring up the next slide, I will demonstrate

11   that.

12   Q.    Let's go to PDX-548, please.

13   A.    So this slide shows the data from a separate

14   experiment.  This is actually from a peer-reviewed

15   manuscript by Drs. Coppola and Calhoun.

16          Again, I will go through this a little quicker

17   because the data are essentially the same.

18          In the Fabry fibroblast you see this

19   dose-dependent uptake of recombinant galactosidase A

20   produced in baculovirus.  This shows the uptake in normal

21   fibroblast.  You can see both cell types take up the enzyme.

22   But again, if you go out here and come over to this axis,

23   you can see that the level of enzyme activity in the Fabry

24   fibroblasts, again, is either normal or actually in this

25   case exceeds normal, very much like what was presented in

1    the previous slide, in the previous experiment.

2    Q.    Now, before moving on to another subject, given Dr.

3    Grabowski's opinion that the '831 patent, his opinion that

4    it does not have an adequate written description, in your

5    opinion, does the '831 patent meet the written description

6    requirement?

7    A.    Yes.   I personally believe that it meets the written

8    description for a method of treatment for Fabry disease.

9    Q.    Let's move on to Dr. Grabowski's next opinion.

10            We can drop this, Mr. Ryder?

11            You heard Dr. Grabowski's testimony regarding

12   his opinion that the '831 patent is invalid because it's not

13   enabled?

14   A.    Yes.

15   Q.    Do you have an understanding of what the enablement

16   requirement is?

17   A.    I am not a lawyer.   But my understanding is that in

18   order to meet the enablement requirement, a person of

19   ordinary skill in the art, again, someone with the right

20   expertise, the right knowledge, would be able to take the

21   patent, read it, then go back to their lab and basically

22   reproduce the invention.

23   Q.    And do you understand Dr. Grabowski's opinion relating

24   to enablement, that a baculovirus-produced enzyme would not

25   be therapeutically effective?

Sands - direct

1   A.    Yes.

2   Q.    And do you agree with that opinion?

3   A.    No, I don't.

4   Q.    Have you prepared any slides to summarize why you

5   don't agree?

6   A.    Yes, I have.

7   Q.    All right.  If we can go to PDX-537.  What have you

8   shown on this slide?

9   A.    So this is just, again, my opinion on whether the

10  presence of manno-6-phosphate on the recombinant

11  galactosidase A would be necessary to be therapeutic.  My

12  opinion is no.

13          What has been presented up to this point, at

14  least primarily, is a single uptake system.  That's the

15  mannose-6-phosphate receptor uptake system.  That clearly

16  exists.  And if you have enzyme that is phosphorylated, it

17  binds that receptor, it will be taken up, and you can get it

18  taken up in therapeutic amounts.

19          But there are other uptake systems that will

20  also bring lysosomal enzymes into the cell and it can bring

21  in therapeutic levels.

22          One additional system is the mannose receptor.

23  Not the mannose-6-phosphate, but the mannose receptor.

24          Another system is fluid phase pinocytosis.

25          Another point is that it is believed that in

Sands - direct

1    most lysosomal storage diseases, at least storage diseases

2    that are caused by a deficiency in a lysosomal enzyme, like

3    Fabry disease, nucleopolysaccharide disease, any of those, a

4    relatively small amount of enzyme taken up into the cell can

5    be therapeutic.  And the numbers that people typically cite

6    for that are levels of maybe five to ten percent normal

7    levels.  So from a therapy point of view, that's great.

8              We don't have to get up to normal levels.

9    Relatively low levels can be therapeutic.

10   Q.    Dr. Grabowski testified regarding a Marchesan paper

11   which I think relates to fluid phase pinocytosis.  If we can

12   call that up.  PDX-535.

13             Let's go back to 536, please.  Are you familiar

14   with the Marchesan paper?

15   A.    Yes, I am.

16   Q.    Do you recall Dr. Grabowski's testimony regarding this

17   paper?

18   A.    Yes, I do.

19   Q.    What was significant about the Marchesan paper?

20   A.    So, actually, there were two very significant findings

21   about that paper.  That paper actually shows one of the

22   first, if not the first, examples of somebody looking at the

23   mechanism of uptake of galactosidase A in endothelial cells.

24   Remember, endothelial cells are the cells that are

25   specifically most severely affected in Fabry disease.

Sands - direct

1           So the first significant finding was that the

2   recombinant enzyme in this case it was phosphorylated, the

3   recombinant enzyme could be taken up in these cultured

4   endothelial cells.

5           The second finding, which is really quite

6   interesting, is that it appears that this uptake mechanism

7   doesn't involve the mannose-6-phosphate receptor because

8   they were unable to detect any, or at least a vanishing

9   small level of the mannose-6-phosphate receptor in those

10  cells.

11  Q.    Why is that significant in terms of a method for

12  treating Fabry disease?

13  A.    Well, it's significant because it helps define or it

14  helps us understand what these uptake mechanisms are.  The

15  more we understand about the uptake mechanisms, we may be

16  able to produce or generate or create different kinds of

17  enzymes that can be more actively or more efficiently taken

18  up.

19          If we know which receptors are involved, or if

20  it is a receptor-independent mechanism, again, that gives us

21  information where we may be able to develop more effective

22  therapies.

23  Q.    If we can call up PDX-543.

24          It was PTX-702 that you had been speaking about.

25  That is the Marchesan article?

1    A.    It is the Marchesan article, yes.

2    Q.    Have you prepared this slide?

3    A.    Yes, I have.

4    Q.    What are you describing on this slide?

5    A.    So this is the Marchesan paper.  This was performed by

6    a group at the University of Cambridge.  It's a very recent

7    paper.  It just was accepted for publication earlier this

8    year.

9               As was brought up previously, it was in a

10   peer-reviewed journal.  In other words, several independent

11   experts reviewed the data, viewed them to be correct and

12   that the data supported the conclusions of the paper.

13   Q.    You also heard Dr. Grabowski's testimony regarding a

14   Genzyme posterboard.  Do you recall that?

15   A.    Yes, I do.

16   Q.    If we can call up DTX-601?

17              Mr. Ryder, if you could do it as the PDF, with

18   the larger version, please.

19              You heard Dr. Grabowski's testimony suggesting

20   that this particular posterboard calls into doubt the

21   Marchesan paper.  Do you recall that testimony?

22   A.    Yes, I do.

23   Q.    Do you agree with it?

24   A.    No, I don't.

25   Q.    Why?

Sands - direct

1  A.     The reason is -- and what's pointed to as evidence is

2  basically, primarily down here -- is it possible to expand

3  that?

4  Q.     Let's call out Figure 4, please.

5  A.     So if you remember, these are tissue sections, so from

6  people, either normal or a person with Fabry disease.  It is

7  actually, again, a tissue section.  And they used what's

8  called an antibody to try to determine whether the

9  mannose-6-phosphate receptor was in these cells and try to

10 determine what cells they were.

11         And the brown stain shows where the antibody

12 binds and where the mannose-6-phosphate receptor is.  There

13 is clearly mannose-6-phosphate receptor in the cells of

14 these tissues.  There is really no dispute about that.

15         The two questions that come up, however, are,

16 the first one was already discussed by Dr. Grabowski, these

17 are labeled as endothelial cells.  But without a specific

18 endothelial cell marker to definitively identify those as

19 endothelial cells, these data are really inconclusive as to

20 whether that is truly an endothelial cell.

21         The other issue is -- and I am not sure if this

22 has come up during the trial or not yet -- but the

23 mannose-6-phosphate receptor, as you have heard, is on the

24 surface of the cell.  And it is responsible for capturing

25 enzymes and bringing them to the lysosome.

1          But the mannose-6-phosphate receptor is also

2    inside the cell.  And it's responsible for taking normal

3    synthesized lysosomal enzymes and targeting them to the

4    lysosome but within the lysosome.  And those

5    mannose-6-phosphate receptors that are inside the cell are

6    not responsible for taking up enzyme from outside the cell.

7          If you look at the staining here, for example,

8    this cell here, the dark blue stain actually are nuclei of

9    the cells.  And if you look, most of the stain appears to be

10   around the nuclei.  And that would suggest, at least, that

11   it's inside the cell.

12         So there is really no way to tell from these

13   images whether the mannose-6-phosphate receptor is truly on

14   the surface of the cell.  And if a receptor is not on the

15   surface of the cell, it can't find the enzyme.  It can't

16   take it out.  You can't get therapeutic response.

17         So, again, clearly the mannose-6-phosphate

18   receptor is present.  But in what cell type and where it is

19   on the cell, it's really not clear.

20         Again, these data are really inconclusive.

21   Q.    Very quickly, you also testified earlier about the

22   mannose receptor mediated uptake?

23   A.    Yes, that's correct.

24   Q.    If we can pull up PDX-530.  Can you describe very

25   briefly what you were referring to when you referred to the

1    mannose mediated receptor?

2    A.    Sure.  So the mannose receptor is again another uptake

3    system.  If you have a recombinant enzyme that has mannose

4    residues on them, which, for example, alpha-galactosidase A

5    produced in the baculovirus system, as Dr. Jarvis taught

6    this morning, it has mannose on the enzyme.  If it has

7    terminal mannose residues, it can bind to the mannose

8    receptor, it can be taken up to the cell and target the

9    lysosome.

10            If you focus on this particular panel, in this

11   particular case -- there you go -- the red staining, it is

12   not a lysosomal enzyme, but it is a molecule that would bind

13   the mannose receptor and be internalized.

14            The green shows the distribution of the mannose

15   receptor in the cell.

16            This is called a colocalization experiment, also

17   using immunofluorescents, so these little guys glow.

18            If you take something that glows green and

19   something that glows red, if it is in the same spot it turns

20   yellow.

21            As you can see, you see yellow stain here and

22   here.  So in these cells, which happen to be dermal

23   endothelial cells, the mannose receptor is expressed and it

24   can take up this molecule through the mannose receptor,

25   again, targeted to the lysosome.

1    Q.    And the green in this photo, is that the lysosome or

2    the mannose receptor?

3    A.    Actually, if you raise that slide a little bit.

4          I did make a mistake.  This designation here,

5    CD107(b) is actually what is stained in green.  That is a

6    marker for a protein called LAMP2.  LAMP2 stands for

7    lysosomal associated member protein.  So the green indicates

8    the presence of where lysosomes are localized.  Clearly,

9    this red material is being taken up into the lysosome, and

10   you see what we call colocalization.

11   Q.    Do you understand that the '831 patent is directed to

12   a method of treatment?  Correct?

13   A.    That's correct.

14   Q.    Even if somebody decided to produce

15   alpha-galactosidase A in an insect cell system, what is your

16   opinion as to whether or not it would be therapeutically

17   effective?

18   A.    I believe if you made high levels of recombinant

19   alpha-galactosidase A in a baculovirus system and

20   administered it intravenously to a patient, it could be

21   therapeutic.

22   Q.    And in your opinion, does the '831 patent meet the

23   enablement requirement because of that?

24   A.    In my opinion it does, yes.

25   Q.    And in summary, the '831 patent, do you believe that

Sands - cross

1    it's valid or invalid?

2    A.    I believe that the '831 patent is valid.

3              MR. PAUNOVICH:  Thank you.  No further

4    questions.

5              THE COURT:  Mr. Haley.

6              Ladies and gentlemen, I am going to keep you a

7    little longer tonight because I think we are going to

8    complete the evidence in short order.

9                        CROSS-EXAMINATION

10   BY MR. HALEY:

11   Q.    Good afternoon, Dr. Sands.

12   A.    Good afternoon.

13   Q.    Now, returning to your last couple of answers, when

14   Mr. Paunovich was asking you the summary questions, he asked

15   you about whether an alpha-GAL produced in a recombinant

16   baculovirus would be therapeutic, and you were very careful

17   in your answer to say, well, it could be therapeutic?

18   A.    Yes.

19   Q.    You are not willing to say it is therapeutic.  Right?

20   A.    Say that again.

21   Q.    You are not willing to say it is therapeutic.  Right?

22   A.    Well, the experiment has not been done yet.

23   Q.    So you really don't know?

24   A.    Until the experiment is done, no.  But there is

25   growing evidence, some of it I presented, there is some that

Sands - cross

1     has not been presented yet, there is growing evidence that

2     it could be, yes.

3     Q.     And no one has actually testified a baculovirus

4     produced alpha-GAL in a Fabry diseased patient; correct?

5     A.     That's correct.

6     Q.     Now, if we can pull up the last picture you showed

7     which is in Groger.  PDX-530 I believe it is.  And the

8     middle picture.

9                  Now, I believe you said that the green is the

10    lysosomes.  Correct?

11    A.     Yes.  It's an antibody in lamp 2.

12    Q.     And the yellow is proteins that have become associated

13    with the lysosomes, that is, the alpha-GAL; correct?

14    A.     Well, the red is actually a Dex strand molecule which

15    can be taken up through the Mannose receptor.

16    Q.     And the yellow?

17    A.     The yellow is where the Dex strand, which glows red

18    coalesces with the lamp 2.  Red plus green equals yellow in

19    this case.

20    Q.     So the yellow indicates what got to the lysosome.

21    Right?

22    A.     That is correct.

23    Q.     And it's correct, is it not, there is all sorts of

24    green areas there that have no yellow; right?

25    A.     That's correct.

Sands - cross

1    Q.    So none of those lysosomes picked up any of the

2    protein.   Correct?

3    A.    Well, again, Dex strand, not protein.  But it's below

4    the level of sensitivity.

5    Q.    Right.  So all of lysosomes didn't get treated with

6    this Dex strand?

7    A.    They didn't take it up, that's correct.

8    Q.    Now, you talked about the Marchesan paper and you

9    indicated it was recently published by the University of

10   Cambridge in 2012?

11   A.    That's correct.

12   Q.    That is not something Dr. Calhoun could have known

13   about in 1989.  Right?

14   A.    Clearly, he wouldn't have known about that.  But  the

15   alternate uptake mechanism that they propose in the

16   Marchesan paper has been postulated for a number of years.

17   Q.    Hypothesis; correct?

18   A.    That's correct.

19   Q.    And, in fact, the Marchesan paper is about in vitro

20   experiments, that is, in glass in the laboratory?

21   A.    Yes, it is.

22   Q.    It's not about experiments in patients; right?

23   A.    There were no patient samples in this.

24   Q.    So you don't really know what would happen when you

25   treat patients with this, the Marchesan hypothesis, if the

1    cells don't have M-6-P receptors?

2    A.    That's right.  That experiment hat been done yet.

3    Q.    Now, you also talked about the patent in suit.

4          If we can pull up PDX-1.

5          And this was in your discussion of written

6    description.  Do you recall that?

7    A.    Yes, I do.

8    Q.    And you indicated in that discussion that you found

9    a number of places in the patent where it said, recombinant

10   enzyme or recombinant alpha-GAL, and it didn't go on to say

11   produced in baculovirus insect cell.  Is that correct?

12   A.    That is correct.

13   Q.    That was your argument as to why the patent was

14   broader than just producing in baculovirus and insect cells.

15   Correct?

16   A.    Yes.

17   Q.    And you specifically mentioned Example 5 as one

18   example of that.  Right?

19   A.    Yes, I did.

20   Q.    Can we pull up Example 5, please?

21         Now, the title of Example 5, you see is the

22   uptake of recombinant alpha-GAL A by normal and Fabry

23   fibroblast.  Correct?

24   A.    Yes.

25   Q.    That doesn't talk about baculovirus or insect cells,

1  does it?

2  A.    No, it does not.

3  Q.    But you agree the entire example, following the title,

4  is all about protein made in baculovirus and insect cells.

5  Right?

6  A.    The example they use in the patent is baculovirus

7  produced enzyme.  Yes.

8  Q.    That isn't quite what I asked.  I asked under the

9  title of recombinant alpha-GAL A, and the title of this

10  experiment, everything else in this experiment, this

11  experiment Example 5, is related to baculovirus produced

12  protein.  Right?

13  A.    That's the protein they used for the uptake

14  experiment, yes.

15  Q.    Now, you also talked a little bit about diligence and

16  you said, well, four years is a very long time.  How long

17  did it take you to get your Ph.D.?

18  A.    It took me five years.

19  Q.    And were you diligent during those five years in

20  trying to get your Ph.D.?

21  A.    Yes, I was.  Diligent in that I had one project, and I

22  worked on that one project for the entire time.

23  Q.    And like you and I and Dr. Ioannou, we probably worked

24  seven days a week, most long hours?

25  A.    It was only a few years ago I stopped working seven

Sands - cross

1    days a week, yes.

2    Q.    Now, can we pull up PDX-549 -- I'm sorry -- PDX-541,

3    which I think is the time line.

4              Now, you presented this time line to the jury as

5    your understanding of Dr. Calhoun and Coppola's work and

6    then Dr. Desnick's work.  Correct?

7    A.    Yes, I did.

8    Q.    Now, you put down the conception in the spring of 1999

9    for their work.  Right?

10   A.    I'm sorry.  1999?

11   Q.    Sorry.  In the spring of 1988, you have conception of

12   Dr. Calhoun and Coppola.  Right?

13   A.    In my opinion, that is when they had the idea and they

14   started working on the baculovirus system.

15   Q.    Do you have a piece of paper that said at that date,

16   they planned to make a baculovirus derived protein for use

17   in treating Fabry disease?

18   A.    Well, in the notebooks, what I can point to is in

19   the notebooks, they begin to bring all the reagents for

20   baculovirus and start working towards that.

21   Q.    Yes.  They brought in the reagents, didn't they?

22   A.    Yes.

23   Q.    Did they write down anywhere, we're going to do this

24   in order to have a method of treating Fabry disease?

25   A.    I don't remember the specific language, no.

Sands - cross

1    Q.    They didn't even make a hypothesis.  They just used

2    reagents to make a protein in baculovirus?

3    A.    Yes, and they did it within a year.

4    Q.    We're talking about what they conceived in March, the

5    spring of 1988.  They never said we are conceiving a method

6    of doing this, did they?

7    A.    Again, that specific language I don't remember, no.

8    Q.    Now, you also refer to the February and March 1989

9    uptake experiments?

10   A.    Yes.

11   Q.    And if you look at PTX-664, Page 268.

12   A.    What volume is that?

13   Q.    I think that's in -- it should be under PTX-664,

14   Volume 2?

15   A.    I've got it.  664 you said?

16   Q.    Yes.  Page 268.

17   A.    I'm sorry.  Which page?

18   Q.    268.  PTX-664, 268.

19   A.    Oh, I'm sorry.

20   Q.    No problem.  We've also put it up on the screen if it

21   makes it easier for you.

22   A.    Almost there.  268.  Okay.  Got it.

23   Q.    And this is an uptake experiment done in March of

24   1988, which is the date -- I'm sorry -- March of 1989 which

25   is the date you referred to.  Correct?

Sands - cross

1    A.    That's correct.

2    Q.    And if you look at the bottom table, this presents the

3    results of the uptake experiment.  Right?

4    A.    Yes.

5    Q.    And you agree to treat Fabry disease, you need to get

6    the protein to the lysosome.  Correct?

7    A.    Yes, that's right.

8    Q.    And you understand the construction of the claims

9    under which you are working here requires that the level of

10   lysosomes be raised to near or normal levels; correct?

11   A.    No.  No.  To be therapeutic, the numbers that people

12   consider to be therapeutic could be as low as 5 to 10

13   percent normal.

14   Q.    Could we pull up the claim construction order, please?

15         While they're getting the claim construction

16   order, let's look at this figure.

17   A.    Sure.

18   Q.    On this table, do you agree that N refers to the

19   nucleus?

20   A.    That is the nuclear fraction.  Yes, that's correct.

21   Q.    And in Fabry, the Fabry cells, which are Columns 2 and

22   3; right?

23   A.    I believe the Fabry cells are Columns 3 and 4.

24   Q.    Yes, I'm sorry.  3 and 4.

25   A.    Yes.

Sands - cross

1   Q.    Three is without alpha-GAL and 4 is with alpha-GAL?

2   A.    Yes.

3   Q.    So in the nucleus, when you add alpha-GAL, you get a

4   large increase in the level of nucleus?

5   A.    Yes, increased quite a bit.

6   Q.    And the nucleus isn't where you want to treat Fabry

7   disease?

8   A.    No, it's the lysosome.

9   Q.    Look at the lysosome fraction.  That is L?

10  A.    Yes, it is.

11  Q.    And in the normal cells, you started out with L being

12  10.7, and when you add alpha-GAL it went up to 15.4?

13  A.    That's correct.

14  Q.    In the Fabry cell, you start out at .1 and it only

15  went up to .9.  Right?

16  A.    That is a nine-fold increase.

17  Q.    Which is less than 10 percent of what was in the

18  normal cell; right?

19  A.    Sure.  But that is, again, that is fibroblasts, so in

20  principle it should be extremely low.

21  Q.    And then you notice --

22  A.    I'm sorry.  Go ahead.

23  Q.    You notice the note that Dr. Coppola wrote, too low

24  for percentage?

25  A.    I see that.

Sands - cross

1    Q.    Now, going back to your -- sorry.  Let's pull up

2    DDX-228.

3             So you understand that this is the claim

4    construction of what "therapeutically effective" means, and

5    you see it says, "to reduce the level of GL-3 in the

6    mammalian tissues that are affected by the alpha-GAL A

7    deficiency to normal or near-normal levels."

8             Do you see that?

9    A.    Yes, I do.

10   Q.    Now, you referred in your direct testimony to the

11   Invitrogen manual which I think was PDX-922.

12   A.    Yes, I remember that.

13   Q.    You said with that manual, virtually any lab could

14   produce proteins in baculovirus using the insect cell

15   expression system.  Correct?

16   A.    Well, I qualified that.  Any lab that is set up at a

17   molecular biology lab.  Not any lab.

18   Q.    And you agree that the Summers manual that Dr. Jarvis

19   testified about and that Dr. Calhoun used was available in

20   1986 and 1987.  Correct?

21   A.    Yes.  That was a laboratory manual.  And actually if

22   you read the manual in the very beginning of that, there are

23   several excerpts which basically say additional development

24   may be required.

25   Q.    And, I'm sorry.  Dr. Calhoun used the manual and the

1   protocols in his expression.  Correct?

2   A.    Yes, he did.

3   Q.    And Dr. Jarvis indicated he used it in his expression

4   of tissue plasminogen activator which took six weeks;

5   correct?

6   A.    Yes, that's right.

7   Q.    Now, you have never treated a Fabry disease patient.

8   Correct?

9   A.    That is correct.  I'm not an MD.

10  Q.    And prior to March of 1989, you have never expressed

11  protein as a baculovirus insect cell expression system.

12  Correct?

13  A.    That is correct also.

14  Q.    And prior to that date, you never looked at the

15  glycosylation of proteins from that system.  Right?

16  A.    That is correct also.

17  Q.    And you agree that if you assume you could produce a

18  protein such as alpha-GAL in a baculovirus insect cell

19  expression system that it was not reasonable to assume that

20  a skilled worker would be able to produce it in CHO cells.

21  Correct?

22  A.    I think there would be a reasonably high expectation

23  that you could express it.  Once you express it in one

24  system, which is baculovirus, I think there is a high

25  expectation that you could express high levels in CHO cells.

Sands - cross

1  Q.    Let's look at your deposition, which should be in your

2  book.

3  A.    Which book?

4  Q.    Volume 1.

5              THE COURT:  What page?

6              MR. HANEY:  52.

7              THE COURT:  Line?

8              MR. HANEY:  Beginning at Line 12.

9              THE WITNESS:  I'm sorry.  Which tab?

10             MR. HANEY:  Beginning at Line 12, Page 52

11  through Page 53, Line 10.

12             THE COURT:  Do you see it, Doctor?

13             THE WITNESS:  Page 52?

14             THE COURT:  Yes.  The page numbers are in the

15  upper right-hand corner of each box.

16             THE WITNESS:  Got it.

17             THE COURT:  The lines again?

18             MR. HANEY:  52, Line 12.

19             THE COURT:  Through?

20  BY MR. HANEY:

21  Q.    Do you recall asking me the question --

22             THE COURT:  Mr. Haley, hold on.  That's why I'm

23  asking you Line 12 through?

24             MR. HANEY:  12 through Page 53, Line 10.

25             THE COURT:  Take a look at that.

1              THE WITNESS:  Okay.

2    BY MR. HANEY:

3    Q.    And after you have had a chance to read it, let me

4    know.

5    A.    Certainly.

6              Okay.

7    Q.    You recall I asked you the question:

8              "Question:  So, for example, if I produced a

9    protein in Cos cells, you wouldn't be able to predict

10   whether I would be able to successfully produce in CHO cells

11   in the mid-to-late 1980s?

12             "Answer:  I don't believe that is correct, or I

13   believe that is correct that you can't automatically go from

14   one platform to another.

15             "Question:  And I guess the same thing would be

16   true if I produce the protein in the baculovirus insect cell

17   expression system in the mid-1980s.  You wouldn't predict I

18   could do it in CHO cells?

19             "Answer:  The technology would be the same but

20   the outcome would not be certain.

21             "Question:  Would you expect it to work?

22             "Answer:  I don't know.  The experiment would

23   have to be done."

24   A.    Yes.  I think actually one of the key words there on

25   Line 20 is "can't automatically go."  So it's not

Sands - cross

1   100 percent certain.

2   Q.    Now, you talked a lot about alternate pathways and the

3   Mannose pathway for getting things into cells to treatment

4   Fabry disease.  Right?

5   A.    Right.

6   Q.    And you agree, don't you, that in 2006, you published

7   a paper, you were the lead author.  And it's -- let me call

8   it up.  It's PTX-692.

9              Go to the next page.  The next page.  The next

10  page.

11             And it was published in Molecular Therapy.  Is

12  that right?

13  A.    PTX-692?

14  Q.    PTX-692.

15  A.    I don't believe I have that.

16  Q.    I'm sorry.

17  A.    Mine goes from 694 to --

18  Q.    You are absolutely right, sir.  Sorry.

19  A.    That's okay.  Thanks.

20  Q.    So do you have PTX-692?

21  A.    Yes.

22  Q.    And do you recognize this as an article you were the

23  lead author on?

24  A.    That's correct.

25  Q.    Which you published in 2006?

Sands - cross

1   A.   Yes.

2   Q.   And it's a review article.  Correct?

3   A.   Yes, it is.

4   Q.   And it's in the a journal called Molecular Therapy, a

5   Journal of the American Society of Gene Therapy?

6   A.   That's correct.

7   Q.   And if you look at Page 840 of the article?

8   A.   Um-hmm.

9   Q.   And particularly on the right-hand column, the bottom

10  last sentence I guess, beginning with there.

11  A.   Yes.

12  Q.   Other column.  The right-hand column, the last

13  sentence of the beginning with there.

14           And you say there:  To the scientific community,

15  therefore, dephosphorylated or hypophosphorylated

16  glucocerebrosidase can be used to target the affected cells

17  in Gaucher disease efficiently.

18           Do you see that?

19  A.   Yes.

20  Q.   Then you say, In contrast -- I will say MPS I so I

21  won't totally mess up that word -- MPS VI, Fabrazyme and

22  Pompeii disease, each one a candidate for ERT -- which I

23  take it is enzyme replacement therapy?

24  A.   Yes.

25  Q.   -- affect RE cells and other cell types and therefore

1   require phosphorylated enzyme.  That means an enzyme that

2   has M-6-P, doesn't it?

3   A.    Yes --

4            MR. HALEY:  I have no further questions.

5            THE WITNESS:  May I finish?

6            THE COURT:  Your lawyer will have a chance to

7   ask you questions.

8            THE WITNESS:  Thank you.

9            Mr. Paunovich, redirect.

10                 REDIRECT EXAMINATION

11   BY MR. PAUNOVICH:

12   Q.    Dr. Sands, you were about to say something?

13   A.    Yes.  With respect to my comment, in fact, I can go

14   ahead and it read again.

15            In contrast, Polysaccharides 1, 6, Fabry disease

16   and polymer diseases, each one a candidate for ERT, affect

17   RE cells and other cell types and therefore require

18   phosphorylated enzyme.

19            This paper was published in 2006.  Since that

20   time we have actually learned a lot more about different

21   uptake systems, fluid phase pinocytosis.  And there is a

22   particularly interesting manuscript or study that was

23   published by Dr. Bill Schlei (phonetic), who has been one of

24   the pioneers in therapies for lysosomal storage diseases, it

25   was a very interesting paper where he took a lysosomal

Sands - cross

1    enzyme and he literally stripped off all the sugars, took

2    off the sugars, there is no mannose, there is no sialic

3    acid, no mannose-6-phosphate.  No sugars at all.

4              It's actually an interesting story.  He thought

5    this would be his negative control.  We come to find out, it

6    turned out to be very therapeutic and he postulates that one

7    of the uptakes mechanisms might be fluid phase pinocytosis,

8    the same mechanism postulated by the Marchesan paper.  And

9    he did this in vivo, in a whole animal model of a lysosomal

10   storage disease, and corrected most of the tissues, till

11   there were therapeutic levels to most of the tissues.

12             So it really brings into question our reliance

13   on mannose-6-phosphate as the primary uptake mechanism.

14             MR. PAUNOVICH:  Thank you.  No further

15   questions.

16             THE COURT:  Doctor, thank you.  You are excused.

17             THE WITNESS:  Thank you.

18             (Witness excused.)

19             THE COURT:  Mr. Lorig.

20             MR. PAUNOVICH:  Your Honor, the plaintiffs rest

21   their rebuttal case.

22             THE COURT:  All right.

23             Ladies and gentlemen, good news.  We have come

24   to the end of the evidence.

25             Tomorrow you should anticipate when you come in

1    the first thing that is going to happen is you are going to

2    hear my jury instructions, then you will hear from counsel,

3    their closing speeches.  Typically, plaintiff will go first,

4    defendants will follow, and then, if they choose, plaintiffs

5    will be entitled to a rebuttal.

6              So it is my great hope that we will have the

7    case to you by lunch.  That may depend to some extent on a

8    conversation I am about to have with the lawyers.  But it

9    will be in the early afternoon that you should have the case

10   for your deliberations.

11             It's critical, as always, to follow my

12   instructions previously that you keep an open mind, come in

13   refreshed and receptive to the discussion you are going to

14   hear from both sides.

15             Travel safely.  We will see you tomorrow at

16   9:00.

17             (Jury leaves courtroom at 4:55 p.m.)

18             Let's take a bio break, and then let's come

19   back.

20             (Recess taken.)

21             THE COURT:  Appreciate the additional volumes.

22   But, counsel, I have been up here working from what you gave

23   me here this morning.  Otherwise, we wouldn't get out of

24   here tonight.

25             I am a little disappointed, quite frankly.  I

1    count 56 separate instructions and 28 of which, at least as

2    of this morning in the version that you gave me, 28

3    competing instructions.  I don't quite understand that.

4              Let me see if I can help get us through this

5    reasonably quickly.

6              Some I am not -- most I am not going to

7    entertain conversation and discuss about.

8              Some I will invite discussion.

9              MR. LORIG:  Your Honor, you are probably

10   noticing this rather impolite talking as you are speaking.

11   As I understand it, we don't have the ones that were filed

12   this morning.

13             MS. KAUBLE:  The ones that were filed last

14   night, we have the new revised instructions that the parties

15   agreed upon in the wee hours of the morning, and we are

16   ready to hand those up.  The parties have agreed to submit

17   these to the Court.  They are very similar to the ones that

18   we agreed upon prior to that.

19             MR. LORIG:  What we are trying to say is, I

20   apologize, it appears whatever set you are working on I

21   don't have on the table.  I will take notes.

22             THE COURT:  Your name?

23             MS. KAUBLE:  Kristi Kauble, Your Honor.

24             THE COURT:  Are there significant differences

25   between the versions I got?

1   MS. KAUBLE:  The only differences -- for the

2   most part.  There were a couple of revised instructions on

3   behalf of Genzyme.  But for the most part the parties agreed

4   on a few instructions and turned them into joint

5   instructions.

6   I don't think those should be too much of a

7   problem for Your Honor.

8   THE COURT:  Are you saying that you have agreed

9   now on most of the instructions?

10   MS. KAUBLE:  I wouldn't characterize it as

11   agreeing on most of the instructions.  But we have agreed on

12   I think three additional instructions that we had not agreed

13   on prior.

14   THE COURT:  So there isn't much difference.

15   Unfortunately, we are going to have to work off what I had.

16   MR. LORIG:  I will just take notes.

17   THE COURT:  I think you can work from your

18   colleague's iteration.

19   As soon as you are ready, let knee know.  Are

20   you ready?

21   Using the index, as I did, to identify the

22   instructions that were not joint submissions, and if I skip

23   something, you need to let me know, the first one I have in

24   my version is, the first contest is over 2.4, Summary of

25   Patent Issues.

1    MR. RADSCH:  We have reached agreement on that

2    one, Your Honor.

3    THE COURT:  Great.  Let's get that out.

4    Then the next I have is Open-Ended Or

5    Comprising, at 3.4.  This is a Shelbyzyme-only submission.

6    MS. KAUBLE:  Yes, Your Honor.  The parties have

7    not reached agreement on that.

8    THE COURT:  All right.  Let me find it.

9    What I would encourage the parties to do is, in

10   giving short shrift, as I predicted I would, IF you feel a

11   need to, that you want to try to convince me to take your

12   position, just let me know.

13   MR. RADSCH:  Your Honor, we had proposed that we

14   would join in this instruction if it tracked the language of

15   the cited model instruction.  There are changes to this

16   instruction.  We said we would be happy to join in an

17   instruction as long as it tracks the model instruction

18   cited.  But we weren't able to reach agreement on that.

19   THE COURT:  On what the model says?

20   MR. RADSCH:  We said, as long as it says what

21   the model says, we are fine with that.

22   THE COURT:  You weren't -- Shelbyzyme doesn't

23   want to agree with the model -- let me talk.

24   Do I understand correctly, Mr. Radsch,

25   Shelbyzyme doesn't like the model?

1    MR. RADSCH:  I believe that's correct.  It made

2    revisions to it.

3    THE COURT:  Let me hear from whoever is going to

4    speak from Shelbyzyme.

5    MS. KAUBLE:  We are willing to accept that

6    proposal.

7    THE COURT:  Agreed?

8    MR. RADSCH:  That is fine.

9    THE COURT:  Wonderful.  All right.  We are going

10   great guns here.

11   No. 3, 3.6, Literal Infringement, there seems to

12   be disagreement over that one.

13   Let me see what I noted to myself.

14   I think the major difference that I saw -- there

15   may be additional differences that you want to talk about --

16   is over the plaintiff's proposed -- maybe not proposed use,

17   or discussion of the word agents.  I believe that Genzyme

18   has the better position in terms of the law on this.  Do you

19   disagree, Mr. Lorig?

20   You can speak from your seat, because it is

21   going to be more convenient for me.

22   MR. LORIG:  As Your Honor knows, we have not yet

23   heard from the en banc Federal Circuit, who is looking at

24   this infringement issue.  As of the last time they spoke,

25   direct infringement includes activities of an agent.

```
 1    Therefore, it would seem that putting an agent in --

 2              THE COURT:  If I might interrupt, which you know

 3    I will, it seems the defendants contend -- and you will

 4    speak for your team, Mr. Radsch or whomever is going to

 5    speak, you are all invited to participate, you might as

 6    well.  The disagreement, I think, regardless of what the

 7    circuit says, is over the definition of agent.  Based on

 8    this record, what has been adduced to this jury, this

 9    instruction shouldn't be given in the manner suggested by

10    Shelbyzyme because of Shelbyzyme's use of the word agent,

11    aside from the circuit en banc.

12              Am I inartfully --

13              MR. RADSCH:  I think that's correct, Your Honor.

14    None of the model instructions I have seen in the various

15    iterations have these definitions of agents in it.  It's

16    very confusing, and I think it's not supported.

17              THE COURT:  I don't think it's supported by the

18    record, number one, and perhaps it would need a change in

19    the law that I accept the Shelbyzyme proposal.  But I

20    wouldn't do that.

21              MR. LORIG:  The only reason I brought it up is

22    we thought we had laid sufficient ground that physicians

23    performing clinical trials, following the instructions and

24    controls of Genzyme, were acting as agents in those clinical

25    studies.  Not when they are treating patients, just when --
```

 1            THE COURT:  Admittedly, I was focusing on

 2    treating patients.

 3            MR. RADSCH:  Two responses.  I think if they

 4    wanted to make a joint infringement claim, they should have

 5    pled joint infringement.  The second point would be the

 6    evidence they adduced in clinical trials, I think about 95

 7    percent of them occurred before the patent issued.  And

 8    there was evidence adduced that the Fabrazyme that is used

 9    in those trials would not stop royalties on this Fabrazyme.

10            THE COURT:  I am going to go with what we have.

11    I will stop the disagreement on that.

12            Let's go to the next.  3.8, Limitations on

13    Doctrine of Equivalents, my note to myself is pretty

14    succinct:  Shelbyzyme, no.  Genzyme, yes.

15            Do you want to talk about this?  I think

16    Genzyme's instruction is a correct statement of the law.  I

17    think there are parts or is a part, a paragraph in the

18    Shelbyzyme suggestion that is argumentative and confusing.

19    I am referring specifically to the second paragraph on the

20    first page.

21            MR. LORIG:  Your Honor, I got that from some

22    instruction.  I don't know which.  I do recognize the

23    language, which is, it comes out of a Supreme Court or a

24    Federal Circuit case.  We took it out of the instruction

25    just because it does tell the jury that they are not slaves,

```
 1    just as we are told, whether it was the Supreme Court or the

 2    Federal Circuit -- actually, as I think about it, I think

 3    that language is from the Supreme Court.

 4              THE COURT:  Well, the Supreme Court doesn't try

 5    cases, usually.

 6              MR. LORIG:  I realize that.

 7              THE COURT:  With all deference to my brethren on

 8    the up court.  I am being a little irreverent, but not

 9    completely.  I think that the Genzyme suggestion is a rather

10    straightforward statement of a proposition of law that is

11    well recognized by the Federal Circuit and other colleagues

12    of mine, including this particular judge.

13              I do continue to agree with Genzyme that some of

14    the language, specifically in the second paragraph, is

15    somewhat argumentative, and confusing.

16              I don't see the need for it.

17              MR. LORIG:  I don't have anything more to say,

18    Your Honor.

19              THE COURT:  Okay.  I will adopt the Genzyme 3.8B

20    suggestion.

21              The next one I have identified is 3.10, Joint

22    Direct Infringement.

23              MR. RADSCH:  Your Honor, 3.9.

24              THE COURT:  3.9.

25              MS. KAUBLE:  That is a Shelbyzyme only
```

```
 1     instruction, 3.9.

 2               THE COURT:  Okay.  Make that 27 of 58.  I missed

 3     this.

 4               What is Genzyme's objection to this instruction.

 5               MR. RADSCH:  A couple of objections.  Genzyme

 6     has a license to a patent from Dr. Desnick, the '804 patent.

 7     It doesn't cover the method.  It is the sale and manufacture

 8     of Fabrazyme.  To say the accused method I think is

 9     misleading.  I think that the -- it's not a contention that

10     the accused method is covered by a patent.  I think it would

11     be more acceptable if it had language along the lines of

12     Genzyme has presented evidence that it has a license to the

13     '804 patent.  I do not believe we have presented a

14     contention that we don't infringe because the '804 is an

15     improvement, represents an improvement and that is a

16     noninfringement position.  We haven't said --

17               THE COURT:  If you were to rewrite this

18     instruction, assuming you were willing to have it delivered

19     by the Court --

20               MR. RADSCH:  Yes.  My change would be, to

21     particularly the first paragraph --

22               THE COURT:  There is only one paragraph.

23               MR. RADSCH:  The first sentence.  Genzyme has

24     presented evidence that it has a license to the '804 patent

25     to Drs. Desnick, Bishop, and Ioannui, period.
```

```
 1                 THE COURT:  Any difficulty with that, counsel?

 2                 MR. LORIG:  Your Honor, the point of the

 3    instruction is to avoid jury confusion so that they don't

 4    think, just because there is a patent that Mt. Sinai has,

 5    that it can't infringe --

 6                 THE COURT:  I didn't hear you.

 7                 MR. LORIG:  Let me come up, if I may.

 8                 Your Honor, the point of the instruction is to

 9    avoid jury confusion, so they don't think, just because Dr.

10    Desnick and Dr. Ioannou and Mt. Sinai got a later

11    improvement patent, that means the broader original Calhoun

12    patent is not valid.

13                 THE COURT:  Talk about not wanting to engender

14    confusion, it seems to me that is an issue -- Mr. Radsch, I

15    don't even know what you are talking about.  Go ahead.

16                 MR. RADSCH:  The '804 patent is not a later

17    patent.  The '831 patent issued in 2006.  To call the '804

18    patent a later patent I think is also very confusing.

19                 THE COURT:  I think this would do just what you

20    don't want it to do, that is to engender confusion with this

21    jury.  What is the point of the instruction?

22                 MR. LORIG:  The point of the instruction is that

23    the patent issued in this case has a 1989 priority date.

24    The fact that the later 1990 patent application filed by Mt.

25    Sinai was issued does not mean if you practice the Mt. Sinai
```

```
 1    patent that you don't infringe the earlier 1989 patent.

 2    That engendered some confusion early in the 20th Century and

 3    it went up to Santori Refrigerator.

 4              All we want to make sure is we don't want the

 5    jury to think just because Mt. Sinai got a patent, that

 6    doesn't mean they still can't infringe the Mt. Sinai

 7    patent.

 8              I am not wedded to any particular language, Your

 9    Honor.  I think one way or the other the jury has to

10    understand that, because otherwise they will think, gee, Mt.

11    Sinai got a patent so Calhoun must not be infringed.  That

12    is the issue.

13              That's the issue.

14              MR. RADSCH:  Your Honor, we're not going to

15    argue that we don't infringe because of Mt. Sinai patents.

16    That is certainly not a position we're pressing.  We think

17    the instructions on infringement and the instructions are

18    very clear what the jury needs to decide.

19              I think that this particularly as worded in the

20    instruction is very confusing.  The argument that it's an

21    earlier patent because the original application was filed in

22    '89 assumes that those applications are enabling and meet

23    the written description requirements, but, of course, that

24    is an issue in this case.

25              THE COURT:  Yes.  So he is not going to make the
```

```
 1    argument that you are trying, that you anticipate, were

 2    anticipating what the jury is going to have to wrestle with.

 3              MR. LORIG:  I'm not sure it's a matter of making

 4    the argument explicitly as implicitly.

 5              THE COURT:  Let me ask this.  Is 4.12 going to

 6    help inform the resolution of that instruction?  Going to

 7    help inform this discussion on the priority date?

 8              MR. LORIG:  I don't think so, Your Honor.

 9              THE COURT:  It's not going to solve it.

10              MR. LORIG:  I don't think so.  If you recall

11    from my opening, I made the argument, look, one person can

12    have a patent on the automobile.  Somebody else can have a

13    patent on the hybrid automobile.  That doesn't mean they are

14    free of the infringement of the more general patent.  That

15    is the issue I was trying to address in this instruction.

16              I didn't think it was confusing.  I'm certainly

17    not wedded to any language.  If Your Honor can come up with

18    a better way of saying it?

19              THE COURT:  No, I don't have a better way of

20    saying it.

21              MR. LORIG:  Let me work on it a little bit, if I

22    can.

23              THE COURT:  Is there any language you could

24    agree on, Mr. Radsch?  I think you were beginning to.  Was

25    this the one we were just discussing you were offering
```

1   submitted?

2          MR. RADSCH:  Yes.  And just speaking off the

3   scuff here and weighing in.  Maybe I'm overstepping my

4   bounds but something along the lines of:  Genzyme has a

5   license to the '804.  Simply having a license to the '804

6   patent doesn't mean it cannot infringe the '831 patent.

7   Very plain vanilla.

8          THE COURT:  Something like that?

9          MR. LORIG:  That's fine, Your Honor.

10          THE COURT:  All right.  So you can freshen up

11   the language.  Okay.  Good.

12          So now we can go to 3.10.  Doesn't "agent" come

13   up in this one as well?  And I have a note to myself:  Agree

14   with defendant's objection, re: agents.  See also 3.6 at

15   Page 26.

16          MR. LORIG:  This is that same point, Your Honor.

17   Most of the infringement, nearly all infringement we're

18   complaining about is inducement where you know there is a

19   level of intent.  But, in addition, there is direct

20   infringement because following FDA approval, they ran a

21   series of clinical tests.  Remember, Dr. Rheed talked about

22   he participated in one of those.

23          THE COURT:  Yes.

24          MR. LORIG:  And if that satisfies the agency

25   requirement of a last joint direct infringement case by

```
 1    the Federal Circuit, that is good enough for direct

 2    infringement.

 3              THE COURT:  Yes.  I have already told you,

 4    Mr. Lorig.  Okay?  It's gone.

 5              MR. LORIG:  It's gone.

 6              THE COURT:  I'm going to take Genzyme's position

 7    on this.  So that is the one the plaintiff should include in

 8    the instruction.

 9              So moving on to 3.12.  Let's see.  This is

10    inducement, inducing patent infringement.

11              Counsel, you need to help me a little bit on

12    this one.  And I'm trying to recall, there were seven

13    objections, there are seven objections that Genzyme poses

14    here.

15              MR. RADSCH:  We have  --

16              THE COURT:  One of them that resonated with me,

17    it seems, and probably because it's the easiest to deal with,

18    was the repetitive nature of some of the patent instruction.

19              Let's work from Genzyme's proposal.  I think

20    that is going to be the easiest for our purposes, for

21    purposes of discussion.  And let me get you to tell me,

22    Mr. Lorig or colleague or one of your colleagues why you

23    disagree with the Genzyme proposal.

24              MR. LORIG:  Well, we've had two recent cases on

25    inducement to infringe.  The first is Global Tech which says
```

```
 1    willful blindness to the fact that you are inducing

 2    infringement is good enough.  The second recent case is the

 3    Broadcom v Qualcomm case which says that if you have -- if

 4    you don't disclose the opinion you obtained, they approved

 5    the jury instruction allowing the jury to infer intent to

 6    induce infringement.

 7                Those are both new cases.  Global Tech was this

 8    last term and the new Federal Circuit case in Broadcom v

 9    Qualcomm.

10                THE COURT:  I read the cases.  Go ahead.

11                MR. LORIG:  And I'm just trying to conform the

12    recent case law.

13                MR. RADSCH:  I disagree with the explanation of

14    the holding in Qualcomm.  I think it is a factor but

15    certainly there is no inference.

16                THE COURT:  Mr. Lorig, I'm going to be more

17    comfortable with you speaking while you are sitting.  Okay?

18                MR. LORIG:  Okay.  I'm sorry.

19                THE COURT:  Go ahead.

20                MR. RADSCH:  The first issue he addressed was

21    the willful blindness standard we have included.  And the

22    language about what willful blindness is directly out of

23    Supreme Court decision, Global Tech.

24                THE COURT:  Which instruction?  Is that, that is

25    in this one?
```

1    MR. RADSCH:  Willful blindness goes to the

2    second page.

3                THE COURT:  Yes.  And I think I found that

4    language consistent with the cases.  So I'm going to opt for

5    Genzyme's instruction as presented in 3.12(b).

6                MR. LORIG:  Your Honor, may we submit a

7    supplemental instruction based on Broadcom v Qualcomm?

8    Because they approved.

9                THE COURT:  No, you may not.  I believe that

10   less is more with juries in these cases.  And I don't know.

11   What do you want to say?  They approved what?

12               MR. LORIG:  In Broadcom v Qualcomm, there was

13   a specific instruction that told the jury because the

14   defendant didn't disclose its opinion, the jury could infer

15   the intent to induce infringement.  They distinguished it

16   from willfulness.  And there is a specific instruction that

17   was approved.  This instruction was one that we submitted.

18               THE COURT:  I'm not sure the context of that

19   statement.  Mr. Radsch?

20               MR. RADSCH:  I don't think there was any

21   evidence there was an opinion obtained and not produced in

22   this case.

23               MR. LORIG:  There was Ms. Shafmaster.

24               THE COURT:  Ms. Shafmaster what?

25               MR. LORIG:  Ms. Shafmaster did a written opinion

1    which they didn't disclose.

2              MR. RADSCH:   There is no evidence of that in the

3    record.

4              THE COURT:   There is no evidence of that on this

5    record.   You don't get to make that argument.

6              Yes, Mr. Paunovich.

7              MR. PAUNOVICH:   Your Honor, I believe in

8    Broadcom, the facts of Broadcom were very similar to this.

9    The party, the defendant had obtained an internal -- it

10   might have been an outside counsel opinion on validity.

11   They chose not to disclose it.   They did not obtain an

12   opinion of noninfringement.   And the Court, the Federal

13   Circuit found that it was proper to include as part of its

14   inducement instruction that the jury could consider, as part

15   of the totality of circumstances, the failure to obtain an

16   opinion of counsel.   And they specifically distinguished

17   that from the situation that you have with Knorr Bremse and

18   Seagate for willfulness.

19             MR. RADSCH:   Your Honor, first of all, I don't

20   think there is any -- there has been any evidence on the

21   record that they failed to obtain, produce an opinion of

22   counsel they obtained.   Ms. Shafmaster testified that she

23   did not get an opinion of counsel on infringement.   She did

24   not need to go that far based on her analysis on invalidity.

25             There has been some limitations on what Ms.

```
 1    Shafmaster can talk about.  I think given those limitations,

 2    it would be sort of unfair to allow this jury instruction

 3    about her failure to obtain an opinion of counsel

 4    considering she did not get to explain all of what she did

 5    do, vis-à-vis, the owner of the patent.

 6                THE COURT:  Mr. Lorig.

 7                MR. LORIG:  Your Honor, if I can read from the

 8    Qualcomm decision.

 9                THE COURT:  Go ahead, Mr. Lorig.

10                MR. LORIG:  Because opinion of counsel evidence,

11    along with other factors, may reflect whether the accused

12    infringer knew or should have known that its actions would

13    cause another to directly infringe, we hold that such

14    evidence remains relevant to the second prong.

15                THE COURT:  You know, Mr. Lorig, I wrote an

16    opinion along that line long before that decision came down.

17    So I'm aware of that particular reasoning.  You might have

18    found that decision.  That might have been better to quote

19    back to me or my colleagues on the court.

20                MR. LORIG:  It would have been.

21                THE COURT:  I get your point, but I think what

22    Mr. Radsch is saying is that the record doesn't support that

23    instruction and, moreover, that because of the constraints I

24    have placed upon their ability to adduce opinion evidence

25    from Ms. Shafmaster, now Mr. Paunovich might want to say,
```

1    well, that is their fault.

2              Go ahead, Mr. Paunovich.

3              MR. PAUNOVICH:  Your Honor, the facts I think

4    are particularly relevant of Broadcom because in that case,

5    as I mentioned, the defendant, they did obtain an opinion on

6    validity.

7              THE COURT:  Yes.

8              MR. PAUNOVICH:  They chose not to disclose it.

9    They did not obtain an opinion on infringement, which is the

10   exact same situation that we have here.

11             The Court still found for purposes of inducement

12   that the failure to obtain an opinion on infringement was

13   relevant to the inducement standard, and they put that into

14   the instruction as something that the jury could consider.

15   And so it wasn't even an issue of fairness.

16             That exact situation, the facts that we have

17   here were identical to what was in Broadcom.

18             THE COURT:  So you heard the argument,

19   Mr. Radsch.

20             MR. RADSCH:  Sure.  What has not been explained

21   to the jury is the reasons that Ms. Shafmaster never got to

22   the step of needing to obtain an opinion of counsel.  They

23   didn't get to understand that fact.  She testified about the

24   actions she went through.  She did not get to testify about,

25   for example, what she told RCT about her belief in, you

```
 1    know, the validity and unenforceability.  So it's not, it's

 2    not the case where there was an opinion on validity that

 3    discussed but no opinion on infringement was obtained.  So

 4    what they're going to be led to believe is that there was no

 5    opinion on infringement and no understanding or knowledge

 6    about the validity of the patent.

 7                    THE COURT:  Let's come back to this one.

 8                    MR. LORIG:  Your Honor?

 9                    THE COURT:  Yes.

10                    MR. LORIG:  If it would help, I did ask

11    Ms. Shafmaster, did you get an opinion on infringement?  Did

12    you do an opinion?

13                    THE COURT:  She didn't get to that.

14                    MR. LORIG:  She didn't get to that the point of

15    the case.  Under DSU, the inducement, it's the opinion of

16    infringement that counts, not an opinion on validity, and

17    that's the point I've been trying to make.

18                    I'm sorry.  We're double teaming.

19                    THE COURT:  Well, you are.

20                    Do you accept that distinction, Mr. Radsch?

21                    MR. RADSCH:  I don't accept that distinction.  I

22    think that your prudent accused infringer would first do a

23    validity analysis.  If you do an infringement analysis

24    first, any time you change your product you have to do a new

25    infringement analysis.  That is an incredibly expensive
```

1    procedure to do your infringement analysis first.  You think

2    you are covered for your patent for anything that covers

3    the product.  So to draw that fine distinction and draw an

4    inference based on failure to get an infringement opinion

5    doesn't -- is not being prudent and doesn't make sense.

6              THE COURT:  So you don't find the argument by

7    Mr. Paunovich persuasive that we are, on the current record,

8    four square on with the Bard case?

9              MR. RADSCH:  That's correct.

10             THE COURT:  We're going to take a closer look at

11   Bard.

12             Let's remember we have to go back to this one.

13             Contributory infringement I think is next.

14   3.13.

15             MS. KAUBLE:  Your Honor, if I may.  Just for

16   this instruction particularly from Genzyme we find it to be

17   really problematic if, for no other reason, there are many

18   reasons, but they mention the burden of proof two times

19   throughout this instruction and we think that is obviously

20   really prejudicial to Shelbyzyme.  So I mean more than

21   anything, the idea of an instruction that submits that twice

22   is being prejudicial to the jury.

23             THE COURT:  Where do they do that, counsel?

24             MS. KAUBLE:  Both in the second paragraph:  To

25   prove that Genzyme contributed to infringement by another,

1    Shelbyzyme must prove by preponderance of the evidence.  And

2    then again at the end of the instruction, they say:  In

3    order to prove contributory infringement, Shelbyzyme must

4    prove each of these requirements by a preponderance of the

5    evidence.

6              And we think that that emphasis is prejudicial.

7              MR. RADSCH:  We can remove the last paragraph.

8    I think that is fine.

9              MS. KAUBLE:  In addition to that, there are a

10   lot of different segments in this instruction that are not

11   based on any model instructions at all and are prejudicial

12   to Shelbyzyme.

13             THE COURT:  Let me say this to counsel.  And I

14   know I sort of, as I said, have been a little irreverent

15   with the Court, and I don't mean to be because certainly

16   we do take instructions based upon the law that the Court

17   gives us.

18             But there has been a lot of citation and

19   reasons given by both sides, well, it's not in the model

20   instructions.  Well, models instructions are just that.

21   They're model instructions and they're not the law.  So I

22   just want to offer that generally.

23             But to the extent they're well considered and by

24   both judges and practitioners, and certainly those that you

25   both have cited I think generally fall into that category

1   that are worthy of citation, but they're not intended to fit

2   all the circumstances that different trials present.

3            So go ahead.

4            MS. KAUBLE:  If I may, Your Honor.  I think

5   the part we really object to would be the statement that

6   noninfringing uses are substantial when they're not unusual,

7   farfetched, illusory, and impossible, occasional and

8   aberrant.  This was not the model instruction.  They

9   provided no authority for this information, and we think

10  that should be excluded along with the additional burden

11  that was below.

12           THE COURT:  What about that, Mr. Radsch?

13           MR. RADSCH:  Yes, I have to read the quote.

14           It's In Re:  Bill of Lading Transmission and

15  Processing System Patent Litigation, 681 F3d 1323.  And

16  the quote is:  In the context of a claim of contributory

17  infringement, under Section 271(c), its substantial

18  noninfringing use is any use that is not unusual,

19  farfetched, usury, impractical, occasional, aberrant or

20  experimental.

21           And it cites Vitamix Corp. v Basic Holdings.

22  That's a Federal Circuit 2012 case.

23           THE COURT:  2012.

24           MS. KAUBLE:  Your Honor, first of all, they

25  didn't cite this case and the authority but the evidence has

1    shown that the non-infringing use that they are suggesting

2    is less than 1 percent for 2012.  And it's experimental.

3              THE COURT:  In that case.

4              MS. KAUBLE:  Yes.

5              THE COURT:  What about that, Mr. Radsch?

6              MR. RADSCH:  I don't think they presented any

7    evidence of experimental.  The Fabrazyme product can be used

8    for research.  That doesn't mean it's an experimental use.

9    I think experimental means you don't know what is going to

10   happen.  You use it, see what happens with it.

11             THE COURT:  What about the first half of your

12   opponent's statement?

13             MR. RADSCH:  It wasn't cited in the

14   instructions?

15             THE COURT:  No, not that one.  The percentage

16   that she cited.

17             MR. RADSCH:  I think that that is something for

18   the jury to consider, whether that is substantial or not.

19             MS. KAUBLE:  Your Honor, they have adduced no

20   evidence on this issue.  For the record, what difference is

21   there between research and experiment?

22             MR. RADSCH:  I think there is a great

23   difference.  I think an experiment is, let's use this and

24   see what happens.  Research is I am going use this as a

25   building block for studies.  I know that this is useful for

1    a study.  I am going to study it further.  I am going to

2    study the enzyme further.

3              MS. KAUBLE:  How is every experiment not a

4    building block on a further study?

5              THE COURT:  What was the context of the Court's

6    statement?  What were they confronting?

7              MR. RADSCH:  In this case I cited, that was just

8    an introduction to the law of contributory infringement.  It

9    was not within the context of the facts of the case.

10             THE COURT:  They cite to?

11             MR. RADSCH:  Vitamix Corp. v.  Basic Holdings,

12   Inc., 581 F.3d, 1317, Federal Circuit 2009.

13             THE COURT:  Counsel, you say, regardless of that

14   proposition of law stated by the circuit, that the record

15   doesn't support the delivery of this instruction.

16             MS. KAUBLE:  Correct, Your Honor.

17             THE COURT:  That is her point.  I am tending to

18   favor her view.  Why should I disagree?

19             Ms. Loring, do you want to weigh in here?  I see

20   you getting edgy.

21             MS. LORING:  Your Honor, I was going to ask if I

22   could be excused.

23             THE COURT:  Sure.  Yes.  You are in safe hands.

24   Good evening.

25             MS. LORING:  Thank you very much.

```
 1                    THE COURT:  Mr. Radsch?

 2                    MR. RADSCH:  I think that there are, among the

 3      clinical research agreements between Mt. Sinai and Genzyme,

 4      agreements for the use of Fabrazyme that prohibit it being

 5      administered to humans, that it is for research only.

 6                    MS. KAUBLE:  Your Honor, if I may.  There has

 7      been not a single Genzyme witness who has testified to

 8      research.

 9                    THE COURT:  You know, I am going to agree with

10      you on this one.  We will take this one out.

11                    And the redundant reference, I don't think you

12      have difficulty with that.

13                    MR. RADSCH:  Right, Your Honor.

14                    THE COURT:  All right.

15                    MR. RADSCH:  Is it okay if we take out the last

16      two paragraphs of -- is that 13B?

17                    MS. KAUBLE:  That is acceptable to Shelbyzyme.

18                    MR. RADSCH:  Thank you.

19                    THE COURT:  I think the next one is 4.1.

20                    MS. KAUBLE:  I believe 3.14 comes before that,

21      willful infringement.

22                    THE COURT:  This brings up an interesting

23      subject.  Counsel for plaintiff, I am not prepared to submit

24      willful infringement to this jury.  It's not there.  It's

25      not there in this record.  So we are not going to need to
```

```
 1   discuss this.  That sort of eliminates the need to discuss
 2   whether I have to decide as a matter of law, which I do,
 3   under the most recent jurisprudence from the circuit, the
 4   second prong of the objective test.
 5              All right.  So I think is the next one 4.1 then?
 6              MR. RADSCH:  4.1, we have a joint instruction
 7   on, I believe, as of last night.
 8              THE COURT:  Good.  Invalidity?
 9              MR. RADSCH:  Yes, Your Honor.
10              MS. KAUBLE:  That's correct, Your Honor.  We
11   accepted Genzyme's instruction.
12              THE COURT:  Very good.  Then 4.2, presumption --
13   I know.  This is an ongoing discussion.  With all due
14   respect to Genzyme's note here, and to the National Jury
15   Instruction Project -- and I want to talk about this a
16   little bit, to make this statement, I know, I am not jumping
17   on you, Mr. Radsch, or your team, a note to the 2009
18   National Jury Instruction Project Model, the Rule on
19   Validitiy states that like all presumptions, the presumption
20   of validity is, quote, a procedural device, and, quote, in
21   light of the particular role of the presumption of validity,
22   the instruction that there is a presumption, in addition to
23   informing them of the highly probably burden of proof, may
24   cause jury confusion as to its role in deciding invalidity.
25              That's a constitutional precept.  How does it
```

1    get reduced to a mere procedural device?

2            MR. RADSCH:   I think the shifting of the -- I

3    think the shifting of the burdens is the procedural device.

4    We talked a lot in here about the burden that is on Genzyme

5    to prove its case.   There is no separate instruction on

6    infringement about what Shelbyzyme's burden is, I don't

7    believe.   We have an entirely separate instruction as to

8    what Genzyme's burden is.   It seems to raise that burden to

9    an even higher level, especially when you have to prove that

10   the Patent Office acted wrongly, they made a mistake, that

11   is built into that higher presumption.

12            So it seems to be sort of elevating it above

13   what it should be and make it here.

14            MR. LORIG:   Your Honor, when I was Ms. Kauble's

15   age, there was an attempt made to convince the then new

16   Federal Circuit that once you got to a certain level, the

17   presumption disappeared and the burden shifted.   And Judge

18   Markey in very harsh words said the presumption is there,

19   it's always there.

20            Here we are, I am much older than Ms. Kauble.

21   As far as I know, the presumption is there.   It's always

22   there.   The burden doesn't shift.

23            THE COURT:   Fair enough.   But we know that this

24   issue continues to be one of fairly substantial discussion

25   at the Patent Bar.

```
 1            MR. RADSCH:  The presumption is also there that
 2    Genzyme doesn't infringe.  You don't have a separate
 3    instruction on that.
 4            THE COURT:  I think in the context of this case
 5    I am going to decide -- and I normally give the presumption
 6    instruction.  I am going to agree with you, Mr. Radsch.
 7            Is the next one 4.3?
 8            MS. KAUBLE:  Yes, Your Honor.
 9            MR. RADSCH:  If I may, Your Honor.
10            We had removed all of our instructions on
11    obviousness.  We are not asking -- we are not asking that be
12    submitted to the jury.  As you can see, we didn't present
13    evidence on obviousness.  We had suggested that this be
14    removed.  I do not believe that prior art is relevant to the
15    remaining defenses.  We have prior invention, which there is
16    an entire instruction on.  There is enablement, and there is
17    written description.  We said, it should just be removed for
18    simplicity.
19            THE COURT:  I think that's an excellent
20    suggestion.  And it is a brain dead moment for me.
21            MR. LORIG:  Your Honor, you told me during this
22    trial that, periodically, take a chance on saying something.
23            THE COURT:  No.  You have taken it.
24            MR. LORIG:  If you don't mind, Your Honor, I
25    think not instructing the jury that there is a presumption
```

```
 1    of validity, that it has to be overcome by clear and

 2    convincing evidence, is contrary to the film, the

 3    pre-instructions, and --

 4              THE COURT:  And they have been instructed in the

 5    film and I gave them the preliminary instruction and I have

 6    determined it's enough under the circumstances as

 7    articulated -- for those reasons, I am going to adapt Mr.

 8    Radsch's rationale.  I think it's an excellent argument.  I

 9    am persuaded.

10              MR. LORIG:  May I still argue the presumption,

11    since it was in the pre-instructions?

12              THE COURT:  No -- well, what do you say about

13    that?

14              MR. RADSCH:  I think that's fine.

15              THE COURT:  Let me revise that.  We can't put

16    our heads in the sand on this.

17              MR. LORIG:  Certainly.

18              THE COURT:  Fair enough.

19              MR. LORIG:  I apologize.  I wanted to clear that

20    up.

21              THE COURT:  You don't need to apologize.

22              So I agree with Mr. Radsch that prior art should

23    come out, that the prior art instruction should come out.

24    Any resistance to that?

25              MR. PAUNOVICH:  No.
```

1       THE COURT:  Mr. Paunovich, you agree?

2       MR. PAUNOVICH:  Yes.

3       THE COURT:  4.4 would be next.

4       MS. KAUBLE:  If I may, Your Honor.  I think the

5  main issue that we are all having with 4.4 is that

6  Shelbyzyme thinks that the issue of invalidity by prior

7  invention is incredibly complicated, as you can see from

8  reading through Genzyme's instruction.  They bring up a lot

9  of different issues throughout their instruction, reduction

10  to practice, corroboration, all of these things that we

11  think need to be fully explained, in an effort to improve

12  jury instructions, after all this 102(g) information came to

13  the Court and all of the different reports that have

14  recently been submitted regarding 102(g), we consulted a

15  recent case -- a case --

16       THE COURT:  Let me interrupt.  Let me make a

17  suggestion.  I am not opposed to giving this instruction in

18  a slightly different form.

19       MR. RADSCH:  Your Honor, if I may respond.

20  Their anticipation instruction actually spans I think nine

21  different instructions.  So it starts at 4.4 and goes on to

22  4.11.  It goes on to 4.11.  So there is nine separate

23  instructions on the issues.  I know that the Model

24  Instructions aren't the law.  Every model instruction I have

25  seen is one instruction.  I think this is really going to

 1    confuse the jury.

 2              THE COURT:  Let's take them -- I understand what

 3    you are saying, on a number of occasions, in Genzyme's

 4    objections to those, that group of instructions, you say

 5    Repetitive, 404(b), I think is what you cited.

 6              MR. RADSCH:  That's correct.

 7              THE COURT:  Let's take a moment.  Let me get a

 8    reaction.  Number one, we are at 4.4, I think I am picking

 9    up on a suggestion made by Genzyme that rather than saying

10    to the jury that Shelbyzyme claims -- let me read the

11    sentence.

12              Genzyme contends that Shelbyzyme's patent is

13    invalid because the subject matter of Shelbyzyme's

14    claims was allegedly previously invented by Mt.

15    Sinai -- I don't think Genzyme contends that, necessarily.

16    I was going to say Drs. Desnick, Bishop and Iaonnui --

17    before the alleged date of invention of Shelbyzyme's patent.

18    Any difficulty with that revision?

19              MR. PAUNOVICH:  I don't believe we have a

20    difficulty with that.

21              THE COURT:  Okay.  Then let's read on.

22              According to patent law, a person shall not be

23    entitled to a patent if before the applicant's

24    invention thereof the invention was made in this

25    country by another who had not abandoned, suppressed or

```
 1   concealed it.

 2             I am going to refer to them from herein as "the

 3   doctors."  Genzyme claims that the doctors made the

 4   invention underlying the '831 patent before Shelbyzyme did.

 5             Then I delete these words:  proof that Mt. Sinai

 6   School of Medicine -- and I insert these.  If you conclude

 7   that the doctors invented the method of the '831 patent

 8   before David Calhoun and George Coppola, then the '831

 9   patent is invalid.

10             MS. KAUBLE:  That is fine with Shelbyzyme, Your

11   Honor.

12             MR. RADSCH:  That is fine.

13             THE COURT:  Did you get that language?  Because

14   you got to get that to your word processor.

15             MR. MOORE:  I will take it.

16             THE COURT:  Moving on to 4.4B, which I rather

17   like as an instruction, the only change I made -- and we can

18   go back.  On some occasions, on those that you cite, Mr.

19   Radsch, later on, I agree that there is some redundancy, but

20   some I am not quite sure that I agree.

21             MR. RADSCH:  If I may, Your Honor.  Our 4.4B is

22   a single instruction on anticipation.  I believe that

23   basically their competing instruction is 4.4 through 4.11.

24             THE COURT:  I think, yes.

25             MS. KAUBLE:  That's correct, Your Honor.
```

1      THE COURT:  I think that's right.  And so the

2  only edit I made was to use "the doctors."  I specifically

3  called out, as you did in this case, Genzyme contends that

4  Drs. Desnick, Bishop and Iaonnui, and I just said, whom I

5  will refer to hereafter as "the doctors," rather than

6  Desnick -- it's just a nudge.

7      You can go through and make the necessary tense

8  adjustments and that kind of thing, or I can give you this

9  thing.

10      But then we go to 4.5, my note to myself on 4.5

11  is that it is indeed repetitive.

12      MR. PAUNOVICH:  Your Honor, I believe there is

13  some confusion.  Originally, there was a single anticipation

14  instruction offered by Genzyme when their motion to add the

15  102(g) defense was pending.  Once that was added -- and at

16  that time Shelbyzyme had not proposed an alternative jury

17  instruction.  Once the defense was added to the case, we

18  investigated the Monsanto case from the Federal Circuit,

19  which goes through -- it has a number of instructions which

20  cover some of this material that's in Genzyme's instruction

21  and very clearly articulate the, what is sometimes some very

22  complicated legal issues that are required in deciding this

23  102(g) issue.

24      One of the big problems that we have with

25  Genzyme's instruction is it's actually inconsistent with the

```
1    evidence and the theory that they are adducing in this case.
2              THE COURT:  How so?
3              MR. PAUNOVICH:  The first of which, in Paragraph
4    2, it states, because Shelbyzyme and Genzyme dispute who is
5    the first inventor -- the person who conceived of the
6    claimed invention and first reduced it to practice is the
7    first inventor.
8              Now --
9              THE COURT:  Let's make sure we are on the same
10   instruction.  Where were you just reading from?
11             MR. PAUNOVICH:  4.4B.
12             THE COURT:  Which paragraph?
13             MR. PAUNOVICH:  Paragraph 2.
14             THE COURT:  The numbered paragraph?
15             MR. PAUNOVICH:  4.4B.
16             MR. RADSCH:  Your Honor, I believe this may have
17   changed from last night.
18             MS. KAUBLE:  Was this the instruction that you
19   all changed?
20             MR. RADSCH:  Yes.  I may have one I can hand up
21   to the Court.
22             THE COURT:  Would you do that?  I am looking at
23   a different version.
24             Where were you just reading from?
25             MR. PAUNOVICH:  I was reading from the first
```

1    sentence of the second paragraph of the instruction.

2              THE COURT:  Because Shelbyzyme...

3              MR. PAUNOVICH:  Correct.

4              Some short -- their theory and the theory of

5    their expert is that the doctors had conceived of this

6    invention at Mt. Sinai in 1986 and they claim it's a

7    constructive reduction to practice after Drs. Calhoun and

8    Coppola.

9              I think that the language, it's confusing

10   because you can't -- it doesn't articulate exactly what

11   their theory is and what they are deciding.  For example,

12   the first sentence, The person who conceived of the claimed

13   invention and first reduced it to practice is the first

14   inventor.  They are not alleging that in this case.  They

15   claim to be the first inventor who constructively reduced it

16   to practice after Drs. Calhoun and Coppola.  And I think

17   there is some potential for confusion that they have

18   actually done this, reduced it to practice prior to Dr.

19   Calhoun and Coppola.  And there is no dispute about that

20   among the expert and the parties.  That is the theory and

21   the evidence.

22             MR. RADSCH:  If I may respond.  You heard Dr.

23   Calhoun testify that he has never actually used his own

24   invention, so he has never actually performed the method.

25   He has never actually reduced it to practice.  We also have

1    invalidity claims in this case of no enablement and lack of

2    written description.  You cannot constructively reduce to

3    practice unless the application you filed meets the

4    requirements of Section 112.

5              So we would argue that the '804 patent is also a

6    first constructive reduction to practice, because the

7    earlier filed patent application is not enabling, it does

8    not meet the written description requirements of Section

9    112.

10             MR. PAUNOVICH:  I believe Mr. Radsch is

11   referring to the requirement in an interference proceeding

12   or during patent prosecution.  There is a different standard

13   for enablement in a 102(g) situation when it is an

14   interference as opposed to a situation like this in this

15   case.  There is no enablement requirement in a 102(g)

16   dispute in litigation.

17             MR. RADSCH:  Your Honor, the '831 patent was

18   filed in 2002.  For it to claim priority back to 1989, the

19   1989 patent must meet the requirements of 35 U.S.C. 112.  We

20   contend it does not do that.  So it is not entitled to that

21   priority date.  There was never a constructive reduction to

22   practice of the claims of the '831 patent in 1989.  You

23   heard him testify --

24             THE COURT:  I remember that.  Ms. Raymond is

25   trying to get your attention.

1            THE COURT:  I remember that.  But Ms. Raymond is

2    trying to get your attention.

3            MR. RADSCH:  Also, on the evidence that Example

4    5 was added to the patent.  Example 5 in the patent

5    specification was added in the second patent application

6    that was filed.  That's the uptake experiment.  That they

7    contend was the critical date it approved effectiveness.

8            That Example 5 was not in the original file

9    specification in the first patent application.  It was not

10   until the second patent application.  So for them to say

11   that you necessarily have a constructive reduction to

12   practice in the first application is also inconsistent

13   with that evidence.

14           THE COURT:  Mr. Paunovich.

15           MR. PAUNOVICH:  There is no law to support the

16   theory that Mr. Radsch is stating here.  This is a

17   requirement in an interference proceeding.

18           THE COURT:  See, that's what you didn't talk

19   about is his assertion this is a requirement.  The one you

20   maintain in an interference, not in the situation we have

21   today.

22           MR. RADSCH:  I think that -- I think that is

23   mistaken.  I think that -- well, the reason is that to

24   have -- there are requirements for actual constructive

25   reduction to practice.  The requirement for constructive

1    reduction to practice is you have to have filing of the

2    patents with the Patent Office.

3                    MR. PAUNOVICH:  It's simply not true.  There

4    is very clear, it's in the MPEP where they describe the

5    difference between the interference standard.  And when you

6    are outside and you already have an issued patent, there is

7    a presumption.

8                    THE COURT:  Counsel, have you looked at the

9    MPEP?

10                   MR. RADSCH:  No, I have not recently.

11                   THE COURT:  When I say that, Mr. Paunovich seems

12   to be quite certain about his stated proposition of law.

13   And this one might bear some additional discussion and a

14   revisit before we end here today.  If you can agree on -- I

15   think, would you agree, if you agree with Mr. Paunovich,

16   that the proposition you make here is problematic?

17                   MR. RADSCH:  If it indeed says that, that would

18   be problematic.  I would be surprised to learn that you

19   could have a constructive reduction to practice where the

20   claims are enabled.  In other words, you haven't proved that

21   you invented what you claimed.  That is the whole purpose of

22   the 112.

23                   THE COURT:  No, I understand that.  It's just I

24   never heard this argument before about distinguishing

25   between an interference proceeding standard.  Go ahead.

1            MR. PAUNOVICH:  If may, Your Honor.  The reason

2   is in an interference, you don't have issued patents yet,

3   and so you don't have a presumption of validity.

4            THE COURT:  Yes.

5            MR. PAUNOVICH:  So the Patent Office said if

6   there is this interference argument and it comes down to it,

7   you have to actually prove enablement.  That is different

8   once the patent issued, and there is very clear case law on

9   the matter.

10           MR. RADSCH:  I guess the other point, too, is

11  that the '831 patent application was filed in 2002.  For it

12  to claim priority to the earlier filed application, the law

13  is clear that you have to meet the Section 112 requirement.

14  So if they're relying on the filing of the '831 patent, that

15  is a 2002 constructive reduction to practice.  But in order

16  to have that priority back to 1989 filing, you must meet the

17  requirements of 35 U.S.C. 112.

18           THE COURT:  How about that, Mr. Paunovich?

19           MR. PAUNOVICH:  Yes.  The '421 application,

20  which there was evidence that we brought into the record

21  during our case-in-chief, has a nearly identical method of

22  treatment claim.  There is clearly support to the original

23  priority 1989 application.

24           MR. RADSCH:  And that specification, Your Honor,

25  does not have the Example 5 in the specification which they

```
 1      rely upon to show invention to the actual, the reduction to

 2      practice of their method of treatment.  They didn't show it

 3      could be taken up until that Example 5 was added.  Not in

 4      the original filed specification.

 5              THE COURT:  I think you would agree with that.

 6      What effect does that have on your argument?

 7              MR. PAUNOVICH:  There is an argument about who

 8      did this first.  And we have Mt. Sinai and the doctors

 9      saying we tried to treat people with an enzyme that we

10      isolated from placentas back in 1979.  Neither parties'

11      patents cover this and they suggested that if they get a

12      secret enzyme in the lab in glass that they have the

13      complete invention.

14              The method in our patent is a method of

15      treatment.  If there is -- all of the evidence, and it's

16      undisputed, is that if you are looking at a proof of

17      principle, which is still not a reduction to practice, it's

18      that you have to actually show uptake.  The their own

19      doctors admitted that you have to do that uptake experiment

20      to know you have a therapeutically relevant protein.  Once

21      they have that, you can file the patent and constructively

22      reduce to practice.  And,

23              In addition, all of the evidence as shown, it's

24      undisputed, that there is multiple uptake experiments that

25      occurred over the course of the past seven-eight months
```

```
 1    prior to that.  They, very quickly after that, filed a

 2    second patent.

 3              We believe that they constructively reduced to

 4    practice in the first patent regardless.  Yes, an example

 5    was added by the second patent but it's irrelevant.

 6              THE COURT:  So what would you do with this

 7    language, Mr. Paunovich?

 8              MR. PAUNOVICH:  I would change it so that it

 9    matches the theory in the second paragraph such that they're

10    contending that they conceived of the complete and permanent

11    invention, or whatever the proper language would be, and

12    they reduced it to practice constructively after Drs.

13    Calhoun and Coppola did, which is their theory.

14              MR. RADSCH:  Two points.  One is about the proof

15    of principle.  They've contended in this suit, I believe

16    their experts have contended proof of principle is that

17    uptake experiment that was not added until the second patent

18    application.

19              The second point about the requirement for

20    enabling disclosure is that you can claim, under that

21    theory, where it does not need to be enabling.  You can

22    claim a perpetual motion machine and say you reduced to

23    practice.  You would have a claim on something.  The

24    specification doesn't support it.  I can file any old claim

25    and I can say I constructively reduced it to practice.  I
```

1    don't think that is supported by the law.

2              MR. PAUNOVICH:  It is the law.  There is a

3    presumption of validity that you have met the written

4    description requirement, that you met the written enablement

5    requirement.

6              Mr. Radsch's argument is essentially we should

7    be able to sort of shift the sands of how we're going to

8    argue this 102(g) because we also argue that your patent is

9    invalid for enablement and/or written description.

10             There is a presumption.  They haven't proven

11   that at this point.  It's up to the jury to decide that.

12   They've presented one theory of 102(g) which has only

13   come up recently but it's a single theory.  We deposed

14   their expert on the basis of that theory.  His opinion

15   unequivocally was that it was a constructive reduction of

16   practice by the doctors at Mt. Sinai after Drs. Calhoun and

17   Coppola.  There has been no evidence or testimony, expert or

18   percipient or otherwise, that it's based on a reduction of

19   practice or invention that occurs before Drs. Calhoun or

20   Coppola.

21             THE COURT:  Yes.

22             MR. RADSCH:  May I respond?  One thing.  He

23   talked about the presumption.  The presumption only applies

24   to the patent application filed that led to the '831 patent

25   itself.  You don't get that presumption to go back and claim

1    an earlier priority date.  They have to prove the earlier

2    priority date.  The burden is on them to show that their

3    earlier application, the requirements of the patent laws,

4    and then the burden shifts back to Genzyme to prove that it

5    does not.  But the presumption to which Mr. Paunovich

6    alluded is the presumption that applies to the patent

7    application filed in 2002.

8              We have talked a lot about the presumption of

9    validity.  I'm sorry.  Yes, presumption of validity.  The

10   jury is going to be instructed on that, but they should

11   also understand that we have more than one theory of prior

12   invention, particularly when you have the inventor talking

13   about how he never has actually used his own patent.

14             MR. PAUNOVICH:  I'm not aware of any such

15   shifting presumption of validity.  There is one presumption

16   of validity, and it exists once your patent issues.  And

17   there is no dispute that this patent claims priority from

18   initial application in 1989.  It has broad support for the

19   method of treatment which was Claim 45 which was presented

20   and displayed before the jury.

21             THE COURT:  Let's discuss other problems that

22   you have with this instruction other than the second

23   paragraph.

24             MR. PAUNOVICH:  And I was just informed, Your

25   Honor, I think what we would prefer is to change a

1    paragraph.  Am I right?

2              (Counsel confer.)

3              MR. PAUNOVICH:  In 4.5, we believe there is an

4    accurate statement of the invalidity theory that Genzyme is

5    attempting to prove.

6              THE COURT:  Where is that?

7              MR. PAUNOVICH:  It's 4.5 on, it's a Shelbyzyme

8    only instruction.  The second paragraph.

9              THE COURT:  Shelbyzyme contends that Drs.

10   Calhoun ...

11             MR. PAUNOVICH:  Correct.  Shelbyzyme contends

12   that Drs. Calhoun and Coppola reduced the method of

13   treatment underlying the '831 patent to practice before the

14   Mt. Sinai School of Medicine.  Mt. Sinai School of Medicine

15   may be considered a prior inventor -- I'm sorry.  I believe

16   that this language is a little off.  The first sentence

17   should be Genzyme contends that the doctors reduced the

18   method of treatment underlying the '831 patent to practice

19   before Shelbyzyme.

20             Mount Sinai.  I'm sorry.  The doctors may be

21   considered prior inventors if you find that both the doctors

22   conceived of the claimed inventions first and the doctors

23   exercised reasonable diligence in reducing the technology to

24   practice after Shelbyzyme.

25             I believe that is an accurate statement of the

1    theory that we have taken depositions on and presented our

2    case on.

3              THE COURT:  Mr. Radsch.

4              MR. RADSCH:  A couple of issues.  One.  After

5    Shelbyzyme is a little bit confusing.  Shelbyzyme did not

6    submit the patent.

7              THE COURT:  I'm sorry.

8              MR. RADSCH:  I'm sorry.  The language about

9    reducing the technology to practice after Shelbyzyme.  You

10   may not have the most updated version.  I'm not sure.

11             THE COURT:  Oh, yes.  I see it.  The romanesque

12   2.

13             MR. RADSCH:  Yes.  So, first of all, I think

14   that is confusing to talk about after Shelbyzyme which did

15   not exist until 2009.

16             But the other issue is again this assumption

17   that the doctors necessarily reduced it to practice after

18   Calhoun and Coppola did.  It was never actually used, their

19   own claimed method of treatment.

20             We are not seeking to shift the burden on

21   invalidity.  All we're saying is they get a presumption of

22   validity.  They get a presumption their 2002 patent filing

23   meets the written description enablement requirement but

24   they don't get the presumption back to the first patent

25   application unless they prove that is enabling.

1    Q.    So in what way does this language incorrectly, if it

2    does, misstate Genzyme's theory?

3             MR. RADSCH:  It --

4             THE COURT:  And how would you change it?

5             MR. RADSCH:  I would take the language from the

6    second paragraph of 4.

7             THE COURT:  4.4(b).

8             MR. RADSCH:  4.4(b).  That's right.  I believe

9    it's the second paragraph of 4.4(b).

10            MR. LORIG:  Your Honor, may I add something?

11            THE COURT:  Yes.

12            MR. LORIG:  You heard a moment ago, until

13   Shelbyzyme proves its patent was enabling, it's not entitled

14   to a priority date.  The law, as I understand it, is that

15   patents are presumed valid.  It's presumed enabling.  It's

16   presumed to be definite.  It's presumed not to be obvious.

17   It's presumed, et cetera.

18            We don't have to prove that.  And the idea that

19   they can get behind their priority date by saying we have

20   the burden of proving enablement, that is just not the law.

21            The patent claims are method of treating a

22   patient.  Nobody treated a patient until sometime in the

23   1990s.  Neither Dr. Desnick, Dr. Ioannou nor Dr. Calhoun

24   treated a patent.

25            There is a contest who got the enzyme first,

1   who did the uptake first.  But there has been no evidence

2   in this trial that any of the doctors, Dr. Ioannou or Dr.

3   Desnick, treated a patent with a recombinant enzyme until

4   sometime in the mid '90s, way after these patents were

5   filed.  So this all becomes, if you will forgive me, a phony

6   issue.

7            We filed the patent application.  It's presumed

8   to be enabled.  It's presumed to be valid.  It's presumed to

9   be a constructive reduction to practice.  We were the first

10  one to file the claims for the treating patients.  It's a

11  constructive reduction to practice.  Not an actual reduction

12  but a constructive reduction.  And that's the law.

13           We're getting involved here with an awful lot of

14  creativity; and for the life of me, I don't know why we have

15  to get creative in this case.  The law is the law.

16           MR. RADSCH:  There is no -- there is the

17  presumption.  The patent application immediately leads to

18  the patent.  So the 2002 filing, the '831 patent does enjoy

19  the presumption that Mr. Lorig was talking about.  There is

20  no presumption of priority back.  Just because it lists

21  priority, there is no presumption you get that priority

22  date.

23           MR. LORIG:  It's the same specification.  The

24  spec didn't get changed.

25           MR. RADSCH:  It doesn't have Example 5, Your

```
 1   Honor.
 2                MR. LORIG:  Your Honor, Example 5 was not added
 3   in 2002, Your Honor.  The only change that was ever made in
 4   that patent was way back in 1990, before the Mt. Sinai
 5   doctors filed theirs.  So you still have a constructive
 6   reduction to practice before they filed anything.
 7                If you don't want to credit the '89 patent,
 8   credit the 1990 patent, which was filed before theirs.  It's
 9   still a constructive reduction to practice.  And the idea
10   that we have to prove this, that there is some burden now on
11   the plaintiff to prove validity, it just stands in the face
12   of the law as I understand it.
13                THE COURT:  Well --
14                MR. RADSCH:  Okay.  So I think that we should
15   probably start working out a proposal on a solution.  I
16   don't think we are in agreement on the law, but I think we
17   can reasonably come to a solution on it.
18                THE COURT:  Would you, Mr. Radsch and
19   Mr. Paunovich like to remove yourself from the table, hand
20   over the laboring oar to other colleagues or are you --
21                MR. PAUNOVICH:  Sure.
22                THE COURT:  -- are you the ones that are leading
23   it?  Maybe you can work this out rather quickly, or what do
24   you think?
25                MR. RADSCH:  Yes.
```

1    THE COURT:  Because I don't want to leave here

2  without everything being done.

3    MR. RADSCH:  Yes.

4    MR. LORIG:  Your Honor, speaking for myself,

5  they have really been doing the instructions.  I should

6  probably be working on closing.  I am staying to help.  But

7  I think they should stay.

8    THE COURT:  Is there some way that we can --

9    MR. RADSCH:  I would like to propose right now,

10  this not being particularly productive, I think Your Honor's

11  guidance would be helpful in working out one of the ones we

12  have here.  For example, if we used -- I am going to have to

13  take a look at this.

14    MS. NOREIKA:  Your Honor, for 4.5, we were

15  suggesting that perhaps we could, for that second paragraph,

16  changing the Genzyme and the Shelbyzyme and getting rid of

17  the underlining, where I guess you are supposed to emphasize

18  something, remove from (ii), can we remove the words "after

19  Shelbyzyme"?  Just say that we would have to show that the

20  doctors conceived of the claimed invention first and the

21  doctors exercised the reasonable diligence in reducing the

22  technology to practice?

23    Then we don't have to deal with all this stuff.

24    MR. PAUNOVICH:  Your Honor, we have proceeded.

25  We have taken depositions all in the span of the last two

weeks and presented our case to the jury based on the theory
that they belatedly added.

Now, if they are going to allege that they have
reduced to practice before we filed for a patent -- you can
take either the '89 or '90.  It is very simple to see on the
demonstrative that we had, their expert says, my 102(g)
opinion is based on a constructive reduction to practice by
the doctors at Mt. Sinai.  Under either priority
application, that constructive reduction to practice occurs
after Shelbyzyme, Dr. Calhoun's constructive reduction to
practice.

There is no evidence right now -- frankly, I
would be surprised at what would be argued tomorrow, since
there is no evidence that they have actually reduced
anything to practice until they filed their patent
application, under either application, many months after Dr.
Calhoun.

MR. RADSCH:  Two points to that.  There has been
several suggestions that we added this defense.  It was
pleaded in our original answer.  Plaintiffs moved to exclude
it, and Your Honor did not grant that motion.  It's not a
new defense.  It's been on the table.  They have known this
entire time that we also have an enablement and written
description defense, which means that the patent does not
meet those requirements, in our view.  Then Dr. Calhoun

1    never used the invention, never actually practiced it.  They

2    know that we contend that there has never been a

3    constructive reduction to practice because they don't have

4    an enabling disclosure.  It shouldn't come as a surprise.

5              MR. PAUNOVICH:  Your Honor, one last point.  You

6    asked Mr. Radsch earlier what was inaccurate about the

7    second paragraph on 4.5.  I don't believe he responded as to

8    how that inaccurately portrayed their theory of 102(g).  We

9    would be certainly fine with changing the word Shelbyzyme to

10   Drs. Calhoun and Coppola and Mt. Sinai to the various

11   doctors at Mt. Sinai.  I think that would be easily

12   understandable.

13             But it is a very accurate statement of the facts

14   and the theory that they have presented in this case.  I

15   don't think we have heard anything as to why that is

16   inaccurate in some way.

17             THE COURT:  Mr. Radsch.

18             MR. RADSCH:  There is two points.  First of all,

19   it is not after Shelbyzyme.  Shelbyzyme didn't exist.  But

20   the other point is, it could suggest to the jury that there

21   was an enabling disclosure in 1989, that there was, in fact,

22   a constructive reduction to practice by Drs. Calhoun and

23   Coppola.  But that suggestion, they would have to find

24   against our enablement and written description defenses.

25             MR. LORIG:  There is a presumption that it was

1    enabling.  It all exists, Your Honor, as a matter of law.  I

2    don't understand this argument.  Those are all presumed to

3    be true.

4              THE COURT:  Do you two want to talk?

5              MS. NOREIKA:  I think the issue is, Your Honor,

6    there is obviously a dispute as to the facts and what the

7    evidence shows.  And that is something that perhaps the jury

8    is going to decide.  They are asking Your Honor to instruct

9    the jury as to an issue that's ultimately an issue of fact.

10   That is why I tried to make a suggestion, if the offending

11   language in this second paragraph, 4.5, it's the two words,

12   after Shelbyzyme, that seems to remove, at least from our

13   perspective, the Court instructing the jury as to an issue

14   that we think is ultimately one of fact.

15             MR. PAUNOVICH:  Your Honor, if we had known that

16   that was going to be their theory, we would have adduced

17   testimony from the doctors regarding when their reduction to

18   practice was.  We had an expert report from Genzyme where

19   they allege a constructive reduction to practice by the

20   filing of the '804 patent, which indisputably comes after

21   priority applications.

22             And to the point of an enabling or properly

23   described application, if you take the second patent

24   application of Dr. Calhoun and Coppola, it also is

25   indisputably prior to the '804.  We would now be prejudiced

1   greatly if we are sending this issue to the jury, where we

2   have not had an opportunity to adduce evidence where they

3   had no reduction to practice whatsoever until the

4   constructive reduction to practice of their '804 patent.

5   That is well after each of our applications.

6           MR. RADSCH:  This whole thing assumes that the

7   '831 patent gets to claim priority back.  I don't think

8   there is that presumption that it gets priority.  There is

9   presumption that the 2002 filing is valid based on 35 U.S.C.

10  112.  I don't think there is a presumption of priority back,

11  especially to the first application, in which there is no --

12          THE COURT:  That is in response to your

13  argument, Mr. Lorig.

14          MR. LORIG:  Your Honor, as you know, as a matter

15  of law, when you put it on the front page, you put those

16  priority dates on the front page, it is presumed to be

17  accurate.  There isn't a magic stamp that requires the

18  patentee to go backwards.

19          Again, if I can just finish, if I might.

20          It all comes down to burden.  As I understand

21  the argument this afternoon, the burden is on us to show

22  that we properly swore back.  I mean, there was a

23  continuation filed.  The paperwork swore back.  It is part

24  of the file history.  I didn't do it.  The prosecuting

25  lawyer did it.

1           That was all done as part of the progression.  I

2    mean, they fill out an application, they say what the

3    priority date is.  It's all there.  It's all presumed to be

4    valid.

5           You know, most of the afternoon, we have been

6    discussing essentially trial de novo on everything from

7    validity to enablement to written description.

8           Now we are going de novo on priority date, de

9    novo, de novo.

10          MR. HALEY:  Your Honor, I am a little confused

11   by what Mr. Lorig is saying.  The related data on the U.S.

12   application says the application filed on May 7, 1990 is a

13   continuation-in-part.  That means the continuation bit may

14   go back to 1989.  The in part bit doesn't go back to any

15   date earlier than May 7th of 1990.  The in part bit is

16   Examples 4 and 5, the glycosylation experiment and the

17   uptake experiment.

18          What Mr. Lorig is trying to do is saying, there

19   is a presumption of validity because we listed this on the

20   front of the patent, we get all of the way back to March 24

21   of 1989.  Even on the face of the document they don't do

22   that, because it's in part.  You don't get priority to

23   something that is in part.  The new stuff, you get the new

24   date.  There is no presumption issue in all.

25          MR. LORIG:  That is not what I was trying to

1    say.  The argument that was made by Andrew was that, you

2    can't assume that the 2002 filing was entitled to the

3    priority date.  Now, there is two priority dates.  There is

4    an '89 and a '90.  Both of those were before the filing by

5    Mt. Sinai.

6              All I was saying is, when Mr. Radsch said you

7    couldn't assume the priority date for the 2002 filing, I

8    said, it's presumed from the application that you get the

9    benefit of either the 1989 or the 1990.  In either event,

10   it's before the Mt. Sinai application was filed.

11             MR. RADSCH:  May I read one case cite to the

12   Court?

13             THE COURT:  Sure.

14             MR. RADSCH:  This is from Bone Care

15   International LLC versus Pentech Pharmaceuticals.  It is a

16   Northern District of Illinois case from March 22, 2012,

17   2012WL987121.  This is a quotation in full from the Federal

18   Circuit case.

19             It is elementary patent law that a patent

20   application is entitled to the benefit of the filing date of

21   the earlier filed application only if the disclosure of the

22   earlier application provides support for the claims of the

23   later application as required by 35 U.S.C. Section 112,

24   quoting In Re Chu, 66 F.3d, 292 at 297, Federal Circuit,

25   1995.

1    MR. LORIG:  But that basis is presumed to be

2  valid, to be proven false by clear and convincing evidence.

3  The burden stills remains with them.

4    THE COURT:  I don't think Mr. Radsch disagrees

5  with that.

6    MR. RADSCH:  That is exactly right.  We intend

7  to prove that.  And we don't want --

8    THE COURT:  And the jury needs to be able to

9  resolve those competing contentions.  The question is, how

10  to best instruct the jury in this regard.  For the two sides

11  to be making these factual arguments that, these fact-based

12  arguments that are really for the jury to resolve is not

13  helpful in terms of concluding an instruction.

14    MR. PAUNOVICH:  If I may, Your Honor.

15    THE COURT:  Yes.

16    MR. PAUNOVICH:  I think it would be instructive

17  to --

18    THE COURT:  I am not going to resolve the facts.

19  I am not going to try to rely on my recollection or yours,

20  for that matter, as to what this record, as to the current

21  status of this record.  That would be in effect, in my view,

22  invading the province of this jury, without giving them a

23  chance, preemptively, without giving them a chance to

24  address the facts that are in dispute.

25    The question is, what is the proper proposition

```
 1    of law to give them the guidance they need to resolve these

 2    facts?  You all should be able to agree on that.  Put aside

 3    your differences of view over what the record shows.  That's

 4    what's frustrating me at this moment.

 5              MR. RADSCH:  I think the proposal put forth of

 6    just deleting those words "after Shelbyzyme" is a

 7    reasonable, simple proposal.

 8              THE COURT:  I think it is.  That is the proposal

 9    I am going to adopt.  We have discussed this ad nauseam.  We

10    have beaten this proverbial horse to death.

11              It's over.  I am going to adopt the friendly

12    amendment and remove the language in 4.5, near the end, in

13    the next-to-last sentence, remove the words "after

14    Shelbyzyme."

15              MR. RADSCH:  Your Honor, the reference to Mt.

16    Sinai should be "the doctors."

17              THE COURT:  Yes.  Also, counsel, you suggested

18    removing the underlinings.

19              MS. NOREIKA:  Yes.

20              THE COURT:  We are going to do that as well.

21              I think, Mr. Paunovich, you indicated it should

22    be, Genzyme contends.

23              MR. PAUNOVICH:  That's correct.

24              THE COURT:  At the beginning, rather than

25    Shelbyzyme.
```

```
 1              MR. RADSCH:  It should be, I believe, Genzyme

 2    contends that Drs. Bishop, Desnick and Iaonnui.

 3              MS. KAUBLE:  Right.

 4              THE COURT:  Okay.  Let's go to the next one

 5    then.

 6              I probably shouldn't have let Ms. Loring go

 7    without asking this question.  I know you need to leave, Mr.

 8    Lorig.

 9              I normally don't place time limits on closings,

10    but I am in this case.  I am soliciting the view, your views

11    as to how much time you think you are going to want.  I will

12    tell you how much time I am going to give you.

13              MR. HALEY:  I believe we want an hour, Your

14    Honor.

15              THE COURT:  That seems reasonable.

16              MR. LORIG:  An hour, Your Honor.

17              THE COURT:  That's what you got.  I am going to

18    cut you off at the end of an hour.  We are going to keep the

19    time.  You keep the time as well.  But my Chief Deputy will

20    keep the time.  I will interrupt.

21              Let me say one more thing about interruptions by

22    opposing parties during the delivery of a closing speech.  I

23    encourage it.  I prefer you don't wait.  We will retire to

24    sidebar after the offending comment.  To ask me to give a

25    curative, that reemphasizes the point.  I think there is a
```

1    different standard that applies as well when you wait.

2           What you don't want to do is have us field an

3    objection and then repeat the offense, and have me

4    interrupt.

5           That's fair warning.  I have heard about some

6    recent activities, I am not going to name any parties, but I

7    have heard about some recent activity in a courtroom in this

8    building that resulted in an admonishment.

9           I am not going to tolerate that here.  Mr.

10   Lorig, Ms. Loring, you are both very experienced.  I think

11   you understand what I am saying.

12          Let's continue.  4.6.

13          MS. KAUBLE:  Correct, Your Honor.

14          THE COURT:  Invalidity by Prior Invention.

15   Again, I think Mr. Radsch would make a similar argument that

16   this is a repetitive instruction.

17          MR. RADSCH:  That's right.  I think we can all

18   boil it down into a couple of the pages, not nine different

19   instructions.

20          THE COURT:  Let me suggest, counsel, that that

21   is my decided preference.  These instructions are long

22   enough.  You don't have to deliver them.  But, more

23   importantly, you don't have to sit through them.  Go ahead.

24          MS. KAUBLE:  If I may, Your Honor.  I think we

25   would be amenable to reading a lot of these as one continued

1    instruction.  To the extent that an issue like conception

2    appears in Genzyme's 4.4B, taking the language from our 4.5

3    and putting it in their 4.4B, we are okay with using the

4    conception instruction.

5            The problem is that later on, we get to this

6    issue where -- because I understand --

7            THE COURT:  When you say the conception

8    instruction, you are talking about --

9            MS. KAUBLE:  4.6 is the conception instruction.

10   I think we would be amenable to using issues like reducing

11   the instructions to the extent that conception and reduction

12   to practice and reasonable diligence are combined into an

13   instruction.

14           However, there are additional instructions after

15   that that are not a part of Genzyme's instruction that we

16   believe are critical to the case.

17           THE COURT:  Starting with which one?

18           MS. KAUBLE:  So I believe we start, Joint

19   Inventors.

20           THE COURT:  That's 4 --

21           MS. KAUBLE:  That is 4.8?

22           THE COURT:  My note, Mr. Radsch, for your

23   benefit to myself here is:  Discuss.  Doesn't appear

24   repetitive.

25           Now, you also state in your footnote -- are you

1    okay with this, Mr. Haley?

2              MR. HALEY:  I wasn't quite sure what they meant

3    when they were saying they were going to incorporate some of

4    their --

5              THE COURT:  Let's see if we can get some

6    clarification.  Mr. Radsch, do you have a reaction?

7              MR. RADSCH:  I think that that is generally

8    okay.

9              THE COURT:  Let's put a finer point on it, if we

10   can.

11             Counsel, I have forgotten your name already.

12             MS. KAUBLE:  Krista Kauble.

13             Mr. Paunovich, would you like to speak to

14   conception?

15             MR. PAUNOVICH:  I think the point of conception,

16   there is a Genzyme statement that's part of Genzyme's 4.4B

17   of what conception is.  I think, especially given this case

18   and the testimony that's been given about various ideas in

19   this field that existed as early as the 1970s, that to make

20   sure the jury is clear that there is a difference between

21   conception and an idea.  And this instruction, which we have

22   pulled essentially verbatim from the Federal Circuit, the

23   Mycogen-Monsanto case, describes, for example, an idea is

24   definite and permanent when the inventor has a specific

25   settled idea, a particular solution to the problem at hand,

1    not just a general goal or research plan he hopes to pursue.

2              THE COURT:  Any problem with that language?

3              MR. RADSCH:  I thought we were on joint

4    inventors.

5              MS. KAUBLE:  Andrew, I think we are going back

6    to a few of the instructions -- Mr. Radsch, I apologize, I

7    believe we were going to a few of the instructions before

8    that.

9              MR. RADSCH:  We are fine with that.

10             MS. KAUBLE:  Okay.

11             MR. PAUNOVICH:  We would add the sentence that I

12   had just read from our 4.6.  We could add that to Genzyme's

13   4.4 and eliminate what is now our 4.6.

14             THE COURT:  Agreed, Mr. Haley?

15             MR. HALEY:  One sentence, yes.  The one sentence

16   you just read.

17             THE COURT:  That is right, Mr. Paunovich?

18             MR. PAUNOVICH:  Yes.

19             THE COURT:  Okay.

20             So we are all right?

21             MR. RADSCH:  We add that into 4.4B, and I think

22   we are good.

23             THE COURT:  Mr. Radsch, what do we need to take

24   up next?

25             MR. RADSCH:  I believe the next one -- there are

```
 1    several in this line.
 2              THE COURT:  That's my point.  I am wondering
 3    whether we can consolidate these.
 4              MR. RADSCH:  I think both these here are already
 5    in the 4.4(b) instruction already.  So, for example,
 6    corroboration is already in the 4.4(b), I think.
 7              THE COURT:  Well, I'm not sure that it is.  Take
 8    a look.  Because I went back and looked for corroboration.
 9    But, again, I didn't have the current iteration of 4.4(b),
10    so ...
11              MR. RADSCH:  The second page reads:  In order to
12    prove prior invention of this case, Genzyme is required to
13    present additional evidence beyond its testimony of the
14    prior inventor.
15              THE COURT:  Here it is.
16              MR. RADSCH:  However, you must evaluate all
17    pertinent evidence and testimony to make a sound
18    determination that the evidence creditably establishes prior
19    invention.  Ultimately, Genzyme bears the burden it is
20    highly probable that the patent claims are invalid.
21              THE COURT:  Counsel.
22              MR. PAUNOVICH:  I think it's not a full and
23    accurate statement of the rule of reason, the Monsanto
24    instruction which we included.  And I think we could
25    probably pare it down a bit between the parties as a more
```

```
 1    accurate statement of what the rule of reason is.
 2              THE COURT:  I'm going to trust that you are
 3    going to be able to do that.  I think there should be a
 4    midpoint here that you can agree upon.
 5              Okay.  And your concern, in part, the statement,
 6    the simple sentence is not fulsome enough.
 7              MR. PAUNOVICH:  Correct.
 8              THE COURT:  It's not descriptive.
 9              MR. PAUNOVICH:  You can't have inventor
10    testimony and sort of willy-nilly.  There has to be some
11    written corroboration of some sort.
12              THE COURT:  Yes, I think that would be helpful
13    guidance for the jury.  Okay?
14              MR. RADSCH:  We can pare it down and go back and
15    forth.
16              THE COURT:  Yes.
17              MR. PAUNOVICH:  Yes.
18              THE COURT:  I'm going to trust that you all can
19    work this one out.
20              Mr. Radsch, in this series of instructions, what
21    next do you want to discuss?
22              MR. RADSCH:  I don't know.  The next is 4.8,
23    Joint Inventors.  It seems to be a little bit redundant of
24    the conception idea.
25              THE COURT:  I think you can probably work some
```

```
 1    of this in.  I didn't find it.  Again, I didn't have the

 2    benefit of the more recent iteration.

 3              MR. RADSCH:  We'll edit it.

 4              THE COURT:  Okay.  That was 4.9.  Right?

 5              THE LAW CLERK:  4.8.

 6              THE COURT:  4.8.  So 4.9, Reduction to Practice?

 7              MR. RADSCH:  That is in 4.4(b) already.

 8              THE COURT:  That is there.  Do you agree?

 9              MR. PAUNOVICH:  Your Honor, I think that there

10    is.  Let me just ...

11              (Counsel confer.)

12              MR. PAUNOVICH:  I think the key point with

13    4.9 -- and I'm scanning quickly because I haven't had the

14    benefit of this one either.  But the key point is that both

15    parties have a constructive reduction to practice, and this

16    I think there could be a possibility for some confusion

17    about actually needing to administer the drug.  There is

18    no evidence that either of the doctors at Mt. Sinai or

19    Drs. Calhoun, Coppola actually did this before filing their

20    patents.

21              MR. RADSCH:  That's all in there in 4.4(b).

22    Actual constructive reduction to practice.

23              MR. PAUNOVICH:  I think that there is no actual

24    reduction to practice in this case, so I think that could

25    safely be removed and then we're okay.
```

1    MR. RADSCH:  The reduction to practice occurs

2  either as the filing of the enabling patent application or

3  when the invention was actually made and was shown to work

4  for its intended purpose.

5    MR. PAUNOVICH:  And that hasn't been done by

6  either party by the time of filing.

7    THE COURT:  Go ahead.  Talk to Mr. Haney.

8    MR. HANEY:  It says "or."

9    THE COURT:  Does it say "or?"

10    MR. RADSCH:  Yes, it says "or."  It's either

11  constructive or actual.  I suppose the jury could find.

12    THE COURT:  They could.  No, I'm going to leave

13  it in.  I'm going to leave it the way it is.  It's "or."

14  It's disjunctive.

15    MR. PAUNOVICH:  Understood.

16    THE COURT:  Do you want to talk?

17    MR. RADSCH:  The next is 4.10.  I don't think

18  any expert or any other person has talked about this concept

19  of simultaneous conception, reduction to practice.

20    THE COURT:  Yes.  Where is the evidence in the

21  record as best we can remember?  The support for this

22  instruction?

23    MR. PAUNOVICH:  We can take it out.

24    THE COURT:  Good.  Diligence.  I think there was

25  a complaint by Genzyme that this was repetitive.

1    MR. RADSCH:  As it appears in 4.4(b) already.

2    THE COURT:  How about that, Mr. Paunovich?

3    MR. LORIG:  Your Honor, Mr. Paunovich and I were

4    involved in these last night, but due diligence is going to

5    be key here because they took four and-a-half years, and the

6    question is whether it's due diligence or not.

7    THE COURT:  Well, the point I think Mr. Radsch

8    is making is were you involved in this discussion?  Why

9    don't you speak?

10    MS. KAUBLE:  Your Honor, we didn't discuss the

11    issue of due diligence last night.  We were able to move a

12    little bit on some of these different instructions, so we

13    didn't discuss it together.  But I think what Mr. Lorig --

14    THE COURT:  Do you want to discuss it now?  This

15    would be a good time.

16    MS. KAUBLE:  Sure thing.

17    MR. RADSCH:  If I may?  Mr. Lorig is free to

18    make the arguments.  It is an important issue I'm sure for

19    their case and there is an instruction in 4.4(b).

20    THE COURT:  That's what I'm trying to get at.

21    You both agree there is an instruction.

22    MR. PAUNOVICH:  I think we can drop this one.

23    THE COURT:  All right.  Did you hear that,

24    Mr. Radsch?

25    MR. RADSCH:  Yes.

```
 1                    THE COURT:  They're dropping it.

 2                    MR. RADSCH:  4.12 is the next one, Priority

 3       Date.

 4                    THE COURT:  Yes.

 5                    MR. RADSCH:  This was another one because it

 6       talks about how to determine priority, which is conception

 7       and reduction to practice these things.  We didn't think

 8       priority date was necessary now that we dropped obviousness

 9       because this was relevant to determining what was and was

10       not prior art.  Now that prior art is out, they're

11       adequately being instructed on what prior invention is.  We

12       just felt it would be better to get rid of it.

13                    THE COURT:  I tend to agree with that,

14       Mr. Paunovich.

15                    MR. PAUNOVICH:  I would agree with that.

16                    THE COURT:  Okay.  Good.  You agree on level of

17       ordinary skill, so we have competing proposals on 4.14,

18       Written Description.

19                    MR. RADSCH:  There is no agreement, Your Honor.

20                    THE COURT:  Okay.  So let's deal with Genzyme's

21       objections.  Mr. Radsch.

22                    MR. RADSCH:  I think that one of our primary

23       objections is that it doesn't state that the full scope of

24       the claims need be described.

25                    The purpose is to show not that you had some
```

```
 1    portion of what you claim, the purpose is to show you filed
 2    your application, you are in possession of the entire scope
 3    of the claimed invention, and that is in a lot of the case
 4    law.  I'm happy to ...
 5             THE COURT:  No, I agree with you.
 6             MR. RADSCH:  Okay.  That is one of our main ...
 7             THE COURT:  Main objections?
 8             MR. RADSCH:  Main objections.
 9             THE COURT:  To the Shelbyzyme instruction?
10             MR. RADSCH:  That's correct.
11             MR. PAUNOVICH:  I think we would be amenable to
12    adding that language of full scope into our written
13    description.
14             THE COURT:  Do you agree with that, Mr. Radsch?
15    Can you live with the instruction with that addition?
16             MR. RADSCH:  The other issue that we had, that
17    we had with it.
18             THE COURT:  Sure.
19             MR. RADSCH:  In the middle part of the
20    paragraph, it talks about how the applicant may keep the
21    originally filed claims or expand or narrow them.  It goes
22    on.  It doesn't state what the import of that is.  The
23    import of that is if that an applicant does do that, it's
24    necessary to see if those changed claims are supported.
25             THE COURT:  Let's add that language.
```

```
 1                      Do you agree?

 2                      MR. RADSCH:  And that appears in 4.42(b),

 3      Genzyme's proposal.

 4                      THE COURT:  So can we incorporate that language?

 5      I think that is a proper.

 6                      MR. PAUNOVICH:  I was not.

 7                      THE COURT:  You were not following?

 8                      MR. PAUNOVICH:  I did not have any eye on the

 9      language of Genzyme's.

10                      THE COURT:  Would you do that again, Mr. Radsch?

11      We're in the middle of the page of your instruction.

12                      MR. RADSCH:  We're in the middle of the page,

13      so it's 4.14, the second paragraph.  It discusses how -- I

14      guess the bottom of that second paragraph and how an

15      applicant may amend the claims or add new claims and change

16      or broaden the scope, but it doesn't go on to say why that

17      is relevant to the written description issue.

18                      In Genzyme's proposal, it states that, at the

19      bottom of the second paragraph:  The purpose -- their

20      purpose of written description requirement is to ensure that

21      the scope of the claims that are at issue remain within the

22      scope of the written description of the invention that was

23      provided in the original application.

24                      MR. PAUNOVICH:  We can add that sentence.

25                      THE COURT:  Okay.  Fair enough then.  We have an
```

1    agreement.

2              Enablement.  There is a disagreement on 4.15.

3              MS. KAUBLE:  On this one, Your Honor, I just

4    wanted to mention ours is nearly verbatim from the Delaware

5    2003 instructions.  We think it's very straightforward.

6              Genzyme's is very long and very complicated.  It

7    includes all these factors that we don't think are necessary

8    for the jury's analysis.

9              To the extent this instruction proposed by

10   Shelbyzyme is so straightforward, we think it is a

11   reasonable proposal.

12             THE COURT:  My tendency, Mr. Radsch, is without

13   doing violence to the law if we can that less is more.

14             MR. RADSCH:  Yes.  May I -- I tend to agree

15   especially on these jury instructions, they're very, very

16   long.  One thing we would like to see added is the same as

17   written description:  It must enable the full scope of the

18   claims.  Not some portion but they need to enable everything

19   in the claim.

20             THE COURT:  Do you agree with that.  Counsel?

21             MR. PAUNOVICH:  That's fine.

22             THE COURT:  That's fine.

23             Damages.  I know that Shelbyzyme objects to

24   Genzyme's sentence, and I don't know if this would otherwise

25   make the instruction palatable.  In the next to last full

1   paragraph, which reads:  Bear in mind that a patent owner

2   is not entitled to recover damages that are remote or

3   speculative.

4            I think that should come out of the instruction.

5   Otherwise, I found it not objectionable.  But, counsel, what

6   do you think?

7            MS. KAUBLE:  To Genzyme's instruction, Your

8   Honor?

9            THE COURT:  Yes.

10           MR. RADSCH:  I'm sorry.  This is another one we

11  changed last night.

12           THE COURT:  Okay.

13           MR. RADSCH:  Verbatim out of Edwards Life

14  Sciences v CoreValve case.

15           THE COURT:  Okay.

16           MR. RADSCH:  2010.  The final jury instructions

17  that Your Honor read.  So we took it verbatim from there and

18  changed it.  I'm happy to hand it up and let you look at it.

19           THE COURT:  Let's see if there is agreement.  I

20  don't remember it.

21           MS. KAUBLE:  Your Honor, this is not something

22  we discussed in the meet and confer process.  It came

23  afterwards.  As you can see -- well, you can't see, of

24  course, but one of the big problems that we have was that

25  Genzyme failed to include a definition of a reasonable

```
 1    royalty.  That was the big thing that was probably --

 2                THE COURT:  I think we should define reasonable

 3    royalty just ahead of the Georgia-Pacific factors.

 4                Mr. Radsch, go ahead.

 5                MR. RADSCH:  The next instruction is the

 6    definition of reasonable royalty, which is 5.2.

 7                THE COURT:  Yes.

 8                MR. RADSCH:  That's Shelbyzyme's construction.

 9    If I can give my brief reason why I have not agreed to that?

10                There is instruction on what a reasonable

11    royalty is.  I'm sorry.

12                THE COURT:  Where is it?

13                MR. RADSCH:  The reasonable royalty

14    instruction here discusses a hypothetical -- it's based on a

15    hypothetical negotiation, and we feel that that is just one

16    of the 15 factors.

17                THE COURT:  Oh, no.  I saw that, and I agree

18    with that.  I agree with that.  So I think we can give a

19    definition of a reasonable royalty, of what the statute

20    requires.

21                MS. KAUBLE:  In addition, Your Honor?

22                THE COURT:  Yes.

23                MS. KAUBLE:  Going through what they claimed was

24    essentially a verbatim language, they add an entire section

25    that said, again, they repeat Shelbyzyme's burden.  So they
```

1    say:  Again, Shelbyzyme has the burden to establish the

2    amount of its damages by a preponderance of the evidence.

3              THE COURT:  So slow down, Mr. Maurer is trying

4    to take this down.

5              MS. KAUBLE:  Thank you, Your Honor.

6              THE COURT:  Or Mr. Gaffigan is taking it down.

7              MS. KAUBLE:  Then they say:  In other words, you

8    should only award those damages that Shelbyzyme establishes

9    that it more than likely not suffered -- more likely than

10   not suffered.

11             THE COURT:  Where are you reading from?

12             THE LAW CLERK:  We don't have it.

13             THE COURT:  We don't have it?  Okay.

14             MS. KAUBLE:  Right.  So they say this is taken

15   verbatim from Edwards Life Sciences, and there is a chunk

16   that does not come from the model instruction.  That is what

17   we found problematic.  And I think to the extent that it

18   could be removed, that would be something we would be

19   amenable.

20             MR. RADSCH:  That was probably an oversight on

21   my part, and that is fine to take out.

22             THE COURT:  Or put back.  Whichever.

23             MR. PAUNOVICH:  Whichever one it is, we'll go to

24   the model.

25             MR. RADSCH:  Is that the third paragraph you are

1    reading from?

2              MS. KAUBLE:  It's the second paragraph.

3              MR. RADSCH:  5.1(b)?  Are you on 5.1(b)?

4              MS. KAUBLE:  I'm sorry.  I'm reading from my

5    objections is where I had the language.  Let me make sure I

6    am guiding you to the right spot.

7              MR. RADSCH:  I believe I basically cut and

8    pasted the instruction.

9              MS. KAUBLE:  Yes, it's the third paragraph.  We

10   thought it's prejudicial.  If we can get rid of that and it

11   conforms to the model instruction, we're in a much better

12   position to agree to that.

13             THE COURT:  So we have an agreement?

14             MS. KAUBLE:  Well, I was a bit confused about

15   Your Honor's comments on whether a reasonable royalty

16   definition be included in this instruction.

17             THE COURT:  Well, we need a definition somewhere

18   of reasonable royalty.  So I don't mind where you put it but

19   I think we agree; right?

20             MR. RADSCH:  Okay.  So 5.1(b), we'll take out

21   the third paragraph and then I think we're on to the next

22   one.

23             THE COURT:  Okay.  Counsel, how does that work

24   for you?

25             MR. PAUNOVICH:  I believe that is fine.  I

```
 1    haven't seen the instruction.  I understand if that is the

 2    model, we'll just conform to that.

 3                THE COURT:  The Edward Life Sciences model?

 4                MR. PAUNOVICH:  Correct.

 5                THE COURT:  I think he intended to lift it

 6    verbatim.

 7                MR. PAUNOVICH:  So we would be fine with that,

 8    and we will also incorporate the reasonable royalty

 9    definition into this instruction.

10                THE COURT:  Yes.  Mr. Radsch, is that?

11                MR. RADSCH:  I think the reasonable royalty is a

12    separate instruction from the general purpose of damages,

13    and then it goes on to --

14                THE COURT:  And I think that is a better way to

15    present the issue to the jury.

16                MR. PAUNOVICH:  Okay.  So a separate reasonable

17    royalty instruction.

18                THE COURT:  Instruction.

19                MS. KAUBLE:  Which we conveniently propose next

20    in 5.2.

21                THE COURT:  Yes.  And there is, I gather, if I'm

22    working from a --

23                MS. KAUBLE:  This would be Your Honor's version.

24    This is taken verbatim from the Federal Circuit Bar

25    Association model patent jury instruction.  So we think it's
```

1   a very reasonable proposal.

2           THE COURT:  Solid set of instructions,

3   Mr. Radsch?

4           MR. RADSCH:  This probably not a popular view,

5   but our view is that this is actually just Georgia-Pacific

6   Factor 15 and is one of the many factors that the jury

7   should consider when determining what a reasonable royalty

8   is.  A hypothetical negotiation is one of 15 factors.

9           MS. RAYMOND:  If I can jump in here, Your Honor?

10          THE COURT:  Yes.

11          MS. RAYMOND:  In the Georgia-Pacific case, they

12  listed 15 factors to consider in coming to a rate.

13          THE COURT:  Which we're going to instruct the

14  jury about.

15          MS. RAYMOND:  Correct.  And one of those, only

16  one of those factors ...

17          THE COURT:  No. 13, yes.  So that is the

18  complaint.  I'm reminded now.  That that is the complaint

19  with the instruction.

20          MR. PAUNOVICH:  We still think there is some

21  benefit to defining what a reasonable royalty is.

22          THE COURT:  I agree.  But just don't unduly, it

23  shouldn't be focused on one of the factors because I'm going

24  to follow right on the heels of that instruction and say

25  what you have suggested that I say.  I think you both

1   suggested:  In determining the value of the reasonable

2   royalty, you may consider evidence of any of the following:

3   And it shouldn't, I shouldn't have just told them that they

4   should just be thinking about Factor 13.

5           Mr. Lorig, I think your colleagues have it

6   covered.

7           MR. PAUNOVICH:  I think we would -- I'm told we

8   would probably be okay with the first paragraph.  Well,

9   there is a first sentence and first paragraph is a fairly

10  concise statement of reasonable royalty.

11          THE COURT:  Should we take a look at that, Mr.

12  Radsch?

13          MR. RADSCH:  I believe that's almost the same as

14  what Factor 15 is, if you turn a couple pages forward.

15  That's just a statement of a hypothetical negotiation.

16          MS. KAUBLE:  Your Honor, the language is

17  different.  We think to the extent that it informs the jury

18  about the concept of a reasonable royalty and helps to

19  define the concept, it should be permitted.  It's

20  instructive.

21          THE COURT:  I want the jury to be guided as to

22  the concept.  You could just cite the statute, but that's

23  not going to really help them.

24          MR. LORIG:  Your Honor, I was going to say,

25  Georgia-Pacific has been used to help define what a

 1    reasonable royalty would be as of the time infringement

 2    began.   It's true, it's redundant because all of the factors

 3    go into deciding what they would have agreed to at the time

 4    infringement began.

 5                But Georgia-Pacific isn't a list of factors

 6    standing alone, it's a list of factors to be considered when

 7    deciding what a reasonable royalty would be agreed to as of

 8    the time infringement began.

 9                THE COURT:  And it is not an exclusive list, by

10    the way.

11                MR. LORIG:  Right.

12                THE COURT:  So are we agreed on conceptually how

13    to get this done?

14                MR. RADSCH:  Do we have -- I think we can just

15    do the first paragraph.  I think that would be fine.

16                MS. KAUBLE:  Agreed.

17                MR. RADSCH:  Or the first two paragraphs,

18    rather.

19                MR. PAUNOVICH:  Sentence and paragraph.

20                MR. RADSCH:  We will take out the last

21    paragraph.

22                MS. KAUBLE:  I agree.

23                THE COURT:  Timing.  5.4.

24                MR. RADSCH:  I believe Shelbyzyme withdrew that

25    one.

1    MS. KAUBLE:  We did, Your Honor.

2    THE COURT:  Non-infringing alternatives, Genzyme

3    only.

4    MS. KAUBLE:  Actually, Shelbyzyme agreed to

5    this, and when we agreed to it, Genzyme withdrew the

6    instruction.  So it is now a Shelbyzyme only instruction.

7    To the extent Genzyme proposed the instruction we would ask

8    that they reconsider and allow it in this case.

9    MR. RADSCH:  We thought there could be evidence

10   adduced about this issue.  But there has been no testimony

11   by any witness on either side, I believe, about the

12   presence -- I have been in the courtroom not every day, but

13   I have not heard any evidence adduced about the presence or

14   absence of non-infringing alternatives.

15   THE COURT:  Somebody said something on the

16   witness stand about non-infringing alternatives.  Let's

17   leave it in, especially if you proposed it.

18   MR. RADSCH:  Okay.

19   THE COURT:  5.7, Closing Statements.

20   MS. KAUBLE:  Your Honor --

21   THE COURT:  Here is my note to myself.

22   Defendant says unnecessary, yet it proposes a similar

23   instruction somewhere.

24   MR. RADSCH:  Ours is, I believe, verbatim of the

25   2003 Delaware jury instructions.  They cite the 1993 ones.

 1    It is actually a completely different concept.  The one we

 2    have proposed informs them that, basically informs them what

 3    the purpose of damages is again.

 4              This is redundant of the reasonable royalty.  We

 5    pulled it verbatim out of the 2003 Delaware instructions.

 6              THE COURT:  Ms. Kauble?

 7              MS. KAUBLE:  Your Honor, ours is also a verbatim

 8    instruction.  I know it is from 1993.  But we find it

 9    important that it mentions that you should include the loss

10    of royalty income.  I don't believe that is mentioned in

11    Genzyme's instruction.  As the royalty income would be key

12    to damages in the case, we think it's important to the jury

13    to be able to put this reasonable royalty concept into some

14    sort of framework and know that is something they should

15    take into account when deciding damages.

16              MR. RADSCH:  Loss of royalty income sounds to me

17    like a lost profits argument and they haven't claimed lost

18    profits.

19              THE COURT:  It is not a lost profits argument.

20    But it is an attempt to help the jury, I think,

21    conceptualize how you put plaintiff in a position they

22    otherwise would have been but for the infringing activity.

23    I think that's what's going on here.

24              MR. LORIG:  Your Honor, if I may, the only

25    damages --

```
 1              THE COURT:  You don't want to go work on your
 2    closing, do you?  You don't trust them.  They are doing just
 3    fine.
 4              MR. LORIG:  I probably should have left an hour
 5    ago.
 6              The only damages we are seeking is a reasonable
 7    royalty.  There is no lost profits claimed here.  So to have
 8    something talking about damages that doesn't mention
 9    reasonable royalty --
10              THE COURT:  Mr. Radsch, do you think including
11    this sentence is a misstatement of the law?
12              MR. RADSCH:  I believe it is, particularly on
13    the facts of this case, where there is no evidence that they
14    tried to ever license it and lost any income from trying to
15    license it.
16              THE COURT:  My concern is it could be confusing.
17    Let's read the instruction up to that point.  In determining
18    the amount of damages awarded, the Court instructs you that
19    in no event shall Shelbyzyme be awarded less than a
20    reasonable royalty if you find that Genzyme infringed -- it
21    should be the Shelbyzyme patent or Shelbyzyme's patent.
22    There is a typo there.  If under the Court's instructions
23    you find Shelbyzyme is entitled to damages, in fixing the
24    amount of such damages you may not include and/or add to an
25    otherwise just award any sum for purposes of punishing
```

 1    Genzyme or to set an example.

 2              I think that's what you are trying to get at.  I

 3    think it should stop right there.

 4              MS. KAUBLE:  That is fine with us, Your Honor.

 5              THE COURT:  All right.

 6              MS. NOREIKA:  Your Honor, I think that's it.

 7              THE COURT:  I am just going to give this to you,

 8    and add two things.

 9              MS. RAYMOND:  Your Honor, we just noticed an

10    issue with 5.6A.  It says if you find that Genzyme infringed

11    Shelbyzyme's patent.  I think we need something in there

12    about that it's valid -- something that gets that concept

13    in.

14              THE COURT:  Okay.  Any problem with that?

15              MR. LORIG:  That's in the instruction, Your

16    Honor.  They don't get to damages unless they find invalid.

17    That is in the verdict form.  They are going to find damages

18    if they find invalid.

19              THE COURT:  Where are we now?

20              MS. KAUBLE:  We are to 5.A, I believe.

21              THE COURT:  What are you suggesting?

22              MR. MOORE:  Your Honor, I think it was the one

23    you were just reading.

24              MS. KAUBLE:  Yes.  Sorry.  It's been renumbered

25    since some of our changes.

```
 1              MR. MOORE:  It's probably numbered differently
 2   on the set you had.
 3              THE COURT:  You want to add a valid patent?
 4              MS. RAYMOND:  Yes, Your Honor.
 5              THE COURT:  Any difficulty with that?
 6              MS. KAUBLE:  I believe the verdict form says you
 7   only go to the issue of damages if you find that the
 8   patent --
 9              THE COURT:  These are the jury instructions,
10   let's add it.
11              So as to 6.1, you need to just add one sentence.
12   That directs the jury, or suggests to the jury that they
13   choose a foreperson before they do anything else.
14              We don't need 6.2 at all.  It is completely
15   redundant.
16              Unanimous verdict, joint.  It's already covered
17   in the previous instruction on jury deliberations.
18              I think we have one left, 3.2.
19              What we are going to do is take a short stretch
20   break, because we have to talk about the verdict form.  I
21   have had too much coffee today.
22              (Recess taken.)
23              THE COURT:  Let's resume.  I know my facility is
24   a little closer.
25              MR. LORIG:  Your Honor, before we get started on
```

1   the verdict form --

2            THE COURT:  I am not ready to go to the verdict

3   form.  We have another instruction or two.  We also need to

4   talk about an evidentiary issue we had with regard to

5   comparable licenses.  We are not going to talk about it.  I

6   am going to rule.  Go ahead.

7            MR. LORIG:  I was just going to say, I am

8   obviously getting more tired than I thought, when you hear

9   this, you will understand.  When we were talking about the

10  closings, I realized I didn't ask to save anything for

11  rebuttal.  I know I can do the closing in an hour.  I might

12  need another 15 minutes for rebuttal.

13           THE COURT:  I will give you 15 minutes.

14           MS. RAYMOND:  Your Honor, for the record, I

15  would like to renew our JMOL motions, in addition, move on

16  invalidity, including prior invention, and then 112 for

17  description and enablement.

18           THE COURT:  There is more than enough evidence

19  for a reasonable jury to conclude that the plaintiffs have

20  made a case in this regard, and those defenses have not been

21  established.

22           I am going to deny those motions, that motion.

23           MS. RAYMOND:  I understand, Your Honor.

24           THE COURT:  Remind me, I agree with Mr. Lorig's

25  point -- I don't remember who it was -- regarding Broadcom's

1    application to inducement.  And there was evidence, albeit

2    brief, there was a question of Ms. Shafmaster, did you ever

3    get an opinion, words to that effect, on infringement.  We

4    didn't get that far.

5              I think it was confined to infringement.

6              MR. LORIG:  I actually thought I confined it to

7    infringement.  But I was told by Mr. Paunovich afterwards, I

8    covered written opinion on anything.  But I thought I said

9    infringement.

10             THE COURT:  I think it was on infringement.  Mr.

11   Radsch?

12             MR. RADSCH:  I have a recollection of two

13   questions.  One was you never did an infringement -- you

14   never obtained an infringement opinion.  Second was, I

15   believe you never obtained an official opinion of outside

16   counsel.

17             THE COURT:  My view, you remembered two, I

18   remembered one, that is one of the reasons we have a jury.

19   I am trying to remember how that informs our discussion on

20   3.12.

21             MR. LORIG:  What that transition is, in Broadcom

22   v. Qualcomm, it was a jury instruction that was approved

23   that said --

24             THE COURT:  What part of the instruction

25   specifically?

```
 1              MR. LORIG:  Let me be specific.

 2              Here it is, it was actually very short.  Your

 3    Honor, may I read it?

 4              THE COURT:  Yes.

 5              MR. LORIG:  With regard to the third prong of

 6    this test, that Genzyme knew or would have known but for its

 7    willful blindness that the encouragement or instructions

 8    would result in infringement of at least one of the asserted

 9    patent claims, you may infer that intent from the failure of

10    Genzyme to obtain an objective opinion of counsel that it

11    did not infringe the '831 patent.

12              That is pretty straightforward.

13              THE COURT:  You may infer that -- I would

14    rather, You may consider it as a fact.  That is really the

15    more accurate statement.  That would be more accurate.

16              MR. LORIG:  We will make that statement.

17              THE COURT:  You get into inferences and

18    presumptions, Knorr-Bremse and that whole line, it becomes

19    problematic.

20              Mr. Radsch.

21              MR. RADSCH:  Your Honor, generally, I think

22    that's an accurate statement of the law.  It is one of many

23    factors to consider.

24              THE COURT:  It is one of many factors.  I don't

25    want to give it undue influence or weight by saying you can
```

```
1    infer.
2              MR. LORIG:  I made the change.  Should I read
3    it?
4              THE COURT:  Yes, if you would like.
5              MR. LORIG:  With regard to the third prong of
6    this test, that Genzyme knew or would have known but for its
7    willful blindness that the encouragement or instructions
8    would result in infringement of at least one asserted patent
9    claim, you may consider as a factor the failure of Genzyme
10   to obtain an objective opinion of counsel that it did not
11   infringe.
12             THE COURT:  I think you need to muscle that up a
13   little bit.  Perhaps, Mr. Radsch, you may have some
14   suggestion on this.  It's sort of dangling out there.  You
15   may infer.  If there is a factor of what?  Go ahead.
16             MR. LORIG:  You may infer that intent -- let
17   me -- we will come up with something.
18             MR. RADSCH:  We speak about willful blindness
19   there.  I don't know if that should go to the jury.  I don't
20   know if there is enough evidence.
21             THE COURT:  That is other evidence.
22             MR. RADSCH:  Given the rulings, especially on
23   willfulness, I don't believe there is any evidence of
24   willful blindness here.
25             THE COURT:  I tend to concur in that.  What is
```

1    Genzyme's position?

2              MR. LORIG:  Willful blindness, as I understand

3    Globaltech, has nothing to do with willful infringement.

4    Willful blindness has to do with the fact, as I understood

5    it from reading the two cases, by not going off and getting

6    a -- an objective opinion on infringement.

7              THE COURT:  No.  I don't understand the law to

8    bring us to that point.  I think what you need to tell me is

9    why you think this record would support an instruction on

10   willful blindness.  I see nothing in the record to support

11   that.

12             MR. LORIG:  Because I don't think on this record

13   we have any evidence that they sought an outside, objective

14   opinion of anybody, on either infringement or validity.

15             THE COURT:  I don't think that leads you to --

16   could lead the jury to conclude, the mere fact that they

17   didn't -- I say mere fact -- that they didn't get an opinion

18   of CUNY could lead a jury to reasonably conclude that they

19   were willfully blind as to the issue of inducement.  That is

20   what we are talking about.

21             MR. LORIG:  Let me do that.  To keep things

22   uncontroversial, what about if we just copy out the

23   instruction from Broadcom v. Qualcomm.  There was an

24   instruction that was approved.  And we won't get creative

25   with it.

1             **MR. RADSCH:  On that basis there may have been a**

2    **record to support willful blindness.**

3             **THE COURT:  That is his point.**

4             **MR. LORIG:  I don't think they referred to the**

5    **willful blindness.  I don't have the case in front of me.  I**

6    **don't know if Your Honor has the case in front of you.**

7             **THE COURT:  Let me offer this guidance.  I am**

8    **not going to instruct this jury that they should consider**

9    **whether Genzyme was willfully blind.  I don't see the**

10   **support in the record for an instruction along those lines.**

11            **MR. LORIG:  Will Your Honor give them the**

12   **instruction out of Broadcom v. Qualcomm, which talks about**

13   **inferring from the circumstances, including the failure --**

14            **THE COURT:  Do you have the cite?  I have the**

15   **case in my hands.**

16            **MR. LORIG:  Your Honor, it's a right-hand**

17   **column.  I have read it a number of times.  I don't have it**

18   **in front of me.**

19            **THE COURT:  You are excused, Mr. Lorig.**

20            **In considering whether Qualcomm acted in good**

21   **faith, you should consider all the circumstances, including**

22   **whether or not Qualcomm obtained and followed the advice of**

23   **counsel with regard to infringement.**

24            **The acquisition of a lawyer's opinion by itself**

25   **is insufficient to support a finding of willfulness.**

1          This is on willfulness.  But the opinion does

2    deal with inducement as well.

3          And you may not assume that merely because a

4    party did not obtain an opinion of counsel the opinion would

5    have been be unfavorable.  However, you may consider whether

6    Qualcomm sought a legal opinion as one factor in assessing

7    whether, under the totality of the circumstances, any

8    infringement by Qualcomm was willful.

9          Do you want to adapt that to an inducement?

10         MR. PAUNOVICH:  Your Honor, actually in

11   Broadcom, I think it might be further down.

12         MR. LORIG:  It's the second one.

13         MR. PAUNOVICH:  The Court rules on two

14   instructions, the willfulness instruction and inducement.

15         THE COURT:  Inducement instruction?

16         MR. PAUNOVICH:  Correct.

17         THE COURT:  Where is it?

18         MR. PAUNOVICH:  I'm going to take a stab this is

19   the right cite:  543 FRD 683.

20         THE COURT:  What headnote?

21         MR. PAUNOVICH:  699 through 700.  And there is

22   an indented quote of the jury instructions that were read by

23   the District Court which the Federal Circuit agrees.

24         THE COURT:  I don't see that.  I have, the pin

25   cites you have just given me, 699 to 700, I'm in the Westlaw

```
 1      version.  And I was previously reading from headnote 11 and
 2      that is the indented version.  That is the only indented
 3      version I see in those three columns.  Is there another
 4      indented?
 5                  MR. LORIG:  I believe there is.  I don't have a
 6      copy.  May I approach and just look?
 7                  THE COURT:  Mr. Lorig, you may be excused.  I
 8      mean it.  Leave, please.  Go work on your closing.
 9                  MR. LORIG:  All right, Your Honor.  I'm sorry.
10                  THE COURT:  No, good night.
11                  MR. LORIG:  Good night.
12                  MR. HANEY:  Do you have the Westlaw version?
13                  THE COURT:  I do.
14                  MR. HANEY:  It may be under point 13.
15                  THE COURT:  Okay.
16                  MR. HANEY:  Page 17 of the case.
17                  THE COURT:  Okay.  The headnote starts:  While
18      inducement requires ...
19                  MR. HANEY:  I think that was it.
20                  MR. PAUNOVICH:  Can I look at it?
21                  MR. HANEY:  Sure.
22                  (Counsel confer.)
23                  MR. PAUNOVICH:  Your Honor, I believe it is at
24      Page 17, which would be at pin cite 700.
25                  THE COURT:  Okay.
```

```
 1              MR. PAUNOVICH:  Thus, the District Court did

 2    not err in instructing the jury to consider all of the

 3    circumstances, nor in instructing the jury to consider as

 4    one factor whether Qualcomm sought the advice of counsel as

 5    to noninfringement.

 6              THE COURT:  Yes.

 7              MR. PAUNOVICH:  I think that is all we're asking

 8    for.  I think maybe we're confusing the willful blindness

 9    issue.  I think we would be happy to take that out.  We

10    would like the instruction to include that they consider,

11    can consider as one factor the failure to obtain an opinion

12    of counsel.

13              THE COURT:  And subject of inducement?

14              MR. PAUNOVICH:  Correct.

15              THE COURT:  Yes.  Mr. Radsch?

16              MR. RADSCH:  I'm not sure that the record

17    supports that.  I'm not sure that that states just -- maybe

18    I have it wrong.  It states it's only relevant to opinion of

19    infringement.

20              THE COURT:  I'm sorry.

21              MR. RADSCH:  I think that there is, there is

22    evidence, there is reference I think you need to seek

23    opinion on infringement.  The record doesn't reflect you

24    need to seek any sort of opinion on validity.

25              THE COURT:  You said you had two recollections.
```

1    My recollection was and Mr. Lorig's recollection was

2    confined to infringement.  Those are the only -- you

3    indicated, I thought I heard you to say, that there was a

4    question about whether you got an infringement opinion,

5    period.  Did you not say that?  I don't, I don't recall that

6    question.  I only recall one inquiry.  Am I wrong?  Or am I

7    I'm thinking about another?

8              MR. HANEY:  I thought he asked about outside

9    counsel, and he may have asked about infringement.  I don't

10   know.  But what the answer was, I didn't get far.

11             THE COURT:  Well, he may not have -- exactly.

12   He may not have posed the question that way, made it

13   specific to infringement, but I thought she focused her

14   response on -- no, I think he did.  I think he did.

15   MR. PAUNOVICH:  Your Honor, we didn't stand up.  I believe

16   there was a door that was opened by Ms. Shafmaster, and he

17   said she responded to the question of:  Did you obtain --

18   Mr. Lorig asked her:  Did you obtain an opinion as to

19   noninfringement?

20             THE COURT:  Right.

21             MR. PAUNOVICH:  He didn't obtain one.  And she

22   said --

23             THE COURT:  We didn't get that far.

24             MR. PAUNOVICH:  She said we never got past

25   validity, opening the door.

```
 1          THE COURT:  Well, I don't know she said that.

 2   I think she said -- I think this is a pretty accurate

 3   restatement of what she said:  We didn't get that far.

 4          MR. PAUNOVICH:  She said we didn't get past.  I

 5   am 99 percent sure she said:  We did not get past it because

 6   of we didn't get past validity, at which point opening the

 7   door.  Mr. Lorig asked her:  And you never obtained an

 8   outside opinion of counsel -- competent opinion of counsel.

 9   Correct?  She said correct.

10          THE COURT:  Well, that referenced the earlier

11   question regarding infringement.  Right?

12          MR. PAUNOVICH:  It was just a general statement

13   question.

14          THE COURT:  My recollection is imperfect on the

15   subject.

16          MR. PAUNOVICH:  I think at the end of the day in

17   terms of inducement, what is relevant and what Broadcom says

18   and what the Federal Circuit seems to have adopted is a

19   factor that can be considered is the failure to consider

20   opinion of counsel as to infringement.  That has been

21   adduced.  It was not only through Ms. Shafmaster but also

22   through our expert witness as one of the factors that he

23   considered in his inducement opinion.  It's before the jury.

24   I think it's proper and rightfully something they should

25   consider just as one factor, ignoring willful blindness.
```

```
 1              THE COURT:  Okay.  So here is what I think is
 2    appropriate.  When considering whether -- and this is out of
 3    the case.  Whether considering whether Qualcomm knew of --
 4    let me start again.  It's getting late.
 5              Whether considering whether Qualcomm knew of --
 6    it's probably a typo here, a sic -- or should have known
 7    that the induced actions would constitute infringement in
 8    the totality of the circumstances, you may consider all of
 9    the circumstances, including whether or not Qualcomm
10    obtained advice of a competent lawyer.
11              And I think the period should, it should end
12    there.
13              Go ahead.
14              MR. RADSCH:  I think Genzyme did have the advice
15    of a competent lawyer.  They weren't allowed to adduce --
16    they weren't allowed to adduce the full scope, but that was,
17    Ms. Shafmaster was counsel.
18              THE COURT:  I'm not going to let you do
19    indirectly what I told you can't do.  You are stuck with my
20    ruling, Mr. Radsch.
21              MR. RADSCH:  I understand that.
22              MR. HANEY:  In this case, Ms. Shafmaster told
23    whatever she told RCT.  They considered it.  She sent the
24    chronology.  They went away.
25              THE COURT:  Yeah, but you want --
```

1                    MR. HANEY:  At that point, there was no problem.

2    She didn't need to go any further.

3                    THE COURT:  And the jury could infer, I think

4    reasonably, as a result of the detailed activities she

5    described, the inquiry that she engaged, that she engaged,

6    that she concluded, you weren't inducing.

7                    MR. HANEY:  And that what she did with them

8    doesn't say she didn't get an opinion.

9                    THE COURT:  Well, she didn't get an opinion of

10   counsel.

11                   MR. HANEY:  Except that she is counsel.

12                   THE COURT:  Well, she does that at her peril,

13   Mr. Haney.  I don't care whether she is expert or chief IP

14   counsel or not.  She does not seek an outside opinion.  And

15   anyone operating in this world that doesn't seek an outside

16   opinion are subject, aren't they, to having themselves

17   involved in litigation like this and having the jury

18   instructed:  Because you didn't get an outside opinion, that

19   is a factor that can be considered.  Let's say it's

20   willfulness.

21                   MR. HANEY:  I thought the law was if they didn't

22   get an opinion, it could be in-house, it could be outside.

23   I think the law doesn't require an outside opinion.

24                   THE COURT:  No, an opinion.  Right.  And you

25   don't have evidence on this record of an opinion.

1            Let me back up.  I follow your logic.  And you

2    are saying that she did render an opinion.  That's what you

3    are saying.

4            MR. HANEY:  She provided facts to somebody and

5    they went away.  She said I provided facts, they went away.

6    I didn't have to do anything else.

7            MR. PAUNOVICH:  That's not an opinion.  Having a

8    conversation with an opposing or someone who comes to you

9    and says, hey, I have a license, having a conversation with

10   them isn't an opinion of counsel.  That wouldn't hold up

11   under any standard of a competent reliable opinion of

12   counsel.  And it is undisputed that she did not obtain.

13           (Court and law clerk confer.)

14   THE COURT:  I think part of the problem is -- and I

15   understand your point, Mr. Haney.  And I stand corrected if

16   I misstated the proposition as to whether it needs to be

17   outside counsel or an opinion from an in-house lawyer.

18           She appears -- correct me if I'm wrong -- in

19   this litigation in the context of a 30(b)(6) witness; right?

20   Speaking for the company.

21           MR. HANEY:  Well, 30(b)(6) as well as personally.

22           THE COURT:  Okay.  And not in the role that we

23   classically see; right?

24           Well, let me back up.  I think the genesis of

25   part of my unpleasant ruling for Genzyme was some assertions

```
 1    as to some failures on the part of Genzyme in terms of --

 2    and, Mr. Paunovich, remind me exactly what your argument was.

 3               MR. PAUNOVICH:  The failure to obtain an opinion

 4    of counsel as to infringement, which is the only relevant

 5    consideration for the induced part of the case.  Willfulness

 6    is out.

 7               THE COURT:  So she wasn't presented for the

 8    purpose that you might have otherwise utilized her.  And I

 9    think as I recall, in the pretrial and lead up to this, that

10    part of the complaint was they never got to discuss at

11    deposition her opinion as to the intent issues, intent

12    matters that are at issue.

13               MR. HANEY:  That isn't quite correct, Your

14    Honor.

15               THE COURT:  Well, correct me.

16               MR. HANEY:  What they were able to discuss at

17    the deposition was anything that she, thought any personal

18    opinion that she had, and anything she told RCT.  They just

19    could not ask her what she told her client, Genzyme.

20               MR. PAUNOVICH:  And I think that it's a fine

21    line distinction that just doesn't exist.  The testimony

22    that Ms. Shafmaster offered both at deposition and even a

23    little farther here today is I looked at all of these

24    documents.

25               We're not given any of those documents.  We
```

1  can't look to find out if that is reasonable.  You did legal

2  research.  What legal research was it?  Why can't we look at

3  that and determine it's competent?

4          THE COURT:  No, I don't need to revisit that

5  ruling.  And that leads me to conclude that it's appropriate

6  to give the instruction that I have just articulated.  It's

7  supported by Qualcomm.

8          MR. RADSCH:  Your Honor, I don't want to reargue

9  it but they were entitled to ask her anything about the

10  legal research.

11          THE COURT:  Yes, but you are rearguing and I'm

12  not going to let you.  Okay?  No.

13          All right.  I think that puts to bed the jury

14  instructions.

15          MR. RADSCH:  I'm sorry.  Did you read out the

16  instruction that you wanted us to?

17          THE COURT:  I did.

18          MR. RADSCH:  Okay.

19          THE COURT:  I did.

20          (Court and law clerk confer.)

21          THE COURT:  Yes, we had a discussion I think it

22  was Ms. Raymond's objection.

23          MS. RAYMOND:  Yes, Your Honor.  We had a

24  discussion about standing.  I believe the discussion was

25  about not having a license.  I had not been involved in

```
 1   that.  I believe the sidebar was with Mr. Herman.

 2             THE COURT:  I'm going to let damages go to the

 3   jury.  Okay?  So is that your standing?  What do you want

 4   to say?  I'm not prepared to hear a standing argument.  I

 5   concluded that I'm not going to entertain that argument at

 6   this point.

 7             MS. RAYMOND:  I understand, Your Honor.  I

 8   thought you were asking about non-comparable licenses, which

 9   goes to damages, not damages/standing.  I believe there was

10   a sidebar about non-comparable licenses.

11             THE COURT:  Yes.

12             MS. RAYMOND:  I don't believe I was part -- I

13   admit --

14             THE COURT:  You weren't part of it.

15             MS. RAYMOND:  Mr. Herman is on his way.

16             THE COURT:  That's okay, because, after

17   listening, particularly after listening to Mr. Leonard, I

18   was already leaning in Genzyme's direction that, based on

19   the case law, that we have discovered and you have provided,

20   which we had -- we were looking at the same cases -- that

21   those two licenses -- I think there were two in question.  I

22   don't remember their names.

23             MR. HALEY:  Synpac and Alcafleu.

24             THE COURT:  They are not comparable licenses.

25   What does that net?
```

```
 1              MS. RAYMOND:  I don't know where it leaves Mr.
 2    Wagner and Shelbyzyme on their ability to prove damages by a
 3    preponderance of the evidence.
 4              THE COURT:  They have other licenses that Mr.
 5    Leonard found comparable.
 6              MS. RAYMOND:  Certainly, there are the licenses
 7    with RCT, 3 to 6 percent licenses, and there is the license
 8    ████████████████████████████████████████████████████
 9    There are those licenses.
10              THE COURT:  My point is, I think the objection
11    is well taken, but I think there are still licenses that
12    went into the analysis that would support --
13              MS. RAYMOND:  Yes.  That's correct.  I don't
14    think they would support Mr. Wagner -- Mr. Wagner relied
15    upon the Synpac and the Alcafleu licenses to come to his
16    opinion of the 30 percent royalty.
17              THE COURT:  What I think Ms. Loring will be able
18    to argue as result is that those licenses aren't comparable
19    and she can attack his opinion in that way as a result of
20    that ruling.
21              MR. RADSCH:  May we propose an instruction to
22    the jury on that matter, since they heard testimony on it?
23              THE COURT:  Yes.  But I am going to tell you, if
24    it is not agreed upon, it won't get in, because I want a
25    complete set of instructions, collated and done, when you
```

 1    get over here in the morning.

 2              MR. PAUNOVICH:  Just to make the record --

 3              THE COURT:  You dashed over here for no reason,

 4    Mr. Herman.

 5              MR. PAUNOVICH:  We do believe the licenses are

 6    comparable.

 7              THE COURT:  I know you do.

 8              MR. PAUNOVICH:  And there is one point that,

 9    unfortunately, Mr. Lorig --

10              THE COURT:  You would agree that is my call to

11    make.  Right?

12              MR. PAUNOVICH:  I understand.

13              THE COURT:  That is a matter of law issue.

14              MR. PAUNOVICH:  Understood.  The point that Mr.

15    Lorig did not deduce during the cross-examination, in the

16    book of Mr. Leonard, there is actually a discussion

17    immediately following the portions that they kept going back

18    and forth on where it talks about this AB standoff situation

19    being -- I am going to misquote it -- it was something to

20    the effect of future economic, and I -- unfortunately,

21    that's not my specialty of this side of the case.  In any

22    event, I understand --

23              THE COURT:  I just think there are other

24    matters, other things that existed, bundle of rights issues

25    and know-how and R&D -- it wasn't about patents -- and other

```
 1    drugs, three other drugs, I think, in one of the licenses.
 2              MR. PAUNOVICH:  Understood, Your Honor.  The one
 3    additional point that I would add, just for the record, is
 4    that I believe that there is additional evidence in the
 5    record that would support Mr. Wagner's analysis, which came
 6    in through --
 7              THE COURT:  But I am rejecting Mr. Wagner's
 8    analysis as to compatibility.
 9              MR. PAUNOVICH:  As to those two licenses.
10              THE COURT:  As to those two licenses.  I
11    disagree with him.  One of the reasons I wanted to hear more
12    evidence was I then got the benefit of hearing Mr. Leonard,
13    I was persuaded that his analysis is the correct analysis,
14    given the state of the law.  So I hear what you are saying.
15    You will get a chance to maybe argue.  Maybe, maybe not.
16              MR. PAUNOVICH:  All I was saying is that Mr.
17    Wagner's opinion and his conclusion is based on more than
18    just the two licenses, which Your Honor has ruled on.
19              THE COURT:  Mr. Herman, did you want to weigh in
20    here at all?  I think I am siding with you on this.
21              MR. HERMAN:  I think you are.  That is why I am
22    sitting down.
23              THE COURT:  All right.  I saw a look of distress
24    on your face.
25              MR. HALEY:  We understand we should work with
```

```
 1    plaintiff's counsel to come up with an instruction that

 2    would at least alert the jury that these are not comparable

 3    licenses.

 4              THE COURT:  That would be helpful, quite

 5    frankly, that would be appropriate under the circumstances,

 6    because they heard evidence on the point, and now the Court

 7    has made a ruling that should take that evidence out of

 8    their consideration.

 9              Some things are not evidence.  That is not

10    evidence.  Those two licenses.

11              Okay.  I hope that's sufficient guidance.

12              Please remove the citations to sources and just

13    give me a vanilla copy, with a caption and Proposed Final

14    Jury Instructions.

15              On the verdict form, let's do this.  Small

16    thing, on the front page, remove the language Demand For

17    Jury Trial.  And it's not Joint Proposed Verdict Form, it's

18    Verdict Form.

19              So --

20              MS. KAUBLE:  Your Honor, brief guidance.  Going

21    through the verdict form, I think most of the disputes are

22    where in our opinion Genzyme has inserted language that

23    somewhat adds jury instructions to the verdict form.  To the

24    extent that we can get rid of that language and take --

25              THE COURT:  Give me an example.
```

1    MS. KAUBLE:  I think the most flagrant of

2    example is on willful infringement.

3         MR. RADSCH:  That is out.

4         MS. KAUBLE:  Right.

5         MR. RADSCH:  Actually, I think your rulings are

6    pretty clear on the jury instructions.  I think adding those

7    to the verdict form will take care of almost all of this.

8         THE COURT:  I think it takes care of agents and

9    stuff like that.  That's my feeling.

10        Go ahead, Mr. Paunovich.

11        MR. PAUNOVICH:  I guess I want to understand.

12   Our understanding from local counsel has been that there is

13   a preference among the Delaware Bar to have a more basic

14   verdict form that would not restate the instructions that

15   the jury has already been given, since they will have those

16   instructions in the jury room with them, have them for

17   guidance.  A very plain, vanilla statement of the bottom

18   line issue?

19        THE COURT:  I agree.  We don't typically, I

20   don't, want to see the verdict form used as another source

21   of jury instructions.  Certainly, they need guidance:  If

22   you decide thus and such, you don't need to do this or go to

23   the next number, yes.

24        MR. PAUNOVICH:  I think in this instance, at

25   least Shelbyzyme's proposal, it's the plain vanilla

```
 1    statement of do you believe, for example, Genzyme infringes?

 2    Check yes or no.

 3              And that may be a bad example.

 4              MS. KAUBLE:  If you refer to 8, anticipation, I

 5    think that lays it out pretty clearly.  Shelbyzyme proposes,

 6    Has Genzyme proven by clear and convincing evidence that an

 7    asserted claim of the '831 patent is anticipated?  Genzyme

 8    by contrast says, Has Genzyme proven by clear and convincing

 9    evidence that any of the assert claims of the '831 patent

10    are anticipated because Drs. Desnick, Bishop and Iaonnui

11    invented it first?

12              MR. RADSCH:  Can I have a brief explanation for

13    that?

14              I don't think the jury instructions really

15    discuss the concept of anticipation.  They discuss the

16    concept of prior invention.  And it was simply to make clear

17    that this relates to the prior invention instructions,

18    because they don't really refer to the concept of

19    anticipation.

20              THE COURT:  Well, the concept of anticipation is

21    in the case.  Right?

22              MR. RADSCH:  Yes.

23              THE COURT:  Do you want to put an instruction --

24              MR. PAUNOVICH:  I think there is an adequate

25    instruction that we have come with here today.  Now we have
```

1    got, they have this add-on at the very end, anticipated

2    because X, but it's only a partial statement of the

3    instruction.

4              THE COURT:  I don't think it's helpful or

5    necessary to add that language.  I would say that as well

6    with regard to 1, Question 1, where we see "performed a

7    method" in the Genzyme proposal.  I think the Shelbyzyme

8    proposal is adequate to the task that will be before the

9    jury.

10              MR. RADSCH:  With the exception of the language

11   about the agents.  Correct?

12              THE COURT:  Yes.  The agents language, that

13   comes out.

14              MR. PAUNOVICH:  Your Honor, I thought that your

15   ruling on the agency issue was that the definition of agency

16   that was proposed by Genzyme would be adopted in the

17   instructions and it wasn't that we would remove the language

18   of Genzyme or its agents.

19              THE COURT:  I don't see any basis for the jury

20   to consider agents in this case at all.

21              MR. RADSCH:  That was my understanding.

22              THE COURT:  That was my ruling.

23              MR. PAUNOVICH:  I may have misunderstood that.

24   I think it was in reference just to the clinical trial

25   aspect.

```
 1                    THE COURT:  No, no.

 2                    MR. HALEY:  Your Honor, on anticipation, I was

 3      just looking at the Instruction 4.4.  It says, invalid

 4      because it was previously invented by.  It never really

 5      mentions anticipation.

 6                    THE COURT:  It should.

 7                    MR. HALEY:  We all know it's under 102.

 8                    THE COURT:  Don't you think, Mr. Haley,

 9      something should be said?

10                    MR. HALEY:  Yes.

11                    MR. PAUNOVICH:  I think we could agree to have

12      the title of it be Anticipation and then in parentheses

13      Prior Invention.  This is also subject to -- I have to go

14      look at my notes.  We have the 4.5 that has the language

15      that we were proposing in the second paragraph, we were

16      working together.

17                    MR. HALEY:  We can do that.

18                    MR. RADSCH:  We will put that out.

19                    THE COURT:  Let me give you some further

20      guidance.

21                    As to Question 7, I think that Genzyme -- here

22      is the difference.  One uses the article "an," the other

23      "the," as I see it.  And the questions at the end are

24      different.  You have the claims.  One has the claim chart.

25      Can you figure this out?
```

1         MR. RADSCH:  I think we are fine with their

2    proposal.

3         THE COURT:  Good.

4         Question 9, I think, in Genzyme's proposal, are

5    you fine, Mr. Radsch, with Shelbyzyme's proposal as to

6    Question 9?  I would rather see the royalty rate called out.

7    So I want to adopt a version of your proposal, Mr. Radsch,

8    without including that emboldened direction there, Answer

9    Question 9 only if you find -- it is rather editorial in

10   nature.  If you want to give some less --

11        MR. RADSCH:  This was directly taken out of the

12   model I worked on.

13        THE COURT:  Do you have any difficulty with

14   that?

15        MR. PAUNOVICH:  I think the only concern would

16   be if the jury identifies a royalty rate that would be

17   inconsistent with the amount of damages that they have

18   identified given what is essentially a set infringement

19   period.

20        The patent issued in 2006.  It expired in 2009.

21   So they simply would be deciding an amount of money that

22   they find to be equivalent to the reasonable royalty in this

23   case.

24        MR. RADSCH:  Your Honor, I think a royalty rate

25   spelled out is necessary given the pending standing issue in

1    order to resolve that down the road.

2              THE COURT:  I think we should have a royalty

3    rate.

4              MR. PAUNOVICH:  Our understanding is that they

5    have dropped the standing issue in their, what was it, the

6    jury instructions, there was a prior jury instruction, which

7    Genzyme has dropped.  Our understanding was -- maybe I am

8    misunderstanding.

9              MR. RADSCH:  We dropped the instruction as an

10   issue for the jury.  Standing is an issue for the Court.

11             THE COURT:  Mr. Radsch, you were saying this

12   guidance in your proposal comes out of where?

13             MR. RADSCH:  I am pretty sure both parties'

14   instructions came out of, I think it's the AIPLA or the

15   National Jury Instruction Model Rules.  I have a copy here

16   with me if you would like to look at it.

17             THE COURT:  Just give the guidance in the same

18   font and unbolded print as the others.  This doesn't have to

19   be emphasized in that way.

20             Do not underline the word "not."  They can read.

21             Finally, Mr. Radsch, also there under 9, it

22   reads What amount, if any, has Shelbyzyme proven.  They get

23   that.  What I would prefer is, What amount of monetary

24   damages has Shelbyzyme proven.

25             MR. PAUNOVICH:  The one point that I wanted to

1    raise, Your Honor, is, the wording that I have is that the

2    jury identify identifies a damages amount for a set

3    infringement period and they identify a royalty that is

4    associated with that, that wouldn't actually net out from

5    the math because we have got a --

6                THE COURT:  They are going to have to do the

7    math.

8                MR. PAUNOVICH:  If it ends up being different,

9    then there is a question --

10               THE COURT:  What is your complaint about them --

11   they have heard competing propositions as to the royalty

12   rate.  What is your difficulty with them deciding that?

13               MR. PAUNOVICH:  I have no problem with that.

14               THE COURT:  And telling us what they decided.

15               MR. PAUNOVICH:  I have no problem with that.  I

16   am imagining a situation where they say, our royalty is

17   whatever, six percent, ten percent, whatever it is.  And the

18   number for damages ends up being a different number and we

19   are left trying to sort out this possible standing issue

20   after the fact of, do we calculate the effective royalty

21   based on the damages amount that they have decided or do we

22   use the royalty rate that they have put in the verdict form,

23   which could be inconsistent?  We can calculate an effective

24   royalty regardless.

25               THE COURT:  What is your reaction?  What if we

1    said and/or total damages?  I don't know.

2              MR. RADSCH:  I guess we could drop the rate as

3    long as there is some sort of agreement that we can get back

4    to it from the number.  But it would have to be, I imagine,

5    some sort of stipulation so that when this damages/standing

6    issue is resolved it is clear what amount of damages is

7    either in or out.  Is that fair?

8              MR. PAUNOVICH:  That seems fair to us.

9              THE COURT:  How do you want this to be reflected

10   in the verdict form?

11             MR. RADSCH:  Do we have an agreement on the

12   royalty base?

13             I believe we have an agreement on the royalty

14   base.  I guess that would just be dividing the damages

15   number by the royalty base.

16             MR. PAUNOVICH:  I am not sure it's that simple

17   of a calculation.  My colleague, Mr. Brown, is not here to

18   tell me if I am doing the right or wrong thing.

19             THE COURT:  What should the form look like?

20             MR. RADSCH:  Maybe we should leave it with the

21   rate and the dollar amount.  I would have both in there,

22   Your Honor.  I think that we need to know the rate and I

23   think -- I think the jury can do the math.  That works.

24             THE COURT:  That's what I am anticipating they

25   would be able to do.  They will probably ask for a

```
 1    calculator, as they typically to, if they get to that point.

 2    And I think we can trust them to do the math.

 3                  MR. RADSCH:  It's pretty standard.

 4                  MR. PAUNOVICH:  I think we would be fine with

 5    it.

 6                  MS. KAUBLE:  Your Honor, if I may clarify, I

 7    wanted to ensure that I got the correct statement, that we

 8    have agreed to:  What amount of monetary damages has

 9    Shelbyzyme proven.  Is that correct?

10                  THE COURT:  Yes.  What amount of monetary

11    damages.

12                  MS. KAUBLE:  Okay.

13                  THE COURT:  Finally, on the last page, I say in

14    the last sentence there, your foreperson should then sign is

15    the nudge, and date the verdict form in the space below and

16    notify the jury officer, not the marshal, there is no

17    marshal, the deputy marshal out there, then your foreperson

18    should retain possession.

19                  That's it.

20                  MR. PAUNOVICH:  Thank you, Your Honor.

21                  THE COURT:  Anything else?  Counsel?  Get some

22    sleep.

23                  (Court recessed at 7:30 p.m.)

24                              -  -  -

25    Reporters:  Kevin Maurer and Brian P. Gaffigan,
      Official Court Reporters
```