IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHELBYZYME, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-768-GMS |
| ) | |
| GENZYME CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

### I. INTRODUCTION

The defendant, Genzyme Corporation ("Genzyme"), requested that the plaintiff, Shelbyzyme, LLC ("Shelbyzyme"), be required to produce certain privileged documents under the crime-fraud exception to the attorney-client privilege. (D.I. 201.) The court ordered letter briefing on this subject, (D.I. 199 at 11), and issued an order on May 22, 2013 granting in part Genzyme's request, (D.I. 219).

Presently before the court is Shelbyzyme's Motion for Reconsideration of the Court's Order to Produce Attorney-Client Privileged Documents (D.I. 220). For the reasons that follow, the court will deny this Motion for Reconsideration.

### II. BACKGROUND

Genzyme seeks the production of certain documents pursuant to the crime-fraud exception to the attorney-client privilege, arguing that the applicants committed fraud in reviving U.S. Patent Application 08/790,491 (the "'491 Application"), which eventually issued as U.S. Patent No. 7,011,831 (the "'831 Patent"). (D.I. 201 at 1–2.) In their February 2, 2002 Petition

for Revival, the applicants conceded that the '491 Application became abandoned on October 4, 1999 following their failure to "file a timely and proper reply to the Notice of Allowance and Issue Fee Due." (D.I. 221 at Tab 9, PTX 14-436.) The relevant regulations, however, provide that "[i]f the delay in reply by applicant or patent owner was unintentional, a petition may be filed pursuant to this paragraph to revive an abandoned application." 37 C.F.R. § 1.137(b). Here, the applicants represented to the Patent and Trademark Office (the "PTO") that "[t]he entire delay in filing the required reply from the due date for the required reply until the filing of this Petition . . . was unintentional," and were thus able to revive the '491 Application.

In its letter briefing, Genzyme suggested that the applicants' statement to the PTO was fraudulent, arguing that both the abandonment of the '491 Application and at least part of the delay in seeking its revival were intentional. (D.I. 201 at 2.) While the court found insufficient evidence of an intent to abandon, it was able to infer "that [the Research Foundation of the City University of New York ("RF-CUNY")] knew by December 1999 that the '491 Application had been abandoned, which would render false the applicants' February 2002 representation that '[t]he entire delay in filing the required reply . . . was unintentional.'" (D.I. 219 at 2.) From this conclusion, the court was able to find the remaining elements of *prima facie* fraud in the patent prosecution context.[1] (*Id.* at 2–3.)

---

[1] "The party seeking discovery of privileged communications or documents must prove the crime-fraud exception applies by showing: (1) a *prima facie* case of criminal or fraudulent conduct, and (2) the communications were made in furtherance of the crime or fraud." *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 482 (D. Del. 2012). As the court explained in its May 22 order, fraud in the prosecution of a patent requires:

> (1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted.

*C.R. Bard., Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998).

Shelbyzyme now contends that the court erred in drawing the inference that RF-CUNY knew of the abandonment by December 1999 and thus was mistaken in its subsequent finding on the "intent to deceive" prong. (D.I. 220 at 1–2.) Additionally, Shelbyzyme takes issue with the court's characterization of a declaration attached to the Petition for Revival, which the court referenced in its discussion of the "reliance" element. (*Id.* at 2.)

### III. STANDARD OF REVIEW

While the Federal Rules of Civil Procedure do not mention either motions for reargument or reconsideration, courts have generally treated such requests as motions to alter or amend a judgment under Rule 59(e). *See Flash Seats, LLC v. Paciolan, Inc.*, No. 07-575-LPS, 2011 WL 4501320, at *1 (D. Del. Sept. 28, 2011). "A proper Rule 59(e) motion . . . must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010). These limited bases are consistent with the fundamental purpose of a motion for reconsideration, which is "to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

Numerous decisions from this district make clear that such motions are to be granted "sparingly" under the Local Rules, *Tristrata Tech., Inc. v. ICN Pharms., Inc.*, 313 F. Supp. 2d 405, 404 (D. Del. 2004); *see also* D. Del. LR 7.1.5, and are appropriate only where "the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension." *Flash Seats*, 2011 WL 4501320, at *2 (citing *Shering Corp. v. Amgen, Inc.*, 25 F.Supp.2d 293, 295 (D. Del. 1998)). Accordingly,

3

motions for reconsideration or reargument are improper when used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Daoud v. City of Wilmington*, 2013 WL 2284888, at *2 (D. Del. May 23, 2013) (quoting *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990)). "A guiding principle in applying the limitations on reargument under Local Rule 7.1.5 is that a motion for reargument can never be allowed to encourage 'a never ending polemic between litigants and the Court.'" *Shering Corp.*, 25 F.Supp.2d at 295 (quoting *Pirelli Cable Corp. v. Ciena*, 988 F. Supp. 424 (D. Del. 1997).

## IV.   DISCUSSION

Shelbyzyme suggests that the court's May 22 order contained two legally significant errors relating to the intent and causation/materiality prongs of the crime-fraud inquiry. The court addresses each claimed error below.

### A.   The Reardan Email

First, Shelbyzyme contends that the court's finding of intent was flawed. Specifically, it argues that the court's determination that an inference of intent to deceive was supported by "clear evidence" and "not only reasonable but effectively required here"[2] was itself predicated

---

[2] The parties identify some ambiguity in Federal Circuit case law on the question of what showing of intent a party must make to invoke the crime-fraud exception. Specifically, Shelbyzyme relies on the decision in *Therasense, Inc. v. Becton, Dickinson, & Co.*, 649 F.3d 1276 (Fed. Cir. 2011), in arguing that the "Federal Circuit now requires specific intent to deceive [to] be 'the single most reasonable inference able to be drawn from the evidence' to pierce privilege under the crime-fraud exception." (D.I. 220 at 3 (quoting *Therasense, Inc.*, 649 F.3d at 1290).) Genzyme, on the other hand, advocates the "independent and clear evidence" standard set forth in decisions such as *Unigene Laboratories, Inc. v. Apotex, Inc.*, 655 F.3d 1352 (Fed. Cir. 2011). In *Unigene Labs.*, the Federal Circuit directly addressed the crime-fraud exception and required only that "[a] party must establish *Walker Process* fraud, also known as common law fraud, to successfully pierce the attorney-client privilege under the crime-fraud exception. A finding of common law fraud in the patent context 'must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance.'" *Id.* at 1358–59.

The court notes that (1) *Therasense, Inc.* concerned the requirements for a party to prevail on a claim of inequitable conduct, not the requirements to invoke the crime-fraud exception, *see* 649 F.3d at 1290, and (2) the

4

upon a misreading of the December 1, 1999 email from Dayton Reardan ("Reardan"), Vice President of Regulatory Affairs at Orphan Medical, RCT's licensee to the Calhoun patent family, to Genzyme.[3] (D.I. 202 at DTX-10.) The court's Order stated that:

> It is apparently undisputed that [Reardan] and Calhoun met with Genzyme in November 1999 and that Genzyme inquired about pending applications. Reardan's December 1, 1999 responsive email to Genzyme indicates that (1) Woessner believed that, if the Issue Fee was not paid, the application would become abandoned, (2) Reardan asked RF-CUNY if it had paid the Issue Fee on the '491 Application, and (3) RF-CUNY responded that it had not paid the Issue Fee. While Shelbyzyme correctly notes that neither Woessner nor Reardan were the assignees of the '491 Application as of December 1999, the email indicates

---

later *Unigene Labs.* decision neither mentioned the "single most reasonable inference" standard nor even cited *Therasense, Inc., see* 655 F.3d 1352. As such, the court is unconvinced that the *Therasense, Inc.* standard has been imported into the crime-fraud context. Regardless, it need not resolve this question in order to address the present motion. In noting that "an inference of intent is not only reasonable but effectively required here," the court's May 22 order implicitly found that intent to deceive was the single most reasonable inference, and the court continues to believe that Genzyme has demonstrated the requisite intent under either standard. (D.I. 219 at 2.)

[3] On November 19, 1999, Reardan and Calhoun met with Genzyme to discuss the Calhoun baculovirus patents. (D.I. 201 at 3.) In the December 1, 1999 email Reardan appears to provide a response to a question from Jennifer Tegfeldt ("Tegfeldt"), one of the Genzyme representatives at that meeting. (D.I. 221 at Reardan Tr., 266:20–24.) The email states, in its entirety:

Dear Jennifer: You asked one question at our recent meeting with respect to whether or not there is any active prosecution still pending on the Calhoun technology. The following is the statement from our patent counsel. I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status.

"HI Dayton:::The answer to the first question is that the last application in the A-gal chain was allowed on July 6, 1999. The file was then transferred to CCNY. We were instructed not to pay the base issue fee. If CCNY did not pay it, the application went abandoned on Sept 6, 1999. However, the application can be revived by paying a fee, and additional continuing applications could be filed to add new claims (if we could think of any). There are no other pending applications in this group.

However, the short answer is 'no'. Warren"

With respect to your second question about talking with our patent counsel, he is certainly amenable to any discussion which Genzyme may require. I might suggest thath the best way for you to do your assessment would be to come out in person to meet with our patent counsel (Dr. Warren Woessner), any of his associates as appropriate where you could also review the entire prosecution history for both Calhoun and Miyamura. Any discussions you may have with our patent counsel we would also like to be present. I hope this answers your questions. Sincerely yours, Dayton Reardan, Orphan Medical Inc.

(D.I. 202 at DTX-10 (emphasis added).)

5

that RF-CUNY itself informed Reardan that it had not paid the Issue Fee. This admission permits the reasonable inference that RF-CUNY knew by December 1999 that the '491 Application had been abandoned, which would render false the applicants' February 2002 representation that "[t]he entire delay in filing the required reply . . . was unintentional."

(D.I. 219 at 2 (internal citations omitted).) Significantly, the court's subsequent finding of intent to deceive relied upon its inference from the email that "Reardan asked RF-CUNY if it had paid the Issue Fee on the '491 Application, and . . . RF-CUNY responded that it had not paid the Issue Fee." (*Id.*) Shelbyzyme, however, now claims that Warren Woessner ("Woessner"), the prosecuting attorney and Orphan Medical's patent counsel, was the source of the information that the issue fee had not been paid.[4] (D.I. 220 at 1, 6.)

   a. The court's interpretation

Given the record before it at the time of Genzyme's production request, the court continues to believe that the most reasonable interpretation of the Reardan email is that RF-CUNY was the source of Reardan's knowledge that the issue fee had not been paid and that Reardan conveyed that knowledge to Tegfeldt. A close examination of the message supports this view. In the email, Reardan reproduced a statement from Woessner noting that Woessner was not instructed to pay the issue fee and that "[i]f CCNY did not pay it, the application went abandoned on Sept 6, 1999." (D.I. 202 at DTX-10.) Through this conditional statement, Woessner plainly indicated that he was unaware as to whether RF-CUNY actually had paid the fee. If Woessner had known that RF-CUNY did not pay and if Woessner was the source of

---

[4] Shelbyzyme's precise position is unclear. Its Motion for Reconsideration can be read as suggesting two different theories linking the knowledge of the issue fee to Woessner: (1) the statement "I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status" was itself a separate statement from Woessner that was then copied into the body of Reardan's email; or (2) the statement was Reardan's own, and, despite the note that he "asked CUNY," it was actually Woessner who confirmed status of the issue fee for Reardan. (D.I. 220 at 6.) The court addresses the shortcomings of both interpretations below.

6

Reardan's knowledge to that effect, it would make little sense for him to structure his statement as a conditional.

Apparently supplementing Woessner's reproduced message, Reardan wrote: "The following is the statement from our patent counsel. I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status." (*Id.*) The court understands Reardan to be (1) drawing Tegfeldt's attention to the conditional Woessner statement below that "[i]f CCNY did not pay it, the application went abandoned on Sept 6, 1999," (2) indicating that he asked RF-CUNY if it, in fact, had paid the fee, and (3) further indicating that RF-CUNY did not pay the fee, thereby rendering the application abandoned and making Woessner's assessment "correct." Given Woessner's apparent ignorance as to whether the fee had been paid at the time he emailed Reardan, the structure and formatting of Reardan's message to Tegfeldt, and the statement that "I asked [RF-CUNY] if they paid the fees," the court believes it was quite reasonable to infer that RF-CUNY informed Reardan that it had not paid the issue fee. On the other hand, the alternative interpretations presented in Shelbyzyme's Motion for Reconsideration suffer from serious flaws.

b. Shelbyzyme's interpretation(s)

The first theory potentially offered by Shelbyzyme is that the statement "I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status" was actually a report from Woessner, which Reardan then copied into the body of his email to Tegfeldt.[5] (D.I. 220 at 6.) There are several problems with such an interpretation. First, it conflicts with the overall structure and formatting of the email—while Reardan isolated and placed quotation

---

[5] This reflects Genzyme's apparent understanding of Shelbyzyme's position. (D.I. 226 at 5–7.) As discussed above, however, Shelbyzyme's Motion for Reconsideration might actually be read as advancing either one of two different theories. *See supra* note 4.

7

marks around the long statement from Woessner, there was no similar indication that the disputed sentence was also a quotation.[6]

More importantly, even if one assumes that the statement was Woessner's, Shelbyzyme is left to contend with a representation that Woessner asked RF-CUNY whether they paid the fee and "apparently they have not." This brings Shelbyzyme back to the very inference it seeks to avoid—that RF-CUNY was aware of the failure to pay the issue fee by December 1999. Shelbyzyme now seeks to avoid this conclusion by referencing Woessner's deposition testimony that, outside of sending the Notice of Allowance to Catherine McGrath ("McGrath"), Chief Counsel for RF-CUNY, he had no further communication with RF-CUNY during that period. (D.I. 220 at 6.) It apparently takes the position that Woessner spoke with the Examiner, not RF-CUNY. (*Id.* 5–6.) This stance, however, is inconsistent with the very language Shelbyzyme attributes to Woessner. As Genzyme rightly points out:

> If Woessner made the statement and was referring to a call with the Examiner, the sentence would have said, "I asked the Examiner . . ." or "The Examiner told me . . ." If Woessner made the statement and was referring to an unsuccessful attempt to call CUNY, the statement would have said, "I tried to call CUNY." It does neither.

(D.I. 226 at 5.) Given the many problems created by this interpretation of the disputed statement, the court believes its earlier inference to be far more reasonable.

---

[6] The court also notes the substantive inconsistencies between this statement and the longer Woessner block quotation. While Woessner refers to RF-CUNY as "CCNY" in the latter, the statement Shelbyzyme attempts to attribute to him uses name "CUNY." Additionally, as suggested above, the conditional nature of Woessner's statement that "[i]f CCNY did not pay it, the application went abandoned on Sept 6, 1999," conflicts with his supposed knowledge of the issue fee's status.

The court, of course, recognizes that neither of these inconsistencies is insurmountable—the naming issue might simply indicate that Woessner used multiple names to refer to RF-CUNY, and the tension created by the conditional statement can be resolved if one assumes Woessner wrote the two messages at different times. These issues, however, when taken together with the problems discussed above, prevent the court from giving much credit to this interpretation of the Reardan email.

The second reading potentially offered by Shelbyzyme would concede that the contested statement was Reardan's but would attribute his knowledge regarding the status of the issue fee to Woessner rather than RF-CUNY. (D.I. 220 at 6.) This interpretation, however, also faces several obstacles. As an initial matter, it clashes with the plain language of the email—Reardan represented that he "asked CUNY," not that he asked Woessner. Additionally, as noted above, the conditional nature of Woessner's statement in the block quotation is inconsistent with a reading identifying Woessner as the source of Reardan's knowledge as to the issue fee. Again, the court regards its interpretation as the more sensible.

  c. Shelbyzyme's arguments

In its Motion for Reconsideration, Shelbyzyme now references a June 2, 2013 declaration in support of its position that Woessner was the source of Reardan's knowledge that the issue fee had not been paid. Woessner states in the declaration:

> When Dr. Reardan called me in November 1999, as reflected in Dr. Reardan's email to Genzyme, I told Dr. Reardan that the patent examiner had called me shortly after the issue fee was due to advise me that no issue fee had been paid to the examiner's knowledge. I did not pass the examiner's comment onto RF-CUNY since, as I testified, I did not believe RF-CUNY was my client at the time.

(D.I. 220 at Ex. A, ¶ 3.) While the court recognizes that this sworn statement might weaken both its above inference regarding the Reardan email and its finding that the applicants acted with the specific intent to deceive,[7] it must disregard the Woessner declaration in considering the present

---

[7] As noted above, the court's eventual determination that the applicants possessed the requisite intent to deceive was premised on its interpretation of the Reardan email. (D.I. 219 at 2–3.) Specifically, the court's reading of the Reardan email led it to infer "that RF-CUNY knew by December 1999 that [U.S. Patent Application 08/790,491 (the "'491 Application")] had been abandoned, which would render false the applicants' February 2002 representation [to the PTO] that '[t]he entire delay in filing the required reply . . . was unintentional.'" (D.I. 219 at 2.) The court then based its finding of intent to deceive on "the apparent falsity of the applicants' representation to the PTO and their demonstrated knowledge that 37 C.F.R. § 1.137(b) required the entire delay to be unintentional." (*Id.*)

9

motion. As explained above, a motion for reconsideration should not be used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Brambles USA*, 735 F. Supp. at 1240. Here, Shelbyzyme failed to present an equivalent to this June 2, 2013 declaration in support of its initial Answering Letter Brief on Genzyme's production request, making consideration of the above-quoted statement improper.[8] (D.I. 206.)

The remaining evidence offered by Shelbyzyme to challenge the court's reading of the Reardan email is unpersuasive. For example, Shelbyzyme points to Reardan's deposition transcript and argues that "Reardan testified that his patent counsel [Woessner] told him [that RF-CUNY had failed to pay the issue fee], not RF-CUNY." (D.I. 220 at 6.) The transcript, however, merely reflects that Reardan quoted the following language from his email: "The following is the statement from our patent counsel. I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status." (D.I. 221 at Tab 1, 267:3–6.) While Shelbyzyme may wish to read this language as attributing the contested statement—"I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status"—to Woessner, it is by no means the only possible interpretation, and for the many reasons addressed

---

The court, however, acknowledges only that the Woessner declaration "*might* weaken" its findings given (1) the seeming inconsistency of that declaration with Woessner's deposition testimony that he did not recall being contacted by Reardan shortly before December 1, 1999 regarding active prosecutions in the pending Calhoun technology and (2) the notable absence of any explicit representation from either Reardan or Woessner that the "I asked CUNY" language came from Woessner. Regardless, for the reasons discussed below, the court will not consider this untimely declaration.

[8] While "[a] proper Rule 59(e) motion" may rely upon "the availability of new evidence," the Woessner declaration does not rise to that level. *Lazaridis*, 591 F.3d at 669. The Third Circuit has made clear that "'new evidence,' for reconsideration purposes, does not refer to evidence that a party obtains or submits to the court after an adverse ruling. Rather, new evidence in this context means evidence that a party could not earlier submit to the court because that evidence was not previously available." *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 252 (3d Cir. 2010).

above, such a reading is problematic. Reardan's testimony never directly identifies the source of his knowledge that the fee was unpaid.[9]

Finally, Shelbyzyme notes that McGrath, Barbara Sawitsky ("Sawitsky"), the former Director of the Office of Technology Transfer, Licensing, and Management at RF-CUNY, Jake Maslow ("Maslow"), RF-CUNY's 30(b)(6) witness, and Calhoun each testified that they were not the source of Reardan's knowledge regarding the issue fee. (D.I. 220 at 7–8.) However, even if this characterization of their testimony was accurate,[10] it would have no meaningful effect on the court's interpretation of the Reardan email. The mere fact that Sawitsky, McGrath, Maslow, and Calhoun did not discuss the status of the issue fee with Reardan tells the court little about the actual source of Reardan's information.

---

[9] The Reardan testimony excerpted by Shelbyzyme reads:

Q.  In one paragraph, do you agree that it says, "If CCNY did not pay it, the application went abandoned on September 6, 1999?

A.  I'm just going to clarify . . . I've taken a quote here from our patent counsel to reply to this question. "The following is a statement from our patent counsel. I asked CUNY if they paid the fees, but apparently they have not, so this is the correct status." So the document appears pretty descriptive. I don't have anything to add to this document.

(D.I. 220 at 6.) The full text of the transcript from the cited pages provides no additional relevant information. (D.I. 221 at Tab 1, 266:17–267:9.)

[10] Shelbyzyme argues that these witnesses each testified that they were not the source of Reardan's information regarding payment of the issue fee. (D.I. 220 at 7–8.) While the cited portions of the deposition transcripts support Shelbyzyme's characterization of Sawitsky's testimony, the testimony of the other three witnesses is not so straightforward. (Id.)
McGrath actually stated that she could not recall ever speaking to Woessner. (Id. at 7.) Presumably, Shelbyzyme reasons that, if Woessner was the direct source of Reardan's knowledge and McGrath never communicated with Woessner, then McGrath could not be an upstream RF-CUNY source of the information that the issue fee was unpaid. At no point in the cited portion of the transcript, however, does McGrath address whether she communicated directly with Reardan. (Id.)
Calhoun simply testified that, while he was unaware of any conversations between Orphan Medical or Reardan and RF-CUNY, he would not typically be involved in such discussions. (Id. at 8.) When asked whether he had "any understanding of who at CUNY [Reardan] asked about paying fees," Calhoun responded that he had no recollection but that there was no reason he would have been involved in such a request. (Id.)
Similarly, Maslow was asked whether he knew "who at CUNY [Reardan] contacted to ask if the fees had been paid." (Id.) He responded only "No. [Reardan] would know that." (Id.)

11

B.   The Sawitsky Declaration

Shelbyzyme also challenges the court's characterization of the Sawitsky declaration attached to the Petition for Revival. (D.I. 220 at 9.) In its May 22 order, the court referenced this declaration in its discussion of the reliance prong of the fraud inquiry:

> Shelbyzyme objects that "the PTO could not have relied upon [Woessner's] statement regarding the length of the delay in the Petition for Revival" because "the PTO already knew that [Woessner] was sent the Notice of Allowance and Notice of Abandonment." Woessner's representations, however, concerned the knowledge of RF-CUNY and Sawitsky. While the PTO may have been aware that it sent the Notice of Allowance and Notice of Abandonment to Woessner, it could not independently determine what the applicants themselves knew, and Sawitsky's declaration attached to the Petition for Revival indicates that the applicants had no knowledge of the Notice of Allowance and Issue Fee Due.

(D.I. 219 at 3.)

Shelbyzyme takes issue with the court's statement that "Sawitsky's declaration attached to the Petition for Revival indicates that the applicants had no knowledge of the Notice of Allowance and Issue Fee Due." It argues that no such statement appeared in Sawitsky's declaration and that, more precisely, "[s]he testified, as her declaration stated, that she was responsible, as the Director of [the Office of Technology Transfer, Licensing, and Management], for managing prosecution of the '491 Application and did not receive notice regarding payment of the issue fee and had she been contacted she would have given instructions to pay the fee." (D.I. 220 at 9.)

While the court recognizes that its prior characterization of the Sawitsky declaration may have oversimplified matters, conflating Sawitsky's own knowledge with that of the applicants, it does not believe that any error resulted in its conclusion as to the reliance issue. The court intended only to make the modest point that Woessner's receipt of the Notice of Allowance and

Notice of Abandonment—and his resulting knowledge that the '491 Application was abandoned in October 1999—was insufficient to undermine the PTO's reliance on his statement in the Petition for Revival that "[t]he entire delay in filing the required reply [to the Notice of Allowance and Issue Fee Due] from the due date for the required reply until the filing of this Petition . . . was unintentional." (D.I. 202 at DTX-19.) Under 37 C.F.R. § 1.137(b), the requirement that the entire delay be "unintentional" is a requirement directed toward the applicant rather than its patent counsel. *See* § 1.137(b) ("If the delay in reply by applicant or patent owner was unintentional, a petition may be filed pursuant to this paragraph to revive an abandoned application . . . ."). As such, Woessner's statement in the Petition for Revival that the delay was unintentional was, in fact, a representation that the applicant did not intend any portion of the delay. The PTO's reliance on this representation was not rendered unreasonable by the mere fact that Woessner knew of the abandonment at some earlier date. The court's earlier characterization of the Sawitsky declaration was not required to reach this conclusion.

## V. CONCLUSION

For the foregoing reasons, the court will deny Shelbyzyme's Motion for Reconsideration (D.I. 220).

Dated: June **25**, 2013

CHIEF, UNITED STATES DISTRICT JUDGE

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHELBYZYME, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-768-GMS |
| ) | |
| GENZYME CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## ORDER

At Wilmington this 25th day of June 2013, consistent with the memorandum opinion issued this same date, IT IS HEREBY ORDERED THAT:

The plaintiff's Motion for Reconsideration of the Court's Order to Produce Attorney-Client Privileged Documents (D.I. 220) is DENIED.

_____
CHIEF, UNITED STATES DISTRICT JUDGE